UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
                                 :

UNITED STATES OF AMERICA           :

                                 :

        - v -                 :       S1 11 Cr. 907 (JSR)

                                 :

RAJAT K. GUPTA,               :

                                 :

          Defendant.        :

                                 :

----------------------------------------------------------------X


**GOVERNMENT'S MOTION IN LIMINE**
**FOR THE ADMISSION OF CERTAIN STATEMENTS**


 

PREET BHARARA
United States Attorney for the
Southern District of New York


REED BRODSKY
RICHARD TARLOWE
– Of Counsel –

TABLE OF CONTENTS

I.    Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Rule 804(b)(3): Statements Against Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            1.    Whether The Declarant Is Unavailable. . . . . . . . . . . . . . . . . . . . . . . . . . 5

            2.    Whether The Statement Is Against Interest. . . . . . . . . . . . . . . . . . . . . . . 6

            3.    Whether Corroborating Circumstances Clearly Indicate The
                  Trustworthiness Of The Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    Rule 801(d)(2)(E): Co-Conspirator Statements During The Course
            And In Furtherance Of The Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.    Rule 807: The Residual Exception To The Hearsay Rule. . . . . . . . . . . . . . . . . 11

III.  The Court Should Admit Rajaratnam's Statements to Horowitz During The
      Wiretapped Telephone Conversations On September 24, 2008. . . . . . . . . . . . . . . . . . . 14

      A.    Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.    Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            1.    Rajaratnam's Statements Are Admissible As Statements
                  Against Interest Under Rule 804(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . 18

                  a.    Rajaratnam Is Unavailable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                  b.    The Statements Were Self-Inculpatory. . . . . . . . . . . . . . . . . . . 19

                  c.    Corroborating Circumstances Clearly Indicate The
                        Trustworthiness Of The Statements. . . . . . . . . . . . . . . . . . . . . 22

            2.    Rajaratnam's Statements Are Admissible As Co-Conspirator
                  Statements Under Rule 801(d)(2)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                  a.    There Was A Conspiracy Of Which Gupta and Rajaratnam
                        Were Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                  b.    The Statements Were Made During The Course And
                        In Furtherance Of The Conspiracy. . . . . . . . . . . . . . . . . . . . . . 25

      i.   The Statements Served A Number Of Current Purposes
         In The Charged Conspiracy .. . . . . . . . . . . . . . . . . . . . . . 25

      ii.   Horowitz Played An Important Role in Helping
         Rajaratnam Carry Out The Charged Conspiracy. . . . . . . 28

      iii.   Horowitz's Participation Was, At A Minimum,
         Reasonably Foreseeable to Gupta. . . . . . . . . . . . . . . . . 31

    3.   Rajaratnam's Statements Are Admissible Under The
      Residual Exception To The Hearsay Rule. . . . . . . . . . . . . . . . . . . . . . . . 33

IV.  The Court Should Admit Rajaratnam's Statements To David Lau During
   The October 24, 2008 Wiretapped Call. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

   A.   Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

   B.   Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    1.   Rajaratnam's Statements Are Admissible As Statements
      Against Interest Under Rule 804(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . 38

    2.   Rajaratnam's Statements Are Admissible As Co-Conspirator
      Statements Under Rule 801(d)(2)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    3.   Rajaratnam's Statements Are Admissible Under The Residual
      Exception To The Hearsay Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

V.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## TABLE OF AUTHORITIES

### CASES

*Bourjaily v. United States*, 483 U.S. 171 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Crawford v. Washington*, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

*Glenn v. Bartlett*, 98 F.3d 721 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*State of New York v. Hendrickson Brothers*, 840 F.2d 1065 (2d Cir. 1988). . . . . . . . . . . . . . . . 11

*United States v. Bakhtiar*, 994 F.2d 970 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Blackmon*, 839 F.2d 900 (2d Cir.1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Bryce*, 208 F.3d 346 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . 12, 13, 33, 34, 42

*United States v. Desena*, 260 F.3d 150 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . 9, 10, 25, 27

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 25

*United States v. Dolah*, 245 F.3d 98 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Doyle*, 130 F.3d 523 (2d Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11

*United States v. Gambardella*, S2 10 Cr. 674 (KBF), 2012 WL 279469
    (S.D.N.Y. Jan. 27, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Geibel*, 369 F.3d 682 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Katsougrakis*, 715 F.2d 769 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . 5, 22

*United States v. Lieberman*, 637 F.2d 95 (2d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . 9, 26

*United States v. Matthews*, 20 F.3d 538 (2d Cir. 1994). . . . . . . . . . . . . . . 7, 8, 13, 22, 35, 40, 42

*United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Morgan*, 385 F.3d 196 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 34

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Padilla*, 203 F.3d 156 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Paone*, 782 F.2d 386 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 21, 22

*United States v. Persico*, 832 F.2d 705 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 22

*United States v. Rajaratnam,* 802 F. Supp. 2d 491 (S.D.N.Y. 2011). . . . . . . . . . . . . . . . . 22, 24

*United States v. Rastelli*, 870 F.2d 822 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 25

*United States v. Rivera*, 22 F.3d 430 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Ruggiero*, 726 F.2d 913 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Saget,* 377 F.3d 223 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 19

*United States v. Salerno*, 868 F.2d 524 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Sasso*, 59 F.3d 341 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . 7, 8, 13, 22, 35, 40

*United States v. Schwimmer*, 882 F.2d 22 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Simmons*, 923 F.2d 934 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 10

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Stratton*, 779 F.2d 820 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 22

*United States v. Terrorist Bombings of U.S. Embassies in East Africa,*
   552 F.3d 93, 139 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 31

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 25

*United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 22

*Williamson v. United States*, 512 U.S. 599 (1994). . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8, 21, 22

## **RULES OF EVIDENCE**

Fed. R. Evid. 801(d)(2)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 9, 11, 14, 24

Fed. R. Evid. 803. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Evid. 804. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Evid. 804(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Evid. 804(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Evid. 804(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4-7, 14, 18, 21, 38

Fed. R. Evid. 807. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11-14, 34, 41

## **OTHER AUTHORITIES**

S. Rep. No. 93–1277 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

The Government respectfully moves *in limine* for the admission of certain oral statements by co-conspirator Raj Rajaratnam ("Rajaratnam") concerning certain trading activities and the information on which such trading was based, during three separate telephone conversations that were intercepted pursuant to a wiretap on Rajaratnam's cellular telephone.  The statements consist of (1) Rajaratnam's recorded statements to his principal trader at Galleon, Ian Horowitz, during two wiretapped phone conversations on September 24, 2008, and (2) Rajaratnam's recorded statements to a Galleon portfolio manager, David Lau, during a wiretapped phone conversation on October 24, 2008.

These statements are each admissible as statements against the declarant's penal interest, pursuant to Rule 804(b)(3), and as co-conspirator statements made during and in furtherance of the charged conspiracy, pursuant to Rule 801(d)(2)(E).  Alternatively, Rajaratnam's statements are admissible because they fall within the residual hearsay exception, pursuant to Rule 807.

First, the Government seeks to introduce Rajaratnam's recorded statements to Horowitz during two wiretapped conversations on the morning of September 24, 2008.  Independent evidence shows, among others things, that:

- the prior afternoon, from approximately 3:15 p.m. to 3:54 p.m., defendant Gupta participated, by telephone, in a Goldman Sachs ("Goldman") Board meeting during which the Board approved a $5 billion infusion of capital by Warren Buffett's Berkshire Hathaway (which would be announced to the public later that day, after the market closed);

- almost immediately after that Board call ended, Gupta called Rajaratnam; and

- within minutes of receiving that call from Gupta, Rajaratnam caused two traders at Galleon to order the purchase of approximately 350,000 shares of Goldman stock with a value of approximately $43 million.

1

The following morning, on September 24, Rajaratnam called Horowitz twice. During those calls, which were both intercepted by law enforcement, Rajaratnam informed Horowitz, among other things, that Rajaratnam had received a call with positive information about Goldman in the final minutes of the prior trading day, shortly before Goldman announced Buffett's investment, and then directed two other traders at Galleon to purchase Goldman stock.

Second, the Government seeks to introduce Rajaratnam's recorded statements to David Lau, a portfolio manager for Galleon International, during a wiretapped conversation on October 24, 2008. Independent evidence shows, among others things, that:

- the prior afternoon, after the market had closed for the day, Gupta participated in a Goldman Board call that lasted approximately 30 minutes;

- approximately 23 seconds after the Board call ended, Gupta called Rajaratnam and they spoke for approximately 13 minutes; and

- starting one minute after the market opened for trading on October 24, Rajaratnam sold all his shares of Goldman stock.

Within hours of selling his shares of Goldman stock on the morning of October 24, Rajaratnam called Lau. During that call, which was intercepted by law enforcement, Rajaratnam told Lau, among other things, that he had learned the prior day from "somebody who's on the Board of Goldman Sachs" that Goldman was losing $2 per share and that this information differed dramatically from market expectations.

Rajaratnam's statements in these three recorded conversations are essential evidence of the insider trading charges against Gupta in this case. There are no recordings of the conversations between Gupta and Rajaratnam on September 23 and October 23 in which Gupta is alleged to have tipped Rajaratnam (as there was no wiretap over Rajaratnam's work phone or any of Gupta's phones). And because there were no other participants in those conversations,

2

there are no witnesses available to testify about the content of the calls between Gupta and Rajaratnam.  Thus, Rajaratnam's statements in the subsequent wiretapped calls with Horowitz and Lau provide indispensable evidence that (a) Gupta tipped Rajaratnam during unrecorded phone conversations between Gupta and Rajaratnam on September 23 and October 23, and (b) Rajaratnam purchased and sold Goldman stock on September 23 and October 24, respectively, on the basis of those tips by Gupta.   Particularly in light of certain arguments that Gupta has already made, and has proffered to the Court he intends to pursue at trial, the importance of this evidence cannot be overstated.

I.      **Background**

On January 31, 2012, the grand jury returned a Superseding Indictment against Gupta that charges one count of conspiracy to commit securities fraud, from in or about 2007 through in or about January 2009, and five counts of substantive securities fraud.

In general, the Indictment alleges that Gupta, while serving on the boards of directors of Goldman and Procter & Gamble ("P&G"), agreed with Rajaratnam and others to provide material, nonpublic information ("Inside Information") to Rajaratnam and others at Galleon, in violation of Gupta's duties of confidentiality, for purposes of trading on that information, in exchange for benefits.

Rajaratnam was the founder and head of Galleon, a family of hedge funds in New York, New York.  (S1 Ind. ¶¶ 5-6).  At Galleon, Rajaratnam was the portfolio manager of the Galleon Technology Offshore Fund, Ltd., and the Galleon Diversified Fund, Ltd. (collectively, the "Galleon Tech Funds").  (*Id*.)  Rajaratnam specialized and, in general, traded stocks of technology companies in the Galleon Tech Funds.  Others at Galleon managed portfolios

focusing on other sectors.

As alleged, Gupta tipped Rajaratnam and others at Galleon because of Gupta's personal and business relationships with Rajaratnam and Galleon.  For example, during the relevant period, Rajaratnam and Gupta were equity investors in an investment fund called Voyager Capital Partners ("Voyager").  (S1 Ind. ¶ 9(b)).  In addition, in or about 2008, Rajaratnam appointed Gupta Chairman of Galleon International, which managed funds invested primarily in Asia and other emerging markets, and awarded Gupta an equity ownership interest in Galleon International.  (S1 Ind. ¶ 9(e)).  At that time, Galleon International had approximately $1 billion in assets under management.  (*Id.*).  In 2008, Gupta met with potential Galleon investors abroad and in the United States to solicit investments for Galleon.  In or about early 2008, Rajaratnam gave Gupta an ownership stake in Galleon Special Opportunities Management, which had more than $300 million in assets under management at the time.  (S1 Ind. ¶ 9(f)).

As alleged in the Indictment, on multiple occasions, from in or about early 2007 through in or about January 2009, Rajaratnam traded on the basis of Inside Information he received from Gupta and/or shared Inside Information he received from Gupta with other co-conspirators at Galleon who then traded on the basis of that information.  As a result, Rajaratnam and Galleon reaped illicit profits and illegally avoided losses.

## II.     Applicable Law

### A.     Rule 804(b)(3): Statements Against Interest

If a declarant is "unavailable," Rule 804(b)(3) provides an exception to the hearsay rule for statements "against interest."  The rule defines a statement against interest as one that:

(A) a reasonable person in the declarant's position would have made only if the

4

> person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed.R.Evid. 804(b)(3).  "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 599, 604 (1994).

To satisfy Rule 804(b)(3), therefore, the proponent must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008); *United States v. Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983) (same).[1]

### 1.    Whether The Declarant Is Unavailable

Rule 804(a)(1) provides that a declarant is "unavailable" if he is "exempted by ruling of the court on the ground of privilege from testifying."  "It is settled in this Circuit that a witness who invokes the privilege against self-incrimination is 'unavailable' within the meaning of Rule 804(b) even though the Government has the power to displace the witness's privilege with a

---

[1]    Prior to 2010, Rule 804(b)(3) required corroborating circumstances only for statements "offered to exculpate the accused."  *See* Fed.R.Evid. 804(b)(3) advisory committee's note to 2010 amendments.

grant of use immunity." *United States v. Dolah*, 245 F.3d 98, 102 (2d Cir. 2001).

## 2.  Whether The Statement Is Against Interest

In general, a statement is against penal interest if "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." *United States v. Saget,* 377 F.3d 223, 231 (2d Cir. 2004). "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context." *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007). In *Williamson*, the Supreme Court explained:

> Even statements that are on their face neutral may actually be against the declarant's interest. "I hid the gun in Joe's apartment" may not be a confession of a crime; but if it is likely to help the police find the murder weapon, then it is certainly self-inculpatory. "Sam and I went to Joe's house" might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy. And other statements that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest.

*Williamson*, 512 U.S. at 603. In *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011), the Second Circuit stated that "[a] statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." (quoting authority omitted). The Rule "does not require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution." *Id.* (quoting authority omitted). Thus, the declarant's statements that he routinely met with the defendant at a particular location, and that they met at that spot to evade surveillance by the FBI, were admissible because while these statements "would not have been sufficient, standing alone, to convict the declarant of any crime, they would have been probative in a criminal trial against [the declarant] to show his membership in the Colombo Crime Family and to support an inference

6

that criminal messages were passed when he and Persico met at that spot." *Id*. at 102-03.

### 3. Whether Corroborating Circumstances Clearly Indicate The Trustworthiness Of The Statement

In analyzing the trustworthiness of statements against interest, the Second Circuit in *United States v. Sasso*, 59 F.3d 341, 350 (2d Cir. 1995), held that "[a] statement incriminating both the declarant and the defendant may possess adequate reliability if (a) the statement was made to a person whom the declarant believes is an ally, not a law enforcement official, and (b) the circumstances surrounding the portion of the statement that inculpates the defendant provide no reason to suspect that that portion is any less reliable than the part that directly incriminates the declarant."[2]  *See also United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994) (statements had "particularized guarantees of trustworthiness:" the statements were not made to law enforcement or in response to questioning, and were not made in a coercive atmosphere; there was no attempt to curry favor with authorities; and there was no attempt to shift blame); *United States v. Bakhtiar*, 994 F.2d 970, 978 (2d Cir. 1993) (trustworthiness reflected by fact that declarant's statements inculpated himself as much as the defendant and did not attempt to shift blame); *United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) (declarant believed he was speaking to co-conspirators, not authorities, in recorded conversations).

---

[2]  The Court in *Sasso* addressed a Confrontation Clause challenge to the admission of statements against interest.  In light of the Supreme Court's holding in *Crawford v. Washington*, 541 U.S. 36 (2004)*,* the Confrontation Clause analysis no longer applies to non-testimonial statements, such as the calls at issue here.  Nevertheless, the Court's analysis in *Sasso* (and other Confrontation Clause cases dealing with statements against interest) are still instructive.  The relevant determination under that analysis was whether the statements at issue had "particularized guarantees of trustworthiness." *Sasso,* 59 F.3d at 349.  Under Rule 804(b)(3), the Court must find "corroborating circumstances that clearly indicate the trustworthiness of the statements."

The Second Circuit has considered the following factors in assessing the trustworthiness of statements against interest: (1) the relationship between the declarant and the party with whom the declarant was speaking, *see Sasso*, 59 F.3d at 350; *Mathews*, 20 F.3d at 546; (2) whether the statement was voluntary or made in a coercive environment, *see Mathews*, 20 F.3d at 546; (3) whether the statement was made to "curry favor" with authorities, *Williamson*, 512 U.S. at 603; *Mathews*, 20 F.3d at 546; *Stratton*, 779 F.2d at 829; (4) whether the declarant was attempting to shift blame to another or minimize his own culpability, *Williamson*, 512 U.S. at 603; *Mathews*, 20 F.3d at 546; (5) the existence of corroborating evidence of the declarant's statement, *see Wexler*, 522 F.3d at 220; (6) the extent to which the declaration was against penal interest, *id.*; (7) the trustworthiness of the declarant in the context in which the statement was made, *United States v. Doyle*, 130 F.3d 523, 544 (2d Cir.1997); (8) whether the declarant's statements were contradictory or the declarant recanted, *id.* at 542-44; and (9) whether the declarant's statement was based on personal knowledge.

### B.    Rule 801(d)(2)(E): Co-Conspirator Statements During The Course And In Furtherance Of The Conspiracy

Rule 801(d)(2)(E) states that out-of-court statements are not hearsay if they were made "by a coconspirator of a party during the course and in furtherance of the conspiracy."  The exception, like its common-law precursor, is based on "agency principles, the underlying concept being that a conspiracy is a common undertaking where the conspirators are all agents of each other and where the acts and statements of one can be attributed to all."  *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).

To admit a statement under Rule 801(d)(2)(E), the Court must find by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011) (internal quotation marks omitted); *see also Bourjaily*, 483 U.S. at 175-76. The party to whom the declarant made the statement need not be a member of the conspiracy so long as the other requirements are met. *United States v. Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 139 (2d Cir. 2008); *Glenn v. Bartlett*, 98 F.3d 721, 728-29 (2d Cir. 1996) ("A statement can further a conspiracy when uttered to a 'person who is not a member of the conspiracy in a way that is designed to help the co-conspirators to achieve the conspiracy's goals.'") (quoting authority omitted).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of goals of the ongoing conspiracy. Thus, statements are in furtherance of a conspiracy if they, among other things, (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Diaz*, 176 F.3d 52, 88 (2d Cir. 1998); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158; (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; (6) "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d at 88; or (7) inform a co-conspirator of "the identity and activities of his coconspirators," *Rastelli*, 870 F.2d at 837. A

9

statement must be more than "idle chatter," *United States v. Lieberman*, 637 F.2d 95, 102-03 (2d

Cir. 1980), or "a merely narrative description by one co-conspirator of the acts of another."

*Desena*, 260 F.3d at 158.  But a narrative description of a past event is admissible as long as it

serves "some current purpose in the conspiracy."  *United States v. Thai*, 29 F.3d 785, 813 (2d

Cir. 1994) (tape-recorded conversations about past events served current purpose of giving

another co-conspirator confidence to carry out his assignment); *see also Farhane*, 634 F.3d at

162 (rejecting defendant's claim that statements were "idle chatter;" seeking to persuade an

undercover agent that declarant and co-conspirator were trustworthy furthered conspiracy).

Accordingly, the Second Circuit has repeatedly affirmed the admission of co-conspirator

statements regarding past events.  *See, e.g.*, *United States v. Mulder*, 273 F.3d 91, 103 (2d Cir.

2001) (narrative of past events furthered conspiracy by keeping co-conspirator apprised of the

delicate arrangements for extortion); *Desena*, 260 F.3d at 158 (statements to club members

ridiculing defendant about his inexpert attempt to commit arson years earlier were admissible

because they "could be understood as informing other coconspirators about the status of the

conflict between the two gangs, and perhaps as an exhortation to avoid ridicule by doing things

right"); *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 88-89 (2d Cir. 1999) (written

notes about past events intended "to act as a record and as a guide to future conduct"); *Diaz*, 176

F.3d at 85 (narrative of past events attempted to apprise "of the progress or status of the

conspiracy, to facilitate and encourage his assistance, and to foster the cohesiveness"); *Thai*, 29

F.3d at 813-14 (narrative description of past event intended to encourage future misconduct);

*United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991) (narrative of past events may have

encouraged cohesiveness and induced assistance); *Rastelli*, 870 F.2d at 837 (statements about

10

what happened to money furthered multiple current purposes of the conspiracy); *see also United States v. Salerno*, 868 F.2d 524, 535-37 (2d Cir. 1989); *United States v. Blackmon*, 839 F.2d 900, 912-13 (2d Cir.1988); *United States v. Persico*, 832 F.2d 705, 716 (2d Cir. 1987); *United States v. Rahme*, 813 F.2d 31, 35-36 (2d Cir. 1987); *United States v. Paone*, 782 F.2d 386, 390-91 (2d Cir. 1986); *United States v. Ruggiero*, 726 F.2d 913, 924 (2d Cir. 1984).

Hearsay statements may themselves be considered in determining admissibility under Rule 801(d)(2)(E) provided there is "some independent corroboration" of the defendant's participation in the conspiracy. *Farhane*, 634 F.3d at 161. "Where . . . the hearsay evidence itself so convincingly implicates a defendant (in the conspiracy), a district court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting co-conspirators' statements against him." *United States v. Padilla*, 203 F.3d 156, 162 (2d Cir. 2000). "In making preliminary factual determinations, the court may take into account not only the other evidence before it, but also the proffered out-of-court statements themselves if those statements are sufficiently reliable in light of independent corroborating evidence." *State of New York v. Hendrickson Brothers*, 840 F.2d 1065, 1073 (2d Cir. 1988).

### C.        Rule 807: The Residual Exception To The Hearsay Rule

Statements "not specifically covered" by a hearsay exception may nonetheless be admissible pursuant to the "residual" or "catch-all" exception set forth in Rule 807. That Rule provides, in relevant part:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material

fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 807.  A statement will be admitted if "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party."  *United States v. Bryce*, 208 F.3d 346, 350-51 (2d Cir. 1999); *accord United States v. Morgan*, 385 F.3d 196, 208 (2d Cir. 2004).  "These requirements independently ensure that the rule will 'be used very rarely, and only in exceptional circumstances.'"  *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232 (2d Cir. 1999) (quoting S.Rep. No. 93–1277, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7062).

In *Bryce*, the Court affirmed the admission of a wiretap call under Rule 807.  Bryce was charged in a narcotics conspiracy.  The Government introduced wiretap calls, including: (a) calls between Bryce and a customer, Johnson; and (b) one call between Johnson and a third party involved in narcotics trafficking, Gomez, during which Johnson advised Gomez that Bryce had cocaine for sale.  *See* 208 F.3d at 349.  The Court rejected Bryce's argument that the Gomez-Johnson call was insufficiently trustworthy under Rule 807.  *See id.*[3]  If a statement "is made to a person whom the declarant believes is an ally rather than a law enforcement official, and if the circumstances surrounding the portion of the statement that inculpates the defendant provide no

---

[3]     Although Bryce's principal argument was based on the Confrontation Clause, not Rule 807, the Court treated the two as rising and falling together on the question of trustworthiness and expressly held that the call was admissible under *both* the Confrontation Clause and Rule 807.  *See id.* at 349-51.  Although the Confrontation Clause would not apply to the Johnson-Gomez call under *Crawford* because the call would not qualify as "testimonial," *Crawford* has no bearing on *Bryce*'s interpretation of Rule 807.

12

reason to suspect that that inculpatory portion is any less trustworthy than the part of the statement that directly incriminates the declarant, the trustworthiness of the portion that inculpates the defendant may well be sufficiently established." *Id.*

The Court cited "[s]everal factors" that were "particularly relevant" in explaining why the Gomez-Johnson call was admissible under the residual exception:

> (i) the statements were obtained via a covert wiretap of which neither Johnson nor Gomez was aware; (ii) the statements were made during the same time period that Johnson was conversing with Bryce; (iii) Johnson's statements implicated both himself and Bryce as participants in a narcotics conspiracy; and (iv) Gomez was Johnson's colleague in the narcotics trade.

*Id.* at 351. Accordingly, the statements bore sufficient indicia of trustworthiness to satisfy Rule 807. *Id.* Similarly, in *Morgan*, the Court upheld the admission under Rule 807 of a letter from the co-defendant to her boyfriend, explaining that it was "trustworthy" because it "was not in response to police questioning"; "[i]t was not written in a coercive atmosphere"; "[i]t was not addressed to law enforcement authorities"; and the co-defendant "had no reason to expect that it would ever find its way into the hands of the police" and "did not write it to curry favor with them or with anyone else." 385 F.3d at 208. *Cf. Matthews,* 20 F.3d at 546 (statements had "particularized guarantees of trustworthiness"); *Sasso*, 59 F.3d at 349 (holding strong indicia of trustworthiness after evaluating (a) equal inculpation of defendant and his co-defendant; (b) no effort to shift blame; (c) the context of when, where, and to whom statements were made; and (d) no attempt to curry favor.); *United States v. Gambardella*, S2 10 Cr. 674 (KBF), 2012 WL 279469, at *4 (S.D.N.Y. Jan. 27, 2012) (oral statement admissible "for the independent reason that it falls within Federal Rule of Evidence 807's residual hearsay exception").

**III.    The Court Should Admit Rajaratnam's Statements to Horowitz During The
Wiretapped Telephone Conversations On September 24, 2008**

The Court should admit certain of Rajaratnam's statements to Horowitz during a

wiretapped conversation at approximately 7:09 a.m. on September 24, 2008 (hereinafter "7:09

a.m. Statements"); and certain of Rajaratnam's statements to Horowitz during a second

wiretapped conversation at approximately 7:56 a.m. on September 24, 2008 (hereinafter "7:56

a.m. Statements").[4]

Rajaratnam's statements during these calls are admissible on three separate grounds:

(1) they are statements against Rajaratnam's penal interest under Rule 804(b)(3); (2) they are

statements of a co-conspirator during and in furtherance of the conspiracy under Rule

801(d)(2)(E); and (3) they are admissible under the residual hearsay exception under Rule 807.

**A.    Relevant Facts**

On September 23, 2008, from approximately 3:13 p.m. to 3:54 p.m., Goldman's Board

held a special meeting during which it approved a $5 billion infusion of capital to Goldman by

Warren Buffett's Berkshire Hathaway.  Until the public announcement of that transaction, which

was made after the close of the market on September 23, Buffett's investment in Goldman was

confidential.  Buffett's $5 billion investment was particularly significant because it occurred in

the midst of the 2008 financial crisis and approximately one week after Lehman Brothers

declared bankruptcy.  Buffett's investment helped shore up Goldman's liquidity, as well as

investors' confidence that Goldman was going to survive the crisis.

Gupta participated in the Goldman Board call by telephone from a conference room in

---

[4]        The specific statements that the Government seeks to admit appear in bold in the
next section.  Horowitz's responses to Rajaratnam's statements are admissible for completeness.

14

McKinsey's Manhattan office.  Gupta's assistant, who was in McKinsey's Connecticut office, dialed into the Board call, and then connected Gupta to the call.  Gupta's phone disconnected from the Goldman Board call at approximately 3:54 p.m.  Almost immediately thereafter, Gupta's assistant placed a call to Rajaratnam's direct line at Galleon and then connected Gupta to the call.  Gupta's phone disconnected from that call at approximately 3:55 p.m.

Within minutes of Gupta's call with Rajaratnam, Rajaratnam caused two traders at Galleon to order a total of approximately 350,000 shares of Goldman stock with a value of approximately $43 million.  Rajaratnam's principal trader and close confidante, Ian Horowitz, was unavailable at the time, so Rajaratnam turned to other traders to execute the buy orders.  At approximately 3:57 p.m., a junior trader at Galleon (Ananth Muniyappa) placed an order with Morgan Stanley to purchase approximately 100,000 shares of Goldman stock.  One minute later, at approximately 3:58 p.m., one of Rajaratnam's partners at Galleon (Gary Rosenbach) placed an order with Deutsche Bank to purchase approximately 250,000 shares of Goldman stock.  Because these orders were placed within minutes of the close of trading, both broker-dealers executing these trades for Galleon were unable to fill the orders completely.  As a result, Rajaratnam ended up purchasing a total of approximately 217,500 shares of Goldman stock for Rajaratnam's technology fund, at a cost of more than $25 million, and Rosenbach purchased an additional 50,000 shares of Goldman stock for the Galleon portfolio he managed.

The next day, on September 24, 2008, before the market opened, Rajaratnam spoke to Horowitz twice using his cell phone.  Unbeknownst to Rajaratnam and Horowitz, there was a court-authorized wiretap over Rajaratnam's cellular telephone, and the FBI was monitoring these calls.

The first call took place at approximately 7:09 a.m.  In relevant part, the following exchange took place between Rajaratnam and Horowitz:

**Rajaratnam: Hey Ian.**

Horowitz:      Hey, buddy, how are you?

**Rajaratnam: Good.  So, big drama yesterday, but I have to ...**

Horowitz:      Yeah, I, I, I heard.  I heard a little, you mean the last three minutes of the day?

**Rajaratnam: No, I got a call at 3:58, right?**

Horowitz:      Yeah.

**Rajaratnam: Saying something good might happen to Goldman.  Right?**

Horowitz:      So it is what it is.  Everything, everyone's fine, I saw it cross the board....

**Rajaratnam: No I saw, I, so, I told Ananth [Muniyappa] to buy some, he was f—ing around, he can't, you know.  So I went to Gary [Rosenbach] and say just buy me, right?  Because you were not there.  It happens all the f—ing time, you know, you're there every day of the year, right?  So anyway Gary ....**

(Exhs. 1 and 1-T, Recording and Transcript).  At that point, another individual at Galleon joined the call, and the conversation abruptly turned to a different subject.  Rajaratnam told that Galleon employee that Rajaratnam wanted to request from Goldman two million shares of Goldman common stock in a secondary stock offering that Goldman had announced at the same time as Buffett's investment.

At approximately 7:56 a.m., Rajaratnam received a call on his cell phone from Horowitz, who was at the Galleon office.[5]  In relevant part, the following exchange took place:

---

[5]      Rajaratnam initially called David Lau at 7:56 a.m.  Approximately 5 minutes into that conversation, Rajaratnam received the call from Horowitz.

**Rajaratnam:  Okay.  How much Goldman do we have on the books?**

Horowitz:     367 [thousand shares]

**Rajaratnam:  Okay, yeah, let me tell you what happened, honestly, right?**

Horowitz:     Yeah, no, I looked at our price, I looked at our price, and I looked at what happened.

**Rajaratnam:  Yeah.**

Horowitz:     Someone had this before us, someone, whatever went on, something happened, someone, they ...

**Rajaratnam:  I got a call, right, saying something good's gonna happen.**

Horowitz:     We'll talk about, how 'bout this, we'll talk when you come in.

**Rajaratnam:  Okay.**

Horowitz:     We'll talk when you come in, okay?

**Rajaratnam:  But I didn't do anything, you were not there, I asked Ananth to buy some.**

Horowitz:     You did nothing.

**Rajaratnam:  Then I went to Gary ... and ...**

Horowitz:     You did nothing wrong.

**Rajaratnam:  Yeah at 3:58, I can't, I can't yell out in the f—ing halls.**

Horowitz:     No.  You did nothing wrong, we'll talk about it when you come in, nothing's wrong.

**Rajaratnam:  It is, I guess, Leon [Shaulov][6] was very upset.  You know, f— him, look, I've kept my mouth shut when he gave me WaMu, right?**

Horowitz:     Get, get upset about what?  You got nothing, this is at 3:58.

---

[6]        Leon Shaulov was a senior portfolio manager and trader at Galleon.

17

**Rajaratnam:** **Yeah, if it was, one o'clock, I always am good with him, I always call him in, I tell him everything, you know?  AMD, IBM, everything, right?**

Horowitz:    He's not in, so I'm, he hasn't said anything.  Listen, if something comes in, I'll let you know.

(Exhs. 2 and 2-T, Recording and Transcript).

Evidence presented at the Rajaratnam criminal trial established that on multiple occasions, Rajaratnam traded based on Inside Information about AMD that Rajaratnam obtained from Anil Kumar, a former senior partner and consultant at McKinsey & Company ("McKinsey").[7]  The evidence also established that, on multiple occasions, Rajaratnam traded based on Inside Information about AMD and IBM that Rajaratnam obtained from Danielle Chiesi, a portfolio manager at another hedge fund, who had sources of confidential information at both of those companies.[8]

**B**.    **Discussion**

    **1.**    **Rajaratnam's Statements Are Admissible As Statements Against Interest Under Rule 804(b)(3)**

Pursuant to Rule 804(b)(3), Rajaratnam's 7:09 a.m. Statements and 7:56 a.m. Statements are admissible as statements against Rajaratnam's interest.  All three requirements of Rule 804(b)(3) are met by, at a minimum, a preponderance of the evidence: (1) the declarant

---

[7]    Kumar pled guilty to securities fraud and conspiracy pursuant to a cooperation agreement, and he testified at Rajaratnam's trial that he repeatedly violated his duty of confidentiality to McKinsey and its clients by giving Inside Information to Rajaratnam about AMD and other companies in exchange for money and friendship.

[8]    Chiesi pled guilty to three counts of conspiracy to commit securities fraud. During the Rajaratnam trial, the Government proved that Chiesi obtained Inside Information from the former Chairman/CEO of AMD and from a senior executive at IBM, and exchanged that information for other Inside Information from Rajaratnam.

(Rajaratnam) is unavailable as a witness; (2) the statements are sufficiently reliable to warrant an inference that a reasonable man in Rajaratnam's position would not have made these statements unless he believed them to be true; and (3) corroborating circumstances clearly indicate the trustworthiness of the statements.

### a.    Rajaratnam Is Unavailable

With respect to the first requirement, Rajaratnam is unavailable as a witness.  On or about May 11, 2011, a jury found Rajaratnam guilty of five counts of conspiracy to commit securities fraud and nine substantive counts of securities fraud.  On or about October 13, 2011, the Honorable Richard J. Holwell sentenced Rajaratnam to a term of 11 years' imprisonment.  On or about October 13, 2011, Rajaratnam filed a notice of appeal.  On or about January 25, 2012, Rajaratnam filed his appellate brief seeking to overturn his conviction.  Rajaratnam's Fifth Amendment privilege against self-incrimination continues to exist while his appeal is pending. *See United States v. Schwimmer*, 882 F.2d 22, 25 (2d Cir. 1989).

### b.    The Statements Were Self-Inculpatory

With respect to the second requirement, Rajaratnam's statements were sufficiently self-inculpatory to warrant an inference that "a reasonable person in [Rajaratnam's] shoes would perceive the statement[s] as detrimental to his [] own penal interest."  *Saget,* 377 F.3d at 231.

During the 7:09 a.m. conversation, Rajaratnam stated that "I got a call at 3:58, right?" (Exh. 1-T, at 1, ln. 39).  After Horowitz responded "yeah," Rajaratnam continued, "[s]aying something good might happen to Goldman." (Exh. 1-T, at 1, ln. 43).  Shortly thereafter, Rajaratnam stated "so, I told Ananth to buy some, he was f—ing around, he can't, you know.  So I went to Gary and say just buy me, right?" (Exh. 1-T, at 2, lns. 5-6).  During the 7:56 a.m.

19

conversation, Rajaratnam stated that "I got a call, right, saying something good's gonna happen," that Horowitz was not there so he went to "Ananth to buy some" and "[t]hen I went to Gary," and that "at 3:58, I can't, I can't yell out in the f—ing halls."  (Exh. 2-T, at 2-3).  Rajaratnam further stated he knew "Leon was very upset" but "I've kept my mouth shut when he gave me WaMu, right?" and that Rajaratnam tells Leon "everything," including "AMD" and "IBM."  (Exh. 2-T, at 3, lns. 22-29).

A reasonable person in Rajaratnam's position would have understood that his statements about having purchased shares of Goldman stock in the last few minutes of the trading day — shortly before a significant announcement by Goldman — because of a call he received shortly before the close of trading alerting him to impending positive news about Goldman, were detrimental to his penal interest.  During both calls with Horowitz, Rajaratnam acknowledged that he directed specific traders at Galleon to purchase Goldman shares in the brief window of time between (1) receiving a call alerting him to positive news about Goldman, and (2) the close of the market.  As the head of Galleon, a former research analyst, and an experienced professional in the securities industry, Rajaratnam understood that the insider trading laws prohibited him from causing trades to be made on the basis of material, nonpublic information and that, therefore, these statements indicating that he had directed trades based on material nonpublic information were against his penal interest.

In addition, a reasonable person would have recognized that his statement that he could not "yell out" this information in the halls of Galleon reflected a consciousness of the impropriety of the information.  A reasonable person also would have recognized that the statements about keeping his "mouth shut" concerning information he received regarding

20

"WaMu" from another Galleon employee and sharing "everything" with that employee, including "AMD" and "IBM," would be detrimental to his penal interest as further admissions of having engaged in insider trading.

Although Rajaratnam's statements are sufficiently self-inculpatory to satisfy Rule 804(b)(3) even when considered in isolation, viewed in context as the law requires, *see Williamson*, 512 U.S. at 603, *Persico*, 645 F.3d at 102, that conclusion is inescapable.  In particular, the statements are highly inculpatory when considered in the context of the following circumstances, all of which would have been known to a reasonable person in Rajaratnam's position at the time he made the statements: (1) Goldman publicly announced Buffett's investment after the market closed on September 23, 2008, and that announcement was perceived favorably by the market; (2) Rajaratnam had ordered $43 million worth of Goldman stock within the last three minutes of the trading day, resulting in the purchase of 217,200 shares at a total cost of more than $25 million; (3) those orders and purchases of Goldman stock were recorded and maintained in Galleon's trading records; (4) those orders and purchases of Goldman stock were also recorded and maintained in the records of the broker-dealers who executed the trades; and (5) Rajaratnam directed the traders to place those orders almost immediately after receiving a call from Gupta, a member of the Goldman Board.  Although Rule 804(b)(3) does not require the declarant to recognize that the statements would subject him to immediate criminal prosecution, *see Persico*, 645 F.3d 85 at 102, a reasonable person in Rajaratnam's position would have understood that these surrounding circumstances were easily ascertainable.  Not surprisingly, Horowitz tried three separate times to stop Rajaratnam from talking about what had happened over the phone.  *See* Exh. 2-T, at 3, lines 2, 6, and 19.

21

Accordingly, Rajaratnam's statements not only would be "probative" in a criminal trial

against him, *Persico*, 645 F.3d at 102, but would provide compelling proof of his guilt.  In fact,

the 7:09 a.m. Statements were introduced at Rajaratnam's criminal trial and the Government

argued during summation that it was proof in Rajaratnam's own words that Rajaratnam traded

Goldman stock based on an illegal tip from Gupta.  Moreover, Judge Holwell expressly relied on

the 7:09 a.m. Statements in finding sufficient evidence to support Rajaratnam's conviction.  *See*

*United States v. Rajaratnam,* 802 F. Supp. 2d 491, 501 (S.D.N.Y. 2011).

### c.      Corroborating Circumstances Clearly Indicate The Trustworthiness Of The Statements

All factors considered by the Second Circuit in assessing the trustworthiness of

statements against interest demonstrate the trustworthiness of Rajaratnam's statements to

Horowitz in the two wiretapped calls on September 24.  *See, e.g., Williamson*, 512 U.S. at 603;

*Doyle*, 130 F.3d at 544; *Williams*, 506 F.3d at 155*; Sasso*, 59 F.3d at 349-50; *Matthews,* 20 F.3d

at 546; *Rahme*, 813 F.2d at 36; *Stratton*, 779 F.2d at 829; *Katsougrakis*, 715 F.2d at 776.

Rajaratnam's statements were not made in response to questioning by law enforcement or in a

coercive environment.  They were voluntary and made in private conversations that,

unbeknownst to Rajaratnam, were intercepted through a court-authorized wiretap.  The

statements were not part of any attempt to shift blame or minimize culpability, or to curry favor

with law enforcement.  Rajaratnam believed he was speaking with an ally.  Indeed, Horowitz was

one of his close and trusted confidantes, and other intercepted recordings show that Rajaratnam

and Horowitz discussed Inside Information with each other, and that Rajaratnam was trustworthy

22

when discussing Inside Information with Horowitz and other confidantes at Galleon.[9]  On the

7:09 a.m. and 7:56 a.m. calls, among other reasons, Rajaratnam needed to explain to Horowitz

why other co-conspirators should not be angry that he did not share the illegal tip from Gupta

with them; and Rajaratnam wanted Horowitz to understand the basis for the trading decision for

purposes of determining when to sell the Goldman stock.  Moreover, Rajaratnam's statements

were not contradictory.  His 7:09 a.m. Statements and 7:56 a.m. Statements were consistent, and

Rajaratnam did not say anything to co-conspirators (prior to his arrest) inconsistent with them.

Nor did he recant these statements prior to his arrest.  Furthermore, Rajaratnam's statements

were based on personal knowledge; he stated when he received a call, and he described what he

was told in that call and his instructions thereafter to trade.

Finally, there is extensive independent corroboration of Rajaratnam's statements.  That

evidence includes records showing Rajaratnam received a call from Gupta just minutes before

the market closed on September 23; Gupta placed that call right after Gupta disconnected from

the Goldman Board call in which the Board approved the Buffett investment; and almost

immediately after that call, just before the market closed, Rajaratnam directed two Galleon

traders to purchase more than $25 million worth of Goldman stock for him.  It also includes

evidence corroborating that Rajaratnam was talking about trading based on Inside Information.

For example, Rajaratnam told Horowitz during the 7:56 a.m. conversation that Rajaratnam

shared "everything," including "AMD, IBM" with another Galleon employee.  And the evidence

---

[9]	Examples of such calls between Rajaratnam and Horowitz are described *infra*, pp. 28-30.  In addition, on May 2, 2008, Rajaratnam learned confidential information about Spansion from Kumar (Exh. 6-T), and minutes later, Rajaratnam expressly told two Galleon employees that Kumar had provided information about Spansion and instructed the employees to create a cover email to disguise future purchases of the stock. (Exh. 7-T).

presented at the Rajaratnam trial established that Rajaratnam repeatedly obtained and traded

based on Inside Information about AMD and IBM.

In sum, the Government respectfully submits that Rajaratnam's 7:09 a.m. Statements and

7:56 a.m. Statements are admissible because they were against Rajaratnam's interest.

### 2. Rajaratnam's Statements Are Admissible As Co-Conspirator Statements Under Rule 801(d)(2)(E)

Pursuant to Rule 801(d)(2)(E), Rajaratnam's 7:09 a.m. Statements and 7:56 a.m.

Statements are also admissible as co-conspirator statements during the course and in furtherance

of the conspiracy.  All three requirements of Rule 801(d)(2)(E) are met by, at a minimum, a

preponderance of the evidence: (1) there was a conspiracy; (2) the members included the

declarant (Rajaratnam) and the party against whom the statements are offered (Gupta); and (3)

these statements were made during the course of and in furtherance of the conspiracy.

### a. There Was A Conspiracy Of Which Gupta and Rajaratnam Were Members

Count One charges Gupta with a conspiracy to commit securities fraud, and Rajaratnam

was a member of that conspiracy.  The wiretap calls, phone records, and trading records

establish, at a minimum, the existence of that conspiracy by a preponderance of the evidence.

Indeed, Rajaratnam already has been convicted of an insider trading conspiracy that encompassed

the September 23, 2008 tip from Gupta and subsequent Goldman trades.  *See Rajaratnam,* 802 F.

Supp. 2d at 501 (evidence of Gupta's tips to Rajaratnam "sufficient for the jury to conclude that

Rajaratnam conspired to trade on the basis of inside information regarding Goldman Sachs").

24

**b.     The Statements Were Made During The Course
And In Furtherance Of The Conspiracy**

The 7:09 a.m. Statements and 7:56 a.m. Statements were in furtherance of the charged

conspiracy because they served a number of current purposes in that conspiracy.  The statements

(1) informed and updated Horowitz about the status and progress of the conspiracy; (2) sought to

induce Horowitz's assistance and prepared Horowitz for further trading based on the Inside

Information; (3) provided reassurance; and (4) served to foster trust and cohesiveness.

Because Horowitz played an important role in helping Rajaratnam carry out his illegal

insider trading activity, Rajaratnam's statements to Horowitz were in furtherance of  the

conspiracy whether or not Horowitz's participation was known or reasonably foreseeable to

Gupta.  Nonetheless, the evidence establishes, at least by a preponderance, that Horowitz's

participation was within the scope of the unlawful agreement between Gupta and Rajaratnam

and, at a minimum, was reasonably foreseeable to Gupta.

**i.     The Statements Served A Number Of Current Purposes
In The Charged Conspiracy**

Rajaratnam's statements served a number of "current purposes" in the ongoing

conspiracy.  *Thai*, 29 F.3d at 813.

First, Rajaratnam's statements informed Horowitz about the status and progress of the

conspiracy to trade based on Inside Information.  *See, e.g.*, *Desena*, 260 F.3d at 158; *Diaz*, 176

F.3d at 87; *Rastelli*, 870 F.2d at 837.  Both prior to and after September 2008, Horowitz executed

trades for Rajaratnam during and in furtherance of the charged conspiracy.  For example,

Horowitz purchased Goldman stock on March 12, 2007 and September 19, 2007 based on Inside

Information that Gupta had provided about Goldman (S1 Ind. ¶¶ 13-15, 33(a)-(b)), and sold

25

Goldman stock on October 24, 2008 based on Inside Information that Gupta had provided about Goldman.[10] (S1 Ind. ¶¶ 22-25).  On the morning of September 24, 2008, during the 7:09 a.m. and 7:56 a.m. calls, Rajaratnam updated Horowitz regarding Rajaratnam's most recent purchases of Goldman stock based on Inside Information provided by Gupta about Buffett's capital infusion to Goldman.  Horowitz was not in the office at the time the tip was received and the trades were made.  Given his relationship with Rajaratnam and, in particular, the role he played to help Rajaratnam execute the illegal insider trading scheme, it is hardly surprising that before the market opened on September 24, Rajaratnam wanted to update Horowitz on Gupta's latest Goldman tip.  And by updating Horowitz, Rajaratnam's statements served a current purpose in the conspiracy.

Second, Rajaratnam's statements served to promote and facilitate the carrying out of the charged conspiracy.  *See Maldonado-Rivera*, 922 F.2d at 958.  By informing Horowitz of the basis for his recent purchases of Goldman stock,  Rajaratnam was arming Horowitz with critical information to make decisions about selling Goldman stock to maximize profits from trading on the Inside Information.  At the time of the calls, Rajaratnam had not yet sold the Goldman shares he had purchased the prior day, and Rajaratnam's reasons for having bought the stock on September 23 were relevant to decisions to be made about when and in what manner to sell the stock in order to maximize profits and/or conceal the basis for the purchases.  Indeed, Horowitz was one of the traders who sold Goldman stock for Rajaratnam later on September 24, 2008, following the wiretapped calls, and on prior occasions, Horowitz similarly helped Rajaratnam

---

[10]     As reflected in the wiretap calls described *infra*, p. 28-30, Rajaratnam also shared Inside Information he received from other sources with Horowitz so that Horowitz could assist him in trading other stocks on the basis of that Inside Information.

sell securities that had been purchased based on Inside Information once that information became public. (*See*, *e.g.*, S1 Ind. ¶¶ 22-25).

Third, Rajaratnam's statements served to reassure Horowitz about his role in the conspiracy, insofar as Rajaratnam had directed two other individuals, including a junior trader, to purchase Goldman stock on September 23. *See Desena*, 260 F.3d at 158. Rajaratnam explained that he had been compelled to use other traders because Horowitz was not around at the time Rajaratnam received the call at 3:58 p.m., and Rajaratnam had only a very narrow window of time within which to act on the information.

Finally, and relatedly, Rajaratnam's statements served to foster trust and cohesiveness among Horowitz and other members of the conspiracy at Galleon who also helped Rajaratnam carry out the insider trading scheme. *See Desena*, 260 F.3d at 158. Rajaratnam believed that another Galleon employee was "very upset" because Rajaratnam had not shared Gupta's latest Goldman tip with him. Rajaratnam explained to Horowitz that he had been unable to share the tip because it came just before the market closed and, given the sensitivity of the information, it was hardly something that Rajaratnam could "just yell out in the f—ing halls." Rajaratnam assured Horowitz that he shares "everything" with that Galleon employee, including "AMD" and "IBM" — references to other companies for which Rajaratnam had sources of illegal inside information, i.e., Kumar and Chiesi. By trying to allay discontentment over the prior day's events, and quell potential dissension, Rajaratnam's statements served yet another current purpose in the conspiracy.

27

### ii.     Horowitz Played An Important Role in Helping Rajaratnam Carry Out The Charged Conspiracy

The evidence makes clear that Horowitz played an important role in helping Rajaratnam execute his illegal insider trading schemes, including trading based on Inside Information provided by Gupta.

The starting point is the wiretap calls themselves.  In these calls, Rajaratnam openly informed Horowitz that he had directed two individuals to purchase Goldman stock based on a call Rajaratnam received just minutes before the close of trading that alerted him to impending positive news about Goldman.  Rajaratnam himself acknowledged that this was not something he could freely disclose to others by yelling it out in the halls of Galleon; yet, he was perfectly comfortable sharing it with Horowitz.  Further, Horowitz's statements reflect that he knew that Rajaratnam was telling him about illegal conduct.  On at least three separate occasions during the call at 7:56 a.m., Horowitz tried to cut Rajaratnam off when Rajaratnam was describing what happened, because Horowitz did not want to have the conversation over the phone.  In addition, it is telling that Rajaratnam referenced having shared with another Galleon employee "AMD" and "IBM" information — Inside Information Rajaratnam obtained from Kumar and Chiesi — without any need to explain to Horowitz the meaning of those references to other illegal tips.

Moreover, additional intercepted calls over Rajaratnam's cellular phone demonstrate Horowitz's participation in Rajaratnam's illegal insider trading schemes.  For example:

- During a March 13, 2008 conversation, which was intercepted by wiretap, Horowitz told Rajaratnam that he had just spoken to "Adam" (referring to Adam Smith, who has pled guilty, pursuant to a cooperation agreement with the Government, to participating in illegal insider trading schemes with Rajaratnam and others while working as an analyst and portfolio manager at Galleon).  Horowitz told Rajaratnam that Voltera (a public company that

28

traded under the ticker symbol "VLTR") had "made the quarter. . . .  The Street's at 20.  They're already at 22 with a couple weeks to go."  Horowitz then told Rajaratnam that, with respect to "AATI" (referring to the ticker symbol for Advanced Analogic Technologies), "He [Adam Smith] says, Street's at 28, they're tracking at 30.5 already, and they're going to add a new customer."  (Both companies' fiscal quarter ended approximately two weeks later).  Horowitz then told Rajaratnam that Rajaratnam did not own any Volterra or AATI, and Rajaratnam told Horowitz to buy "maybe a hundred [meaning 100,000 shares] of each."  Rajaratnam told Horowitz, "I actually have a good check at, uh, Volterra, that I'll do."  Following the call, Horowitz executed purchases of Volterra and AATI for Rajaratnam.  (Exhs. 4 and 4-T, Recording and Transcript of March 13, 2008 Conversation).

• During an April 1, 2008 conversation, which was intercepted by wiretap, Rajaratnam discussed with Horowitz an upcoming acquisition by Nuance (a publicly-traded company) that had not yet been announced.  (Rajaratnam had learned about the acquisition from Rajiv Goel, a former Intel employee who also pled guilty, pursuant to a cooperation agreement with the Government, to conspiracy and substantive securities fraud, in connection with a scheme to provide Inside Information to Rajaratnam).  Rajaratnam told Horowitz to sell his Nuance stock because Nuance was going to acquire another company for $350 million.  Rajaratnam told Horowitz "we have five days to do it," and Horowitz said he would take care of it.  Horowitz then executed sales of Nuance stock for Rajaratnam.  One week after this call, on April 8, 2008, Nuance announced publicly that it was acquiring another company for approximately $360 million.  (Exhs. 5 and 5-T, Recording and Transcript of April 1, 2008 Conversation).

• During an August 22, 2008 conversation, which was intercepted by wiretap, Horowitz told Rajaratnam that a certain Galleon analyst/portfolio manager had just called and told Horowitz that "Broadcom, uh, is going to buy the, uh, AMD piece.  He said you would know. . . . Next, next week."  Horowitz said he "didn't know what to do with that."  (Exhs. 9 and 9-T, Recording and Transcript of August 22, 2008 Conversation). Approximately one minute later, in another intercepted call, Horowitz asked Rajaratnam, "Am I supposed to do anything with what I just told you?"  Rajaratnam replied, "No, nothing. . . .  I mean, I'm the one who told him that they were going to buy it."  Rajaratnam and Horowitz then laughed.  Several days later, Broadcom announced it was buying AMD's digital TV (DTV) business. (Exhs. 10 and 10-T, Recording and Transcript of August 22, 2008 Conversation).

• During a September 12, 2008 conversation, which was intercepted by wiretap, Rajaratnam discussed with Horowitz an upcoming AMD corporate

reorganization that was not yet public.  (At the time, Rajaratnam held a large position in AMD stock based on illegal tips of Inside Information from both Kumar and Chiesi about the corporate reorganization).  On September 11, 2008, the day before this call, Kumar told Rajaratnam that the AMD deal was delayed to the first week of October.  During the September 12 conversation, Rajaratnam told Horowitz to sell some AMD stock because the deal had been "pushed out."  Rajaratnam said: "Nothing is changed, it's just a couple of paperwork, you know."  Rajaratnam directed Horowitz to reduce the position for the time being, explaining: "I'll get a heads up, 48 hours before, we can buy 3, 5 million."  Horowitz replied, "Exactly."  Weeks later, Horowitz bought back shares of AMD before the deal was publicly announced.  (Exhs. 11 and 11-T, Recording and Transcript of September 12, 2008 Conversation).

In addition, on multiple occasions, both before and after September 24, 2008, Horowitz executed trades for Rajaratnam after Rajaratnam received Inside Information about Goldman from Gupta, including on March 12, 2007, September 19, 2007, and October 24, 2008.  (S1 Ind. ¶¶ 13-15, 22-25, 33(a)-(b)).

Thus, there can be no reasonable dispute that Horowitz assisted Rajaratnam in carrying out his illegal insider trading activity, including the charged conspiracy.  Rajaratnam shared Inside Information he received from sources with Horowitz and enlisted Horowitz's assistance in executing trades based on Inside Information from those sources.  That assistance included not only placing orders at Rajaratnam's direction, but also strategizing with Rajaratnam about how best to trade on the basis of the Inside Information to maximize profits and/or conceal the illegal tips.  (*See, e.g.,* Exh.11-T, at 3).  Because Horowitz played an important role in helping Rajaratnam carry out his insider trading activity, Rajaratnam's statements to Horowitz were in furtherance of Rajaratnam's conspiracy with Gupta, whether or not Horowitz's involvement was known or reasonably foreseeable to Gupta.  *See United States v. Rivera,* 22 F.3d 430, 436 (2d Cir. 1994) (statements are "in furtherance" of conspiracy if made to "a person who is not a

30

member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals"); *see also Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d at 139 (person to whom statement made need not be the defendant's co-conspirator for statement to be in furtherance of the conspiracy).

### iii. Horowitz's Participation Was, At A Minimum, Reasonably Foreseeable to Gupta

Although Rajaratnam's statements to Horowitz furthered the charged conspiracy whether or not Horowitz's participation was known or reasonably foreseeable to Gupta, the evidence establishes that Horowitz's participation was, at a minimum, reasonably foreseeable to Gupta.

In an insider trading conspiracy between a tipper and a tippee, the Second Circuit has held that the involvement of other co-conspirators, including individuals who learn about the illegal tips from the tippee, i.e., "remote tippees," can be established in one of at least three different ways: "(1) if the scope of the trading agreement were broader 'to include trading by or for persons other than the small group of conspirators;' (2) if the conspirators reasonably foresaw, as a necessary or natural consequence of the unlawful agreement, information being passed to remote tippees; and (3) actual awareness of the remote tippees." *United States v. Geibel*, 369 F.3d 682, 690 (2d Cir. 2004) (quoting authority omitted); *United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001).

Here, the evidence establishes by at least a preponderance that (1) the scope of Gupta's agreement with Rajaratnam included Rajaratnam's traders and others at Galleon and (2) Gupta reasonably foresaw, as a necessary and natural consequence of his unlawful agreement with Rajaratnam, that his tips were being passed to Rajaratnam's principal trader and others at Galleon

31

in furtherance of the conspiracy.  Gupta was familiar with Galleon, its structure, and its operations, including the roles of employees like Horowitz.  Gupta understood, for example, that Galleon's operation included portfolio managers, analysts, and traders, and that Galleon had teams dedicated to different sectors, such as the financial sector (which included Goldman Sachs) and the consumer sector (which included P&G).

Gupta's familiarity with Galleon stemmed from his close personal relationship with Rajaratnam; his frequent visits to Rajaratnam's office at Galleon; his role as Chairman of Galleon International; his ownership stake in Galleon International and a second Galleon management company; his direct investment in Galleon funds and indirect investment in Galleon funds through Voyager; and his discussions with Rajaratnam about forming other Galleon-related entities.  In fact, in 2008, Gupta met personally with potential investors abroad and in the United States to pitch Galleon's business and solicit investments into Galleon funds.  Thus, it was, at a minimum, reasonably foreseeable to Gupta that Rajaratnam would share the Inside Information with and enlist the assistance of his trader, among others at Galleon, as a natural consequence of their unlawful agreement.  Moreover, that the scope of the agreement extended to others at Galleon beyond Rajaratnam is evidenced by Gupta's desire to help not just Rajaratnam, but Galleon as a whole.  During a July 29, 2008 wiretapped conversation between Gupta and Rajaratnam, for example, Gupta told Rajaratnam — after describing the discussion that had taken place at a recent Goldman Board meeting — that: "I want you to keep, us to keep having the dialogue as to what . . . you know, how I can be helpful in Galleon International.  By the way, not Galleon International, Galleon Group."  (Exhs. 8 and 8-T, Recording and Transcript of July 29, 2008 Conversation, at 13, lns. 9-15).

In sum, Rajaratnam's 7:09 a.m. Statements and 7:56 a.m. Statements are admissible because they were statements made by a co-conspirator during and in furtherance of the conspiracy.

### 3.    Rajaratnam's Statements Are Admissible Under The Residual Exception To The Hearsay Rule

Pursuant to Rule 807, Rajaratnam's 7:09 a.m. Statements and 7:56 a.m. Statements are admissible under the residual hearsay exception.  As in *Bryce*, where the Second Circuit affirmed the admission of wiretapped calls pursuant to Rule 807, these statements bear on material facts; are the most probative evidence available that Rajaratnam traded Goldman shares based on a tip from Gupta just minutes before the market closed on September 23; and the introduction of these statements would be consistent with the Rules of Evidence and advance the interests of justice. 208 F.3d at 350-51.

First, Rajaratnam's statements clearly bear on material facts in dispute.  They provide significant evidence that Rajaratnam spoke to Gupta shortly before the market closed, that Gupta disclosed Inside Information concerning Goldman, and that Rajaratnam traded on the basis of that Inside Information.  Second, Rajaratnam's statements about his purchases of Goldman stock late in the day on September 23 are the most probative evidence of these facts.  The call between Gupta and Rajaratnam on the afternoon of September 23 was not recorded, as there was no wiretap on Rajaratnam's work phone or any of Gupta's phones.  Moreover, because there were no other participants in that call, there is no witness available to testify about the content of the conversation between Gupta and Rajaratnam.  Thus, Rajaratnam's recorded statements in the subsequent wiretapped calls with Horowitz provide crucial direct evidence that (a) Gupta tipped

Rajaratnam during their unrecorded phone conversation at approximately 3:55 p.m. on September 23, and (b) Rajaratnam purchased Goldman stock in the final minutes of the trading day on the basis of that tip.  Those facts are particularly significant in light of Gupta's apparent defenses that (1) someone at Goldman other than Gupta tipped Rajaratnam at some other time and (2) there is doubt about whether Rajaratnam and Gupta actually spoke on September 23, 2008 minutes before the market closed (given the short duration of the call and that it was not intercepted).  These statements will also be critical if Gupta adopts one of Rajaratnam's defenses that Rajaratnam's purchases late in the day on September 23 continued a pattern of purchases of Goldman stock on September 22 and the morning of September 23.[11]

Third, Rajaratnam's statements are squarely on all fours with the Second Circuit's holding in *Bryce* that the statements had sufficient indicia of trustworthiness to satisfy Rule 807: (1) "the statements were obtained via a covert wiretap of which neither [Rajaratnam] nor [Horowitz] was aware;" (2) "the statements were made during the same time period that [Rajaratnam] was conversing with [Gupta];" (3) "[Rajaratnam's] statements implicated both himself and [Gupta] as participants in [an insider-trading] conspiracy;" and (4) Horowitz was Rajaratnam's "colleague" and close confidante in illegal insider trading schemes.  *Id*.; *see also*, *e.g.*, *Morgan,* 385 F.3d at 208 (upholding admission of letter from defendant's co-conspirator pursuant to Rule 807).  Similarly, as discussed above, the circumstances under which the statements were made provide further indicia of their reliability: the statements were made to a

---

[11]     On September 22, 2008, at approximately 9:57 a.m., the phone number for Gupta's assistant called the phone number for Rajaratnam's assistant.  Shortly thereafter, at approximately 10:43 a.m., Rajaratnam purchased 100,000 shares of Goldman stock in his technology fund.  On September 23, 2008, at approximately 9:45 a.m., Rajaratnam called Gupta.  At approximately 9:49 a.m., Rajaratnam purchased 50,000 shares of Goldman stock.

trusted colleague; were volunteered by Rajaratnam in a conversation initiated by him; and were

not made to law enforcement officials or in a coercive environment.  *See Matthews,* 20 F.3d at

546; *Sasso*, 59 F.3d at 349.

## IV.   The Court Should Admit Rajaratnam's Statements To David Lau During The October 24, 2008 Wiretapped Call

The Government respectfully moves to admit certain of Rajaratnam's statements to David

Lau during a wiretapped telephone conversation on October 24, 2008 (hereinafter "October 24

Statements").[12]  Rajaratnam's statements are admissible, once again, because they were against

penal interest, statements of a co-conspirator during and in furtherance of the conspiracy, and fall

within the residual hearsay exception.

### A.   Relevant Facts

In mid-October 2008, Goldman was running a quarter-to-date loss of approximately $1

billion, or nearly $2 per share.  This was at approximately the halfway point in Goldman's fourth

quarter.  Although Goldman's fiscal quarter did not end until November 28, a loss of that

magnitude that far into the quarter was a significant development.  Wall Street analysts at the

time were predicting that the company would realize a quarterly *profit* of approximately $2.50

per share.  Moreover, since going public in 1999, Goldman had never reported a quarterly loss.

On October 23, 2008, at approximately 4:15 p.m., after the close of the market,

Goldman's senior management held a Board "posting call" to apprise the Board of Goldman's

financial condition.  Gupta participated in the call by telephone.  At the time, Goldman's internal

and nonpublic profit and loss statement for the week ended October 17 showed a quarter-to-date

---

[12]     The specific statements that the Government seeks to admit appear in bold in the
next section.  Lau's responses to Rajaratnam's statements are necessary for completeness.

loss of $1.96 per share, and Goldman's most recent daily profit and loss report showed a quarter-to-date loss of $1.75 per share.  Goldman's Board call ended at approximately 4:49 p.m. Approximately 23 seconds later, Gupta called Rajaratnam at Rajaratnam's office at Galleon. Gupta's call to Rajaratnam lasted approximately 13 minutes.  At the time of that call, Rajaratnam held approximately 150,000 shares of Goldman.

The following morning, on October 24, 2008, approximately one minute after the market opened for trading, Rajaratnam began to sell all 150,000 shares of Goldman stock.  At approximately 12:12 p.m. on October 24, after selling his shares of Goldman stock, Rajaratnam called Lau from his cellular telephone.  (Exhs. 3 and 3-T, Recording and Transcript.)  Lau, based in Asia, held the title of chief executive officer of Galleon Asia, and was one of the portfolio managers for Galleon International.  Unbeknownst to Rajaratnam and Lau, the FBI intercepted Rajaratnam's call over a court-authorized wiretap.

In relevant part, the following exchange took place:

Lau:            Hey big guy.

**Rajaratnam:  Hey David, you called?**

Lau:            Yeah, just to give me, give me a, find the pulse because we are quite shocked overseas . . . so I just want to find out what you guys are thinking.

**Rajaratnam:  Yeah, I mean, I think, ah we think that the U.S. is um relatively the safe haven, right?**

. . .

**Rajaratnam:  Yeah I mean our risk here is ah hedge fund redemption risk, right. Citadel I hear is in trouble, you know and thinks like that but I think generally, not that I want to be long equities, but generally I think one trade in equities would be, you know, buy the Spiders and short the EEMs or something, you know.**

36

Lau:            Hmm Hmm.

**Rajaratnam:    But it looks like here the most cyclical companies the Semi equipment companies, and the home builders are the ones that are leading the way out right.**

Lau:            Right.

**Rajaratnam:    Um, now I, I heard yesterday from somebody who's on the Board of Goldman Sachs, that they are gonna lose $2 per share.  The Street has them making $2.50.**

Lau:            Really.[13]

**Rajaratnam:    You know.  Yeah.  Now I can get that number, you know, the one, they don't report until December, they, I think their quarter ends in November, but (UI) one more, but you know they have these huge marks in ICBC and all of that stuff right.  That uh is getting absolutely clobbered.  You know.**

Lau:            Right.

**Rajaratnam:    So what he was telling me was that uh, Goldman, the quarter's pretty bad.  They have zero revenues because their trading revenues are offset by asset losses, and to date they have lost $2 per share, they just announced a 10% cut and uh you know, the basic business is ok but uh you know this is uh tough for them.  I don't think that's built into Goldman Sachs' stock price.  So if it gets to $105, I'm gonna, it's $99 now, it was at $102.  It was looking for $105, I'm gonna whack it [i.e., short the stock] you know.**

Lau:            (Laughs) Okay, Okay, Okay (UI).

**Rajaratnam:    Okay, I don't think it makes sense to take longer term views right now. . . .**

(Exh. 3-T, at 1-2).

---

[13]        It is apparent from Lau's tone that he was surprised by this information.

B.      **Discussion**

1.      **Rajaratnam's Statements Are Admissible As Statements Against Interest Under Rule 804(b)(3)**

Pursuant to Rule 804(b)(3), Rajaratnam's October 24 statements are admissible as statements against Rajaratnam's interest.  All three requirements of Rule 804(b)(3) are met by, at a minimum, a preponderance of the evidence: (1) the declarant (Rajaratnam) is unavailable as a witness; (2) the statements are sufficiently reliable to warrant an inference that a reasonable man in Rajaratnam's position would not have made these statements unless he believed them to be true; and (3) corroborating circumstances clearly indicate the trustworthiness of the statements.

First, as discussed, Rajaratnam is unavailable because his appeal is pending.

Second, a reasonable person in Rajaratnam's shoes would have perceived the statement as detrimental to his own penal interest.  Even when Rajaratnam's statements are viewed in isolation, Rajaratnam admits to essentially every element of a conspiracy to trade based on Inside Information.  His words alone prove that: (1) he learned from "somebody who's on the Board of Goldman Sachs" that Goldman was "gonna lose $2 per share" that quarter; (2) the information was nonpublic ("the Street has them making $2.50"); (3) the information was material ("I don't think that's built into Goldman Sachs' stock price"); and (4) Rajaratnam planned to trade on that information by shorting Goldman stock if the stock price reached $105 per share ("So if it gets to $105, . . . I'm gonna whack it").

Moreover, when viewed in the context of (1) phone records showing that Rajaratnam did, in fact, speak to a Goldman Board member (Gupta) the prior day, after the market had closed, and (2) trading records reflecting that Rajaratnam started to sell his position in Goldman stock at

38

9:31 a.m. on October 24, one minute after the market opened, Rajaratnam's statements are even more self-inculpatory.  Rajaratnam's statement that he had received the information about Goldman's unexpectedly negative results from a Goldman Board member the prior afternoon, before selling his stock the morning of October 24, was effectively an acknowledgment that those sales were made on the basis of Inside Information.

Finally, Rajaratnam's October 24 Statements are supported by corroborating circumstances that clearly indicate their trustworthiness.  As with the September 24 calls, there is extensive independent corroboration.  Phone records, for example, show that Gupta participated in a Goldman Board "posting call" on October 23 from approximately 4:17 p.m. to 4:50 p.m., and internal and confidential Goldman documents reflect that Goldman was, in fact, losing nearly $2 per share at that time in the quarter, while Wall Street analysts were predicting based on publicly-available information that Goldman would *make* approximately $2.50 per share that quarter.  Phone records also show that Gupta called Rajaratnam approximately 23 seconds after getting off of the Board call, and trading records show that Rajaratnam sold his Goldman shares at the first opportunity to do so, when the market opened the very next morning.

Furthermore, the circumstances under which the statements were made provide further assurances of their reliability.  For example, Rajaratnam was talking to a trusted colleague and confidante;[14] the statements were volunteered by Rajaratnam as part of a private conversation

---

[14]     The October 24 conversation was not the first time Rajaratnam had shared Inside Information with Lau.  For example, during an October 6, 2008 conversation that also was intercepted over Rajaratnam's cellular phone, Rajaratnam told Lau that "tomorrow is a big day for me.  I have a big bet on AMD."  When Lau asked, "what's the story there?", Rajaratnam shared with Lau the Inside Information that was the basis for his purchases of AMD stock: "The Arabs uh, um in Mubadala which is the Dubai thing is gonna put 5 billion dollars into them.  And split the company in two." (Exh. 12-T, at 4).  The next day, AMD publicly announced a

that neither he nor Lau knew was being recorded; the statements were not made to law

enforcement authorities or in a coercive environment; there was no attempt to curry favor with

law enforcement; and there was no attempt by Rajaratnam to minimize his own culpability or to

shift blame to someone else. *See Matthews,* 20 F.3d at 546; *Sasso*, 59 F.3d at 349.

### 2.    Rajaratnam's Statements Are Admissible As Co-Conspirator Statements Under Rule 801(d)(2)(E)

The October 24 Statements are also admissible because they were made by a co-

conspirator (Rajaratnam) during and in furtherance of the charged conspiracy.  First, the

Government can demonstrate, at least by a preponderance, the existence of a conspiracy of which

Gupta and Rajaratnam were members.  Second, the October 24 Statements occurred during the

course of that conspiracy, which extended to early 2009.  Third, the statements were in

furtherance of the conspiracy.

The statements were in furtherance of the conspiracy because Rajaratnam was passing

Inside Information to Lau to use for the benefit of Galleon and Galleon International, an entity of

which Gupta himself held an ownership stake.  Rajaratnam's statements were made in response

to Lau asking Rajaratnam for input and advice on trading strategy:  Lau stated that "we're quite

shocked overseas," referring to the volatility in the financial markets at that time, and explained

to Rajaratnam, "I just want to find out what you guys are thinking."  Rajaratnam responded by

---

corporate reorganization that included a spin-off of one of its businesses into a separate company
and an investment by, among others, an Abu Dhabi investment firm called Mubadala
Development.  The evidence at the Rajaratnam trial established that Rajaratnam had obtained
that Inside Information illegally from Kumar and Chiesi.  (This was the same AMD
reorganization that Rajaratnam discussed with Horowitz in the September 12, 2008 wiretap call
described *supra*, pp. 29-30).

sharing thoughts on market conditions, suggesting a possible equity trade to Lau, and then

informing Lau of what he had heard about Goldman's financial performance.  The non-public

information Rajaratnam shared with Lau about Goldman's interim quarterly losses was

particularly significant because it differed so dramatically from the market's expectations at the

time based on publicly-available information.

As an executive at Galleon and a portfolio manager for Galleon International, Lau was

situated to use that information for the benefit of Galleon and Rajaratnam.[15]  Lau could have used

the information, for example, to inform his views of the market and/or his general trading

strategy.  Indeed, Rajaratnam advised Lau, immediately after describing Goldman's unexpectedly

negative results, that "I don't think it makes sense to take longer term views right now."  Lau also

could have used the information in an even more direct way.  Rajaratnam told Lau he planned to

"whack" the stock, meaning sell it short, if the stock price reached $105.  (Although Galleon

International was focused principally on investments in Asia, it also traded U.S. securities).

Although the stock price did not reach $105 prior to Goldman's quarterly earnings announcement

in December 2008, by arming Lau with information he could use in making trading decisions for

his Galleon portfolio, Rajaratnam was furthering the objectives of the conspiracy.

### 3.    Rajaratnam's Statements Are Admissible Under The Residual Exception To The Hearsay Rule

Pursuant to Rule 807, Rajaratnam's October 24 Statements also would be admissible

under the residual hearsay exception.  These statements bear on material facts; are the most

---

[15]    The Government need not establish that the statement actually furthered the conspiracy; "it is enough that the statements were made with the intent to further the conspiracy's purpose."  *United States v. Stewart*, 433 F.3d 273, 293 n.4 (2d Cir. 2006).

probative evidence that Rajaratnam obtained Inside Information about Goldman's financial performance from Gupta prior to selling Goldman shares the morning of October 24; and their admission into evidence would be consistent with the Rules of Evidence and advance the interests of justice. *See Bryce*, 208 F.3d at 350-51.

First, Rajaratnam's statements bear on material facts in dispute.  Among other things, the statements establish that Rajaratnam learned  nonpublic information about Goldman's results from a Board member whom Rajaratnam spoke to the prior day.  The statements also show that Rajaratnam was in possession of Inside Information when he sold his Goldman shares earlier that morning before the call with Lau.  Rajaratnam's own words are the most probative evidence available of what information he knew, when he learned it, and from whom he obtained it.  There is no recording of the conversation between Gupta and Rajaratnam on October 23 and no witness available to testify about its content.  Rajaratnam's statements in the subsequent wiretapped call with Horowitz thus provide crucial direct evidence that Gupta tipped Rajaratnam during their unrecorded phone call on the afternoon of October 23.

Third, Rajaratnam's statements, like wiretapped calls admitted in *Bryce*, were made under circumstances that provide further assurances of their trustworthiness.  The statements were obtained via covert wiretap of which neither party was aware; were volunteered by Rajaratnam in a conversation initiated by him; were made to a trusted colleague; implicated Rajaratnam and Gupta in jointly undertaken criminal activity; were not made to law enforcement officials or in a coercive environment; and did not attempt to shift blame or minimize culpability. *See Bryce*, 208 F.3d at 350-51*; see also Matthews,* 20 F.3d at 546**.**

V.      **Conclusion**

For the foregoing reasons, the Government respectfully submits that the Court should

admit the above-described statements.

Dated: New York, New York
       April 30, 2012

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York

                        By:     _____
                                        Reed Brodsky / Richard Tarlowe
                                        Assistant United States Attorneys
                                        212-637-2492 / 2330

43