UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                             :

UNITED STATES OF AMERICA

                             :    No. S1 11 Cr. 907 (JSR)

          - against -

                             :

RAJAT K. GUPTA,

                             :

           Defendant.

                             :

———————————————————— x

 

**SENTENCING MEMORANDUM OF RAJAT K. GUPTA**

 

KRAMER LEVIN NAFTALIS &
   FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for Rajat K. Gupta

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT .............................................................................1

II.  MR. GUPTA'S PERSONAL BACKGROUND AND CHARACTER.............................3

    A.   Personal History, Education, and Career ....................................................3

        1.   Early Life ...............................................................................3

        2.   Indian Institute of Technology....................................................5

        3.   Harvard Business School ...........................................................6

        4.   McKinsey ...............................................................................8

    B.   Family ..................................................................................................13

    C.   Compassion, Kindness and Generosity......................................................19

        1.   Compassion and Support ..........................................................20

        2.   Financial Support ...................................................................23

        3.   Acts of Kindness ....................................................................26

        4.   Mentoring, Guidance and Support ..............................................29

    D.   Humanitarianism....................................................................................33

        1.   The Global Fund to Fight AIDS, TB and Malaria ....................................35

        2.   The Public Health Foundation of India.........................................40

        3.   Indian School of Business.........................................................43

        4.   American India Foundation .......................................................46

        5.   The United Nations..................................................................48

        6.   Other Humanitarian Efforts ......................................................50

III. ADVISORY GUIDELINES CALCULATION................................................................55

    A.   Gain Should be Calculated Based on the "Value" Actually Realized by
        Rajaratnam .........................................................................................56

    B.   Proper Calculation of Losses Avoided for the October 2008 Trades ...................60

C.    Expressly Acquitted Conduct Should Not Be Included in the Gain Calculation .............................................................................63

D.    Tips Charged Only as Overt Acts Should Not Be Included in the Gain Calculation .............................................................................65

IV.    A NON-GUIDELINES SENTENCE OF PROBATION WITH A CONDITION OF RIGOROUS, FULL-TIME COMMUNITY SERVICE IS APPROPRIATE..............67

A.    The Guidelines Place Undue Reliance on Gain in Insider Trading Cases............68

B.    A Non-Custodial Sentence is Warranted Under Section 3553(a)........................72

1.    An Individualized Assessment of Mr. Gupta's Personal History and Characteristics, and the Nature of his Conduct, Warrant a Non-Custodial Sentence .....................................................................72

(a)    Lifetime of Good Works ................................................ 73

(b)    Aberrational Conduct ................................................... 75

2.    A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities With Closely Comparable Cases .....................75

3.    A Non-Custodial Sentence is Sufficient to Deter Others...........................82

V.    A SENTENCE OF PROBATION WITH A CONDITION OF RIGOROUS, FULL-TIME COMMUNITY SERVICE IS SUFFICIENT TO ACHIEVE THE GOALS OF SENTENCING .............................................................85

1.    Covenant House .............................................................87

2.    Rwanda ......................................................................89

VI.    CONCLUSION ...................................................................92

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Dirks v. S.E.C.*,
    463 U.S. 646 (1983)..............................................................................................71

*Stinson v. United States*,
    508 U.S. 36 (1993)...............................................................................................57

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006).......................................................67, 68, 85

*United States v. Baldwin*,
    389 F. Supp. 2d 1 (D.D.C. 2005), *aff'd*, 563 F.3d 490 (D.C. Cir. 2009)................64

*United States v. Brady*,
    02 Cr. 1043 (JG), 2004 WL 86414 (E.D.N.Y. Jan. 20, 2004) ...............................85

*United States v. Canova*,
    412 F.3d 331 (2d Cir. 2005).................................................................................74

*United States v. Carvajal*,
    04 Cr. 222 (AKH), 2005 WL 476125 (S.D.N.Y. Feb. 22, 2005) ...........................63

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) (*en banc*) .................................................................55

*United States v. Coleman*,
    370 F. Supp. 2d 661 (S.D. Ohio 2005) .................................................................64

*United States v. Concepcion*,
    983 F.2d 369 (2d Cir. 1992) (Newman, J., concurring)..........................................64

*United States v. Contorinis*,
    No. 11-3-cr, 2012 WL 3538270 (2d Cir. Aug. 17, 2012).................................57, 58

*United States v. Cooper*,
    394 F.3d 172 (3d Cir. 2005).................................................................................75

*United States v. Coughlin*,
    No. 06-20005, 2008 U.S. Dist. LEXIS 11263 (W.D. Ark. Feb. 1, 2008)................85

*United States v. Crosby*,
    397 F.3d 103 (2d Cir. 2005).................................................................................67

*United States v. Crouse*,
   145 F.3d 786 (6th Cir. 1998) ....................................................................75

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004)........................................................70

*United States v. Gray*,
   362 F. Supp. 2d 714 (S.D. W.Va. 2005), *aff'd*, 491 F.3d 138 (4th Cir. 2007) ......................64

*United States v. Greene*,
   249 F. Supp. 2d 262 (S.D.N.Y. 2003)........................................................74

*United States v. Howe*,
   543 F.3d 128 (3d Cir. 2008)......................................................................74

*United States v. Huerta-Rodriguez*,
   355 F. Supp. 2d 1019 (D. Neb. 2005), *aff'd*, 158 F. App'x 754 (8th Cir. 2005)....................64

*United States v. Jones*,
   460 F.3d 191 (2d Cir. 2006)......................................................................67

*United States v. Kurland*,
   718 F. Supp. 2d 316 (S.D.N.Y. 2010)........................................................77

*United States v. McDermott*,
   00 Cr. 61 (KMW), 2000 WL 35515558 (S.D.N.Y. July 19, 2000) ..................80, 81

*United States v. Mooney*,
   425 F.3d 1093 (8th Cir. 2005) ..................................................................57

*United States v. Nacchio*,
   573 F.3d 1062 (10th Cir. 2009) ............................................................57, 61

*United States v. Oakford Corp.*,
   98 Cr. 144 (JSR), 1999 WL 1201725 (S.D.N.Y. Dec. 13, 1999) ...........................71

*United States v. Pimental*,
   367 F. Supp. 2d 143 (D. Mass. 2005) ...............................................63, 67

*United States v. Preacely*,
   628 F.3d 72 (2d Cir. 2010) (Lynch, J., concurring)....................................67

*United States v. Rajaratnam*,
   09 Cr. 1184 (RJH), 2012 WL 362031 (S.D.N.Y. Jan. 31, 2012)................... passim

*United States v. Serafini*,
   233 F.3d 758 (3d Cir. 2000).......................................................................75

*United States v. Shuster*,
  331 F.3d 294 (2d Cir. 2003)...................................................................................74

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009)....................................................................................84

*United States v. Thurston*,
  544 F.3d 22 (1st Cir. 2008)...................................................................................74

*United States v. Vaughn*,
  430 F.3d 518 (2d Cir. 2005)..................................................................................63

*United States v. Watts*,
  519 U.S. 148 (1997)........................................................................................63, 64

*United States v. Webber*,
  536 F.3d 584 (7th Cir. 2008) ................................................................................58

*United States v. Wendelsdorf*,
  423 F. Supp. 2d 927 (N.D. Iowa 2006)..................................................................64

## STATUTES

18 U.S.C. § 3553(a) ................................................................................... passim

18 U.S.C. § 3553(a)(1)...........................................................................................67, 68

18 U.S.C. § 3553(a)(2)...........................................................................................68

18 U.S.C. § 3553(a)(6)...................................................................................68, 75, 81

U.S.S.G. § 2B1.1 .....................................................................................................69

U.S.S.G. § 2B1.4 ............................................................................................... passim

U.S.S.G. § 2B1.4 cmt.......................................................................................56, 69

## OTHER AUTHORITIES

Statement of Judge Jon O. Newman, *U.S. Sentencing Commission Public Hearing
  Testimony and Transcripts* (July 9, 2009) ............................................................70

Kaiser Family Foundation Report, *US Global Health Policy: The U.S. Global Health
  Initiative, A Country Analysis* (Feb. 2011) ............................................................89

Raymond Paternoster, *Crimes and Punishment: How Much Do We Really Know About
  Criminal Deterrence?*, 100 J. Crim. L. & Criminology 765, 766 (2010).................85

Reuters, *Goldman May Be Set to Post First Quarterly Loss* (Oct. 31, 2008)................62

U.S. Sentencing Commission, *Results of Survey of United States District Judges January 2010 through March 2010* (June 2010) ...................................................................64

**SENTENCINGS**

*United States v. Jiau*, 11 Cr. 161 (JSR) ..........................................................70, 77

*United States v. Rosen*, 11 Cr. 300 (JSR) ................................................................70

*United States v. Smith*, 11 Cr. 79 (JSR) ..................................................................71

*United States v. Holzer*, 09 Cr. 471 (MGC).............................................................73

*United States v. Peterson*, 11 Cr. 665 (RPP) .....................................................74, 80

*United States v. Moffat*, 10 Cr. 270 (DAB).............................................................77

*United States v. Goel*, 10 Cr. 90 (BSJ) ...................................................................79

*United States v. Gansman*, 08 Cr. 471 (MGC) ........................................................80

*United States v. Collotta*, 07 Cr. 143 (VM) .............................................................80

*United States v. Goehring*, 05 Cr. 209 (JES) ..........................................................80

*United States v. Fleishman*, 11 Cr. 32 (JSR) ...........................................................82

## I.      PRELIMINARY STATEMENT

The convictions in this case represent an utter aberration in the life of the man before the Court – a man whose "personal history and characteristics" are dramatically different from those routinely presented to sentencing courts in white collar cases.  Rajat Gupta's life story does not merely include a record of charitable giving, or of caring for others and having a loving family. It is, instead, a life defined by helping others and one fundamentally at odds with the events of this case.  That is, the events of this case are *uncharacteristic* in the most literal sense, inconsistent with the true character of the man.

As the more than 400 letters submitted to the Court describe in great detail, Rajat Gupta has lived an exemplary life of uncommon accomplishment, compassion, and generosity.  Letters have been submitted by his four daughters, wife and extended family; childhood friends and classmates at every level; McKinsey clients and colleagues; business and philanthropic leaders; a wide array of persons engaged in global health, education and other humanitarian endeavors; and numerous people to whom he has provided career or personal advice – young and old, rich and poor, here and abroad.  Those who have worked with Rajat extensively and directly attest that he adhered to the highest level of probity in his business career, including by strictly protecting the confidences of his clients and institutions he served.  The letters speak forcefully of the kindness Rajat has shown to all, and to the broad reservoir of trust and respect he has earned.  They reveal a strong and unselfish commitment to the public good, centered in landmark work for global health and education.  They show a loving and loved husband, father and grandfather.  And the letters show Rajat's generosity to his extended family, to his friends and even to many whom he knew less well but readily supported – generosity of time, counsel and spiritual and emotional assistance, as well as financial support.  Writer after writer speaks of his good deeds – dozens

- 1 -

and dozens are described – routinely and regularly done, unsolicited, large and small, without expectation of anything in return.  It is astonishing that someone so actively engaged in a demanding and high profile career could have accomplished so many acts of kindness involving his personal time and attention.  In sum, the letters illuminate for the Court a man of extraordinary decency, who believes – and acts on the belief – that every individual is entitled to help in reaching his full potential, allowing that individual to give his best to the world in turn.

Importantly, unlike many who, in the words of Harvard Professor Amartya Sen, are "morally moved" but never "actually [do] anything in the real world . . . [Rajat] actually went on to give practical shape to his insightful social dedication."  His efforts to improve global health and education – through his leadership of The Global Fund to Fight AIDS, Tuberculosis and Malaria; his founding of the Public Health Foundation of India and Indian School of Business; and his leadership of the American India Foundation and many other organizations – have helped to save countless lives.  Throughout, he acted selflessly, not to enhance his image or status, nor with any expectation of recognition or benefit.

In sharp contrast to this record of regard for others, and of a long life lived exceptionally well, stands the conduct of which Mr. Gupta was convicted.  The jury found him guilty of conspiracy and the substantive counts which charged tipping on two occasions in a one-month period, but acquitted him of the two other substantive charges.  Mr. Gupta did not trade for his own account or receive any financial benefit in exchange for information.  He received no financial gain at all.  As we describe in detail below, the offense conduct in this case is comparable to that of defendants who received sentences under 18 U.S.C. § 3553(a) well below the Advisory Guidelines range in this case, including defendants sentenced to probation.

The allegations, trial and jury verdict against Rajat Gupta have deprived him of the dearest aspects of his life, causing him to sever relationships with the many humanitarian organizations so important to him and to which he planned to dedicate much of his time and energy. A career of uncommon accomplishment that made him the role model and mentor of so many, and a reputation built over six decades, have been destroyed. Most damaging for Rajat has been the effect on his family, which has been rocked by sadness, frustration, and disbelief. Yet "[e]ven as he has lost nearly everything that was important to him . . . [Rajat has focused] on how to take care of [his wife and daughters] and to provide for [them] and the network of people who depend on him" (Geetanjali Gupta). In short, Mr. Gupta has already been punished severely.

As this Court has often noted, it is the whole of an individual's life that is at issue at sentencing. Accepting the jury's verdict for purposes of sentencing, we respectfully submit that, weighed against Mr. Gupta's entire life and the punishment he has already suffered, a custodial sentence is greater than necessary to achieve the sentencing purposes of section 3553(a), including the need to achieve general deterrence and to recognize the seriousness of the offense. Instead, a sentence of probation with a condition of rigorous, full-time community service would fully satisfy those sentencing objectives.

## II.     MR. GUPTA'S PERSONAL BACKGROUND AND CHARACTER

### A.     Personal History, Education, and Career

#### 1.     Early Life

Rajat Gupta was born in Kolkata, India on December 2, 1948, the son of Ashwini Kumar Gupta, a freedom fighter and journalist, and Pran Kumari Gupta, an educator who taught and served as a principal of a Montessori school. Rajat has one older sister, Rajashree, and a younger

sister, Jayashree, and brother, Kanchan.  As a teenager, he attended the Modern School in New

Delhi, where he was one of six exemplary students nominated prefect.  Classmate Nawal Kant

Sethi, remembers that "[Rajat] had no ego and was always willing to help others. In fact he spent

long hours coaching, nurturing, helping other class fellows who were slow/weak in studies or

low on confidence."

While Rajat was attending the Modern School, his father, Ashwini, died.  A disciple of

Gandhi, the elder Gupta had been jailed for long periods by the British for his efforts to achieve

Indian independence.  He was permanently injured by beatings and other mistreatment and died

of complications from these injuries.  Classmate Harishwar Dayal remembers that when Rajat's

father died, Rajat helped his mother, "a teacher in a Montessori school with meager wages, run

the home, [and he] cut down on personal expenses to ensure that his siblings . . . were

emotionally and financially cushioned from the loss."  Rajashree Sen, Rajat's elder sister, recalls

that her brother "took on the role of the man of the house, comforting my mother in her extreme

grief and supporting her physically, mentally and emotionally. . .  . Rajat . . . fulfilled the dual

roles of the responsible and dutiful son to our mother as well as the ideal father to his two

younger siblings.  His young age and relative lack of experience did not detract from his putting

the welfare and desires of his younger siblings ahead of his own."  He was especially determined

to see that his younger brother and sister excelled in school, taking "a keen interest in [their]

academic progress . . .  and [keeping] track of the kind of grades they were getting." (Karuna

Kumar).

Three years after his father's death, Rajat's mother died of a heart attack.

The tragic early deaths of his parents were a devastating blow.  "In India[,] where family ties and support are such a strong cementing factor[,] . . . losing one's parents . . .  practically amount[s] to being a rudderless ship in a vast ocean." (Nawal Kant Sethi).  But "Rajat never let any of this pull him down," writes Sethi.  These experiences of his youth shaped Rajat and, early on, revealed traits that blossomed fully in adulthood.

### 2.     Indian Institute of Technology

Despite these difficult personal circumstances, Rajat scored 15th in the nation on the entrance exam for admission to the highly selective Indian Institutes of Technology ("IIT"), and was honored with the Rudra Award, given to "the student with the most outstanding qualities of 'head and heart.'"  (Jayashree Chowdhury).  As he moved forward in his life, Rajat made a point of honoring the example of his parents.  His sister Rajashree explains, "Rajat honors our mother's memory and the lessons he learned from her through his passionate involvement with 'PRATHAM' (i.e. 'beginning' [in Hindi]), an organization dedicated to providing early childhood education to disadvantaged children in India."

Rajat excelled at IIT Delhi, while at the same time continuing to work to keep his family intact.  In addition, as fellow student Akhil Gupta recounts, Rajat was "a leader at IIT [Delhi].  He was President of [the] Students Association . . ., the highest Student's office."  According to lifelong friend Anil Sood, an IIT classmate and a character witness at trial, "the rest of us were willing for him to be our leader . . . because Rajat inspired trust and confidence.  He was able to bring us together based on the strength of his character. . . .  I knew that Rajat could be counted on to do what was right, to stand by and fight for what was right."  And in fact, Rajat's tenure as student body president came at a particularly contentious time in the school's history, with disagreements between students and faculty over pedagogy and other aspects of IIT education

KL3 2899754.1

resulting in disruptions and threatening "a very large breakdown."  (Ash Gupta).  Rajat's skills in principled diplomacy were crucial to reaching a resolution.  Classmate Rajive Johri remembers Rajat "working [tirelessly] to avoid a major hardship to 2000+ students at our institute without compromising any individual or principles."

### 3.    Harvard Business School

Upon graduation from IIT Dehli in 1971, Rajat received a scholarship to Harvard Business School.  He had by then met his future wife, Anita, who is herself described by those who know her as a person of "wise demeanor, simplicity and generosity."  (Shyma Dar).  Anita remembers Rajat "agoniz[ing]" over whether to accept admission in light of a job offer in India and his concern that "he would not be there to look after his siblings, especially his younger brother, about whom he worried a lot. After a lot of soul searching and advice from friends and family he decided it was an opportunity he could not afford to miss."  He headed to Cambridge, Massachusetts "with practically no money" (Jayashree Chowdhury), awaking "at 5 a.m. every morning to deliver newspapers to the other students to help pay for his education."  (Ravi Mehta).  But Rajat did not leave his family behind.  He wrote to his younger brother Kanchan "two or three times a week and called whenever feasible" in a time when "international telephone calls were very expensive."  (Kanchan Gupta). Later, when Rajat was working and more financially secure, "[h]is younger brother, and often his younger sister, would spend nearly every summer with Rajat in the U.S" for many years. (Karuna Kumar).

Some of his IIT classmates worried that Rajat would change once he went overseas. "When Rajat was admitted straight from our college to Harvard Business School, the first student to earn this honor, we teased him about his plans for his well-worn sandals," wondering whether he would lose his humility and "consign his native *Kurta and pajama* [to] the nearest

dustbin when he landed at Boston's Logan airport." (Rakesh Kaul). But to Harbinder S. Gill, who had also attended IIT and emigrated to Buffalo, New York at the same time Rajat emigrated to Boston, "[i]f anything, [Rajat] appeared even wiser, not much interested in our campus parties, and now deeply committed to his future wife Anita back in India."

Anita remembers, "I was very proud of the decision he took [to attend HBS] as I thought it was the best for him as well as his siblings, but in all honesty when Rajat left for HBS I thought that was the last I would see of him. People change when they go to America[,] I was told by well meaning friends. But he wrote long letters to me everyday and in the summer of 1973, when I graduated from IIT and he from HBS, he came home and we got married." Over the next thirty-nine years of marriage, Rajat and Anita built a family. They have four daughters, Geetanjali, Megha, Aditi and Deepali, and twin two-year old granddaughters, Meera and Nisa.[1]

---

[1]  Characteristically, Rajat has been active in giving back to both IIT and Harvard.

He was instrumental in the 2002 founding of "PANIIT," the alumni organization that brings together all graduates of the Indian Institutes of Technology with the goal, among others, of giving back to India through nation building efforts that benefit the underprivileged. As fellow IIT graduate Rakesh Kaul puts it, "We had been the recipients of an extraordinary gift from our college and it made eminent sense to give back. While this is a commonplace action in the U.S., doing so was unknown in India until recent times." According to Arjun Malhotra, founder of Hindustan Computers Limited (HCL) and a former Chair of PANIIT, "Rajat was the automatic choice as Chairman of [PANIIT at its beginning in 2001] as his image, his actions and his reputation were an inspiration for all the alumni." In addition to setting the organization's horizons as the Chair of its Board, Rajat headed the organization's "WHEELS" initiative – an effort to bring technological solutions to problems shared by India and the U.S. in the areas of water, health, energy, education, rural lifestyles and security – one "that has the potential to result in significant trade opportunities while also benefitting the underprivileged in India and the U.S.A.," writes former PANIIT President Suresh Shenoy.

Rajat also served as Chair of the Harvard Business School Advisory Board where, in the words of Board member Leonard Blavatnik, his "vision and leadership . . . enriched the university and the professional and, ultimately, civic lives of HBS students." Blavatnik notes Rajat's commitment to increasing diversity at HBS, as well as his guiding conviction "that

### 4.     McKinsey

After excelling at Harvard Business School, Rajat applied for a position at McKinsey but was turned down for lack of business experience.  After a professor personally intervened with the then head of McKinsey, Ron Daniel, Rajat joined McKinsey's New York office in 1973.  In just over twenty years, he rose to the position of global head of the company, becoming the first ever Indian-born CEO of a United States international corporation.

At McKinsey Rajat honed the skills that would make him so valuable to the non-profits he would subsequently lead, and developed a network of clients, colleagues and others who trusted and respected him deeply and later supported his founding of the Indian School of Business and the Public Health Foundation of India.  As Global Managing Director, he oversaw his firm's increasing involvement in consulting for non-profits, including a significant amount of pro bono work at his direction.  And McKinsey's increasing involvement in the non-profit world sometimes served as a springboard for Rajat's personal engagement.  Patty Stonesifer, former President and CEO of the Gates Foundation,  states that she

> turned to McKinsey's west coast office for assistance with key
> [Gates Foundation] projects – and unexpectedly got the benefit of
> the passion and interest of McKinsey's most senior executive,
> Rajat Gupta, who soon contacted me to offer any personal
> assistance he could – independent of any business relationship we
> had with McKinsey. Rajat just wanted to see this new
> philanthropic endeavor succeed and volunteered to be a sounding
> board and guide throughout my leadership term.

Notably, even after the events of the past two years, a number of senior McKinsey executives who worked with Rajat have written to the Court to express their appreciation for his

---

students fortunate enough to receive a university education should do their utmost to set and accomplish important goals to benefit society as a whole."

contributions to McKinsey, to affirm the integrity with which he conducted himself over decades, and to reaffirm their respect and admiration for him today.  Ian Davis, Rajat's successor as McKinsey's Global Managing Director, states that "[t]he events of the last two years have come as a total shock to me, as to so many [and they] do not reflect at all my experience and observations of his character and integrity, and of his desire to serve others."  Similarly, 32-year McKinsey veteran and former Director Herb Henzler, states that Rajat "always impressed me [as] a person of integrity" and that McKinsey management "benefited immensely from his strong ethical foundation."  Former Director Anupam P. Puri, who spent 30 years at the firm, writes that Rajat's conduct "has been nothing but exemplary and inspirational" and that his leadership of McKinsey was "always guided by a sense of mission about doing the right thing whether in regard to individuals, clients or the Firm itself, even when that was the harder thing to do."  So, too, former Director Alistair M. Hanna (23 years at McKinsey) writes to the Court that, in forty years he has "never known him to do or say anything that was anything other than honorable and the truth."  Edward G. Krubasik, also a former Director (more than 20 years), states that Rajat "always embodied strong ethics and integrity."  And current McKinsey Partner Prashanth Vasu writes that "Rajat's integrity was beyond question in my books.  When I worked with him, there was not an iota of impurity in his intent."

●

Rajat was recognized as a leader and team builder early on at McKinsey.  He was the youngest serving manager when he headed its Scandinavian office at the age of 33, shortly after being elected Principal in 1980; was elevated to Director in 1984; and became head of the Chicago office in 1989.

Rajat's election to Global Managing Director of McKinsey at age 45 in 1994 was a testament to the high regard colleagues had for his integrity, approachability and leadership capacity.  In a process that forbids electioneering or even declaring oneself a candidate for the top job, the hundreds of McKinsey Directors around the world who participated in the secret ballot voting chose Rajat as their leader.  Above all, his election was a tribute to the fact that he always conducted himself ethically, professionally, and honestly with co-workers and clients alike.  According to Edward G. Krubasik, "[Rajat] was elected based on his sincere personality and everyone's trust in his strong professional values.  Rajat had stellar competition among the candidates as McKinsey had many great professionals at the top, but Rajat fit very well into McKinsey's value-oriented leadership role."  McKinsey Director Michael Muth (30 years with the firm) concurs:  "Adherence to the values of the Firm, i.e. putting client interests above the interests of the Firm or self-interests, matters more than economic considerations as criteria for the election of a candidate."

Rajat's election was an inspiration to many young Indians, for he had broken through the "glass ceiling" that had kept Indians from the highest posts in large U.S. multinational corporations.  Madhav Dhar, a successful financier who began his career at Morgan Stanley a generation after Rajat, explains that "Rajat's life story and career [were] inspirational and represented a gold standard of excellence and achievement. . . .  Rajat had risen through the ranks of the most competitive, professional, ethical and intellectual firm in the world – and that was truly special, unique.  And that he had done it with charm, self-deprecation, balance and an elegant reserve and comportment made it even more so."  In addition to serving as an inspiration to many looking on from afar, both before and after his election to Global Managing Director, Rajat would serve as a trailblazing mentor and advisor for a great number of aspiring

- 10 -

businessmen and women (many of whom have submitted letters) who benefitted from the

patience, engagement and wisdom Rajat offered to them even though his existing professional

and family responsibilities were, to say the least, significant.

Rajat remained at the helm of McKinsey for three terms totaling nine years, until he

stepped down in 2003, having instituted term limits that he applied to himself.  During his

tenure, as some of the firm's partners and employees left to participate in the late 1990's internet

boom, a number of those remaining wanted to institute structural changes that would have been

very profitable for partners, but could also have resulted in a deviation from the longstanding

ethic of putting client interests first.  Former McKinsey Director John Stuckey remembers that

there were "quite a few senior and influential partners who were urging the Shareholders Council

to sanction, even encourage, the firm to focus on e-commerce consulting and take equity in dot

com start-ups in lieu of conventional cash fees."  Rajat declined,

> gently [making] it clear that his own judgment was that
> [McKinsey] should not depart significantly from [its] traditional
> values and strategy.  The crux of this was not to be drawn [in] by
> the monetary gains apparently on offer, but instead stick by what
> was in the best long-term interests of the firm.  In the end this view
> prevailed [and if] it had not McKinsey would, in my opinion, have
> never recovered fully.  It would have been changed, for the worse,
> forever.

Former Director Herb Henzler remembers Rajat as "a man who stood by his principles for the

true professional approach.  'Do what is right' was one of his typical comments and 'let us

preserve the integrity of the Firm.'"

Rajat's steadfast adherence to the firm's principles became one of the selling points for

McKinsey.  Manoj Singh of Deloitte Touche Tohmatsu, a McKinsey competitor, explains:

"McKinsey under Rajat was a beacon for excellence, quality, forthrightness and integrity. . . .

- 11 -

Consulting is a profession in which one is successful only if 'you are doing the right thing even when no one is looking.'  Clients are very astute in their assessment of the behavior of consultants and the core values they embrace.  It is no coincidence that these very senior leaders in the corporate world saw in Rajat a person who was well-grounded, sincere, and trustworthy – someone who had earned their confidence."  Abbott Laboratories Chairman and CEO Miles D. White, who began his career at McKinsey, concurs:  "His reputation was always the foundation of Rajat's great success; and that reputation was well deserved and hard earned, through decades of unimpeachable behavior."  For Paul Fribourg, CEO of Continental Grain Company, a firm that has long worked with McKinsey, "Rajat and McKinsey were always one and the same.  They/he represent the highest standards of professional integrity. . . .  McKinsey is the best professional services firm we've ever worked with.  Rajat was McKinsey."  And James M. Kilts, former Chairman and CEO of The Gillette Company, recalls that

> [even after] Rajat became more involved in managing [McKinsey] rather than doing specific project work for me, I always valued him as a confidant and senior advisor on many difficult and important situations in managing my businesses.  He was always helpful, insightful and maintained confidentiality in all my dealings with him. . . .  During the time period that Gillette was in [merger] negotiations with P&G, Rajat was an invaluable confidant and advisor.  The deal was a little unusual in that both myself and A. G. Lafley decided to negotiate the deal without any bankers or lawyers.  It was just us, because it was a deal based on trust, respect, and honesty.  In connection with these negotiations, particularly when they broke down completely, there was only one person who A. G. and I trusted enough to call on; that person was Rajat.

Rajat's tenure as McKinsey's Global Managing Director was also marked by the firm's extension into emerging markets to complete the global footprint of the firm; the initiation of a technology practice; the creation of a Governance Task Force that fostered McKinsey's next generation of leaders and led to the creation of an approach to governance better suited to the much larger firm McKinsey had become, and which is still in place today; and his leadership of a

"concerted effort to expand McKinsey's service to nonprofit organizations and to contribute, in particular, to efforts to improve global public health." (Anil Soni). Rajat involved McKinsey in a number of pro bono projects for humanitarian organizations and encouraged an ethos of public service within the firm. In approximately 2001, "McKinsey . . . set up a Non-Profit Practice, to be a center of expertise and practice for non-profit work," recalls David Salinas, a consultant at McKinsey from 1999-2004 and a Global Fund Senior Manager thereafter. Rajat spoke at one of the first Non-Profit Practice conferences, "a strong and important gesture by the most senior and undoubtedly busiest person in the firm – and a gesture that I know many a McKinsey partner at the time would not have been inclined to make," recalls Salinas. "[H]e encouraged . . . the Practice to move forward boldly [and] I believe that his presence and talk on that day did much to inspire the early generation of non-profit leaders at McKinsey, at a time when they were facing a difficult uphill battle, to build and sustain a strong Practice and to be proud of doing non-profit work at McKinsey."

**B.      Family**

Those who have spent time with the Gupta family describe "the warm-hearted and loving environment in Rajat and Anita's home." (Veena B. Mendiratta). His sister-in-law, Mala Gupta, remembers that in his early days "[a]s a consultant [with] McKinsey, [Rajat] had grueling work hours and international travel. Yet, as soon as he came home, he would seamlessly transition into a model father and be perfectly at home changing diapers or feeding his toddlers." Anita Gupta concurs:

> A consultant's life is not easy, [a] lot of travel and unpredictable
> work hours. [Rajat] still found time to change diapers, give baths
> and walk colicky babies up and down all hours of the night. As
> [the children] grew older, he loved playing games with them.
> They graduated from chutes and ladders and go fish to monopoly,

> scrabble and bridge.  He loved working on math problems with
> them and looked really woebegone when he realized our oldest
> daughter had moved on to a math level he could no longer help
> with.

After "[t]hirty nine years and four daughters and two granddaughters," Anita says, "whenever I try to picture my husband in my mind, I see him tired and jet lagged sleeping on the family room couch with a baby sleeping on his chest.  That was always his favorite thing to do and his girls have always been the most important things in his life."

Despite his grueling work schedule, Rajat's third daughter, Aditi, says that he "was more engaged and more 'present'" as a father than he would have been "simply [being] around on a day to day basis . . . .  In a family of constant book readers," Aditi says, "my dad was the one urging us to put the books down, and pushing for more joint activities – card games, family breakfasts, even team room cleaning. He wanted to spend the time he had with us, not merely around us."  Geetanjali Gupta recalls that, during times when his job required him to travel extensively, "[r]ather than being apart from us for too long, our father would take us on trips around the world with him as he worked . . . .  I lost my first tooth biting into an apple in Paris, spent my eleventh birthday in London, and helped afflict a poor restaurant full of people with endless rounds of 'Old McDonald' as my family tried to keep my littlest sister entertained over dinner in St. Petersburg."

As his daughters entered adulthood, Rajat parented according to the philosophy illustrated by advice he gave to his daughter Aditi when she was struggling to find her way after losing her job in consulting:

> He counseled me to do what I loved, because otherwise success
> would always prove out of reach. He counseled me to think past
> the financial rewards, because no amount of money would make

> up for days, weeks and months passing by in frustration. Most
> importantly he showed me that if you are lucky enough to find
> something that you love, which you are truly great at, you can find
> a way to use your skills to make an amazing amount of positive
> difference in the world.

Consistent with this philosophy, Megha Gupta, "a visual artist, a painter and printmaker," writes

that her calling has "at times . . . been difficult for my parents to understand, as self-described

'math people' . . . [but] though I chose a career very different from [theirs], I never worried that I

would lack [their] support."  Rather, her father, through his own example, has taught her "that

you should find what you love to do, work as hard as you possibly can, and trust that your work

will have value."  And Geetanjali recalls that, "[d]uring my junior year of college, I decided to

suspend my studies.  I ended up going to cooking school for a semester and then doing non-profit

legal work for a semester.  Rather than getting upset or angry, my father was completely

supportive, even helping me research cooking programs."

"[Rajat] has always been incredibly patient with [his daughters], letting them try and find

their own passions and paths in life," explains Anita. "He [has] always listened, gently guided

and encouraged[,] and [been] there for them."  The various paths that their daughters have taken

in life are an emblem of Rajat and Anita's belief that their daughters can best serve the world by

realizing their full potential, wherever it may be found.

Rajat has supported his daughters by being their confidant, advisor, and champion.  Aditi

explains:

> I rely on him for guidance and support in things both big and
> small.  There are many people who have come to depend on my
> father, but none more so than my sisters and me.
>
> . . .

> There are many people who can be empathetic, and many others
> who can think practically about a problem, but I think it is rare to
> find someone who has both the compassion to soothe you in times
> of stress, and the ability to execute on the things that will help you
> move past a problem.  My dad has always been able to do both,
> which is probably why I, and so many others, turn to him first with
> any kind of problem.

He also shares in his daughters' triumphs, cheering at their graduations and tearing-up with pride

at his daughter Geetanjali's wedding.  "In the Gupta household each person's trials or triumphs

bec[o]me those of everyone else.  Plays, recitals, and birthday parties [are] attended by all family

members who [can] attend.  Those who [cannot are] sure to call and convey their congratulations

and regrets.  College acceptances, school graduations and awards achieved [are] celebrated by all

family members."  (Meka Nwanze).

Now that Rajat is also a grandfather, his eldest daughter, Geetanjali, writes that, "[a]s

wonderful of a father as he has been to me and my sisters, he is an even more dedicated and

doting grandfather."  Visitors during Meera and Nisa's infancy recount that Rajat was constantly

"holding at least one of the babies and sometimes two" (Liz Raun Schlesinger), or "chang[ing]

diaper after diaper with affection."  (Ling Hu-Kramer).  Rajat's son-in-law, Meka Nwanze,

notes:

> The Guptas moved into our house for the first two months of the
> twins' lives, to help us out with the tremendous job of taking care
> of two newborns.  Very often the Guptas would take over the care
> of the kids to enable Geetanjali and me to sleep.  Life would have
> been unspeakably miserable without the[ir] help . . . .  Since then,
> the Guptas have remained extremely involved in the lives of their
> grandchildren.  On many occasions they have made the over three
> hour drive from Connecticut to Boston to babysit their
> grandchildren.  Meera and Nisa absolutely dote on their
> grandparents and constantly express the desire to go to Nani's
> (grandmother in Hindi) house.

- 16 -

Since the untimely death of his parents, Rajat has been viewed by his extended family members as their leader and supporter – "a position that he has held with distinction for almost 50 years." (Kanchan Gupta). In this, Anita and Rajat share a sad bond – the untimely passing of their parents. Anita's mother passed away when she was 15 years old. Her father would pass away after Rajat and Anita were married, creating obligations for Anita, the eldest of four, to her younger siblings that paralleled Rajat's obligations to his and that the two of them together have carried out.

In the words of his niece, Nandita Gupta, Rajat has acted as the "patriarch" of his extended family, a term that encompasses being an advisor, model, supporter (financial and otherwise), and force for stability in the lives of many others both in India and the United States. Rajat "generously opens his home to [the] entire clan [of extended family], and whomever we bring along . . . puts others' needs before his own . . . maintains equanimity in the face of great loss – including his own – comforting others . . . [and] serves as a trusted advisor to each member of [the] family." Even now, in the face of the stresses of the past two years, as Geetanjali writes: "Throughout it all, my father has been amazingly strong, and his selflessness in the face of personal tragedy has made him even more of a role model for how I want to live my life."

Rajat's second daughter, Megha, explains that Rajat and Anita have many "'adopted children' . . . . I have seen many people drop 'Rajat' and begin calling my father 'Baba.' My father has the ability to make people feel that it is natural and right to depend on him." And in a very real way, the Guptas *have* adopted children, taking on the responsibility not just of looking after Rajat's brother and sisters, but also for "educat[ing], provid[ing] for and mentor[ing]

Anita's siblings . . . .  To this day, Rajat continues to father Anita's siblings, supervising them in

their professional careers and acting as a mentor in every way."  (Rajashree Sen)

     The story of Rajat and Anita's selfless care for Anita's younger siblings, Arvind and

Aninda Matoo, began even before Anita's father died in 1984.  Arvind had begun spending his

summers with Rajat and Anita even before that time, when Arvind was twelve.  As he recalls,

> I remember Rajat taking us to New York City, Six Flags in New
> Jersey, Washington DC, and Disneyworld.  I also remember us
> playing with the train set that he bought me as a birthday present.
> But of all the fond memories I have of sightseeing and
> experiencing the U.S., I most remember his willingness to look
> after others.  [One] summer, I happened to get very sick with
> malaria and Rajat looked after me like his own child – watching
> over me in bed with a 106 degree fever, cleaning up my vomit, and
> literally carrying me to the doctor's office.

     Arvind, who was just 16 when his father died, remembers that at the time, "Rajat took

charge of getting things set-up [financially].  . . .  He spent his entire vacation in India making

sure that all the appropriate arrangements were in place before he went back to Denmark."  Anita

stood to inherit when her father died, but "she voluntarily chose to gift her inheritance to her

younger siblings, as she felt that some of her siblings were still in school and college and needed

the money more than her. Rajat supported her decision wholeheartedly."  (Shyma Dar).  In

addition, "Going forward," Arvind writes, "I continued to visit Rajat and Anita both in Denmark

and in Chicago during my summer and winter vacations.  Their home practically became my

home, and it was similar to any college kid who goes home during break."

     Anita's younger sister, Aninda Matoo, who was in college when her father died,

remembers there being "a lot of social pressure" to get married in accordance with Indian social

norms that deemed her a burden to her older siblings once her father passed.  But "Rajat didn't

agree with the prevalent social norms and suggested I go to the USA for my MBA so as not to

get pressur[ed] into marriage.  He helped me choose the schools, guided me through the

laborious application process, and also lent me the money to help pay for my school."

### C.     Compassion, Kindness and Generosity

These letters from extended family members reveal Rajat's interest in others' dreams as

opposed to his own accomplishments, and his readiness to offer help to a person in need.  But

these characteristics were not only reserved for family.  They extended to Rajat's interactions

with friends, colleagues and acquaintances alike.  Anita Gupta explains that Rajat's "helping and

caring doesn't stop at our immediate families or even our extended families.  Rajat is always

there for anybody who needs a helping hand.  He gives career advice to any young or not so

young people who ask him, business advice or angel investments to any entrepreneurs starting

out, financial aid to students stuck for lack of funds, help with doctors and money for anybody

with a health problem and so on."  In the words of Rohit Bhandari, who met Rajat for the first

time when they discussed, for the "better part of an hour," Mr. Bhandari's career plans at age 22:

"It was difficult for me to believe that a man that humble, down-to-earth and friendly was the

leader of one of the most well-respected and storied companies in the world."  Tibby Heno, who

observed Rajat daily as his McKinsey secretary during his final term as Managing Director,

writes, "[Rajat] has never been one of those business leaders who are arrogant and domineering.

In fact, he is quite the opposite."

As with his approach to supporting his daughters' various pursuits, Rajat's generous

support of others is rooted in a philosophy that holds we are all entitled to realize our full

potential, and that it is in the interests of all of us that obstacles to that effort are removed.  It is

also rooted in Rajat's recognition that his love for his family should be the experience of every

family.  Suprotik Basu, a character witness at trial and current Managing Director of the office of the UN Secretary General's Special Envoy for Malaria, writes that it "became clear" to him through his interactions with Rajat "that [Rajat's] love for his own family was arguably the greatest driver for him to save other families – who deserved equal happiness and love."  As detailed below in Section II(D), this drive animated Rajat's humanitarian efforts on behalf of those who "did not deserve to be sentenced to a life of poverty simply because they . . . were born in Africa or, for that matter, parts of America."  (Suprotik Basu).

Following are excerpts from just a small fraction of the letters attesting to Rajat's empathy and generosity.  There are many more, each telling a unique story of how Rajat touched the writer's life during times of illness or financial or emotional need, through hours of mentorship; a word of kindness, consolation or advice; or an unexpected favor without the expectation of return or any benefit.

### 1.    Compassion and Support

Rajat has over and over again assisted his extended family and friends – and others beyond – in times of greatest need.  He and Anita provided not just financial help, but also their time, physical presence and emotional support.

- A number of letters recount Rajat's compassion and support during the illness and death of his nephew Sanjay, also known as Partho.  Rajat's sister Jayshree recalls when her "elder sister's only son was diagnosed with [acute mylogenous leukemia, a terminal] cancer when he was only 21.  . . .  [W]e were shattered [but] . . . Rajat in his calm [and] composed manner took charge of the situation" by ensuring his family had the necessary supports.  Rajat's sister and Partho's mother, Rajashree Sen, writes that "[Rajat] and Anita . . . devoted their every spare minute to providing moral, emotional and physical support to my son throughout his devastating illness and even more horrible treatment.  Whenever Partho was out of the hospital he would stay at Rajat's home.  His frequent blood transfusions were set up at Rajat and Anita's house, around which he carried his chemo bag and pump" (Rajashree Sen), and Rajat "took it upon

- 20 -

himself" to obtain a potentially useful drug for Partho when a physician was unable. (Prabir Sen).

When Partho "had to have a bone marrow transplant in Seattle far away from his native Chicago where his parents, friends and extended family lived . . . Rajat quietly arranged tickets for [Partho's] friends [and] family to visit him in Seattle from time to time so that they could cheer [Partho] up and spend time with him when he was undergoing treatment." (Jayashree Chowdhury). And Rajat himself "found the time to come to Seattle as often as he could to be with his very sick nephew." (Rajashree Sen). As Partho's health deteriorated, "[t]o fulfill some of Partho's last wishes," remembers Rajashree, "Rajat took us all for private helicopter rides and whale watching . . . My husband and I will never forget how we were able to fulfill some of our son's last wishes thanks to Rajat's limitless generosity of time, effort, money and anything else that he had to give." Manjusri Majumdar, a friend of Rajashree's, poignantly writes of the "last day of [Partho's] life at Northwestern Memorial Hospital after five years of battle with [his] disease. Rajat came running from the airport and stood by [his nephew's] bedside, touching his chest and reciting Slokas from Bhagavat Gita."

- Rajkumari Devi, Rajat's aunt, writes that in addition to supporting her financially since her husband's death in 1987, Rajat also provided "moral support" without which she would "[not be] alive. . . . He always visited [my] rented flat whenever he visited India. . . . Sometimes he would be nowhere near my apartment, and yet he would fly across the country to visit me. . . . After my husband's death[,] I had to go to [a] nursing home twice. I also had my eye operation within these years. Today[ ] I feel proud to admit it would not be possible without his financial help."

- Dr. Anjana Bhan, Anita's cousin, recounts the nightmare of being "diagnosed with kidney cancer [requiring] urgent surgery and subsequent chemotherapy" to save her life. "Gathering all his resources, [Rajat] immediately sent me a sponsorship letter to travel to [the] U.S.A. and took it upon himself to make arrangements for my appointments with doctors at Memorial Sloan Kettering in New York. Never for a moment did he hesitate to oversee all the arrangements. He could easily have distanced himself from the whole issue or even delegated the work to someone else, but he did not do so."

Dr. Bhan remembers that, in addition to providing financial assistance, "Rajat and Anita drove down numerous times from Connecticut to Washington DC, where I was in hospital, bruised and battered by a battery of scans, procedures, surgeries and chemotherapy. . . . Rajat and Anita would visit me in the hospital, hold my hand, comfort and encourage me not to give up my fight against this deadly disease." She says she will "never forget, how these two people, who led extremely busy lives and had numerous business, social and personal commitments, would take time off from work and home . . . and drive over 300 miles, often taking turns at the wheel, to reach Washington, stay with me to provide short breaks for my parents and husband while they kept vigil over me."

- Anita's sister Aninda Matoo recalls that years ago, when she suffered physical injuries and later suffered from "severe depression," Rajat and Anita visited her in Seattle – where Rajat was often meeting with the Gates Foundation – whenever in the area. "I remember Rajat pushing my wheelchair in the grocery store, making me cups of tea and playing cards with me endlessly," she writes. "After they left, many a night I couldn't sleep due to severe anxiety and would often find myself reaching for the phone calling Rajat. He would calm me down and repeatedly tell me that I was not alone and he and Anita were there to take care of me and my family. It didn't matter how important a meeting Rajat had the next day, he would wake up and take my call. If it were not for his support, I don't know how I would have gotten through this challenging phase in my life."

- Friend J.L. Matu recalls a time when Rajat was at his house in Denmark to play bridge. "During the evening hours, my wife got very sick and it began snowing very heavily. I told all my friends, including Rajat, to go as all roads [would] be closed soon. We called the doctor, who came to our home and prescribed some medicines. My wife needed to get the medicine soon, though, otherwise her high fever could cause damage to her brain. Just before the doctor left, Rajat appeared. I asked him why he hadn't left; it was now impossible to take any form of transportation, with icy and perilous conditions on the road. Without making it a big issue, Rajat took the prescription from the doctor and ran out to his car to go to the pharmacy. I tried to stop him and requested him to stay with my wife and kids, so that I could drive in the dangerous weather. He smiled and in a firm yet polite manner said 'Let me go before it gets worse.' He came back with the medicine after a few hours."

- Rajib Mehra, Rajat's cousin, writes that he is "personally grateful to [Rajat for] when my father Raj K. Mehrah . . . fell ill in the year 1996 and doctors advised . . . a critical urological surgery [that] was too expensive for us. As soon as [Rajat] heard the news he voluntarily sent money before I asked for it[,] anticipating our financial condition in those days." And Rajat's aunt, Smriti Mehrah, states that after paying for her husband's medical procedures, Rajat "extended his help well beyond the post surgery and rehabilitation period. When my husband died in 2001, he asked me to come down to [the] U.S. for [a] few months to stay with him . . . . I [was not] able to do that immediately. But he was very keen about that and I was finally in [the] U.S. in 2003 through his sponsorship for a couple of months to meet him and my other relatives over there."

- Krishna Gooptu, Rajat's cousin, remembers the years when his "father was bedridden with acute arthritis. . . . Rajat played a very important role in supporting my father through these years, both emotionally and sometimes financially. No matter how busy he was, Rajat would specially take time out to come to Calcutta and meet him, whenever he came to India. At other times, he would call from the U.S. and speak to him at length, offering advice and understanding. While I don't know all of the details of how Rajat helped my father, I do know that [my] father received comfort and solace from Rajat in many ways."

- Deepa Kaul, sister of Rajat's sister-in-law, recalls that when his father died, "Rajat made it a point to visit my mother and console her just like any close relative and his listening ability, humility and respect for all human beings came across so distinctly. He sat with everyone, listened to everyone and knew all the details of my father's last days."

- Rajat's bother-in-law, Mrinal Chowdhury, remembers, "My house help had serious heart problems and needed two valve replacements in his heart. I was trying my best to raise money from various sources as it is an expensive operation. [W]hen Rajat heard about this he immediately gave the balance money so that this boy could have his operation."

- Saket Khanna, son of a family friend, remembers when his "father fell gravely ill from a hospital infection after a heart surgery in India [and] [t]he doctors said that a medicine available in the United States could be a hope for saving my father's life." Rajat "was traveling to India from the U.S.A. at the time . . . [and] bought these exorbitantly expensive medicines for my father," refusing to accept repayment in return.

- Anita's aunt, Shyma Dar, recalls "when, in Chicago, [Rajat's] children's nanny, Barbara, was diagnosed with breast cancer. He took over the responsibility of her treatment as if she were his own family."

## 2.    Financial Support

Rajat routinely, and without being asked, provided financial support for the education and other needs of both family and friends. In addition to exemplifying generosity, the many stories of Rajat enabling others to pursue educational opportunities are emblematic of his belief that every individual should have the opportunity to reach his or her full potential.

- Rajat's sister Jayashree recalls, "As soon as he got a job with McKinsey & Co. [in 1973] he worked extremely hard and saved money to send to India so that we could build a family home as we had nowhere decent to live. . . . Rajat saved every penny he made and denied himself even many ordinary pleasures. . . . Within a year, he sent enough money, in installments, so that we could build our own house and escape the threatening insults of our former landlord. While he could easily have built the family home and registered it in his own name, since he was providing the money, he chose to give all the siblings an equal share in the property."

- Rajat's sister Jayshree tells of her dream of sending her sons to an American university. However, "I knew that I would never be able to realize this dream as I did not have enough economic means for such an expensive education. Rajat did not hesitate to put forward this money for both of my sons to continue their higher

education in the U.S. as soon as they secured admission." Jayashree's son Rahul writes, "When I did not have the funds to pay for my graduate studies, he, without hesitation, lent me USD 75,000 and never asked about when he would be paid back. . . . Had it not been for him guaranteeing my fees and paying upfront, I would not have [had] the opportunity to study at Kellogg."

- Rajat's sister-in-law, Mala Gupta, writes, "through the years I have witnessed large acts of generosity, as well as, small acts of thoughtfulness." In her own life, she remembers "[w]hen we miscarried our first pregnancy, [Rajat] sent us plane tickets to travel to Denmark, where [the Guptas] lived, for a 'change of scene' and for me to take the ECFMG, a grueling 6-hour-qualifying exam, given only to foreign medical graduates." When Mala and Rajat's brother Kanchan were back in New Delhi living on "meager government stipends as [medical] residents [and] could not afford a car . . . [Rajat] promptly bought us a bright red 'Maruti' – the first ever foreign automobile in India." When Mala and Kanchan moved to the U.S. with their two children, "[Rajat] was a huge support during [the] relocation. . . . We moved to Chicago to live with him as we were trying to secure residencies. . . . We did not have enough money at the time and he helped us financially to set ourselves up and also helped with our expenses as [we] were traveling for job interviews etc." (Kanchan Gupta).

- Anita's eldest brother, Avinash Matoo, recounts how, "[w]hen both of our sons were young and my wife was alone with them in Dehradun while I was posted at Uttrakashi, Rajat learned of the troubles my wife was having with our old broken down car. To help us out, Rajat presented us with a new car, for which we were incredibly grateful." Years later when it "became very hard to support my family on [the] government salary I was drawing . . . Rajat came forward and supported me both emotionally and financially for four years, during which he counseled me and helped me look for a more financially rewarding job. I eventually was able to secure a job with Motorola. When I suffered a stroke, Rajat was by my side, helping and supporting me through each medical procedure I had to undergo."

- Cousin Raju Mehra writes that Rajat "used to provide me financial aid" whenever his salary was inadequate, adding that "it was Rajat who provided . . . financial assistance to my son [so that he could go] to a good school."

- Harishwar Dayal, who grew up with Rajat and stayed close to him, tells of Rajat spending time with his handicapped relatives in their youth, and "creat[ing] Trusts for these same relatives from [which] they are receiving medical treatment and continuous financial succor for their lifetime." Likewise, Rajat's nephew Rohit Chowdhury writes that "Rajat has never forgotten his elderly aunts and uncles in India, many of whom are in their late 80s, ailing, and in need of emotional and financial support. Rajat keeps in touch with them via phone, letters and visits in-person whenever he can. He has also provided financial support to many of these relatives . . . ."

- Aditya Deb Gooptu, Rajat's nephew, remembers that his "aunt had a troubled marriage and was separated from her American husband who later passed away in

France. When the news of his death reached us, my aunt and her invalid[] father (my grandfather) were actually in dire financial straits and not in any position to go to France or take care of any of the legal proceedings. Rajat Gupta took up the entire responsibility of ensuring that my aunt received the money that her husband had left her. He hired lawyers at his own expense and pursued this matter tirelessly from across the Atlantic. After some months or years he managed to get the bequest settled and this went a long way in ensuring financial relief for my aunt and grandfather."

- Friend J.L. Matu recalls that when he revealed to Rajat that he was experiencing major financial difficulties that would force him to sell his family's home. Rajat "brought peace to [Matu's] soul" by speaking with him about his finances and reciting verses from the Bhagavat Gita, and "[a]fter a few days, without making it obvious, [Rajat] loaned [Matu] a considerable amount of money" without expectation of repayment.

- Bikram Singh, the son of an IIT classmate of Rajat's, describes how he "arrived in America in the fall of 1993, at the age of seventeen, to attend school in Chicago. At the time, my family had just enough money to pay for my airfare and first semester of tuition. Despite my boundless sense of optimism, it did not take me long to realize that I could not make ends meet. . . Through sheer luck I learned that Mr. Gupta . . . had been a classmate of my father's at IIT Dehli. My father initiated an introductory phone call and within a week I found myself invited to visit the Gupta family residence. . . . Destitute and feeling desperate, I was acutely self-aware and promised myself to not exhibit any such emotions during my visit.

  "I was met by Mr. And Mrs. Gupta, who greeted me warmly and introduced me to their family. Within an hour I found myself feasting at the Gupta home . . . [and] [t]he conversation shifted to how I was doing in college and it was at this moment that the emotional floodgates opened up; I could not stop myself from sharing my feelings of despair with Mr. Gupta. I was mid-sentence when he put his arm around me and told me to not worry about the finances and instead to focus on doing well in school. I was not sure what he meant considering that only money would solve my immediate problems. Before I knew it, Mr. Gupta was offering to underwrite my education expenses."

- Julie August, who lived and worked on the Guptas' Colorado ranch, remembers of Rajat: "If we ever needed extra money to fix a broken down vehicle, or to replace one of our appliances, he never hesitated in giving it to us. He even gifted me with a plane ticket to Virginia to go to my cousin's wedding in 1994, after he learned that I hadn't seen my cousin for several years. It was a very special occasion. Without Rajat's help, I wouldn't have been able to go on a trip like that.

  "In 1995, my brother was killed while responding to an emergency as a volunteer fireman on the Brush Fire Department in Brush, Colorado. Rajat immediately sent a memorial contribution to my brother's widow and two young sons, and condolences to all of my family. A year later, Rajat provided me with a plane ticket to the national Fallen Firefighters Memorial Weekend held in Emmitsburg, Maryland, where my

brother was honored along with all of the other firefighters that had passed away in 1995. . . .  I am so grateful to Rajat that I could attend such a meaningful ceremony."

- Meka Nwanze, now Rajat's son-in-law, remembers first meeting Rajat when he was dating Geetanjali Gupta.  "I was warmly accepted by the Gupta family. Their home quickly became my home-away-from-home [in Nigeria].  I spent my vacations with the Gupta family.  When my apartment in New Haven was over-run by rats, I took shelter at the Gupta residence.

   "[And] Rajat [made] my being an ophthalmologist possible.  [W]hen I was in medical school, I was on a student visa, and was thus ineligible for federal educational loans.  My family had limited financial resources, because my father was a Nigerian civil servant – and was paid accordingly – and my mother was a homemaker.  I had to seek private loans to finance my medical education. Rajat initially co-signed my loans, and when these proved inadequate, he provided me with zero percent interest, pay-when-you-can-afford-to-do-so, loans to finance my medical education.  Although the argument could be made that Mr. Gupta financed my medical education because he saw me as his future son-in-law, I do not believe this to be the case.  In fact I know several other people, unrelated to Rajat, whose educations were financed with Rajat's assistance.

   "Rajat believes in human potential and feels that it is the duty of anyone who can to nurture and support it."

### 3.  Acts of Kindness

As numerous letters attest, Rajat regularly went out of his way to offer a kind word or helping hand, in ways both large and small, that deeply touched the recipient.  These acts of kindness were performed as a matter of course, and without expectation of anything in return.

- Sudha Rani, who knew Rajat during his boyhood in India, "remember[s] very well the support he provided me when [my] younger daughter was born, while my husband was away, like brin[g]ing medicines from the chemists and items of use from home. Rajat visited me every day, without fail.  I so looked forward to these daily visits.  One such day, when he did not come over and I enquired, he told me that while on his way to our place, he saw a man who had met with an accident and decided to take him to the hospital."

- Gopi Mathur Sharma, who came to know Rajat and Anita in Denmark, writes that "at the time that I met Rajat I was living in a very tumultuous marriage.  During one particularly bad fight, my now ex-husband threatened to throw me and my one year old son out of the house.  Some friends informed Rajat and requested him to intervene.  At that time, Rajat was travelling, but upon his return he drove straight from the airport to help us – ignoring his own exhaustion and desire to get home and

- 26 -

see his family. He came to guide us, to counsel us and to find a way forward. In response to my ex-husband's statement that he gets violent because I aggravate him, I remember Rajat clearly saying that there is no excuse at all for violence. . . . Rajat's intervention helped in calming [my then-husband] down and us working towards a less volatile environment in the home. Rajat fairly and lovingly counseled us many times and when I had nowhere to go or anyone to reach out to, having no family of my own in town, his home was always open to me and my child. " Neel Mukund Kaul, son of Ms. Sharma and now a student at the Indian School of Business, remembers that "through [Rajat's] solid advice, I could see, even as a young child, how much more peacefully my parents could live. He has always been a tempering hand, and even in this, was able to help two very different individuals bring about a peace that two children (my sister and I) could palpably feel."

Ms. Sharma continues: "Rajat always encouraged me to be fearless and to find and live my truth. He gave me a sense of self worth which I had totally lost in my marriage. Rajat did all this for no other reason than his perpetual need for making this world a better place to live in, contributing in any way he could, without any thought of personal gain . . . ."

- Harishwar Dayal, who grew up with Rajat in India, writes, "When my elder sister died in a road accident in 1995, and my mother passed away in 1996 – on both occasions, Rajat flew from the U.S. to be with us, always deeply concerned and giving immense comfort."

- Atul Kanagat, who worked with Rajat at McKinsey in Chicago, recalls "an accident that shook [him] to the core" in 1995. "While returning home from the Post Office with my daughter one morning, we were entering our neighborhood when an 8-year-old boy darted from behind a bush on his tricycle right in front of my car. Unable to stop in time, I hit the child with the car and knocked him unconscious. The next few hours were excruciating as the police investigated the incident and submitted its report clearing me of any fault . . . . The child was in the hospital, his condition uncertain. During the tormented hours that followed, Rajat was the one person who dropped whatever he was doing and spent the rest of the day in my company as we waited for the report from the hospital. He didn't really do anything other than simply sit with me; it was the most generous and caring thing that anyone had done for me in a long time. Once the incident was over, the boy miraculously recovered with a few broken bones and bruises. Rajat left after making sure I was OK and never mentioned the incident or his role again."

- Jody Cohen Robbins, who befriended Anita after working together at the book store of their children's school and "learn[ing] that Jewish mothers and Indian mothers are cut from the same cloth," writes that "[i]t was a year or so after we had become friends when Anita and I were having coffee and my husband called extremely distraught after leaving his dying father's bedside. Without hesitation, Anita invited us over for dinner, insisting that a table full of chatting and friends was exactly the cushion needed against the realities of an impending loss.

"We arrived at dinner the same time Rajat did, looking weary from his work travels, but welcoming us in nonetheless. Through dinner it was Rajat who talked with my husband, keeping him laughing and busy. After dinner I drove home, but Rajat insisted that my husband stay. Rajat spent the long hours of the night handing my husband several glasses of scotch and allowing him to even beat him once or twice at scrabble, before finally driving him home at 2 a.m. Rajat had not known my husband long, but that did not matter. He saw that my husband was struggling with the impending loss of his father, and Rajat sympathized. . . . Rajat didn't need anything from my husband, he had no ulterior motives. He didn't have to stay up talking and comforting, but he did."

- Karuna Kumar, a lifelong friend of Rajat's sister Jayashree, writes, "After I got married and moved away from New Delhi, I lost touch with Rajat for several years. Even so, in 2004, when my daughter went to the U.S.A. for her undergraduate studies, Rajat and his family recognized that she was new to the U.S. and didn't have any family around her. They made it a point to get in touch with her and invite her to their family home for her first Thanksgiving in the U.S.A. Rajat had never even seen my daughter before but he welcomed her into their home, spent time on getting to know her and made her feel like she too had family in the U.S."

- Neighbor Robert Browne writes, "One time, as Rajat and I were looking at pictures of my family in my hallway, we talked about my brother, Roscoe, who died of AIDS in 1985. I told Rajat how I miss my brother every day and also about the many, many other people that I have lost to AIDS. Rajat then shared with me the losses he experienced, specifically friends who died of AIDS while he was at Harvard Business School. Rajat talked about how much their loss affected him and how he so very much missed those people. Rajat's compassion and experience of the same was so comforting to me."

- John P. Sorin, a friend from the Chicago area, remembers "the kindness and loyalty that the Guptas showed to me and my wife [at the time of] the untimely death of our son. Rajat and Anita could tell how much pain we were in so they wanted to take us away from our loss by offering to have us stay with them in their home in Colorado. We cannot forget such loyalty and generosity."

- Nidhi Reddy, then a student at the Indian School of Business (ISB), tells of having met Rajat just once before the "next time I met him . . . at the graduation ceremony of the Class of 2006. This was the class I would have graduated with but unfortunately I was forced to take a leave of absence due to a diagnosis of Leukemia earlier that year. I . . . was there to cheer my friends and classmates during the convocation. Rajat saw me sitting in the audience, remembered me, and sought me out once the ceremony was over. . . . Not only did Rajat know my name and recollect our previous conversation, but also was genuinely concerned about why a student hadn't graduated on time. I was extremely surprised that a person of his stature would be bothered about one student. On knowing my medical condition, he didn't offer any platitudes, but asked me if there was anything he could help with, and told me that I had to come

back and complete the course once I felt better.  'Be an inspiration to others' he said, and I have never since forgotten that."

- Rakesh Bhan, "cousin" by marriage, remembers the "moral support and comfort" offered by Rajat and Anita after Rakesh suffered a stroke.  "Even while travelling on business, he would call my wife to inquire about my well-being."

- Friend Vinod Gupta writes that "[w]hen my son Benjamin passed away at the age of 28 on December 19, 2011, [Rajat] and his wife were the first to call me and fly out to help our family cope with our grief."  Similarly, Uday Khemka, writing on behalf of the Khemka family and its philanthropic Foundation, offers that "[i]t is a tribute to Rajat that even in the midst of his own recent challenges he has never lost focus [on] what is important ethically in his relationship with others.  Even through these last weeks he has consistently communicated with our family to ask after the health of my mother who is suffering from heart related medical issues."

### 4.     Mentoring, Guidance and Support

Rajat has mentored, guided and supported countless individuals, helping them to reach their full potential, and has deeply touched and influenced their lives in the process.  By way of example:

- Garfield R. Beckstead, who worked with Rajat at McKinsey, writes that Rajat "mentored many younger colleagues and set a strong positive example for them as they progressed in their business careers.  For me personally both when I was with McKinsey and as I developed my own private businesses, Rajat was consistently the positive benchmark that I used for myself whenever ethical questions arose and when I was required to make business decisions involving difficult principles of confidentiality, fairness, and honest dealing.  He was always the example that I looked to and asked myself 'what would Rajat do in a situation like this.'  That belief in Rajat's fundamental integrity and honesty continues through to today."

- Friend Anjan Chatterjee, who has known Rajat since they attended secondary school together, recalls his skepticism as to his own likelihood of being accepted into a top business school.  "Rajat counseled me over the next year and a half, hours at a stretch about how to position my candidacy, helped tighten up my essays and would give me the occasional pep talk when he saw my motivation and intensity level flagging.  I did make it to Stanford Business School[,] an event that transformed my life . . . .

  "I shall never forget how I felt when during my first year, Rajat flew me out from California to spend Christmas with [him and Anita] in NJ because they sensed I was lonely and needed a boost."

And when Chatterjee decided he wanted to work at McKinsey, "[h]ere again, Rajat spent hours coaching me about the interview process – we even did mock interviews – [and] gave me the confidence to believe that I was good enough[;] all in in all it seemed like a repeat of the work we did in getting me to go to business school . . . ."

- Salil S. Pitroda remembers that his "personal relationship with Rajat began in 2001 when I was trying to decide whether to apply to business school. Despite his busy schedule as the CEO of McKinsey, Rajat spent an hour speaking with me and getting to know me as a person while offering me his perspective on the risks and benefits of pursuing business school versus continuing to work.

  "Over the years we developed a deep relationship . . . .

  "Rajat was one of the only people who supported me . . . through the most difficult personal and professional period of my life [when I lost my financial services job after the Lehman collapse].

  "What I remember most about that time period are the conversations in which Rajat helped me to break out of judging myself by the constraining and myopic value system of Wall Street. He taught me that money was not the way to keep score but that the values of integrity, honesty, teamwork and respect for others are what matter most. Rajat gave me a grounded perspective on what is important in life and how to create a fulfilling career that makes a difference in the world, in essence saving me."

- Pramath Raj Sinha, Founding Dean of the Indian School of Business, writes that Rajat "was the first to offer financial help when I started my current entrepreneurial venture – putting in the seed funding that attracted many others, connecting me to others who would help build the business. In all this he has never even bothered to ask how his investment is doing or push me for quick returns as many investors tend to do."

- Dr. Rajan Shanti Sadanandam, Director of Global Health Innovations at Dubai Heart Centre in Dubai, United Arab Emirates, writes that Rajat "has been an inspiration to doctors like me. . . . [D]uring one of our conversations on the choices we make that impact on the largest public good, he shared with me his singular belief that we as gifted individuals must channelize our energies, our talents, our contacts towards agendas that improve the health of families, communities and countries. He was a sincere a strong believer in the great words of the father of our nation Mahatma Gandhi that we must become the change we hope to see in the world."

- Pavan Ahluwalia, who in 2006 was being recruited to return to McKinsey from graduate school, writes that "[a]t the insistence of [a] McKinsey partner, I had a telephone conversation with Rajat, expecting to have to defend my reasons for not returning to the firm. To my considerable surprise, he listened intently, understood why I was making the decision I was making [not to return], and told me that he objectively thought it was the correct decision for me. Rather than try to 'sell' his

firm, or score a point in the recruiting process . . . he was able to put my own concerns front and center and evaluate the decision from my perspective.

"Over the years that followed . . . I found him to be and incredibly generous and wise mentor.  . . .  [H]e went out of his way to introduce me to people, and when I decided to start my own investment firm, he became one of my first investors, as he had been for several young McKinsey alumni starting off on their own.

"Rajat never once mentioned money or wealth creation while discussing either his own involvement in principal investing or my career choices."

- Vaughn Crowe tells the story of his father being "diagnosed with kidney failure [when Vaughn was fifteen], and as a result he was no longer able to work and provide for our family.  . . .  This unfortunate occurrence placed me on a path that was focused entirely on financial success, which I desperately desired."

  Having joined Ray Chambers' MCJ Amelior Foundation after spending some time in the insurance industry, Crowe "traveled to South Africa to assist Ray with the launch of The Elders . . ., an independent group of global leaders who work together for peace and human rights . . . brought together by Nelson Mandela.  Rajat served as a key advisor . . . and also brought senior professionals from McKinsey & Co. to assist with establishing the infrastructure of the organization."

  Crowe writes, "I managed to spend some individual quality time with Rajat, where I explained my story.  His advice changed my life.  . . .  I told him about my plans to go to business school, and he asked the magical question, 'why'?  I responded 'to transition from insurance and non-profit work to investment banking and begin making tons of money.'  Rajat looked at me, closed his eyes, and shook his head. He said there is more to life than making money; you have to make a difference in the world.  Since that day, his words have been cemented in the forefront of my mind, and I consider those words in my entire professional decision making.

  "After my discussion with Rajat, I decided to remain with The MCJ Amelior Foundation and have worked tirelessly to improve the lives and the quality of life for the most underserved in Newark, NJ."

- Vincent C. Nwanze, father of Rajat's son-in-law Meka, is blind.  He writes that during the first meeting between himself and his wife Rosemary with Rajat and Anita, "[o]ne morning . . . Rajat took me for a long walk along the beach in Westport.  What he tried to do was something that has stayed in my memory ever since.  He had observed, I believe, that I did not go anywhere, even indoors, without the assistance of Rosemary.  During that long walk, Rajat was on a mission, trying, with gentleness, purpose, astuteness and cordiality to get me to walk independently.  He would put a guiding arm around me, then let me go for a while and ask me to navigate the path unaided but always a few steps behind, directing me to go left, right or straight.  In issuing his direction, Rajat was so gentle and caring, but so determined that I simply had to take in everything with both gratitude and humility. He advised that I get a

- 31 -

cane.  With discreet and gentle persuasion, Rajat convinced me to start the process of seeing without vision, of gaining confidence in my ability to navigate the world on my own terms.  I will never forget this."

A universal quality of these interactions is that Rajat had nothing to gain from them, a fact of which many writers make note.  For example, Peter Dolan, the former CEO of Bristol-Myers Squibb, who left the company because of a pending regulatory inquiry (in which he was not charged), writes to the Court that, at the time of his

> unplanned exit from Bristol-Myers Squibb . . . [m]any business associates I had known for decades were surprisingly invisible. . . . [M]aybe a little jaundiced by what was happening . . . I wondered why [Rajat reached out to help].  He clearly was at the peak of his game [as then Global Managing Director of McKinsey], I hadn't known him that long and I clearly was not going to be hiring McKinsey to begin a series of profitable consulting assignments.

But when Rajat sat down with Dolan to discuss the future, Dolan remembers that Rajat

> was totally non-judgmental, not particularly interested in what had happened at Bristol-Myers Squibb and very much treated me as an equal.  He clearly had no agenda other than to be helpful.

Rajat followed up a year later to learn about Dolan's new projects and to offer assistance, "again [with] no other agenda than to be helpful."  Revisiting his initial skepticism today, Dolan asks:

> So why do I think Rajat was one of very few individuals who made the effort to connect when he clearly didn't need to and I did not really expect him to do so?  All of my interactions with him suggest he is a person of unusual substance, character and integrity who thought he could be helpful to me and needed no more rationale than that.

This generosity is a core character trait, an essential part of who Rajat Gupta is.

KL3 2899754.1

### D.     Humanitarianism

During his years as McKinsey's Global Managing Director, Rajat devoted increasing amounts of his time to large-scale humanitarian causes.  Right from the outset of his tenure as Global Managing Director in the mid-1990s, it was clear to those who knew him that Rajat

> cared so very deeply for those in poverty . . . in India and elsewhere, how he had a compelling and caring vision of what to try to do about it and how he wanted to use his position of influence to make that change happen.  [He] shared with us his vision that, if you wanted to raise millions out of poverty, you needed to create strategic change and that that could only happen through the establishment of world class institutions in India that could have great multiplier effects.  He wanted to do this in multiple domains touching education, healthcare and philanthropy.  He believed he could rally people of power and influence who might ordinarily focus on self-serving goals but who[] he believed could be inspired to do the right thing and to come together to make real change happen for no other reason than to improve the lives of many.

(Uday Khemka).  His efforts continued and grew after he voluntarily stepped down from the Managing Director position, leading to improvement of countless lives, and making him a major figure in the world of public health, international education, and philanthropy.  While those immersed in the world of philanthropy know of Rajat's involvement – thus, for example, Barry R. Bloom, former Dean and current Distinguished Service Professor at the Harvard School of Public Health, who has "worked in global health for 40 years," writes to the Court that "with the sole exception of Bill Gates, no leader of the private sector or corporate world has invested so much of his time, energy and personal credit to do so much for the poorest people of the poorest countries than Rajat Gupta" – his work is largely unrecognized by the general public.  This is because, in the words of Suprotik Basu, Rajat did not engage in "the spotlight seeking philanthropy we so often see today.  [He] is a man who feels he is most effective out of the spotlight, allowing him to give credit to others, and who believes that solving complicated issues requires absolute immersion in the topic at hand."  Raymond Chambers, the UN Secretary

General's Special Envoy for Malaria, Founding Chairman of the Points of Light Foundation and Co-Founder of America's Promise, agrees, explaining that in the course of "my philanthropic life . . . [n]ot only is [Rajat] the most strategic and clearest thinker I have come across, but his shunning of publicity and desire to fully immerse himself into any problem is unparalleled."

A number of influences, general and particular, have driven Rajat's humanitarian contributions. At the most general level, in the words of Raymond Chambers, "philanthropy and humanitarianism [are] a core part of his belief system and spirituality." Rajat holds it as a matter of faith that part of living a good life is making a positive difference in the world, and he has found inspiration in the Bhagavad Gita and its message of "selfless action" and the performance of duty without reward. Berkshire Hathaway's Ajit Jain, who the Court will recall was a witness at trial via videotape, writes that Rajat "customarily chided me during our social meetings to become more active [in] philanthropic causes, as he viewed such activity to be the obligation of those who have been particularly fortunate in life."

His devotion of a great deal of his energy to improving the lot of India and its poorest citizens in particular grows out of his desire to give back to the people and the country that have given him so much – his IIT education among other things – but where so many are less fortunate. Rajat's work for India's poorest is also a tribute to the memory, and a continuation of the legacy, of his father who fought and died for the country's independence and prosperity.

Of his reasons for involvement in the fight against AIDS, Tuberculosis and Malaria, Dianne Stewart of the International AIDS Vaccine Initiative remembers a dinner prior to a Global Fund Board meeting at which Rajat

- 34 -

KL3 2899754.1

spoke passionately about his college roommate, a dear friend and
fellow student with whom he had bonded as an undergraduate and
with whom he had stayed close friends.  The later death of that
friend from HIV-related causes had been a personal tragedy, he
explained, and it was this experience most especially that drove his
determination to contribute to significant change in the way the
world responds to devastating diseases such as HIV.  He spoke
also of the poverty in India, noting that the burden of disease there
and in Africa contributed to the cycles of poverty and early death
that needed to be broken.

When his friend Ash Gupta asked Rajat why he was involved with the Global Fund, Rajat

answered, "If I live my life feeling that I saved the life of just one human being, I would feel the

life was worth living."

Letters from those who worked with Rajat on various humanitarian projects repeatedly

note that he did nothing for the sake of personal recognition, aggrandizement or benefit.  Rather,

those who worked with him remember that Rajat was refreshingly free of any hidden agenda in

devoting his time, thought, and energy to moving his home country forward and helping the

world's disenfranchised.  In founding and leading educational and humanitarian organizations,

Rajat unswervingly sought to do what he believed was best for the people to be served, not for

himself, and not for the parochial interests of any constituency that had lost sight of the greater

good.  In a number of institutional contexts, he steadfastly defended merit-based decisionmaking,

which was not always immediately popular, rather than bowing to pressure to reward class,

caste, wealth, name, influence or power.

### 1.    The Global Fund to Fight AIDS, TB and Malaria

We recently celebrated the Global Fund's 10th anniversary, but I
believe that might never have come to pass if it had not been for
Rajat's strong leadership and advocacy in the Global Fund's early
days.

> Bill Gates, Microsoft co-founder and
> the creator of the Bill & Melinda
> Gates Foundation

Rajat has a right to be proud of his work at the Global Fund, and
millions of people are alive today because of his leadership.

> Kofi Annan, former Secretary
> General of the United Nations

In 2002 Rajat became a Member of the Board of the Global Fund to Fight AIDS, TB and

Malaria, an organization whose mission is to increase resources devoted to fighting those

diseases and to direct resources to areas of greatest need.  In the ten years since, the Global Fund

has "saved 7 million lives and improved the wellbeing of hundreds of millions of people," and is

a rightly celebrated institution.  (Sir Richard Feachem).  Characteristically, Rajat's involvement

in the Global Fund was principled, selfless and not without risk.  As lifetime HIV/AIDS activist

and Executive Director of International Civil Society Support, D. Peter van Rooijen, remembers:

> Rajat was there from (almost) the beginning of the Global Fund
> and this actually required courage – the private sector was at the
> time not yet per se in favor of such a public acknowledgement of . .
> . corporate social responsibility – without any rewards.  There were
> no financial gains, and not even gains in terms of credibility or
> respectability.  In many ways the Global Fund was an experiment
> and 'risky business' due to its innovative approach in global
> health, and Rajat actually did not gain – I would argue: on the
> contrary, he actually 'brought' credibility to the Fund.

And he brought far more than his credibility to the Fund during his tenure, attests Sir

Richard Feachem, a character witness during trial and the Founding Executive Director of the

Global Fund and former Under Secretary General of the United Nations:

> Rajat made substantial and invaluable contributions in two ways.
> First, he was an exceptionally dedicated member of the Board,
> leading the private sector delegation.  He was a regular, well-
> briefed and well-informed participant at the three meetings per
> year of the Board, and at Board Committees and other Board

- 36 -

> events.  This must have consumed several weeks of his time each
> year. And, as the global managing partner of McKinsey at the time,
> his time was very valuable.
>
> Rajat played an invaluable role as wise counsel and mentor to me,
> assisting me to navigate the stormy waters of the first five years of
> the Global Fund.  I relied heavily on Rajat's business acumen and
> consulting expertise, which he always readily provided.  In those
> five years, with Rajat's assistance, the Global Fund grew from
> scratch (no money, no office, no employees) to have assets of
> US$12 billion, supporting hundreds of programs in 140 countries
> and saving millions of lives.

In 2007 Rajat was elected the Chair of the Board of the Global Fund, a "historically

remarkable" achievement, explains Sir Richard, because Rajat headed the private sector

delegation while "[t]he Board is primarily composed of representative[s] of governments." Sir

Richard attributes the Board members' willingness to elect Rajat to "their respect for him, their

awareness of his dedication, and their confidence in his competence," and adds that

> [t]his decision to appoint Rajat as Chair is the strongest possible
> testament to his character.  It was not taken lightly or naively.  It
> was taken by numerous senior government officials, from the
> U.S.A. and many other countries, after serious consideration and
> close examination of Rajat's personal and professional qualities.

John E. Tedstrom, President and CEO of GBCHealth (formerly the Global Business Coalition on

HIV/AIDS), adds that "[Rajat] didn't seek this 'promotion,' and didn't run for it.  To the

contrary, he was urged by the Global Fund's many constituencies to take the role."

Rajat's tenure as Chair was pivotal in the Global Fund's short history.  Board member

van Rooijen notes at least "three substantial changes that [R]ajat brought to the Global Fund that

subsequently have contributed to saving the lives of at least thousands of people and [brought]

change to the lives of millions of people."  He lists the Global Fund's transition to independence

from the World Health Organization, the transformation of the Global Fund from a financier into

a strategic entity, and the coordination of a global response to malaria as highlights.  Todd

Summers, a character witness at trial and a former representative of the Bill & Melinda Gates

Foundation on the Global Fund's Board, credits Rajat with bringing to the Global Fund a new

approach that "involved rigorous technical review of funding proposals" for their capacity to

save lives, as well as an accountability-based grant management system. Rajat increased the

"strategic discipline" of the Fund, writes Summers, which has "meant more effective use of

Global Fund grants, and that translates – quite literally – into lives saved."  Oliver Sabot, Chair

of the Global Fund's Market Dynamics Committee and Executive Vice President for Global

Programs at the Clinton Health Access Initiative, adds that Rajat

> created, despite the initial resistance of more traditional Board
> members, a committee of the Board focused exclusively on getting
> better value for the more than $7 billion the institution was
> investing in the purchase of health products. . . .  [He] saw that . . .
> negotiating on behalf of the pooled purchasing power of the
> institution could improve the value the Global Fund was getting
> from the funds and his vision has already led to new strategies that
> will save the organization nearly $1 billion over five years –
> money that can now be used to reach millions more people with
> life-saving drugs and other products.

Speaking generally of Rajat's leadership tenure, John Tedstrom writes that

> [a]t the end of his term the Global Fund's prestige was raised, its
> budget grew and its effectiveness was enhanced. It became more
> transparent and accountable to the public. . . .  [Rajat] dedicated an
> extraordinary amount of time and energy to this cause and did so
> selflessly and with a commitment to saving the lives of millions of
> people who will never know his name.

Ambassador Mark R. Dybul, the former United States Global AIDS Coordinator, adds that

> [Rajat's] strong character and impeccable integrity in the service of
> others were major factors in creating a much stronger Board,
> bolstering the organization overall.  [He] gave freely of his own

KL3 2899754.1

> valuable time and committed countless hours to the betterment of
> the Global Fund becoming by far the most active Chair it had.

A number of letters speak specifically to Rajat's efforts in the fight against malaria, with Melanie Renshaw, Chief Technical Advisor for ALMA (African Leaders Malaria Alliance) and Senior Health Advisor at UNICEF, offering that "Rajat is one of the few people in the world who can honestly say he has saved the lives of one million children."  D. Peter van Rooijen concurs, explaining that the joint plan to combat malaria that Rajat shepherded "has directly led to a tripling of the level of investments [above] the start of [Rajat's] tenure, a changed architecture in terms of planning and delivery and – most importantly – thousands of infections being prevented and illness due to malaria being cured, and thousands of lives being saved – there are estimates circulating that to date near to a million lives of children have been saved since [Rajat] changed the way of doing business in malaria."

Steven Phillips, a member of the Board of Malaria No More (a nonprofit organization dedicated to ending malaria in Africa by 2015) and an advisor to the UN Special Envoy for Malaria, tells of a particularly important contribution: Rajat's advocacy on behalf of the "Malaria Scorecard."  The Malaria Scorecard is a simple but innovative approach to ensuring accountability of aid donors, recipient countries and program-executing NGOs to each other with the goal of decreasing waste and increasing the number of lives saved by humanitarian efforts. Phillips remembers seeking guidance from Rajat on how to get difficult-to-penetrate institutions such as the World Bank, USAID, and the Gates Foundation to adopt the Malaria Scorecard, expecting a "cool, detached, imperious reception."  Instead, as he describes for the Court:

> I got a careful and sympathetic hearing, lots of incisive questions,
> thoughtful strategic advice, and most significantly a personal
> commitment to help.  Over the next months and years Rajat
> became a campaigner for "The Malaria Scorecard."  It has now

KL3 2899754.1

> been adopted by nearly four dozen African heads of state and most big development players [and] is now broadly seen as the catalyst to a new way of doing business in the foreign aid arena.  This would not have happened without Rajat's heartfelt hands-on involvement.

Similarly, Dr. Renshaw recalls that Rajat, as Chair of the Global Fund, laid the groundwork for her organization to fill a major funding gap and "scale up life-saving malaria control interventions throughout Africa."  She writes that studies are "documenting significant declines in malaria in Africa, in fact a 33% reduction, and this can be traced back directly to the Global Fund's financing secured when Rajat was chair of the board, and when, thanks to him, we secured more resources to control malaria than ever before."  Olayemi Sofola, a Nigerian doctor who was Director of his country's National Malaria Control Programme until 2009, details Rajat's engagement in securing funding for aggressive anti-malaria efforts and adds that "it goes without saying that Rajat Gupta has, in no small measure, contributed to Nigeria protecting her people from malaria and becoming healthier and happier people."

### 2.    The Public Health Foundation of India

> Rajat's most remarkable achievement was to establish the Public Health Foundation of India (PHFI), which does work of extraordinary reach and effectiveness in enhancing the medical and health care opportunities of Indians, particularly from the bottom layers of the society. Rajat conceived of the idea of having such a foundation, devoted a great deal of time to planning it in a way that would make it efficacious, helped it with its charitable contributions, and led it in its formative years as the Chair of its Board.

> Amartya Sen, Harvard University's Thomas W. Lamont University Professor, Professor of Economics and Philosophy, Nobel Prize Winner in Economics (1998), and PHFI Board member

- 40 -

Rajat is also considered the "principal architect" of the Public Health Foundation of India (PHFI), a public-private partnership he founded and chaired that has brought together governments, NGOs, academia, and the private sector to address health and nutrition in India among other challenges.  (Kiran Mazumdar-Shaw).  PHFI's signal accomplishment has been the establishment of Institutes of Public Health throughout India.  These Institutes endeavor to provide education and research relevant in the context of India, while attaining standards comparable with the finest public health institutions in the world.  As explained by PHFI supporter Bill Gates, "Today, there are institutes in Delhi, Gandhiagar, Hyderabad and Bhubaneswar that provide graduate degrees, diploma programs, training courses and certifications that are fundamentally improving the well-being of India's poorest people, while promoting best practices and effective programs throughout the country."  PHFI is active in communicating evidence-based healthcare options to communities and increasing "health literacy" throughout Indian society.  For example, Mukesh D. Ambani, Chairman and Managing Director of Reliance Industries Limited, notes that Rajat has developed plans for "model districts" of healthcare delivery redesign in collaboration with Ambani's Reliance Foundation.  Ultimately PHFI's goal is to help create a public health infrastructure that will support the Indian nation.

In founding PHFI, Rajat was the "intellectual and persuasive catalyst for a massive new approach to public health training and research in a nation with well over a billion people and dual epidemics of infectious diseases and chronic diseases," writes James W. Curran, a public health expert at Emory University and founding member of the PHFI Board.  Sunali Rohra, the former head of McKinsey-India's external relations who worked with Rajat on the launch of PHFI in 2006, likewise considers the organization "the outcome of [Rajat's] vision and tireless

KL3 2899754.1

persuasion of the political class, the bureaucracy, businesses, civil society and academia globally

and in India."  He notes in particular that Rajat acted as "the glue that stuck all of [the] various

objectives [of stakeholders] together to achieve tangible results."  And, as described by Gautam

Kumra, who worked closely with Rajat on the launch of PHFI and is currently a McKinsey

Senior Partner:

> When Rajat initially tested the idea [of PHFI] with the Indian government,
> it met with a lot of skepticism.  However[,] that didn't deter Rajat. Rather,
> he persisted in his efforts to mobilize broader support for this initiative
> across different constituents in the government, academia, civil society
> and the private sector.  . . .  Rajat poured his heart and soul into
> evangelizing the idea across all concerned stakeholders [in the Indian
> government] . . . .  He eventually managed to convince the Government of
> India not only to give major financial assistance to the initiative, but also
> to give it the independence and autonomy to flourish despite being a
> public-private partnership.

Prashanth Vasu, a McKinsey Partner who worked with Rajat at PHFI's inception, also

credits Rajat with "shap[ing] the expansive future of PHFI with his oft repeated . . . statement

'One school could be *excellent but it will be irrelevant.*  What we need is excellence at scale.'"

Vasu explains:

> [Rajat] was not satisfied with a paltry idea of setting up a school;
> he wanted to set-up a network of over 10-12 schools of global
> preeminence that educated over 10,000 professionals annually who
> could subsequently have genuine impact on the public health
> landscape of the country.  Rajat never deviated from this aspiration
> throughout the over 3-5 year journey that it took to give birth to
> PHFI.

R.A. Mashelkar, former Director General of India's Council of Scientific & Industrial

Research and a member of PHFI's first Board of Governors, also credits Rajat for his firm

defense of the fledgling organization from pernicious influences.  "With politics and politicians

around, . . . Rajat's integrity, his adherence [to] the rules of good [g]overnance, his ability to

stand [up] to pressure [of] unreasonable demands from some influential quarters with vested

interests, etc. was tested.  And I must say that I would give Rajat 100 out of 100 for the way he

came [out] good [on] all these tests.  He always took a principled stand."

Rajat's dedication to the organization spanned beyond its founding.  Prafulla C. Gupta, a

PHFI volunteer in 2009-10, remembers that at that time,

> [d]espite his numerous commitments around the world, Rajat spent
> a week every quarter in India – and was always available for
> guidance and counsel[,] . . . raised more than $150 million and
> made numerous personal financial gifts to help endow the
> Foundation[,] . . . led the search for Faculty[,] . . . [and t]hrough his
> chairmanship of the Global Fund . . . helped PHFI secure further
> research funding, access to international faculty and to the best
> methodologies for promoting public health.

Amartya Sen echoes the sentiments of a number of writers with knowledge of Rajat's

humanitarian contributions when he remembers there being "a great sense of loss when Rajat

decided to withdraw from his leadership role of the Foundation when he was formally charged . .

. (he did not want the PHFI to suffer from the bad image he was personally going to get in the

process of the trial)."  Indeed in the view of Bill Gates, "[PHFI] would not exist, had it not been

for Rajat's commitment to the poor of India, and his generous support, encouragement and

leadership."

### 3.      Indian School of Business

> Rajat played a seminal role in establishing this now globally
> renowned institution.  Rajat's vision was to create a leading world
> class business school in Asia, a goal that quickly materialized.
>
> . . .
>
> Innovation holds the key to inclusive economic development in a
> country like India in solving the monumental challenges in

KL3 2899754.1

education, healthcare and poverty alleviation.  ISB will, no doubt,
be an integral part of this national innovation . . . ."

> Kiran Mazumdar-Shaw, Chairperson &
> Managing Director of Biocon, an Indian
> pharmaceutical firm focused on reducing the
> therapy costs of chronic diseases, and a
> member of the Board of the Indian School of
> Business

Rajat's first major philanthropic effort was his co-founding of the Indian School of

Business (ISB) in Hyderabad, India in 2001, and his service as its Chairman of the Board.  Dean

Emeritus of the Kellogg School of Management at Northwestern University Donald P. Jacobs

remembers when Rajat, who sat on the Board of Kellogg at the time,

> had the inspired idea to create the Indian School of Business . . . in
> Hyderabad and first told me about it during a breakfast session at
> one of our Kellogg executive programs.  He told me that he wanted
> to do something of significant benefit for the country of his birth,
> which had helped him achieve so much professionally.  He wanted
> others to enjoy similar opportunities and saw education as the key
> to success.  In his vision for ISB, Rajat said that he took inspiration
> from Kellogg and wanted to develop an ambitious program that
> would emulate Kellogg and include our school as a partner.

According to ISB's founding Dean, Pramath Raj Sinha, Rajat's ISB "was an audacious

dream powered by his passion and purpose to enable Indian students to experience world-class

management education."  And a decade after its founding, the ISB truly is world class –

consistently having been rated among the top twenty business schools in the world by the

*Financial Times* – and it has brought a U.S.-style MBA education to thousands in Asia at a

fraction of the (prohibitive) cost of attending a U.S. institution.  Ultimately ISB teamed with

associate schools including Kellogg (Northwestern University), Wharton (University of

- 44 -

Pennsylvania), London Business School, MIT Sloan, and Fletcher (Tufts University).  It has close to 5,000 alumni and graduates nearly 800 MBA students yearly.

In envisioning ISB, Rajat also "felt that the changing Indian economy needed a business school that produced world class managers with global outlook" (Kumara Guru), and an institution that would do "research relevant to the society [it] operated in."  (Nidhi Reddy).  Ajit Rangnekar, ISB's current Dean, reports that in addition to educating Asia's future leaders, "with [Rajat's] active encouragement, the ISB now has a Mission to focus on researching the major societal issues facing Emerging Economies, and to find viable, working solutions to these larger problems."

In the words of former Kellogg Dean Donald Jacobs, "Rajat was the person who made this exceptional institution possible."  Soo Chuen Tan, a former McKinsey business analyst who worked on the ISB launch under Rajat, writes to the Court that he

> could see that the founding of this school was a labor of love for
> Rajat.  Rajat . . . was running a global management consulting
> firm, and had many competing demands on his attention, but he
> gave a significant amount of his time and energy, and used up a
> substantial amount of personal and professional capital, in order to
> get the school successfully launched.

ISB Board member Kiran Mazumdar-Shaw credits Rajat with "encourag[ing] and convince[ing] Indian corporations to invest in ISB at a time when such philanthropic endeavors were quite uncommon in the Indian corporate sector.  Doing so is not only a testament to how strongly Rajat believed in ISB, but also in how strongly others believe in Rajat."  Uday Khemka, whose family's Khemka Foundation was an early supporter of ISB, explains that

> [m]ost philanthropic projects in India are done in an individualistic and
> old fashioned way.  A wealthy individual, family or business, creates a

- 45 -

> project to honor itself or burnish its own personal good name or brand.
> Examples of such actors collaborating together to create an institution for
> the common good without any link to a personal brand are very limited.
> Rajat achieved this: he persuaded the country's elite to come together to
> create a great educational institution with no personal agenda, no personal
> benefit, collaboratively.

Many letters note that in the face of significant obstacles, Rajat insisted that ISB operate above-

board at all times, which "helped to establish the vein of integrity in the ISB and has set the tone

for the values the School embodies."  (Keki B. Dadiseth).

Former President and CEO of General Electric India Scott R. Bayman summarizes some

of Rajat's particular contributions to ISB's founding and growth:

> As a member of the [ISB] Governing Board, I witnessed first hand,
> Rajat's passion for building a world-class business school in India.
> He contributed his own funds, raised early money, seconded a key
> McKinsey partner to be the first dean and chaired the board.  He
> committed a significant amount of his personal time and resources
> to the success of the school.

Neeraj Bharadwaj, who was part of the McKinsey team that formulated a plan for founding ISB,

adds that Rajat recruited Board members, established relationships with partner schools, chaired

Board meetings, and worked to ensure placement of early graduates.  Mazumdar-Shaw notes

Rajat's deep involvement in developing ISB's curriculum and code of conduct, both of which

"emphasized the importance of acting professionally and with honesty and integrity at all times."

## 4.  American India Foundation

> Today AIF is the leading Indian Diaspora collective
> [p]hilanthropy.  . . .  In its [eleven] years of existence, AIF has
> directly touched and benefited the lives of 1.5 million . . .
> marginalized people in India.

> Rajat provided crucial leadership to AIF . . . donat[ing] his
> personal funds but more importantly giv[ing] his very valuable
> time, mind . . . and connectivity to benefit AIF enormously.

Pradeep Kashyap, Founding
Executive Director of AIF and
current Vice Chair of the AIF Board

In January 2001, a massive earthquake hit Gujarat, India, killing approximately 20,000 people, injuring hundreds of thousands, and destroying hundreds of thousands of homes.  In response, Rajat worked with former U.S. President Bill Clinton and Victor Menezes, former Senior Vice Chair of Citigroup, to found the American India Foundation (AIF).  Under their leadership, within its first year AIF raised millions of dollars to support earthquake relief efforts, sent a team of physicians to aid victims, and began a program for matching the skills of volunteers from around the world with Indian NGOs in need of them.  Rajat organized a McKinsey team to assist AIF *pro bono*.  Over time the Foundation extended its efforts beyond Gujarat, reaching into the areas of primary education, healthcare and employment opportunity for the country's neediest.  AIF estimates that its work has benefitted 1.5 million people since the organization's inception.

Co-founder Menezes attests that "AIF was built with Rajat's personal commitment, time, energy and wise guidance."  Among other things, he participated in nationwide fundraising efforts, helped decide which projects would receive AIF funds, and reviewed projects on-the-ground through yearly monitoring trips to India.  Vimal C. Bahuguna, an AIF Board member and President of Drona Group, writes that "the Board Members[ ] could always count on Rajat's deep engagement, and indefatigable energy, while deliberating on our agenda to surface the most effective outcomes for AIF's social investments."

One of AIF's investments was in Vikram Akula's SKS Microfinance, "which provides small loans to millions of poor women in India so they can earn income and help get their

families out of poverty." Akula remembers when he converted SKS Microfinance into a for-

profit business

> [in] order to be able to scale our work more widely. However, the
> idea of a for-profit social enterprise was new at that time, making it
> very difficult to find funders who had the sophistication to
> understand that a commercial entity could make a tremendous
> social impact in typically charitable realms. Rajat was one of the
> few who saw the potential, and the American India Foundation,
> which he co-founded and co-chaired, took a chance on SKS and
> provided funding. With that funding, SKS was able to complete its
> conversion to a for-profit and eventually provided billions of
> dollars in loans to more than 7 million poor women across India.

Bahuguna also offers a small but telling example of Rajat's contribution to AIF's success,

remembering that when he (Bahuguna) was first entrusted with starting AIF's Midwest chapter,

he "was more than a little cynical about the support I'd likely receive from Rajat to get the

endeavor going, in large part because of the fact that Rajat's time carried a huge economic

premium." But, writes Bahuguna, "[t]o say that Rajat was generous with his time [is] an

understatement. He spent countless hours with me in making the AIF's case to various corporate

leaders in the Chicago area. . . . In six short years since its inception, AIF-Chicago has become

a highly exemplary charity in Chicago."

### 5. The United Nations

> When I became Secretary General, I undertook an ambitious effort
> to bring about reforms in the management and administration of
> the United Nations. These proposed reforms were radical and far-
> reaching.
>
> As my advisor, Rajat worked with leaders of the NGO community,
> with UN ambassadors and top UN officials to forge alliances and
> create the momentum needed to accomplish reform. Rajat was
> superb. As a result of his efforts, we achieved much of what we
> set out to do.

Kofi Annan, former Secretary
General of the United Nations

In 2004 then United Nations Secretary General Kofi Annan and the United Nations

Foundation (UNF) joined in asking Rajat to lead a McKinsey team with the goal of proposing

reforms to modernize and streamline the UN operations.  Secretary General Annan remembers

asking Rajat to be his "advisor for Management Reform . . . for three reasons:  (1) Rajat had

expertise in management, and we needed that; (2) While serving as Chairman of the United

Nations Association of America, he got to know the United Nations, and we needed that; and (3)

This task required an individual who would work hard and whose integrity was unquestioned.

Rajat was that kind of person."

Of Rajat's involvement, former U.S. Senator and current UNF President Timothy E.

Wirth recalls that Rajat

> was extremely forthcoming and helpful . . . volunteer[ing] his own
> services, and promis[ing] a small team of senior experts [from
> McKinsey] at a very low price.
>
> The project lasted for about two years during 2005-2006 and
> consumed a great deal of [Rajat's] personal schedule, and that of
> his senior team.
>
> When the project was over, he was again very generous with his
> time, explaining conclusions and recommendations to many of the
> internal and external constituencies that make up the UN.

Senator Wirth credits Rajat with "real progress on issues like transparency, audit control

and disclosure, and human resources," and with "provid[ing] the base for further efforts in the

ongoing quest to modernize and streamline the UN."  As a result, he "emerged from the process

with continuing respect and affection for Mr. Gupta.  His generosity, good humor and

- 49 -

professionalism were extremely helpful, and his persistence helped us over some major

stumbling blocks."

Looking back on the two years they worked together on behalf of the UN, Secretary

General Annan writes that he and Rajat "had many conversations, and we developed a

friendship. I found that Rajat was engaged in this work for all the right reasons. He wanted to

make the United Nations a stronger and more powerful force in the world, not only to advance its

humanitarian missions but to advance the cause of peace. Rajat was determined to make a

difference, and I was grateful for his assistance."

### 6.     Other Humanitarian Efforts

Rajat would be rightly considered a humanitarian of the highest order based solely upon

his critical contributions to any one of the Global Fund, the Public Health Foundation of India,

the Indian School of Business, the American India Foundation, and the United Nations, let alone

his combined work at all of them. In addition, and by way of summary:

- Rajat served as an advisor to the executive leadership of the Bill and Melinda Gates
  Foundation and chaired that organization's first Global Development Advisory
  Board, where, in the words of Bill Gates, "he was instrumental in pulling together the
  inaugural group of experts to advise us on this newest category of our giving –
  supporting economic development."

- Rajat also chaired the Gates Foundation's India AIDS initiative, Avahan. In the
  words of Julio Frenk, Dean of the Harvard School of Public Health, Avahan "has
  three primary objectives: to build an HIV prevention model at scale in India; to
  catalyze others to take over and replicate the model; and to foster and disseminate
  lessons learned within India and worldwide. It provides funding and support to
  targeted HIV prevention programs and has helped to significantly expand access to
  HIV prevention services." Avahan reaches hundreds of thousands of people in India
  with prevention services each month.

- Helene D. Gayle, current President and CEO of the poverty-fighting organization
  CARE USA and formerly of the Gates Foundation, also credits Rajat with early
  assistance to the Gates Foundation when that organization engaged McKinsey for

KL3 2899754.1

help in launching Avahan:  "His advice and guidance was crucial in helping us develop a sound strategy and most importantly in finding the right director for the program . . . .  He also was vital in helping us work through some of the initial very difficult political hurdles necessary [to overcome] to have a successful start to that program."

- Rajat was on the Board of the Pratham Education Foundation, the largest non-governmental organization working for the provision of high quality education to India's underprivileged.  Pratham's programs are designed to increase enrollment, attendance, and learning in schools, with a focus on replicating working models for large scale impact.  The organization "reaches over 3 million children in India every year in order to improve their basic literacy and numeracy."  (Madhav Chavan).  Pratham CEO-President Madhav Chavan credits Rajat with "perceptive and quiet support" that was "critical in helping [him] to take the organization to where it is today."

- Rajat served on the Board of Millennium Promise, an organization that mobilizes resources and develops strategies to eliminate global poverty by empowering communities.  To Jeffrey C. Walker, former Chairman of the Millennium Promise Board, "Rajat was one of the most important board members we had because of his deep experience in the global health world through his work at McKinsey and subsequently as head of the Global Fund.  He was a member of the executive committee of the Board and was a very active member of the board overall. . . . Through his involvement in Millennium Promise, Malaria No More and the Global Fund . . . a million more people are alive in the world than would have been without him . . . ."

- From 2006 to 2011 Rajat was a trustee of the Rockefeller Foundation.  As a trustee he helped set Foundation policy, reviewed the performance of senior officers, and monitored the Foundation's budget and investments.  Foundation Chairman David Rockefeller Jr. writes that Rajat was "an exemplary Trustee . . . contribut[ing] to discussions in a wise, respectful and very useful manner. . . .  It was a true loss when Mr. Gupta decided to resign" for the good of the organization in light of the allegations against him.

Judith Rodin, current President of the Rockefeller Foundation and former President of the University of Pennsylvania, writes to the Court that she "so admired Mr. Gupta's contributions to the eradication of poverty and pursuit of more effective global health that I asked him to join the Rockefeller Foundation Board while I was President," and notes his "outstanding contributions [in] helping to elevate a strategic approach to the work and the financial support we give to institutions and efforts around the world." Ms. Rodin shares with the Court her "impress[ion of Mr. Gupta] as someone who dedicated a large portion of his personal time and professional career to serving the world's poorest and most disadvantaged people and did so with enormous conviction and caring.  While others could have taken the personal resources and comfort level that they earned from professional success, Rajat seems more restless and more driven to work on behalf of those who often were the most voiceless as he increased

in personal wealth and power. . . . I have seen him in multiple venues, advocating relentlessly for improved health and poverty reduction, and adding his analytic skills to make sure that the expenditure of funds and the delivery of effort achieved the highest impact."

- Rajat, then McKinsey's Global Managing Director, was "personally involved" in a McKinsey project "to assist the [World Economic Forum (WEF)] to build its global membership and better engage the private sector in its mission-oriented efforts." (Kevin Steinberg).  The WEF is a "Swiss-based non-profit foundation focused on improving the state of the world by fostering interaction and collaboration between the private sector, government and civil society."  *Id.* According to Kevin Steinberg, who was leading the McKinsey project, Rajat "provid[ed] overall stewardship and advice, and ensur[ed] resources were made available on a pro-bono basis.  He took great interest in the organization, actively providing suggestions to further its strategies, and making introductions on its behalf. Ultimately, in acknowledgement of his efforts and contributions he was invited to join the [WEF] Foundation Board."

On the Board he was – according to Kathryn Taylor, formerly responsible for the global health program at the WEF and now a fellow of Ormond College at the University of Melbourne – "a revered figure . . ., one whose [counsel] was sought and respected, especially on matters of integrity.  I know that he devoted a significant amount of time and attention, challenging the WEF to find ways to better deliver on its mission 'to improve the state of the world' and that this in turn sparked broader debates that carried across to changes in WEF companies."  Maurice Levy, Chair and CEO of the Publicis Groupe, adds that "[he] had many occasions to work with Rajat in this context, and saw how tirelessly and selflessly he worked to establish the long-term direction and objectives of the WEF."  When Kevin Steinberg – who had been seconded to the WEF by McKinsey for an extended period with Rajat's support – returned from Switzerland to found WEF USA, the North American Affiliate of the Swiss foundation, Rajat agreed to serve on its Board.

- In 2005, Rajat joined the Board of EMRI, the Emergency Management and Research Institute, an ambulance and health care service private-public partnership in India. The organization operates the equivalent of a 911 service, free of charge, that has handled 12 million emergencies in the last six years, with more than 70% of the beneficiaries being underprivileged.  Former CEO Venkat Changavalli notes Rajat's "professionalism, dedication, hard work [and] involvement" in service to EMRI, especially his critical work seeing the organization through the crisis of losing its founder. Rajat guided Changavalli "three times a week for half-an-hour each time to find a new funder and continue the operations without any break."

- From 2005 to 2008, Rajat served on the Board of the International Partnership for Microbicides, a women's health organization.  CEO Zeda Rosenberg, who sought Rajat's participation on the Board, notes that Rajat was "generous with his time in advising the organization and provided thoughtful, sound input."

- Rajat served on and ultimately chaired the Board of the International Chamber of Commerce (ICC), an organization that works to strengthen commercial ties between nations to improve the standard of living throughout the world and promote peace. ICC Executive Board member Manfred Gentz writes to the Court that beginning in 2006, Rajat and a McKinsey team "advis[ed] the ICC Board, primarily on a pro bono basis, about how to better structure the ICC and how to make its work more efficient. This work involved a lot of research and went on for several years – all under Rajat's leadership. . . . Rajat's broad personal experience combined with McKinsey's analytical research helped us implement changes in our by-laws and greatly improve efficiency. . . . In 2008, Rajat was elected Vice Chairman . . . [and] in 2010, he was elected Chairman. He started . . . new initiatives and was seen by all of us as a highly intelligent, energetic, honest and moral person. . . . [His] initiatives helped raise the profile and strengthen the financial standing of the ICC."

- In 1997 Rajat agreed to serve as President of Chicago's fledgling TiE (The Indus Entrepreneurs) branch. TiE, in the words of Board member and chapter founder Navneet S. Chugh, is "an organization that connects business people of the Indian origin," with the mission "[of] foster[ing] entrepreneurship globally through mentoring, networking, and education. . . . TiE's focus is on generating a nurturing our next generation of entrepreneurs." Chugh remembers that when Rajat agreed to lead the Chicago branch, "[i]t legitimized TiE in everyone's mind. Rajat was highly regarded by everyone in the South Asian community, and his endorsement of TiE was pivotal in the launch and success of TiE worldwide." When TiE decided to form TiE Global to be the parent of nascent TiE chapters, "once again, Rajat agreed to lead that endeavor."

- K.P. Singh, Chair of India's largest real estate developer, DLF Limited, writes that Rajat "was able to achieve what nobody else could previously when he persuaded the Indian government to invest 200 crores of rupees, with a matching amount form the private sector, to set up an Urban Development Institute which will go into all aspects of examining [Indian] urban policies." In India, explains Singh, "almost 60% of [the] population in our urban areas are still living mostly in slums deprived of even basic human living requirements of drainage, sewerage and drinking water facilities. [The] Urban Development Institute was planned to make the government change its present policies and thus ensure that people[s'] living conditions improve in the urban areas of the country." Fallout from Rajat's recent legal battles, the "project is presently at a standstill," explains Singh, "because of the fact that the main initiator, namely, Rajat is not here to steer it through."

- Rajat has also served universities (the Brown University President's Advisory Council on India, University of Chicago Board of Trustees, Yale University President's Council), business schools (Wharton's Lauder Institute Board of Governors, Skolkovos Advisory Board, Kellogg School of Management Advisory Board, Sloan School of Management Dean's Advisory Council, Tsinghua University School of Economics and Management Dean's Advisory Board), and medical schools (Weill Cornell Medical College Board of Overseers, Harvard School of Public Health

- 53 -

Dean's Council), as well as additional public health and business organizations (Chair, US-India Business Council).

This catalogues only Rajat's formal affiliations.  He has helped many other organizations and causes with which he has no official connection, such as the Indo-American Center, an organization assisting immigrants in adjusting to American life; the End Polio Now campaign, an organization for which Rajat helped raise funds in America and India; and the Arpana Group of Trusts, which helps Indian villages establish essential services including childhood education, adult literacy, health and sanitation services.  As Harishwar Dayal, the head of Arpana, remembers, "[i]n the 1990's, we at Arpana decided to try to expand our donor base to the United States. . . .  We were welcomed with open arms to Rajat and Anita's home.  Every resource they had was at our disposal.  We in fact set up our mini office at Rajat's home.  He spent countless hours strategizing with us, connecting us to everyone who could be a potential supporter."

Individuals, organizations and governments have over and over again invested their trust in Rajat.  Ashok Alexander, a character witness at trial who knows Rajat well from business (they were McKinsey colleagues for nearly twenty years) and philanthropy (Alexander is the former director of Avahan and of the Gates Foundation's India office), says the reason for this is that "Rajat stands for integrity. People are attracted to him and his works not only because of his vision, but because he has such an acute sense of what is right and wrong."  And as the letters make clear, this trust was not misplaced.  Indeed, so deep is the reservoir of trust built by Rajat over his lifetime, that even after acknowledging his recent conviction, writer after writer expresses reaffirms his or her abiding trust in Rajat and in his potential for doing future good works.

III.     ADVISORY GUIDELINES CALCULATION

Since the Supreme Court's decision in *Booker,* the Guidelines are merely advisory,

freeing courts to "tailor the appropriate punishment to each offense in light of other concerns."

*United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (*en banc*).  Although the Court must

make a finding regarding the correct Guidelines range, "[a] district court may not presume that a

Guidelines sentence is reasonable; it must instead conduct its own independent review of the

sentencing factors, aided by the arguments of the prosecution and defense."  *Id.* at 189.  As

demonstrated below, a Guidelines sentence would not be reasonable in this case, and a

probationary sentence accompanied by a substantial and rigorous condition of community

service (described in more detail below) is warranted.

The Presentence Investigation Report ("PSR") calculates an advisory Guidelines range of

97-121 months, based on an offense level of 30.  (PSR ¶ 77).[2]  This calculation depends on a

base offense level of 8 for insider trading, plus an enhancement of 2 levels for abuse of a position

of trust, and of 20 levels based on a calculated gain of $15,355,409.  (PSR ¶¶ 68-73).  However,

this gain calculation is flawed in several respects.

- First, the PSR calculation is based on the value realized by the Galleon funds as a
  whole.  This assessment of gain overstates the seriousness of the offense because the
  value actually realized by co-conspirator Rajaratnam is far less than the value realized
  by the funds themselves.  Instead, the calculation should include only the gain to, and
  loss avoided by, Rajaratnam, as described more fully below.

- Second, in calculating the losses avoided by Rajaratnam's October 24, 2008 sales of
  Goldman Sachs stock, the PSR both (i) relies on an unsupported and unrealistic
  assumption that, in the absence of the tip, Rajaratnam would have held these shares
  until December 17, 2008, following the earnings release, and (ii) ignores the fact that
  the stock price was surely affected by market events in the intervening two month
  period.

---

[2]  Mr. Gupta's objections to the PSR were submitted to the Probation Office and to the
government on October 12 and are included as Exh. A hereto.

- Third, the PSR includes both counts of which Mr. Gupta was acquitted and overt acts that were not the subject of substantive charges and which, we respectfully submit, were not proven to the jury's satisfaction. The gain calculation should therefore be based on only the September 2008 and October 2008 transactions.

- Finally, the gain amounts employed in the PSR are, like the October 2008 loss avoided calculation, likely overstated, because they do not limit the "gain" to that which is causally related to the inside information allegedly disclosed, as opposed to gain resulting from other, unrelated market forces.

For all of these reasons, and as set forth below, we respectfully submit that the proper Guidelines calculation in this case results in an offense level of at most 22, which in turn yields a sentencing range of 41-51 months.

### A.    Gain Should be Calculated Based on the "Value" Actually Realized by Rajaratnam

Under § 2B1.4 of the Sentencing Guidelines, the offense level is increased based on the amount of "gain resulting from the offense." The term "gain" is defined as "the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information." U.S.S.G. § 2B1.4 cmt. background. In sentencing Rajaratnam, Judge Holwell found that "[t]he phrase is not a model of clarity and unfortunately no court appears to have addressed its meaning." *United States v. Rajaratnam*, 09 Cr. 1184 (RJH), 2012 WL 362031, at *14 (S.D.N.Y. Jan. 31, 2012). To the extent the definition of gain is ambiguous, the most logical interpretation, and the one best calculated to accomplish the stated purpose of the Guidelines, is that the gain resulting from the offense is the total increase in value realized by the defendant and the defendant's co-schemers or tippees, where that total increase in value is "realized through trading in securities." In other words, the clause "by the defendant and [his co-conspirators and tippees]" modifies "the total increase in value realized," thereby excluding from "gain" the value realized by other parties not referenced in the clause.

KL3 2899754.1

The Guidelines mandate the use of gain in insider trading cases, not victim losses, which is the measurement used in other fraud cases pursuant to the Theft Offenses Guideline. *See, e.g*., *United States v. Nacchio*, 573 F.3d 1062, 1079 (10th Cir. 2009) ("The insider trading guideline commentary expressly rejects victim loss as a metric of culpability."); *United States v. Mooney*, 425 F.3d 1093, 1100 (8th Cir. 2005) ("In explaining what is meant by the defendant's gain and why it is used for sentencing inside trading offenses, the commentary specifically rejects using victim losses in the calculation.").[3]  Therefore, section 2B1.4 should be interpreted with an eye toward finding a proper measure of the defendant's gain.  The commentary expands the gain beyond any gain received by the defendant – here, none – to include gain realized by those whom the defendant tipped and his co-conspirators, because, in assessing the defendant's culpability, it might be argued that it is appropriate to charge him with gains made by culpable parties engaged with him in a common scheme.  What is not appropriate or warranted is an extension of this unambiguous commentary to include gains made by innocent third parties, here the funds' investors.  As such, the gain calculation should be limited to value realized by the culpable persons identified in the commentary itself – namely the defendant and any co-conspirators or tippees.

This understanding of "gain" is further supported by the Second Circuit's recent decision in *United States v. Contorinis*, No. 11-3-cr, 2012 WL 3538270 (2d Cir. Aug. 17, 2012).  Like Rajaratnam, Contorinis was a hedge fund portfolio manager convicted of insider trading.  The district court issued a forfeiture order in the total amount of profits made by the fund Contorinis managed.  Finding that these profits were made ("acquired" in the language of the forfeiture

---

[3]  The explanatory commentary in the Guidelines "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  *Stinson v. United States*, 508 U.S. 36, 38 (1993).

statute) by the fund and not by Contorinis, the Second Circuit vacated the forfeiture order,

holding that "the district court erred in ordering [Contorinis] to forfeit funds that were never

possessed or controlled by himself or others acting in concert with him." *Id.* at *9.  Although

criminal forfeiture focuses on the surrender by a defendant of his ill-gotten gains, it is punitive,

not remedial, serving the same purpose as the Guidelines' gain calculation.  *See id.* at *7-8

(noting that forfeiture is a penalty, and as stated by the Supreme Court, "serves no remedial

purpose, is designed to punish the offender, and cannot be imposed on innocent owners").  Just

as criminal forfeiture of "any profits that the offender realized from his illegal activity," *United

States v. Webber*, 536 F.3d 584, 603 (7th Cir. 2008), is a just and proportionate punishment, so,

too, is using the value realized by the defendant (and his co-schemers) in the Guidelines

calculation.  In both cases, it is the gain – the "value realized" by the defendant – that is meant to

roughly measure the defendant's culpability.  Accordingly, the gain calculation here should

measure the "value realized" by the defendant and tippee Rajaratnam, but not by Galleon's

limited partner investors.[4]

On this basis, the gain should be calculated as follows:

- According to the Declaration of former Galleon employee George Lau submitted to
  Judge Holwell, Rajaratnam's equity share of the Galleon technology funds was
  6.96% as of November 2008.  (Lau Decl., Attach. A, *United States v. Rajaratnam*, 09

---

[4]  Judge Holwell concluded that "by the defendant . . ." should be read to modify "trading in
securities," based on his concern that the reading we are contending applies would somehow
result in tippers escaping all responsibility for the gain made through trading by their tippees.
*Rajaratnam,* 2012 WL 362031, at *4 ("Rajaratnam's construction would render the enhancement
entirely inapplicable to a defendant convicted of tipping rather than insider trading").  But this
concern was unfounded, given that the defendant tipper (including Mr. Gupta here) is chargeable
with the "value realized by" his co-conspirators and tippees, pursuant to the express language of
the Comment.

Cr. 1184 (RJH), Exh. B ("Lau Decl.").[5]  In our view, the total increase in value realized by the funds, that is, profits made on the September 2008 purchases and losses avoided in October 2008, equals $2,066,055.[6]  Multiplying that figure by Rajaratnam's share (6.96%) yields Rajaratnam's share in the value realized, $143,797.43.[7]

- Under the "2 and 20" fee structure, commonly used by hedge funds, the Galleon advisory entity, Galleon Management, LP ("Galleon Management"), generally charged each fund an annual management fee of 2% of the total assets under management in that fund, and if it made a profit for the fund on an annual basis, it also generally charged a fee of 20% of the profit realized by the fund.  (Lau Decl. ¶ 8).  But Rajaratnam, as a part owner of Galleon Management, did not actually receive those amounts.  According to Lau, the 2% management fee winds up covering Galleon Management's expenses.  (Lau Decl. ¶ 9).  As Lau also states, the Galleon funds did not earn a profit in 2008, and therefore Galleon Management did not receive any performance fees.  (Lau Decl. ¶ 12).  Nevertheless, in order to be conservative, Lau still credited Rajaratnam, as the portfolio manager of these funds, with half of the 20% performance fee.  (*Id.*).  Accordingly, multiplying the gain (September trades) and losses avoided (October trades) by 20% yields the management fee realized by Galleon Management, which is then multiplied by 50% to calculate Rajaratnam's share:  ($2,066,055) x (20%) x (50%) = $206,605.50.

Based on Mr. Lau's calculations, the "gain" realized under section 2B1.4 would be the

total of Rajaratnam's share of the gain based on his direct investment in the funds ($143,797.43),

plus his deemed share in Galleon Management's hypothetical performance fee ($206,605.50),

---

[5]  As Lau explains, where he did not have the relevant figures for the month in which the transactions at issue occurred, he used the approximate percentage representing Rajaratnam's interest in the month that was closest in time to the transactions at issue.  (Lau Decl. ¶ 15).  For both the September 2008 and October 2008 trades, that month was November 2008.

[6]  This figure is based upon the use of our proffered loss avoidance calculation for October 2008, that is, using October 31, 2008 as the likely date by which Rajaratnam would have sold his Goldman stock, rather than mechanistically using the date of the earnings release many weeks laetr on December 17, 2008.  *See* Section III(B) *infra*.

[7]  Further, although Voyager, in which Mr. Gupta invested, in turn invested in certain Galleon funds, the government has never suggested that Mr. Gupta actually realized any gain through this investment (which fell to zero during the financial crisis).  Moreover, even if Mr. Gupta's hypothetical share is included, the amount, based on Mr. Gupta's 20% ownership interest in Voyager's modest interest in the Galleon tech funds' profits, is *de minimis* and should not change the advisory Guidelines range.

which brings the total gain to $350,402.93.[8]  But even this number overstates the actual gain, as

Rajaratnam did not in fact realize any performance fees for 2008.  (Lau. Decl. ¶ 12).

### B.    Proper Calculation of Losses Avoided for the October 2008 Trades

In calculating the "gain resulting from the offense" for the October 2008 Goldman Sachs

trades, the PSR points to losses Rajaratnam avoided by selling 150,000 shares of Goldman Sachs

stock (still for a loss) on October 24, 2008.  (PSR ¶ 45).  The $3,800,565 in losses avoided

presented in the PSR represents the difference between the price at which Rajaratnam sold the

stock and the stock price at the opening of the market on December 17, 2008, the morning after

Goldman Sachs reported its quarterly revenue and earnings.  (*See* GX 60).  However, this

calculation is based on an assumption – a guess, really – that had he not been given material

nonpublic information on October 23, Rajaratnam, who was a short term, in and out trader (Tr.

457-59), would have held his Goldman shares for almost *two months*, even in the face of

increasingly negative analyst reports and other news and Goldman's falling stock price during

that time.  This assumption, in addition to being contrary to common sense, is purely speculative,

as FBI agent Barnacle conceded:

> Q.  That calculation depends, does it not, on the assumption that
> Galleon would have held the stock had it not allegedly learned the
> inside information?
>
> A.  Yes.

---

[8]  This figure relies on the use of our proffered loss avoidance calculation for October 2008,
explained in Section III(B) *infra*.  If the PSR's loss avoidance number for October is used instead
(PSR ¶ 45), the total gain becomes $787,207.73.

The calculation also does not include the $390,640 profit in the Galleon fund managed by
Gary Rosenbach, which the PSR does incorporate in its calculation of gain for the September
2008 Goldman Sachs trades.  (PSR ¶ 41).  We do not believe the trades independently made by
Rosenbach in the funds he ran should be included.

> Q.  You have no personal knowledge regarding what Galleon
> would have done in the intervening period; that is simply an
> assumption in the calculation, correct?
>
> A.  The calculation is simply the opening price the day following
> the announcement versus the proceeds from the sale on October I
> believe it was 24th.  *That's it, there is nothing more to it*.

(Tr. 2456 (emphasis added)).

The government has not produced any evidence to support the contention that

Rajaratnam, an experienced and professional money manager, would have ignored Goldman

Sachs's falling stock price and the many negative public reports involving Goldman Sachs

during that time.  Furthermore, the PSR's calculation overstates the value realized by Rajaratnam

by including gain beyond that which "result[ed] from the offense," contrary to the instructions in

U.S.S.G. § 2B1.4.  As the Tenth Circuit explained in *United States v. Nacchio*, the "offense" here

is not trading itself but "trading *on the basis of insider information*."  573 F.3d 1062, 1072 (10th

Cir. 2009) (emphasis in original).  Therefore, the *Nacchio* court reasoned, the gain computation

should be "based upon the gain resulting from that deception" and should not include any effect

on the value of the security not related to the inside information.  *Id*.[9]  Instead of restricting the

calculation to the gain resulting from the insider trading, the PSR just compares the sale price on

October 24 to the price on December 17, and ignores the inevitable impact of numerous

independent market forces and events affecting the price of the security over almost a two month

---

[9]  Judge Holwell declined to follow the *Nacchio* court's reasoning in Rajaratnam's case.  He
believed that *Nacchio* mistakenly "assumes that a single trade can be divided into 'trading with
insider knowledge' and trading on the basis of public information."  *Rajaratnam*, 2012 WL
362031, at *7.  But *Nacchio* does not address the basis upon which the trader made the decision
to trade, but instead simply makes the point that the price appreciation (and, thereby, the "gain")
specifically "resulting" from the insider trading offense is the gain resulting from the inside
information and not that attributable to unrelated market factors.  573 F.3d at 1074.

KL3 2899754.1

period.  This calculation overstates the gain resulting from the offense.  *See id.* at 1074

(remanding where district court failed to exclude market factors unrelated to the offense from its

calculation of gain).[10]

Instead of using the opening price on December 17, 2008 for the calculation, we

respectfully request that the Court make a reasoned assessment of when Rajaratnam would likely

have sold on the basis of public information, in effect, on the basis of a public disclosure of

comparable information.  On October 31, 2008, UBS analyst Glenn Schorr was the first sell-side

analyst to forecast a fourth quarter loss for Goldman Sachs.  Reporting on this assessment, a

Reuters article stated that Goldman "could post its first ever quarterly loss as a public company

in December, as market turmoil weighs on revenue for investment banking businesses and forces

asset writedowns."  ("Goldman May Be Set to Post First Quarterly Loss," Exh. C).  Using the

closing price on October 31 ($92.50) as a comparison instead of the opening price on December

17, the losses avoided by Galleon funds becomes $1,225,065 instead of $3,800,565.  This is a

more accurate approximation of the losses avoided, as it more realistically approximates when

Goldman Sachs's expected fourth quarter losses were disclosed, and ultimately provides a more

realistic approximation of when Rajaratnam therefore would have sold the shares.[11]

---

[10]  For this reason, should the Court adopt the gain methodology advanced by the PSR, it should include only gains that can be shown to result from use of the alleged inside information.

[11]  The fact that the loss avoided calculation is based upon what is essentially a guess at when Rajaratnam would have sold his shares highlights the weakness of the entire exercise, and of the Guidelines' focus on dollar amounts.  Here, depending on the chosen date, the loss avoided that is deemed the "gain" amount may vary by millions of dollars.  Surely such a speculative number, masquerading as arithmetic precision, should not be the basis for determining the extent of a defendant's loss of liberty, particularly because Mr. Gupta himself realized no gain.  For this reason, among many, we respectfully submit that the Court should disregard the Advisory Guidelines range and impose sentence solely on the basis of the statutory factors, discussed

### C.    Expressly Acquitted Conduct Should Not Be Included in the Gain Calculation

Although the Supreme Court has held that acquitted conduct *may* be included in the Guidelines calculation as "relevant conduct," it need not be.  *See United States v. Watts*, 519 U.S. 148, 149 (1997) (holding that under the "relevant conduct" Guideline, a sentencing court may consider any wrongdoing proved by a preponderance of the evidence, even if the subject of an acquittal).  Numerous courts have declined to consider such conduct post-*Booker*.  Thus, for example, in *United States v. Carvajal*, 04 Cr. 222 (AKH), 2005 WL 476125, at *5 (S.D.N.Y. Feb. 22, 2005), where the jury had acquitted on some charges, the Court sentenced the defendant to a term less than the applicable Guidelines range in order to "accord the jury's [not guilty] findings proper respect."  In *United States v. Pimental*, 367 F. Supp. 2d 143 (D. Mass. 2005), Judge Gertner declined to consider acquitted conduct in determining the applicable sentence, explaining that though *Watts* may not have been technically undermined by *Booker*, considering acquitted conduct in the post-Guidelines era "trivializes 'legal guilt' or 'legal innocence' – which is what a jury decides – in a way that is inconsistent with the tenor of recent case law."  *Id.* at 152.  Although it may have been appropriate to consider acquitted conduct in sentencing prior to the advent of the Guidelines,  at a time when "the trial sphere was rule-bound and sentencing was comparatively rule-less," in the post-*Booker* hybrid regime "rules still matter, and certain facts have important, if not dispositive, consequences."  *Id.* at 152-53.  As Judge Gertner concluded, "[t]o tout the importance of the jury in deciding facts, even traditional sentencing facts, and then to ignore the fruits of its efforts makes no sense – as a matter of law or logic."  *Id.* at 153.[12]

---

below.  Because the Court is required to conduct a Guidelines analysis, we urge the Court to use the closing price of October 31, 2008 to determine the avoided losses/"gain".

[12]  *See also United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) (holding that "while district courts may take into account acquitted conduct in calculating a defendant's Guidelines

KL3 2899754.1

In a pre-*Booker* opinion, Judge Newman well described why acquitted conduct should not be considered as part of the Guidelines calculation.  He explains that the flaw in the Guidelines is not that the "Relevant Conduct" provision was included, but that such conduct is measured on the "same scale of severity" that applies to the actual offense of conviction.  *United States v. Concepcion*, 983 F.2d 369, 395 (2d Cir. 1992) (Newman, J., concurring) (noting that this leads to the "astonishing" result that defendants face virtually the same sentence even when acquitted of some charges).  And while acquitted conduct was permitted to be "considered" by sentencing judges before implementation of the Guidelines, this did not mean either that it was required to be taken into account, nor that it was to be given equal weight.  *Id.*  In order for the jury's not guilty verdict to have meaning and be afforded proper weight, there should be some distinction "between an allegation of conduct resulting in a conviction and an allegation of conduct resulting in an acquittal."  *Id.* at 396.

---

range, they are not required to do so.  Rather, district courts should consider the jury's acquittal when assessing the weight and quality of the evidence . . . and determining a reasonable sentence."); *United States v. Wendelsdorf*, 423 F. Supp. 2d 927, 935 (N.D. Iowa 2006) (noting that "nothing in *Watts* mandates consideration of acquitted conduct," and declining to consider such conduct); *United States v. Baldwin*, 389 F. Supp. 2d 1, 2 (D.D.C. 2005) (applying reasonable doubt standard as opposed to preponderance of the evidence standard to acquitted conduct), *aff'd*, 563 F.3d 490 (D.C. Cir. 2009); *United States v. Huerta-Rodriguez*, 355 F. Supp. 2d 1019, 1028 (D. Neb. 2005) (court chose to "err on the side of caution in protecting a criminal defendant's constitutional rights"), *aff'd*, 158 F. App'x 754 (8th Cir. 2005); *United States v. Coleman*, 370 F. Supp. 2d 661, 668-73 (S.D. Ohio 2005) (refusing to consider acquitted conduct); *United States v. Gray*, 362 F. Supp. 2d 714, 721-22 (S.D. W.Va. 2005) (noting that *Booker* called the holding of *Watts* into significant question), *aff'd*, 491 F.3d 138 (4th Cir. 2007).  Interestingly, in a survey of United States district judges conducted in early 2010 by the Sentencing Commission, only 16% of the 639 judges who responded (and who sentenced 116,183, or 79%, of the 146,511 individual federal criminal defendants in FY 2008 and 2009) believed that acquitted conduct should be considered "relevant conduct" for purposes of sentencing.  U.S. Sentencing Commission, *Results of Survey of United States District Judges January 2010 through March 2010* (June 2010), *available at* http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf.

#### D.    Tips Charged Only as Overt Acts Should Not Be Included in the Gain Calculation

The trial record strongly suggests that the jury also rejected the other alleged tips included in the conspiracy count and the December 2008 P&G trading that was not included as an overt act, but which was the subject of evidence offered by the government at trial.[13]  In the absence of a special verdict form, there is no way to know for sure whether the jury found the conspiracy included any transactions other than the September and October 2008 Goldman Sachs trades.  But the Court can make an informed judgment regarding the jury's reasoning underlying the acquittals.  Whereas in some cases there is no readily apparent explanation for a split verdict, this jury provided the starkest and clearest such explanation for acquitting on two counts (March 2007 Goldman and January 2009 P&G).  The jury declined to convict on the counts that were based only on circumstantial evidence and without wiretaps, and did so, as well, in the face of live accomplice testimony.  The reasonable conclusion to be drawn is that with respect to the overt acts, which the government chose not to include as substantive counts – presumably because it understood they were premised on even weaker circumstantial evidence – the jury would have reached the same result and acquitted.  The jurors' request for an instruction on "what would describe an over[t] act to further the conspiracy (Jury Note 2) – and the Court's supplemental charge that an act of any kind toward effectuating the conspiracy in any respect could constitute an overt act – further suggests they did not base the conspiracy conviction on overt acts other than the September and October 2008 Goldman trades.  (Tr. 3385, 3388-90).

---

[13]  The overt acts not included as substantive charges were (a) the September 2007 Goldman Sachs trades (Superseding Ind. ¶ 33(b)); (b) the June 2008 Smuckers trades (Superseding Ind. ¶ 33(c)); and (c) the June 2008 Goldman Sachs trades (Superseding Ind. ¶¶ 33(d) – (k)).  However, as the June 2008 Smuckers trades did not result in any gain, these need not be discussed.  (*See* Tr. 2403; PSR ¶ 49).

KL3 2899754.1

Like the January 2009 P&G trades of which Mr. Gupta was acquitted, the December 2008 P&G trades turned on the discredited testimony of Cardillo.  The government recognized the importance of Cardillo's testimony to the P&G allegations in its summation:  "Mr. Naftalis will surely ask you to discredit Mr. Cardillo's testimony . . . because that testimony is devastating to the defendant, devastating.  Ask yourself when you're evaluating that testimony did it make sense?  Did it fit with the other evidence, the calls, the trading records, the IM's." (Tr. 3233).  If the jury did not find that Cardillo's testimony "made sense" as to the January 2009 tip, surely it rejected, as well, the other alleged P&G tip, for which the government presented even weaker circumstantial evidence.[14]

With respect to the alleged September 2007 and June 2008 Goldman Sachs tips, the government offered in evidence only circumstantial evidence of trades by Galleon in Goldman Sachs after phone calls that may or may not have been between Mr. Gupta and Rajaratnam, with no evidence that the two spoke and no evidence regarding what was said.  Moreover, for September 2007, the call pointed to was four days after Mr. Gupta received the Goldman Sachs earnings information – and for June 2008, the government had to rely on inferential evidence that Mr. Gupta even had any information about Goldman Sachs' upcoming earnings release.  (Tr. 2630-33; DX 7).  This sparse circumstantial evidence, with no corroboration, is not enough to show insider trading by Mr. Gupta – as evidenced by the jury's refusal to convict on the March 2007 Goldman Sachs trades.

---

[14]   The government introduced close to no evidence relating to those trades – trades Cardillo had no recollection of executing – whereas Mr. Gupta provided evidence of both internal Galleon reports and external analyst reports showing that P&G was expected to miss its organic growth projections.  (Tr. 1222; DX 1045; DX 1051).

In sum, the most reasonable reading of the jury's verdict – and the one we submit the Court should adopt – is that Mr. Gupta's tipping of Rajaratnam did not go beyond the September 2008 and October 2008 Goldman Sachs tips.  In this respect, this Court's interpretation of the jury verdict in *United States v. Adelson* is instructive.  There, the defendant was found guilty of three counts of false filings, but was acquitted on seven counts of false filings that were all dated earlier than the three for which Adelson was convicted.  This Court found that the "most likely reading of the jury's verdict – and one that the Court accepted at sentencing – was that Adelson only joined the conspiracy toward its end."  441 F. Supp. 2d 506, 507 (S.D.N.Y. 2006); *cf. United States v. Pimental*, 367 F. Supp.  2d 143, 152 (D. Mass. 2005) (Gertner, J.) (sentencing based upon alleged misconduct not expressly found by the jury would "trivialize 'legal guilt' or 'legal innocence' – which is what a jury decides").  This reasoning applies equally here.

## IV.   A NON-GUIDELINES SENTENCE OF PROBATION WITH A CONDITION OF RIGOROUS, FULL-TIME COMMUNITY SERVICE IS APPROPRIATE

Although calculating the applicable Guidelines range is the required first step in the sentencing process, following *Booker* the Guidelines are advisory only and district judges are directed to "craft an appropriate sentence taking full account of 'the history and characteristics of the defendants.'"  *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring) (quoting 18 U.S.C. § 3553(a)(1)).  Put differently, the mechanistic approach of the Guidelines no longer controls sentencing outcomes, and district judges may once again exercise discretion in fitting sentences to a defendant's individual circumstances, *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005), giving "consideration [to] the judge's own sense of what is fair and a just sentence under all the circumstances."  *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

In exercising this discretion, judges are guided by 18 U.S.C. § 3553(a), which directs

them to impose a sentence that is "sufficient, but not greater than necessary" to, among other

considerations, "reflect the seriousness of the offense, . . . promote respect for the law, and

provide just punishment for the offense," and to "afford adequate deterrence to criminal

conduct."[15]  18 U.S.C. § 3553(a)(2).  The statute also directs courts to consider, among other

things, "the nature and circumstances of the offense and the history and characteristics of the

defendant," 18 U.S.C. § 3553(a)(1), as well as "the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar

conduct," 18 U.S.C. § 3553(a)(6).

We respectfully submit that a sentence within the Guidelines range in this case is far

greater than necessary to satisfy the purposes set forth in section 3553(a).

### A.       The Guidelines Place Undue Reliance on Gain in Insider Trading Cases

As this Court stated in *Adelson*, in financial fraud cases the Sentencing Guidelines place

an "inordinate emphasis" on "putatively measurable quantities, such as the weight of the drugs in

narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why

it is appropriate to accord such huge weight to such factors."  441 F. Supp. 2d at 509 (citing Kate

Stitch & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69

(1998) (concluding that the Sentencing Commission has never presented empirical evidence or

---

[15]   We respectfully submit that, in the circumstances of this case, the other enumerated statutory
considerations ("protect[ing] the public from further crimes by the defendant," and "provid[ing]
the defendant with needed educational or vocational training medical care, or other correctional
treatment in the most effective manner") do not apply.

substantial argument to support the proposition that its rules achieve, even imperfectly, any of the four well-established possible objectives of criminal sentencing)).[16]

The overemphasis upon "putatively measurable quantities" is particularly ill suited to insider trading cases, especially one like this in which the defendant received no financial benefit.  The Insider Trading Guideline (U.S.S.G. § 2B1.4) directs the use of gain in the calculation, employing the loss table used in calculating the Theft Guideline (U.S.S.G. § 2B1.1). In connection with a theft or embezzlement, the loss resulting directly from these types of fraud – for example, the amount of money embezzled from a defendant's employer, or the amount swindled directly from a victim in a one-on-one transaction – can perhaps be defended as a useful rough measure of culpability, because "loss" (whether actual or intended) may be a directly contemplated, and is likely to be a calculable, harm to an identifiable victim.  In such a case, there is at least some rough logic to the notion that thefts of greater sums are generally worthy of greater punishment.  But in insider trading cases, the Guidelines mandate that a gain calculation be used instead of any attempt to approximate victims' losses, because "the victims and their losses are difficult if not impossible to identify."  U.S.S.G. § 2B1.4 cmt. background. In other words, the loss table started as an attempt to measure the seriousness of a theft-type fraud by the extent of the harm, but in insider trading cases it has led to using gain even though it may have no relationship to the harm at all – much less an equivalency.  As this Court has explained, "[i]n the insider trading case . . . it is more attenuated, a more complex analysis."

---

[16]   Here, the gain calculation we believe should apply increases Mr. Gupta's Guidelines sentencing range five-fold, from 6-12 months (based on an offense level of 10) to 41-51 months (based on an offense level of 22).  The PSR calculation increases the range by a factor of as much as *sixteen* (from 6 months to 97 months, at the low end).

Sentencing Tr. at 9, *United States v. Jiau*, 11 Cr. 161 (JSR), Exh. D.[17]  In such cases, although

the dollars and cents calculation is not irrelevant, it is not "central to the evaluation of all the

factors under Section 3553(a)."  *Id.* at 38; *see also* Sentencing Tr. at 4, *United States v. Rosen*, 11

Cr. 300 (JSR) (Guidelines loss calculation "plays an overwhelming role that is contrary to . . .

elementary notions of justice or even common sense"), Exh. E.

And in fact, there is reason to conclude that trading gain is not a rational indicator of

degree of culpability.

First, in virtually all cases, the tipper has no control over either the scope of the trading

by the tippee or the gain realized by the trading.  Here, there was no evidence that Mr. Gupta had

any knowledge, either before or after the fact, of any details of Rajaratnam's trading or the extent

to which the Galleon funds did or did not profit from that trading.  And, indeed, there was no

evidence he realized any profits at all from the trading.  As Judge Lynch noted in a different

context, the gain amount is thus a "relatively weak indicator of the moral seriousness of the

offense."  *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004).

Similarly, in testimony before the Sentencing Commission, Circuit Judge Jon O. Newman

explained how the Guidelines' reliance on an incremental approach to culpability based on dollar

amounts makes "no penological sense" in any context, since the amount of loss often has little to

do with the actions or motivations of the defendant.  *U.S. Sentencing Commission Public*

*Hearing Testimony and Transcripts* (July 9, 2009) (Statement of Judge Jon O. Newman),

*available at*

---

[17]   Where we have cited to a sentencing transcript, we are attaching as an exhibit the relevant
excerpt, rather than the complete transcript.  Should the Court wish to see any of these
sentencing transcripts in their entirety, we will of course provide them.

http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20090709

-10/Newman_testimony.pdf.[18]

Second, the undue emphasis on the tippee's trading gain in the Guidelines calculation

ignores the specifics of the defendant tipper's conduct, including the presence or absence of

financial benefit.  A tipper who was paid in cash in exchange for information, cash he stored in

shoeboxes in his closet, or engaged in extensive trading of his own in off-shore accounts, is

treated the same as a tipper who received nothing more than an intangible relationship benefit

barely satisfying the legal requirement of *Dirks v. S.E.C.*, 463 U.S. 646 (1983).  Mr. Gupta did

not engage in or control any trading, was not in charge of running the scheme, and did not share

in any proceeds of the trading.  Indeed, Mr. Gupta did not profit at all from Rajaratnam's trading

in September and October 2008, and there was no evidence of any quid pro quo, or of any

financial benefit received by Mr. Gupta; there was not even evidence of some measurable

contemplated benefit that just happened not to pan out – only an attenuated (at best) inference of

a potential business or relationship benefit.  Under analogous circumstances in a pre-*Booker*

case, this Court has found a downward departure was warranted.  *See United States v. Oakford*

*Corp.*, 98 Cr. 144 (JSR), 1999 WL 1201725, at *10 (S.D.N.Y. Dec. 13, 1999) (downward

---

[18]   "[N]o criminal wakes up in the morning and decides that he is going to steal $4,000 dollars
but not $6,000 dollars.  He might make a conscious decision to rob a convenience store rather
than a bank, but once inside the convenience store, he opens the till and takes what is there.  The
fortuity of whether the till contains $4,000 or $6,000 dollars should not result in added
punishment."  As Judge Newman further noted, the incremental approach of the loss table
"create[s] an illusion of precision," when "in reality there are so many variables in determining
losses and so many problems in gathering evidence" that these numbers are speculative at best,
and completely arbitrary at worst.  *Id.* at 7.  This is an especially serious methodological flaw
given that, as this Court has recognized, adopting different calculation methods may change the
gain calculation by millions of dollars.  *See* Sentencing Tr. at 7, *United States v. Smith*, 11 Cr. 79
(JSR) (probation officer calculated a gain of $25 million, whereas the government and defendant
agreed the gain was approximately $3.8 million, "illustrat[ing] just once more the absurdity of
the guidelines"), Exh. F.

KL3 2899754.1

departure warranted where the offense level for each defendant was increased based on a $15 million gain calculation, but where "each of the defendants personally realized only a small portion of the overall gain or profits").

Finally, and in violation of the mandate of section 3553(a), the Guidelines' single minded focus on trading gain leads to disparate sentencing results for similarly situated defendants. To cite just one, directly relevant example, in the Galleon cases, the defendant whose offense is most closely comparable to that of Mr. Gupta is Robert Moffat. Moffat – whom we discuss further at pp. 76-77, *infra* – was a well-compensated, senior executive at IBM, privy to high level corporate secrets, who tipped hedge fund manager Danielle Chiesi on at least three stocks not for money but as part of an extramarital relationship. Yet simply because Chiesi's trades turned out to be unsuccessful, Moffat's Advisory Guidelines sentencing range was only 0-6 months. That is, the fortuity that the market turned against Chiesi led to a dramatically different Guidelines range for similar misconduct.

### B.      A Non-Custodial Sentence is Warranted Under Section 3553(a)

#### 1.      An Individualized Assessment of Mr. Gupta's Personal History and Characteristics, and the Nature of his Conduct, Warrant a Non-Custodial Sentence

We respectfully submit that, as described above and in the hundreds of letters presented to the Court, Mr. Gupta is very different from most defendants appearing before this Court for sentencing. His commitment to helping others, both individual human beings and the larger global community, is plainly a core expression of who he is – indeed, who he has always been, from childhood through professional maturity and success, and into his retirement years. Mr. Gupta's role in helping to create, and his lifelong involvement in, organizations devoted to global

health and other causes is extraordinary.  The conduct for which he was convicted represents an isolated aberration and a stark departure from this personal history.

### (a)      Lifetime of Good Works

Many white collar defendants can point to charitable contributions of some kind and in some degree.  But in imposing sentences pursuant to § 3553(a), courts have recognized the separate, and much smaller, category of defendants who have shown a "truly extraordinary" charitable record.  Where the convicted conduct is dramatically at odds with the defendant's life and character, especially where he has devoted significant time to civic and charitable contributions, courts have found the defendant deserving of a non-Guidelines sentence substantially below the Advisory range, including noncustodial sentences.  We do not believe any of these individuals presented a record of contributions to the community matching, in scope or duration, that of Mr. Gupta.  We have not found any case comparable to this one, in which the defendant can point not only to a significant expenditure of time and effort, but further, that he or she was involved in founding and helping to sustain major initiatives improving and in some cases saving millions of lives.

For example, in *United States v. Holzer*, 09 Cr. 470 (VM), the district judge did not follow the Advisory Guidelines range of 12-18 months, but instead imposed a sentence under section 3553(a) of five years probation with nine months to be spent in a halfway house.  In imposing this sentence, the Court agreed with the Probation Office's characterization of Mr. Holzer as a "good person who made a terrible mistake," and cited Mr. Holzer's "commendable community service and his pro bono work with various not-for profit organizations" as reasons for imposing a non-custodial sentence and not an Advisory Guidelines sentence.  *Holzer* Sentencing Tr. at 17, Exh. G.

Similarly, in *United States v. Peterson*, 11 Cr. 665 (RPP) – a directly comparable, and as discussed below at p. 80 in some respects more egregious, case involving an outside director of a public company who disclosed its not yet announced merger – the Court declined to sentence within the Advisory Guidelines range of 12-18 months and instead imposed a sentence of two years of probation and three months of home confinement, stating:

> I'm making that determination based on the content of the presentence report, which shows that he engaged in a number of civic activities not as a figurehead, but as a participant, a person who gave of himself, not just of his wallet, and engaged in community activities to help his community. And that's significant.

*Peterson* Sentencing Tr. at 19, Exh. H. Yet Peterson's admirable civic contributions (described as serving on various boards, instilling a culture of giving back to the community while he was a Managing Partner at Arthur Andersen, and supporting friends' causes) fall dramatically short of Mr. Gupta's extraordinary, decades-long dedication to community service.[19]

---

[19]  Courts in other Circuits as well have found that where the defendant's past good works indicate that the offense conduct was aberrational, a non-Guidelines sentence well below the Advisory Guidelines range is appropriate and just. *See United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008) (affirming sentence of probation with three months home confinement for wire fraud where Advisory Guidelines range was 18-24 months because defendant made an "isolated mistake" in the context of his entire life, which was otherwise outstanding and included devotion to family, community and church); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming 3 month sentence for Medicare fraud conspiracy of more than $5 million based on, among other things, defendant's charitable work, community service, generosity with his time and support and assistance of others).

Even in pre-*Booker* cases, in recognition of "truly extraordinary" charitable and community service, courts imposed sentences well below the then mandatory Guidelines. *See, e.g., United States v. Greene*, 249 F. Supp. 2d 262, 264 (S.D.N.Y. 2003) (in tax fraud case, court found the defendant was entitled to a seven level downward departure because he had donated his time, not merely money, by adopting six "hard to place" orphaned children); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming downward departure based on defendant's volunteer service with Marine Corps and as volunteer firefighter, as well as three recent acts of good samaritanism); *United States v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003)

### (b)    Aberrational Conduct

Recognizing that the jury has rendered its verdict, we respectfully submit that whatever the Court's view of the evidence, it is clear that Mr. Gupta's conviction reflects an aberration in the long life he has led with honesty, impeccable character, and a commitment to the well-being of others – and a deviation from that life record as to which, we submit, the underlying motivation was never adequately explained.  As described in Section III above,  based on the fairest reading of the jury's verdict, it was a brief aberration, covering just a one month period in September-October 2008.[20]

### 2.    A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities With Closely Comparable Cases

In determining the correct sentence, the Court must consider "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Even without regard to the exceptional nature of his character and life history, Mr. Gupta compares favorably with other insider trading defendants who received sentences well below the Guidelines range here.

---

(upholding departure based on, among other factors, the defendant's charitable works); *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (downward departure upheld based on support letters referring to defendant's "assistance, in time and money, to individuals and local organizations"); *United States v. Crouse*, 145 F.3d 786, 790 (6th Cir. 1998) ("exceptional" record of community service was a proper basis for a downward departure); *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (finding charitable contributions relevant to sentencing where the contributions exceeded mere financial support).

[20]  Even were the Court to consider the other alleged tips in fashioning an appropriate sentence – which we believe Your Honor should not, for reasons stated at pp. 63-67 – the record would still reflect a small number of such events, without trading by Mr. Gupta or trading profits, involving his dealings with just one other person, and in stark opposition to the overwhelming evidence of how he otherwise lived his life.

- 75 -

KL3 2899754.1

First, Mr. Gupta's is an anomalous case in several respects, and unlike any of the others arising from the Rajaratnam investigation. Mr. Gupta cannot be compared to Rajaratnam, in any respect. Rajaratnam was convicted of regular and systematic course of insider trading over a period of years. He had numerous sources, many of whom were paid large sums for passing material nonpublic information to him, and some of whom he assisted in hiding the receipt of those funds. At sentencing, Judge Holwell found that he obstructed justice by lying to the SEC. *United States v. Rajaratnam*, 09 Cr. 1184 (RJH), 2012 WL 362031, at *20 (S.D.N.Y. Jan. 31, 2012). In sharp contrast, Mr. Gupta was convicted of two instances of tipping in a one month period and, importantly, did not profit from the trading, nor did he engage in any trading of his own. And, although a relationship-based benefit suffices under the law, what that has generally meant is at least an identifiable such benefit – providing information in exchange for sexual favors or as part of an extramarital relationship, or providing information to a family member. Here, the only evidence of "benefit" was the vague and amorphous evidence relating to the ongoing business relationship and prospective arrangements between the two men. As the Court instructed, the jury had only to find "*some* personal benefit," that need not be financial or "tangible in nature," and could include as little as "maintaining a good relationship with a frequent business partner." (Tr. 3371 (emphasis added)). Whatever benefit the jury found met the government's burden on that element was, we respectfully submit, the slenderest possible such benefit. For this reason as well, the Advisory Guidelines sentencing range resulting from the profits of others is a wholly inappropriate touchstone for sentencing.

As noted above, in the Galleon-related cases, it is Robert Moffat whose sentence most appropriately should serve as a benchmark. Mr. Moffat was a highly compensated IBM senior executive who was paid millions of dollars each year (as much as $11.2 million in 2009), and

who was privy to significant corporate developments, which he illegally disclosed to Chiesi.[21] Chiesi then used the information to trade on behalf of the hedge fund which, although not quite as large as Galleon, had $1 billion under management.  Mr. Moffat's tips covered securities of three major public companies, IBM, Lenovo, and AMD, making his conduct even more severe than Mr. Gupta's conviction on two tips relating to a single stock.  Further, unlike Mr. Gupta, Mr. Moffat received an important and tangible benefit, albeit a romantic and not a financial one, directly in return for his tips.  And, like Mr. Gupta, Mr. Moffat was recognizably less culpable than the tippees, including not only Chiesi but also her supervisor, Mark Kurland.  In sentencing Kurland to 27 months, as opposed to Mr. Moffat's 6 months, the Court explained the difference as justified because "Mr. Moffat, though he breached his duty to his employer, did not provide information in exchange for money, and did not stand to make any monetary gains from his transgression."  *United States v. Kurland*, 718 F. Supp. 2d 316, 321 (S.D.N.Y. 2010).  Neither Moffat nor Kurland presented to the sentencing court anything remotely like Mr. Gupta's exceptional history of good works, justifying a sentence lower than either of them received under § 3553(a).  Finally, although Mr. Moffat pled guilty, he did not cooperate with the government, while Mr. Gupta went to trial.  As this Court has repeatedly recognized, the fact that Mr. Gupta exercised his constitutional right to put the government to its proof may not be used to penalize him further in sentencing.  *E.g.*, Sentencing Tr. at 55-56, *United States v. Jiau*, 11 Cr. 161 (JSR) ("We don't want to place such a premium on that aspect that we discourage people from exercising their constitutional rights.").[22]

---

[21]  As set forth in the government's sentencing memorandum in *United States v. Moffat*, 10 Cr. 270 (DAB), Exh. I.

[22]  As noted, the fact that Moffat's Guidelines calculation is lower than Mr. Gupta's is the result of the fortuity that Chiesi's trading was unsuccessful.

KL3 2899754.1

Mr. Gupta also compares favorably with Galleon-related defendants Anil Kumar, Rajiv Goel and Adam Smith, even taking into account their cooperation with the government (the importance of which we of course recognize).  Clearly, the fact that these men cooperated in the government's investigation was a significant factor in the determination of their sentences.  But their cooperation (meaningfully late in coming in the case of Smith, as we describe below) cannot be the sole determinant and must be weighed alongside (i) their graver misconduct, and (ii) Mr. Gupta's extraordinary personal history and characteristics, in order to avoid an unwarranted disparity between them.

Anil Kumar, who received a non-custodial sentence, is an appropriate comparator.  Their personal backgrounds are similar.  Like Mr. Gupta, Mr. Kumar attended IIT in Delhi before business school in the United States and later working at McKinsey.  At sentencing, Mr. Kumar was given credit by Judge Chin for his "[m]any charitable deeds both here and in India" – deeds that are admirable but represent a small fraction of the amount of time and energy Mr. Gupta has committed to giving back to others around the world.  In terms of the offense conduct, Mr. Kumar provided Rajaratnam with inside information regarding a number of McKinsey clients in exchange for substantial cash payments – $2.1 million (*Rajaratnam* Trial Tr. 243-44, excerpts included as Exh. J hereto) – which they took pains to disguise and on which Kumar paid no taxes.  (*Rajaratnam* Trial Tr. 246).[23]

Rajiv Goel's recent sentencing provides another appropriate Galleon-related point of comparison as well.  He pled guilty to providing Rajaratnam with inside information he learned

---

[23]   Rajaratnam's payments to Mr. Kumar in exchange for information were first made to a bank account in Switzerland held by a shell company, and then the cash was transferred to an off-shore account in the name of Mr. Kumar's house-keeper.  (*Rajaratnam* Trial Tr. 266-67).

as a managing director at Intel.  For two years, from 2007 to 2009, he tipped Rajaratnam on

multiple occasions regarding Intel's quarterly results and Intel's investment in Clearwire

Corporation.  Goel was a close friend of Rajaratnam's, but as with Kumar, the benefit Goel

received in exchange for inside information went beyond just cementing the relationship.

Rajaratnam "loaned" Goel $100,000 in 2005 (money that was never repaid), and he gave him a

gift of $500,000 in 2006 – money that Goel avoided paying taxes on by moving it into foreign

bank accounts.  As further incentive for providing inside information, Rajaratnam also executed

trades in Goel's Charles Schwab account, earning over $700,000 on his behalf.  Although the

government noted that "Mr. Rajaratnam was able to cajole and seduce insiders like Mr. Goel into

providing information," he did receive upwards of $1.3 million from Rajaratnam, whereas Mr.

Gupta did not receive any financial benefit.  Sentencing Tr. at 11, *United States v. Goel*, 10 Cr.

90 (BSJ), Exh. K.  Like Kumar, Goel received a sentence of probation.

Smith was one of Rajaratnam's closest colleagues.  He repeatedly obtained and misused

inside information throughout his time at Galleon, a seven year period from 2002 when he joined

as an analyst until Rajaratnam's arrest and the collapse of the firm in late 2009.  As he admitted

in his testimony in the Rajaratnam trial, Smith both traded illegally on the basis of the

information and provided it to others at Galleon who traded.  (*Rajaratnam* Trial Tr. 2444-45).

After having been confronted by the FBI in late 2009 (and having declined to answer any

questions, as was his right), he continued to violate the law.  He opened his own firm, and

embarked on a further course of insider trading there.  (*Id*. at 2445-46).  He also attempted to

cover up his crimes, by discarding an incriminating notebook and destroying his laptop

computer, later falsely claiming to his employer that he had "lost it."  (*Id*. at 2660-61, 2722).

Although Smith did eventually plead guilty and provide important information to the

government, for which he deserves and has received credit, he did not do so until more than a year after Rajaratnam's arrest.

In sum, Kumar, Goel and Smith (appropriately) received credit for cooperating with the government, whereas Mr. Gupta exercised his right to test the government's proof at trial. But the entirety of Mr. Gupta's circumstances assessed under § 3553(a), including but not limited to the crime of which he was convicted, measured against the totality of the circumstances of Messrs. Kumar, Smith and Goel, justifies for Mr. Gupta, no less than for them, a probationary sentence.

Moving from Galleon-related matters, a case directly comparable to Mr. Gupta's is that of H. Clayton Peterson, an outside director of publicly traded Mariner Energy Inc., who pled guilty to tipping his son that Mariner was about to be acquired by Apache Corp. Peterson's breach of duty was intended unambiguously to confer financial benefit on his family, and did – he directed his son to buy Mariner stock in a family member's account in advance of public disclosure of the merger. Like Moffat, Peterson pled guilty but did not cooperate. In light of Peterson's otherwise unblemished record and history of good works – not even remotely comparable to that of Mr. Gupta – the Court imposed a non-Guidelines sentence of two years' probation with three months of home confinement. Sentencing Tr. at 21, *United States v. Peterson*, 11 Cr. 665 (RPP).

Other non-Galleon cases worthy of the Court's consideration here, because they involve similarly situated defendants and are thus important in avoiding "unwarranted disparities," include *United States v. Gansman* (08 Cr. 471 (MGC)); *United States v. McDermott* (00 Cr. 161) (KMW); *United States v. Collotta* (07 Cr. 143 (VM)); and *United States v. Goehring* (05 Cr. 209

(JES)).  These cases involve defendants with access to inside information who were convicted of tipping others, all of whom are more culpable than Mr. Gupta.

- In *Gansman*, the defendant was a partner at Ernst & Young, accused of tipping his mistress, on numerous occasions, regarding a number of not yet announced mergers and acquisitions transactions involving Ernst & Young clients. Like Mr. Gupta, he went to trial.  He was convicted of tipping on five different occasions, covering multiple Ernst & Young clients.   Like Mr. Gupta, he did not receive a financial benefit of any kind; as here, the gain calculation was based on his tippee's profits.

  Yet Gansman's misconduct was plainly more serious than Mr. Gupta's.  He tipped on numerous occasions, breaching the trust of his employer and a number of its clients, in exchange for a tangible (non-monetary) benefit of importance to him.  Yet in sentencing Gansman to a below-Guideline sentence of a year and a day, Judge Cedarbaum concluded that "some consideration must be given to the nature and circumstances of this crime to the fact that the defendant did not personally gain." *Gansman* Sentencing Tr. at 17, Exh. L.  Moreover, there is no indication in the record that Gansman offered to the sentencing court anything like the personal history of good works presented here.

- *McDermott* is also an appropriate comparison case under section 3553(a)(6), involving a defendant "with a similar record[ ] who ha[s] been found guilty of similar conduct" – but, once again, it is a comparison that favors Mr. Gupta.  McDermott was the CEO of a major Wall Street firm providing investment advice and analysis in the banking sector.  He repeatedly provided material nonpublic merger and other information regarding stocks of six different public companies to his mistress, who had no investment experience and who he knew was going to trade based on the information.  Facing a sentencing range of 24-30 months under the then-mandatory Guidelines, McDermott was sentenced to eight months imprisonment.  Thus, like Mr. Gupta, McDermott was a senior insider who was convicted of tipping, but not trading on his own behalf or receiving any financial *quid pro quo*.  And, unlike Mr. Gupta, McDermott's benefit was clear and substantial – as the government argued, the tips allowed him to continue his affair with the tippee, and her profit from those tips "took the place of additional cash payments from him to her."  Government's Sentencing Mem., *United States v. McDermott*, 00 Cr. 61 (KMW), 2000 WL 35515558 (S.D.N.Y. July 19, 2000).

- Randi Collotta was a Morgan Stanley lawyer who, like Gansman, provided information regarding clients' upcoming transactions.  She tipped her husband, who in turn shared the information with a friend (who made $40,000 in trading profits) and others from whom he received $9,000 in kickbacks.  In addition, Randi Collotta's tips were then shared with a second level of tippees, who collectively made additional profits of $550,000.  She was sentenced to 60 days in jail and four years of probation, with Judge Marrero noting that just because Collotta was an insider did not make her the most culpable participant: "the Court notes that in the present case Ms. Collotta

did not conceive of the scheme and she profited from it only to a modest extent compared to the individuals with whom she disclosed the information." *Collotta* Sentencing Tr. at 11, Exh. M.

- In *Goehring*, the defendant, who was Gerber's director of communications, tipped a "close friend" ahead of two material Gerber announcements. Though his calculated Guidelines range was 10-16 months, he was sentenced to 2 years of probation, including 5 months home confinement. Goehring is comparable to Mr. Gupta in that there were only two tips, and the alleged benefit to him was enhanced friendship. Unlike Mr. Gupta, however, Goehring also financially profited by trading for his own account on the basis of the inside information.

As the sentences in these cases reflect, in carrying out the mandate of section 3553(a), a non-custodial sentence is appropriate in order to avoid unwarranted disparities.

### 3.      A Non-Custodial Sentence is Sufficient to Deter Others

In analyzing the § 3553(a) factors, this Court has pointed to both the need for general deterrence and the importance of assessing that need in relation to "the full measure of the human being who is before the Court." Sentencing Tr. at 39, *United States v. Fleishman*, 11 Cr. 32 (JSR), Exh. N.  For the reasons set forth below, we respectfully submit that a sentence of probation with the condition that Mr. Gupta undertake a lengthy and rigorous program of community service, is sufficient to effectuate the general deterrence objective.

As the Court considers general deterrence, it makes sense to think with precision about who is the target of the message, that is, which class of potential insider traders is sought to be deterred.  It is not simply the business community writ large, but rather directors and other very senior persons with access to sensitive information.  And, we respectfully submit, a person in that position is likely to think long and hard about whether to risk the fate that has been Mr. Gupta's even before imposition of any sentence (along with the requirement, should the Court impose it, that at the age of 64 he spend a lengthy period of time engaged in full time, difficult and rigorous community service).  His once sterling reputation, built over decades, has been

irreparably shattered, and his business and philanthropic accomplishments tainted.  He has had to

sever his association with the numerous humanitarian organizations to which he has been

devoting the lion's share of his time since his retirement from McKinsey, leaving him with little

to do and jeopardizing his ability to continue to serve the causes to which he has dedicated his

life – eradicating global health problems like malaria and AIDs, and strengthening India and its

educational opportunities, to name a few.  So, too, he was required to step down in disgrace from

a number of public company boards.  The amount of press and reporting on the trial has been

relentless and inescapable.  This is the quintessential case of a monumental fall that is, in and of

itself, severe punishment.[24]

        Mr. Gupta's family, too, has suffered under the glare of relentless media attention since it

was first reported in the media that he was being investigated in April of 2010.  Anita remains in

awe of the "strength and grace" her husband maintains for the sake of her and her daughters.

Nevertheless, she recognizes that her "girls put up a brave face but I see the pain and fear in their

eyes and don't know how to comfort them. I know how hard it is for them because they believe

so strongly in their father and the generous, good and honest man he has always been."  The

daughters' letters reveal that their father's trial has indeed been their tribulation as well.

Youngest daughter Deepali, who graduated from college while her father was on trial, writes:

>         This past year has been the most difficult that I have ever
> experienced – I was unsure how to treat the situation while at
> school, found it hard to engage with my classes, and at times felt
> incredibly guilty for even being there while my family was going
> through such a difficult time at home. My father told me repeatedly
> not to worry, that I should be strong, that he would be fine if I was

---

[24]  In addition to the fact that potential similarly situated offenders will likely be deterred by the
extent to which Mr. Gupta has already been punished, the need for a custodial sentence in order
to achieve general deterrence is further lessened by the recent highly publicized insider trading
prosecutions in this district.

fine and that the best thing for me to do would be to take comfort in my every day life – class, work, friends, and family. He said this to me countless times throughout this year, and it was the first thing he said to me after the jury delivered [its] verdict. I am trying to look forward to this year, to building a life and a career for myself, but I can't help worrying about what the immediate future holds. I worry for myself, my nieces, my sisters, and my mother, because I can't imagine every day life for any of us without my father.

Daughter Aditi "worr[ies] about what it would be like to lose my father to a prison sentence," but says the "truth of the matter is that much of what I depended on I have lost already." Having so often relied on her father's care and counsel in the past, now, she writes, "[w]hen I see my father quiet or stressed the last thing I feel that I can do is ask him for help or advice. Knowing that his greatest priority is for me to be happy, I hesitate to ever tell him that I'm not. These lies of omission have escalated over time, as I've waited for a 'better time' to burden him with my problems, and that 'better time' has not come." The impact of the allegations against Mr. Gupta will also be felt by a network of extended family members who have come to rely on his presence in their lives. "Only now," writes eldest daughter Geetanjali, "as we contemplate the possibility of losing him, have I realized how many people my father has helped, comforted, cared for, and supported."[25]

Respectfully, what Mr. Gupta has undergone during the last two-plus years, and impact on his professional and charitable endeavors going forward represents extensive punishment. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (the "need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial

---

[25]  We recognize, of course, that the collateral impact on the defendant's family is not uncommon. We cite it here only as part of the deterrence analysis, i.e., as having a deterrent effect on the type of potential wrongdoer considering Mr. Gupta's situation and assessing whether to risk acting illegally.

KL3 2899754.1

punishment on the defendant"); *United States v. Coughlin*, No. 06-20005, 2008 U.S. Dist. LEXIS 11263, at *27 (W.D. Ark. Feb. 1, 2008) (in sentencing Thomas Coughlin, the former Chief Operating Officer of Wal-Mart, the Court found that a sentence of probation and home detention was "capable of deterring corporate executives like Coughlin, who cherish their freedom of movement and right to privacy, from engaging in conduct similar to Coughlin's").[26]

## V.     A SENTENCE OF PROBATION WITH A CONDITION OF RIGOROUS, FULL-TIME COMMUNITY SERVICE IS SUFFICIENT TO ACHIEVE THE GOALS OF SENTENCING

Courts have recognized that in an appropriate case, and if used wisely, probation is sufficiently serious punishment to satisfy the statutory mandate that the sentence reflect the seriousness of the offense and provide just punishment. *See United States v. Brady*, 02 Cr. 1043 (JG), 2004 WL 86414, at *8-9 (E.D.N.Y. Jan. 20, 2004) (probation "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant.") (quoting U.S.S.G. Manual ch. 5, pt. B, introductory cmt.); *Coughlin*, 2008 U.S. Dist. LEXIS 11263 at *20-22 ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive." Recognizing that white-collar offenses are "gravely

---

[26]  Notably, despite the important role assigned to deterrence in criminal sentencing, "we do not have very solid and credible empirical evidence that deterrence through the imposition of criminal sanctions works very well."  Raymond Paternoster, *Crimes and Punishment: How Much Do We Really Know About Criminal Deterrence?*, 100 J. Crim. L. & Criminology 765, 766 (2010).  Further, there is considerable evidence that general deterrence of white collar defendants is achieved by the imposition of any punishment, regardless of severity.  *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("even relatively short sentences can have a strong deterrent effect on 'white collar ' offenders") (citing Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. Ill. U. L. J. 485, 492 (1998)).

serious and demanding of considerable punishment," the court found that probation and home detention could accomplish the goals of punishment "more effectively than imprisonment" and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished.").

We ask the Court to impose a probationary sentence, with the condition that Mr. Gupta perform, for a significant period, a rigorous, full-time program of community service. Below, we detail for the Court's consideration two such potential programs of community service. At the Court's direction, Mr. Gupta would, of course, be prepared to undertake any community service the Court concluded was appropriate. We first describe a proposed course of service, with Covenant House, which provides emergency shelter and other services for homeless, runaway and at risk youth. Mr. Gupta would provide direct services to these children at Covenant House's New York site, including working as part of the intake team at the Crisis Center, and assisting participants in the transitional living program known as "Rights of Passage" and in job training. In addition, he would assist Covenant House in developing a plan to implement a set of strategic initiatives for the organization.

Separately, we set forth a less orthodox but innovative proposal pursuant to which Mr. Gupta, under the direction and the supervision of the government of Rwanda, along with CARE USA, a leading humanitarian and development organization with operations in Rwanda, would live and work with government officials in rural districts there, helping to implement the country's initiative to improve delivery of health care (with a particular focus on HIV/AIDS and malaria) and agricultural development. We recognize this is an unusual community service proposal, but one that could potentially provide great benefits to large numbers of Rwandans desperately in need of help, and which Mr. Gupta is uniquely situated to perform. Moreover, it would require Mr. Gupta to confront significant hardships and would thus constitute punishment

commensurate with the seriousness of the offense, as Mr. Gupta would be thousands of miles from his family and friends, and would be living in basic accommodations in rural areas of the country.

### 1.    Covenant House

Since 1972, Covenant House has provided emergency shelter and other services for homeless, runaway and at risk youth.  It is the largest privately funded agency fulfilling this critical need in the United States, Canada and Latin America, operating programs in 23 cities and serving more than 50,000 young people each year.  As set forth in greater detail in the enclosed letter to the Court from Kevin Ryan, the President and CEO of Covenant House International, the parent organization, the actual need, particularly in the current difficult economic environment, is far greater.  (Exh. O).

Mr. Ryan and other representatives of Covenant House have met with Mr. Gupta and discussed how his talents might best be utilized by the organization.  The proposed plan, formulated as a result of these discussions and consisting of two parts, is described in Mr. Ryan's letter.

First, with the Court's approval, it is anticipated that Mr. Gupta would provide direct services in three components of Covenant House's work with homeless children:

- **Crisis Care**.  The Crisis Centers, including one on Manhattan's West Side, where Mr. Gupta would work, are the facilities the children see first.  He would be part of the intake team, which takes care of the child's immediate needs (food, shower, clean clothing, a safe bed and environment and establishing trust, a medical evaluation), and develops a case plan tailored to the individual child.

- **The transitional living program known as "Rights of Passage."**  This program addresses the long term needs of the children and provides young adults (18-21 years old) with a stable home for up to 18 months.  They learn to live independently and

develop basic life skills. Mr. Gupta would assist the participants in the Rights of Passage program with, among other things, resume writing, basic financial skills, interviewing skills, job coaching, and other interpersonal skills.

- **Job Training**. As noted in Mr. Ryan's letter, Mr. Gupta would be expected to spend a portion of each day in the Covenant House job training center, helping the young adults understand and make their way through the job search process.

Second, Mr. Gupta would assist in Covenant House's ongoing effort to develop strategic initiatives to enable the organization to expand its services to greater numbers of homeless young people, to improve the quality of services delivered and outcomes obtained, and to put the organization on a stronger financial footing. As set forth in Mr. Ryan's letter, he would work on revenue diversification, measurement of impact of Covenant House programs, expansion of services to meet the current acute need, and organizing and defining the roles of and relationship between the parent organization, Covenant House International, and the individual sites. (Exh. O at 2-4). As noted by Mr. Ryan, "if Covenant House had the resources to engage someone to assist in these initiatives, Mr. Gupta would be an ideal fit. For us to receive his services as part of his sentencing would truly be a blessing, at a crucial time in our history." (Exh. O at 4).

As described in Mr. Ryan's letter, it is anticipated that Mr. Gupta would work from 8:00-10:00 a.m. and from 3:00-7:00 p.m. in the direct services portion of the proposed community service, with the intervening hours devoted to developing and implementing strategic initiatives. Mr. Gupta would be supervised in these two areas by James White, Executive Director of the Covenant House program in New York (direct services) and John Ducoff, Senior Vice President of Strategic Planning and General Counsel (strategic initiatives), with regular reporting as directed by the Court.[27]

---

[27]  In addition to this proposed program of service with Covenant House, Mr. Gupta would be able, on weekends and nights, to continue his assistance to a number of the organizations badly

### 2.  Rwanda

Since the genocide of 1994, the United States has invested heavily in Rwanda, including in the health and well-being of the Rwandan people.  Among other such investments, President Obama created the Global Health Initiative ("GHI") in 2009, incorporating the President's Emergency Plan for AIDS Relief and other similar programs into a six year, $63 billion initiative to develop a comprehensive U.S. government strategy for global health.  Rwanda was named one of the first eight "GHI Plus" countries, which are to receive special consideration and funding. *See*, *e.g.*, Kaiser Family Foundation Report, *US Global Health Policy:  The U.S. Global Health Initiative, A Country Analysis* (Feb. 2011), www.kff.org/globalhealth/upload/8140.pdf.  Aiding in the development of Rwanda, and improving the health of its people, is a U.S. foreign policy priority.

At the request of four leading figures in the fight against disease and poverty in developing countries, and following consultations, the Rwandan government has expressed support for a program of service in which Mr. Gupta would "work with rural districts to ensure that the needs to end HIV, malaria, extreme poverty, and food security, are implemented." (Letter to President Paul Kagame, and Response from the Minister of Justice/Attorney General, Tharcisse Karugarama, Exhs. P and Q).  The Minister further advises the Court that the Rwandan

---

in need of his expertise and assistance.  Along with the humanitarian work we have described in this memorandum, he was also in the process of developing new initiatives such as the Urban Institute of India – an effort to bring the private sector, academia, and the Indian government together to address accelerating migration to India's cities, which are unprepared for the challenge – but he has not been able to see through their growth.  Notably, as described in a letter of Indian lawyer Rajiv K. Luthra, "were Mr. Gupta to receive a prison sentence, his charitable and humanitarian initiatives [in India, including the fledgling Urban Institute] would be substantially impaired."  (Exh. R).  This is because imprisonment, while available under the criminal code in India for "white collar" offenses, is in practice "generally reserved for violent offenders posing a grave threat to society and for political corruption cases."  For this reason, "[m]any business, education and government leaders and organisations involved in [Mr. Gupta's charitable] endeavours, will be likely to and/or unwilling to work with him."

government would accept "responsibility for crafting a [specific] program of work, for the terms imposed on Mr. Gupta being carried out, and to ensure that regular reports are provided to the appropriate authorities in the United States by the Ministry of Justice/Attorney General's office." (Exh. Q at 2).  In addition, the Rwandan government expects to join with a U.S. based organization already working in the country to ensure effective supervision of Mr. Gupta's service.  (*Id*. at 4)  Helene Gayle, the President and CEO of CARE USA, which operates programs in food, livelihood, health and education in Rwanda, writes to the Court that CARE, is prepared to partner with the Rwandan government in the supervision of Mr. Gupta, and to provide such periodic reports on his work and outcomes, as the Court directs.  (Exh. S).

     As the Justice Minister/Attorney General states:

> Mr. Gupta, and his contributions to Rwanda and other developing countries, are well known to us.  We believe he can make a significant difference in helping us to accomplish the aforementioned objectives [*i.e.*, ending HIV, malaria and extreme poverty and ensuring food security].

The challenges facing Rwanda require not just subject matter expertise, but management expertise.  Mr.Gupta's organizational and management acumen is directly relevant to the challenges, including (i) prioritization and efficient deployment of resources given scarcity; Mr. Gupta has spent his entire career working with the private sector, governments, and United the Nations to this end; and (ii) capacity building, that is, helping Rwanda in the creation of institutions that can train the next generation of leaders, as well as "on-the-job" training for the government officials in the rural districts to help ensure that the gains made would be sustained over time.

     As mentioned above and noted in the Minister's letter, Mr. Gupta would live in the rural districts, helping directly to improve outcomes where the need is most acute.  Significantly, he

- 90 -

would experience a measure of real sacrifice, thousands of miles from his family and living in

spare, rural accommodations – that is, it would be punishment reflecting the seriousness of the

offense of which he was convicted, satisfying section 3553(a), while at the same time enabling

him to give back to society and employ his talents in a country, and in a manner, consistent with

U.S. interests.

KL3 2899754.1

## VI.    CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a sentence of

probation with the condition that Mr.Gupta perform a rigorous full-time program of community

service.


Dated:  October 17, 2012




Respectfully submitted,

Kramer Levin Naftalis & Frankel LLP


By:  /s/ Gary P. Naftalis
    Gary P. Naftalis
    David S. Frankel
    Robin M. Wilcox
    Megan Ryan
    Elliot Smith[28]
    1177 Avenue of the Americas
    New York, New York 10036
    Tel: (212) 715-9100
    Fax: (212) 715-8000
    gnaftalis@kramerlevin.com
    dfrankel@kramerlevin.com
    rwilcox@kramerlevin.com
    mryan@kramerlevin.com
    esmith@kramerlevin.com

    *Attorneys for Rajat K. Gupta*

---

[28] Not yet admitted.

KL3 2899754.1