UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
UNITED STATES OF AMERICA :
:
- v. - :     S1 11 Cr. 907 (JSR)
:
RAJAT K. GUPTA, :
:
Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York

Richard C. Tarlowe
Assistant United States Attorney
    - Of Counsel -

I. **INTRODUCTION**

The Government submits this memorandum in connection with the sentencing of Rajat Gupta. Gupta was convicted after trial of one count of conspiracy to commit securities fraud and three counts of securities fraud in connection with an insider trading scheme in which Gupta provided material nonpublic information to Raj Rajaratnam in violation of Gupta's fiduciary and other duties of confidentiality so that Rajaratnam could use the information for trading purposes.

Gupta's position on the Boards of Directors of Goldman Sachs and Procter & Gamble ("P&G") gave him privileged access to sensitive and confidential information. Rather than use that information solely to serve the interests of the shareholders, as he was obligated to do, Gupta violated boardroom confidences and used the information he learned as a Director to help Rajaratnam and others at Galleon make millions of dollars in illegal profits. For the reasons discussed below, a significant term of imprisonment is necessary to reflect the seriousness of Gupta's crimes and to deter other corporate insiders in similar positions of trust from stealing corporate secrets and engaging in a crime that has become far too common. The Government respectfully submits that a sentence within the applicable Guidelines range of 97 to 121 months' imprisonment is appropriate.

II. **OFFENSE CONDUCT**

On June 15, 2012, the jury returned a verdict of guilty on four of the six counts in Indictment S1 11 Cr. 907 (JSR) against Gupta. The evidence at trial established that Gupta, a member of the Boards of Directors of Goldman Sachs and P&G, conspired with Raj Rajaratnam, the head of Galleon Group ("Galleon"), and others to provide material, nonpublic information ("Inside Information") to Rajaratnam in violation of Gupta's duties to Goldman Sachs, P&G, and

1

the shareholders of these public companies, so that Rajaratnam could trade securities on the basis of the Inside Information. Moreover, the evidence established that on multiple occasions between March 2007 and January 2009, Gupta tipped Rajaratnam with specific Inside Information that Rajaratnam and others at Galleon then used to execute trades.[1]

The evidence at trial demonstrated that Gupta knew what he was doing was improper and unlawful. Indeed, Gupta had spent much of his career in a profession built on protecting the confidences of clients. He understood as well as anyone the important responsibility that comes with being in a position of trust. Moreover, as a member of the Boards of Goldman Sachs and P&G, Gupta personally participated in approving the internal policies at these companies that prohibited the disclosure of confidential information.

Gupta tipped Rajaratnam because of their longstanding personal and professional relationships. Gupta himself described Rajaratnam as a "very close friend." (GX 1922). In addition, Gupta's interests often were aligned with those of Rajaratnam and Galleon such that Gupta stood to benefit if Galleon was successful. Gupta benefitted and expected to benefit from the following professional associations with Rajaratnam:

- From 2005 through 2008, Gupta had invested $10 million in and owned a twenty percent ownership stake in a highly-leveraged investment fund called Voyager. Rajaratnam controlled and managed the Voyager assets and invested some of those assets in Galleon funds.

---

[1] The jury convicted Gupta of substantive securities fraud counts relating to two tips: (1) Gupta's tip on September 23, 2008 regarding the $5 billion capital infusion by Berkshire Hathaway and (2) Gupta's tip on October 23, 2008 regarding Goldman Sachs's negative interim financial results. The evidence at trial also established tips by Gupta on several other occasions, as set forth more fully in the Presentence Report prepared by the Probation Office.

- In 2006, Gupta and Rajaratnam served as founding partners of a private equity fund called New Silk Route, or NSR, and Gupta became the Chairman of the fund with a large ownership stake.  Rajaratnam's status as a founding partner, his $50 million commitment to the fund, and his participation on the investment committee helped Gupta and the other partners raise money from investors. Indeed, in the fall of 2007, Gupta solicited investments in NSR from numerous friends and business associates, including members of the Boards of Goldman Sachs and P&G, by specifically identifying Rajaratnam as one of the founding partners with a $50 million capital commitment.

- In or about early 2008, Rajaratnam appointed Gupta Chairman of Galleon International, a billion-dollar Galleon fund, and Gupta believed that he was going to receive a portion of the fund's performance fees.  In connection with Gupta's financial interest in Galleon International, Gupta met with potential Galleon investors abroad and in the United States to solicit investments in Galleon.

- In or about early 2008, Rajaratnam awarded Gupta an ownership stake in another Galleon fund called the Galleon Special Opportunities Fund.

Furthermore, in late 2008, after the Voyager investment declined in value following the bankruptcy of Lehman Brothers, Gupta hoped that Rajaratnam would make Gupta whole from the losses that Gupta had suffered in Voyager.

The July 29, 2008 telephone conversation between Gupta and Rajaratnam intercepted pursuant to a Court-authorized wiretap provides an extraordinary window into Gupta's state of mind and willingness to breach his duties to please Rajaratnam.  After being asked by Rajaratnam about a rumor concerning Goldman's strategic plans, Gupta casually and without any hesitation or reservation disclosed to Rajaratnam the deliberations of the Goldman Board. During that same conversation, Rajaratnam referenced the millions of dollars that he had been paying Anil Kumar offshore, in cash, for several years.  Remarkably, Gupta did not even flinch upon hearing that Kumar, who was a senior official at McKinsey and had been Gupta's protégé, had this secret and almost certainly illicit arrangement with Rajaratnam.  The conversation also

3

reflected that Gupta was motivated to assist Rajaratnam and others at Galleon because of his relationship with Rajaratnam and his direct, personal financial interest in Galleon International.

### III.   THE PRESENTENCE REPORT AND GUIDELINES CALCULATION

The Probation Office calculated Gupta's Guidelines range as follows:

1. Pursuant to U.S.S.G. § 2B1.4, which is the applicable Guideline for insider trading, the base offense level is 8.

2. Pursuant to U.S.S.G. §§ 2B1.4(b) and 2B1.1(b)(1)(K), as demonstrated at trial and as set forth in the Presentence Report, the gain from the defendant's offenses is more than $7 million but less than $20 million and thus Gupta's offense level is increased by 20 levels. The base offense level for insider trading is increased by the "gain resulting from the offense" from the table in § 2B1.1(b)(1). The "gain" is "the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information . . . ." U.S.S.G. §2B1.4. cmt.  This Court need only make "a reasonable estimate" of the gain.  U.S.S.G. § 2B1.1 cmt. n.3(c); *United States* v. *Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007).

3. Pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of public or private trust (and, in this case, both), in a manner that significantly facilitated the commission of the offense, the offense level is increased by 2 levels.

As a result, with a total offense level of 30, and Criminal History Category I, the Guidelines range for Gupta is 97 to 121 months' imprisonment.

IV.   **ANALYSIS**

For the reasons discussed below, Gupta's illegal conduct warrants a significant term of imprisonment.

   A.   **The Nature and Circumstances of Gupta's Criminal Offenses**

Gupta's crimes are shocking. Gupta had achieved extraordinary personal and professional success and was at the pinnacle of a profession built on protecting client confidences. As a member of the Boards of Goldman Sachs and P&G, Gupta held positions of extraordinary privilege and prestige. He understood as well as anyone the special responsibility that came with being in such an extraordinary position of trust. He knew that he had a clear and unequivocal duty to protect the interests of the shareholders of these public companies and to protect the secrets that he learned as a member of these Boards. Yet, time and time again, over the span of nearly two years, Gupta flouted the law and abused his position of trust. Rather than serve the interests of the shareholders, as was his obligation as a Director, Gupta used the confidential information he learned as a Board member to help Rajaratnam and others at Galleon make millions of dollars in illegal profits, at the expense of the public.

Gupta's crimes are extraordinarily serious and damaging to the capital markets. Insider trading causes harm in many forms, including undermining confidence in the integrity of the financial markets, disadvantaging ordinary investors who follow the rules, and violating confidences of companies whose secret information is stolen. In this case, the conduct carries an added layer of harm because of Gupta's status as a member of the Board of Directors. Any time a company insider discloses corporate secrets so that a friend or business associate can use those secrets at the expense of the investing public, it undermines the public's confidence in the

5

integrity of the financial markets. But when that individual is someone of Gupta's stature and position, the resulting damage is magnified. It understandably fuels cynicism among the investing public that Wall Street is rigged and that Wall Street professionals unfairly exploit privileged access to information. This is particularly troubling at a time when there is widespread concern about corruption, greed, and recklessness at the highest levels of the financial services industry.

      Although Gupta's criminal conduct appears to represent a deviation from an otherwise law-abiding life, Gupta's crimes were not an isolated occurrence or a momentary lapse in judgment. Indeed, the opposite is true. Gupta repeatedly tipped Rajaratnam with corporate secrets for nearly two years. And the ease with which he disclosed confidential information to Rajaratnam in the July 29, 2008 wiretapped conversation reflects the total disregard he showed for his fiduciary duties and the callousness with which he handled confidential information.

      Perhaps the most appalling example, though, was Gupta's illegal tip to Rajaratnam on September 23, 2008 regarding Warren Buffett's $5 billion infusion of capital to Goldman Sachs. On that occasion, Gupta learned Inside Information about Buffett's investment during a special meeting of the Goldman Sachs Board that ended just minutes before the market closed for the day. Because the news was going to be made public shortly thereafter, Gupta knew that the window of opportunity for Rajaratnam to illegally profit on the information was very small. Gupta knew that he would have to act fast, and that is precisely what he did. Gupta's first call after the Board meeting ended, made within approximately one minute of the conclusion of that Board meeting, was to Rajaratnam. When Rajaratnam's secretary answered, Gupta told her it was urgent that he speak to Rajaratnam. Gupta then provided the Inside Information to

Rajaratnam, enabling him to purchase hundreds of thousands of shares of Goldman Sachs stock in the final two minutes before the market closed for the day at the expense of other investors. Later that evening, just minutes after receiving an email from Goldman Sachs with the press release announcing Buffett's investment, Gupta eagerly reached out to Rajaratnam again, making three consecutive attempts to reach him at three different numbers in the span of about 60 seconds. At a time when the financial markets were unstable and the public's confidence in the market already rattled, Gupta put personal interests above those of the public, Goldman Sachs's shareholders, and others.

Furthermore, Gupta's insider trading conduct represented a far greater threat to our capital markets than the typical case, not only because of Gupta's status as a Board member but because Gupta knowingly gave material nonpublic information to someone who managed billions of dollars in assets and whose sole business was to buy and sell stocks. Gupta was acutely aware of the size and scope of Galleon's trading operation. Gupta had personally invested in Galleon funds; frequently visited the Galleon office; and in 2008, met with potential investors abroad and in the United States to solicit investments on behalf of Galleon. Gupta fully understood how his illegal tips would be exploited to great financial gain. In that sense, this case is distinguishable from that of a tipper who does not fully appreciate the magnitude of the trading activity that follows. Here, the profits his tips could generate were not only foreseeable, they were an intended and known consequence of his actions.

  **B.**  **History and Characteristics of the Defendant**

On the one hand, trial evidence and the many letters submitted by Gupta to the Court show that Gupta had an incredibly successful career, participated actively in a number of

charitable organizations, and was a loving and responsible family man to his wife, children, and other relatives. The Court can and, of course, should take that good conduct into account in fashioning an appropriate sentence.

On the other hand, Gupta took advantage of the trusted relationships that he had built from a lifetime of good conduct to violate the law at the expense of the public and the companies he was supposed to serve. Gupta was deceptive and dishonest with the other members of the Boards of Goldman Sachs and P&G, the management and employees of Goldman Sachs and P&G, and the shareholders of Goldman Sachs and P&G. His repeated conduct over nearly two years demonstrated an utter lack of respect for the law. In committing his crimes, Gupta displayed an above-the-law arrogance and never expressed any concern about the harm he was causing to Goldman Sachs, P&G, the markets, or other investors.

### C. The Need To Afford Adequate Deterrence

As this Court has recognized in the context of insider trading cases, one of the most important factors the Court must consider under Section 3553(a) is the need for the sentence to afford adequate deterrence. *See United States* v. *Fleishman*, 11 Cr. 32 (JSR), 12/21/2011 Sentencing Transcript, at 38-39. Given the inherent difficulties in detecting and prosecuting illegal insider trading crimes and the evidence of rampant insider trading during the last several years, a substantial term of imprisonment is necessary and, indeed, essential to achieve the goals of general deterrence. *See id.*

Because insider trading schemes are difficult to detect and can be highly lucrative, significant punishment is necessary to deter others from similar conduct. *See, e.g., id.* (discussing need for general deterrence given that "[t]he ability to get access to inside

8

information, the ability to see its potential in the marketplace, the ability to trade on it, is so easy; [and] the ability of the government to detect these activities is so difficult . . . ."); *United States* v. *Jiau*, 11 Cr. 161 (JSR), 9/21/2011 Sentencing Transcript, at 40 (discussing need for general deterrence because "by its very nature [insider trading] is hard to detect but easy to commit and so the temptation is great and the chances of getting away with it, so to speak, are great."); *United States* v. *Naseem*, 07 Cr. 610 (RPP), 5/30/2008 Sentencing Transcript, at 70 ("I'm not sure the guideline offense [level for insider trading] is great enough. This kind of conduct has been prosecuted before and it doesn't seem to deter people very much. So that is a strong reason to adhere to the guideline calculation."); *see also United States* v. *Kurland*, 718 F. Supp. 2d 316, 321 (S.D.N.Y. 2010) (Marrero, J.) ("The Court gives significant weight here to the principle of general deterrence, and the importance of serious enforcement of the securities laws, particularly in cases such as this, where an individual with great influence in the securities field flouts the law. Mr. Kurland built his life off of the integrity of the stock markets, and it is this Court's view that he therefore had a special responsibility to safeguard the integrity of those markets, and to set an example: that insider trading is serious criminal behavior, and not simply an unwritten part of the job description."); *United States* v. *Koulouroudis*, 09 CR 440 (PGG), 4/9/2010 Sentencing Transcript, at 27-28 ("Given the enormous financial awards as a result of this kind of fraud and the difficulties of detecting it, it is my belief that a term of imprisonment is often appropriate in this type of case to serve certain objectives and general deterrence and respect for the law."); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a

9

crime and hence the punishment required to deter it.").

Imposing a significant sentence for insider trading to deter others from participating in this kind of conduct is particularly appropriate in this case for several reasons.  First, Gupta's prominence in the business community means that the Court's sentence has the potential for a greater deterrent impact than a similar sentence in the average case.  Second, a significant sentence will send a clear message to Board members and other high-level corporate insiders – the very people who have the most access to material nonpublic information – that insider trading will not be tolerated or punished lightly, regardless of the status of the offender.  Gupta's counsel argued to the jury in this case that Gupta's conduct had none of the indicia of "real insider trading," such as "secret payments" or "cash changing hands."  (Tr. at 3244).  It may very well have been that type of thinking that contributed to Gupta's callousness and above-the-law arrogance.  This Court should send an unmistakable and unambiguous message that tipping by a Board member or corporate executive *is* insider trading, whether or not there are secret cash payments; and insider trading will be punished severely not only when committed by a low-level employee who receives secret cash payments, but also when committed by a Board member or senior executive who tips a friend or business associate from the confines of an executive suite or corporate boardroom.  Third, a sentence that is not commensurate with the sentences imposed on other recent insider trading defendants who held lower-level positions and were not as successful, prominent, or well-connected as Gupta also runs a serious risk of undermining public confidence in the criminal justice system.

V.  **RESTITUTION AND FORFEITURE**

The Government may obtain a money judgment against the defendant to recover the amount of the crime proceeds. *See United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012). In the context of insider trading violations, the definition of "proceeds" is "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." *Id.* (quoting 18 U.S.C. § 981(a)(2)(B)). As set forth in the Presentence Report, the trading gains resulting from Gupta's illegal tips to Rajaratnam were approximately $11,550,000 (excluding losses avoided). A reasonable and conservative estimate of the portion of those profits that Rajaratnam himself realized (as opposed to investors of Galleon) is 10%, or $1,150,000.[2] The Court should order forfeiture in that amount.

In addition, the Mandatory Victims Restitution Act of 1996 ("MVRA") "provides for mandatory restitution in all sentencing proceedings for convictions of any offense that is, *inter alia*, an offense against property under Title 18 in which an identifiable victim or victims has suffered pecuniary loss." *United States v. Bengis*, 631 F.3d 33, 38-39 (2d Cir. 2011) (citing 18 U.S.C. §§ 3663A(C)(1)(ii)-(c)(1)(B)). Because Gupta was convicted of conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, he is obligated to make restitution under the MVRA. *See United States v. Skowron*, 839 F. Supp. 2d 740, 744 (S.D.N.Y. 2012). Goldman Sachs, an identifiable victim of Gupta's criminal conduct, is seeking restitution in the amount of $6,780,369.34, which Goldman Sachs has advised the Government consists of

---

[2] This is based on an estimate that Rajaratnam received approximately 50% of Galleon's performance fee, which was equal to 20% of the profits less Galleon's 2% management fee. Rajaratnam also had a personal interest in Galleon funds as a direct investor and pursuant to a deferred compensation plan. The size of those interests varied by fund and over time.

(1) the legal fees and related costs Goldman Sachs incurred in the course of investigations and legal proceedings arising from Gupta's conduct and (2) a portion (namely, 25%) of the compensation that Goldman Sachs paid to Gupta as a Director.

## VI. CONCLUSION

The Government respectfully requests that the Court impose a sentence that is commensurate with the significance and gravity of Gupta's criminal conduct and consistent with the need to deter others in positions of trust from succumbing to the same temptation that has landed Gupta in the position he is in today. For the reasons described above, the Government respectfully submits that a sentence within the Guidelines range of 97-121 months' imprisonment is appropriate.

Dated: New York, New York
       October 17, 2012

                                                        Respectfully submitted,

                                                        PREET BHARARA
                                                        United States Attorney

By:    /s Richard C. Tarlowe
        Richard C. Tarlowe
        Assistant United States Attorney
        Tel.: (212) 637-2330