UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

                           :

UNITED STATES OF AMERICA          :

           - against -          :    No. S1 11 Cr. 907 (JSR)

                         :

RAJAT K. GUPTA,

                         :

             Defendant.

                         :

———————————————————————— x

## RESPONSE OF RAJAT K. GUPTA TO THE
## GOVERNMENT'S SENTENCING MEMORANDUM

KRAMER LEVIN NAFTALIS &
   FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for Rajat K. Gupta

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

I.  THE COURT SHOULD REJECT THE GOVERNMENT'S
    CHARACTERIZATION OF THE OFFENSE CONDUCT ............................................. 1

    A.  The Government Overstates the Scope and Duration of the Offense .................... 1

    B.  The July 29, 2008 Call ........................................................................................ 2

    C.  There is No Evidence that Mr. Gupta Had Any Knowledge of the Size or Amount
        of Rajaratnam's Trading ...................................................................................... 4

II. A NON-CUSTODIAL SENTENCE WOULD BE SUFFICIENT TO DETER
    OTHER, SIMILARLY SITUATED POTENTIAL DEFENDANTS ................................ 4

III. THE COURT SHOULD DENY THE GOVERNMENT'S FORFEITURE
     REQUEST ................................................................................................................ 7

IV. THE COURT SHOULD DENY GOLDMAN'S REQUEST FOR RESTITUTION
    OR, IN THE ALTERNATIVE, PERMIT FURTHER BRIEFING ................................ 10

V.  CONCLUSION .......................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Castro v. United States,*
    248 F. Supp. 2d 1170 (S.D. Fla. 2003) ..................................................................8

*United States v. Battista,*
    575 F.3d 226 (2d Cir. 2009)....................................................................................11

*United States v. Contorinis,*
    692 F.3d 136 (2d Cir. 2012)......................................................................................8

*United States v. Elliott,*
    727 F. Supp. 1126 (N.D. Ill. 1989) .......................................................................8, 9

*United States v. Hurley,*
    63 F.3d 1 (1st Cir. 1995)...........................................................................................8

*United States v. Kalish,*
    626 F.3d 165 (2d Cir. 2010)......................................................................................8

*United States v. Tedder,*
    403 F.3d 836 (7th Cir. 2005) (Easterbrook, J.).......................................................8

STATUTES

18 U.S.C. § 3553(a)(6)..................................................................................................6

18 U.S.C. § 3663A(a)(1)..............................................................................................10

18 U.S.C. § 3663A(a)(2)..............................................................................................10

18 U.S.C. § 3663A(b)(4)..............................................................................................11

18 U.S.C. § 3663A(c)(3)(B)..........................................................................................11

18 U.S.C. § 3664(d)(4).................................................................................................11

18 U.S.C. § 3664(e).....................................................................................................11

18 U.S.C. § 3664(h).....................................................................................................11

OTHER AUTHORITIES

Fed. R. Crim. P. 32.2(b)(2)(C)........................................................................................9

Mr. Gupta respectfully submits this memorandum to address briefly certain of the arguments made by the government in its Sentencing Memorandum ("Gov't Mem.").

## I.   THE COURT SHOULD REJECT THE GOVERNMENT'S CHARACTERIZATION OF THE OFFENSE CONDUCT

Without in any way depreciating the seriousness of the conduct of which Mr. Gupta was convicted, we respectfully submit that the government's sentencing submission is incorrect in several respects.

### A.   The Government Overstates the Scope and Duration of the Offense

Failing even to acknowledge that Mr. Gupta was acquitted of the charges that supposedly reflect the starting and ending points of his alleged misconduct, the government simply (and repeatedly) asserts that he violated the law "time and time again, over the span of nearly two years." (Gov't Mem. 5; *id.* at 2, 6, 8). In fact, as set forth in our Sentencing Memorandum, the trial record strongly suggests that the jury rejected not only the March 2007 Goldman and January 2009 Procter & Gamble substantive charges, but also the other alleged tips included in the conspiracy count – particularly given the Court's supplemental charge, in response to the jury's question, that an "act of any kind" in furtherance of the conspiracy would satisfy the overt act requirement. (Trial Tr. 3388-90). Unlike in some cases where the jury's reasoning behind a split verdict is not apparent, in this case the jury provided a clear explanation:  It declined to convict on the transactions that were not supported by wiretaps of Rajaratnam.  The jury's rejection of the supposedly corroborating testimony of Michael Cardillo indicates it was not persuaded by the evidence on P&G and Smuckers.  And the acquittal on Count Two (March 12, 2007 Goldman) underscores its rejection of the other tips not supported by wiretaps. (*See* Sentencing Memorandum of Rajat K. Gupta ("Gupta Mem.") at 65-67).

In sum, the appropriate reading of the jury's verdict – and the one we submit the Court should adopt in fashioning an appropriate sentence – is that Mr. Gupta's tipping of Rajaratnam occurred over a much more limited period of time and did not extend beyond September 23 and October 23, 2008.  It was, as the Probation Office concluded – and as reflected in the hundreds of letters submitted to the Court – aberrant behavior, occurring in a very limited time frame.

### B.  The July 29, 2008 Call

According to the government, the July 29, 2008 telephone call between Mr. Gupta and Rajaratnam is reflective of Mr. Gupta's state of mind and shows his supposed "willingness to breach his duties to please Rajaratnam." (Gov't Mem. 3).  In fact, the call shows no such thing, and the government's one-paragraph argument is incomplete or incorrect in a number of respects.

- The government describes the call solely as one in which Rajaratnam "asked . . . about a rumor concerning Goldman's plans," implying that, on its face, the call is reflective of an agreement to share material nonpublic information. (*See* Gov't Mem. 3).  But the government omits to mention that Rajaratnam explicitly stated that he was preparing for a meeting two days later with Goldman Co-President and Chief Operating Officer Gary Cohn, in which they discussed Goldman's efforts, in this period of great financial turmoil, to ensure its continued business well-being. (Trial Tr. 2843-46).

- As Mr. Blankfein acknowledged, Goldman's consideration of potentially purchasing a commercial bank was not confidential. (Trial Tr. 2639).  It had already been made public *by Goldman* to analysts and hedge funds and other institutional holders of Goldman stock, including Galleon. (Trial Tr. 2570-82; DX 65; DX 74).  Nor, in any event, did Mr. Gupta disclose Board "deliberations." (Gov't Mem. 3).  He stated only that the Board had considered certain strategic alternatives, which obviously would have been the case. (Trial Tr. 791-92; GX 200).

- The government has never alleged that the information conveyed by Mr. Gupta in this call was material. (*See* Superseding Ind. ¶ 33(l)).  There was no allegation that the discussion of Goldman matters was for the purpose of trading, that Rajaratnam had any intention of trading, or that Mr. Gupta had any reason to believe he was going to trade, and it is undisputed that Rajaratnam did not in fact trade.

- According to the government, it is "remarkabl[e that Mr.] Gupta did not even flinch upon hearing that Kumar, who was a senior official and had been Gupta's protégé, had [a] secret and almost certainly illicit arrangement with Rajaratnam." (Gov't Mem. 3).  This assertion is without support in the record.

    - The government initially argued that a consulting arrangement between Rajaratnam and Kumar would have violated McKinsey policies and should have been a red flag to Mr. Gupta.  But when pressed by the Court, the government acknowledged that there was no such policy prohibiting consulting, and that it was relying upon an anecdotal "understanding among the McKinsey partners" that "moonlight[ing]" was not customarily done. (Trial Tr. 1728).

    - Kumar and Rajaratnam had various legitimate business dealings, actual and planned.  (Trial Tr. 1779).  In this context, after complaining that Kumar was not "bringing anything new to the party," Rajaratnam commented that he was giving Kumar money "for doing literally nothing."  Accordingly, there is no basis for the assertion that Mr. Gupta would have understood that the conversation concerned insider trading, let alone any other "almost certainly illicit arrangement."

    - Kumar testified that he concealed his illegal activities from Mr. Gupta, who was unaware of Kumar's illegal tipping of Rajaratnam.  (Trial Tr. 1895).

    - Finally, and especially when considered in the full context of the discussion, there is nothing either illicit or suspicious about paying someone in cash, as opposed to stock or other non-cash compensation.  And the latter understanding of the comment is plainly the correct one; Messrs. Gupta and Rajaratnam made the same reference to "cash" in reviewing Mr. Gupta's discussions with KKR, and there is of course no reason to believe KKR was engaged in anything improper.

The July 29, 2008 call, whatever it may demonstrate regarding the relationship between Messrs. Gupta and Rajaratnam (the only purpose for which the Court admitted the call in evidence), does not reflect a "casual" and "unhesitating" disclosure of Board secrets, much less Mr. Gupta's knowledge of any illicit arrangement Rajaratnam had with Kumar – an argument the government asked for permission to make on three separate occasions during the trial, and which the Court did not allow.

C.     There is No Evidence that Mr. Gupta Had Any Knowledge of the Size or Amount of Rajaratnam's Trading

The government argues that the insider trading in this case "represented a far greater threat to our capital markets than the typical case" because it was allegedly foreseeable to Mr. Gupta that "his illegal tips would be exploited to great financial gain" and that "the profits his tips *could* generate were not only foreseeable, they were an intended and known consequence of his actions." (Gov't Mem. at 7 (emphasis added)).  Accordingly, the argument goes, Mr. Gupta's case "is distinguishable from that of a tipper who does not fully appreciate the magnitude of the trading activity that follows."  (*Id.*)

This argument is speculative and without factual basis in the trial record, which reflects the following:

- There is no evidence Mr. Gupta was ever advised of what trading had been done on any of the occasions charged, or what profits were made or losses avoided.  In other words, and in contrast to many, perhaps most, insider trading cases, there was no evidence that Mr. Gupta knew anything at all about Rajaratnam's trading, including whether or to what degree it was successful.

- There is no evidence that Mr. Gupta knew whether, or to what extent, Rajaratnam may have had an existing position in a particular security.

- There is no evidence Mr. Gupta received any payment for tipping, much less any payment tied to the success or size of any profits, as is true in many other insider trading cases.

## II.    A NON-CUSTODIAL SENTENCE WOULD BE SUFFICIENT TO DETER OTHER, SIMILARLY SITUATED POTENTIAL DEFENDANTS

The government contends that a substantial prison term is necessary to deter "Board members and other high-level corporate insiders." (Gov't Mem. 10).  This argument ignores the very substantial punishment Mr. Gupta has already suffered, which implicates not only his particular situation, but stands as a strong warning and deterrent to this class of persons identified

- 4 -

by the government.  Mr. Gupta's reputation and career have been irreparably destroyed; he has exited all of his public company directorships in disgrace; he has been subjected to unrelenting, highly critical press attacks; he has witnessed the strain and suffering of his family both under the glare of this intense media attention and resulting from the criminal and SEC cases, beginning more than two years ago; and he has had to sever his association with numerous humanitarian organizations, which were his principal pursuit and core purpose in his post-retirement years.  These are real and substantial punishments which will deter other Board members and senior executives from risking so much to tip a friend or business associate.

Moreover, none of the government's cited cases supports its argument, and the government omits recent, appropriately comparable cases:

- As this Court is well aware, Winifred Jiau and James Fleishman were involved in so-called "expert networks" and were guilty of widespread, long-term tipping relating to many clients.  Illegal tipping was a significant component of the business of Primary Global Research, which acted essentially as a match-maker for public company insiders and hedge fund employees, to facilitate the passing of inside information.  Jiau and Fleishman were not corporate insiders.  They had done nothing approaching the accomplishments of Mr. Gupta (or of other, genuinely comparable directors or senior executives) and they suffered none of the reputational or other punishments already visited upon Mr. Gupta.

- Michael Koulouroudis, who was sentenced to three months in prison, was neither an insider nor a tipper, but instead was a tippee who traded on and profited from inside information.

- Hafiz Naseem was a junior Credit Suisse investment banker who repeatedly stole confidential information from his co-workers and the firm's clients.  Importantly, the government makes no mention of another, more recent – and actually comparable – sentence imposed by Judge Patterson.  As discussed in our Sentencing Memorandum, in *United States v. Peterson*, 11 Cr. 665 (RPP), Judge Patterson recognized the need for deterrence in sentencing an outside director of a public company, but further acknowledged that in a case such as Peterson's (and correspondingly, Mr. Gupta's), the defendant's civic and charitable commitments must also be taken into account.  Peterson received a sentence of three months home confinement and two years probation.  (*See* Gupta Mem. at 74, 80).

- Finally, the government cites *United States v. Kurland*, including the district court's specific finding that a hedge fund manager like Kurland deserved a severe sentence because his career was "built off of the integrity of the stock markets." 718 F. Supp. 2d 316, 321 (S.D.N.Y. 2010). But the government does not cite the sentencing of Robert Moffat by the same judge. Moffat was convicted of providing material nonpublic information to Danielle Chiesi, who (like Rajaratnam) was a portfolio manager at a billion dollar hedge fund, and who worked under Kurland. Chiesi (like Rajaratnam) bought and sold stock in transactions in the millions of dollars. Yet Moffat, who pled guilty but did not cooperate, was found to be less culpable than both Chiesi and co-conspirator Kurland, and was sentenced to six months. As the Court stated: "Mr. Moffat, though he breached his duty to his employer, did not provide information in exchange for money, and did not stand to make any monetary gains from his transgression. Most important, Mr. Moffat, unlike Mr. Kurland, was not a powerful player in the securities markets, with hundreds of millions of dollars to invest." *Id.* Further, the language on deterrence quoted by the government addressed specifically the need to deter others who trade securities for a living, not corporate insiders.

As set forth in our Sentencing Memorandum, the Moffat case is a directly relevant comparator, as is the case of Clayton Peterson, and Mr. Gupta compares favorably to both of these defendants. (*See* Gupta Mem. at 72, 74, 76-77, 80).

The government's final argument under the heading of deterrence is essentially that Mr. Gupta's sentence should not differ from those of other recent insider trading defendants solely because he is "prominent" and "well-connected." (Gov't Mem. 10). This argument is a straw man, apparently anticipating an argument we are not advancing. Of course Mr. Gupta should not avoid otherwise appropriate punishment because of who he is – but who he is, including his lifetime of good works for the benefit of the *unconnected* is highly relevant to an appropriate sentence under section 3553(a), and it is on that basis that we seek leniency. We of course recognize and address the statutory directive that the Court, in sentencing him, must avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). To that end, our Sentencing Memorandum sets forth a number of "similarly situated" defendants, which the government fails to do.

Moreover, the government's argument that Mr. Gupta should receive a harsh sentence because his "prominence in the business community means that the Court's sentence has the

potential for a greater deterrent impact than a similar sentence in the average case" violates, rather than furthers, the rule against unwarranted disparities. (*See* Gov't Mem. 10). Not only would Mr. Gupta's individual circumstances not be properly accounted for under the government's deterrence theory, but his hard won prominence, good works and humanitarian achievements would, perversely and contrary to § 3553(a), be used against him. Mr. Gupta's "prominence in the business community" is built on a record of selflessness, generosity, and exceptional character – and this is a life record that warrants a more lenient sentence, not a harsher one.[1]

## III.   THE COURT SHOULD DENY THE GOVERNMENT'S FORFEITURE REQUEST

The government's position on the forfeiture amount, conveyed to us for the first time in its Sentencing Memorandum, is flawed in numerous respects. It ignores the fact that Mr. Gupta received no profits. It fails to take into account the forfeiture already paid by Rajaratnam, which came from the same illegal proceeds and which may not be "forfeited" a second time. It assumes a forfeiture should be paid with respect to both acquitted and non-adjudicated conduct. Moreover, given the pendency of the parallel SEC proceeding where there will be an opportunity for a hearing on a fuller record as to the June 2008 Goldman and January 2009 P&G transactions, there is no need for the Court to enter any forfeiture order at this time.

First, a forfeiture order is inappropriate because the government has never suggested that Mr. Gupta received profits or realized any gain from tipping. Although there may be circumstances where an order of joint and several forfeiture liability is warranted, this is not such

---

[1]  The government makes no attempt to rebut our argument that there is no empirical support for the premise that such a harsh sentence is necessary to afford adequate deterrence. (Gupta Mem. at 85 n.26).

a case.[2]  Because he acquired no profits, any money that Mr. Gupta "forfeits" is in the nature of a

penalty or fine, in contradiction to the very concept of forfeiture, where the amount is supposed

to "represent 'ill-gotten' gains" of the defendant.  *United States v. Kalish*, 626 F.3d 165, 170 (2d

Cir. 2010).  Joint and several liability is also unnecessary.  There is no need in this case to

determine how proceeds were distributed among conspirators; the allocation of proceeds here is

already known.  And as explained further below, ordering joint and several liability is

unnecessary in light of the parallel SEC action in which the Court can better apportion liability.

Second, the government's request for forfeiture in the amount of $1,150,000 is inflated in

several respects.  That figure is based on the government's estimate that Rajaratnam individually

realized approximately 10% of the total trading gains that the Presentence Report attributes to all

the tips alleged by the government.  But, here, Rajaratnam has already paid to the government

$840,990 in relation to his conviction in the *Rajaratnam* trial for Galleon trading on September

23, 2008, the sole tip as to which there was gain and a substantive conviction in this case.  The

government can obtain forfeiture of the proceeds of a crime only once, whether through

forfeiture or civil disgorgement.[3]  Because Mr. Gupta cannot "disgorge what [has] already been

---

[2]  *See United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012), (the Court "may order" defendants jointly liable for forfeiture of proceeds); *Castro v. United States*, 248 F. Supp. 2d 1170, 1183 (S.D. Fla. 2003) (in which the court ordered the defendant, in a case involving unindicted co-conspirators and eight other defendants, to forfeit only the proceeds he actually acquired, $77,204, not the $456,422 acquired by all co-conspirators).

[3]  *See United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005) (Easterbrook, J.) ("If the United States already has all of the boodle, having collected it from Pede and D'Ambrosia, then the funds in Tedder's hands . . . cannot also be traceable proceeds"); *United States v. Hurley,* 63 F.3d 1, 23 (1st Cir. 1995) ("The government can collect its $136 million only once" from defendants held jointly and severally liable for forfeiture amount); *United States v. Elliott*, 727 F. Supp. 1126, 1128 (N.D. Ill. 1989) (defendant's payment of $271,312 in civil disgorgement in relation to the same securities transactions underlying the criminal charges meant that the government's forfeiture demand would be reduced by that amount because it "sought to disgorge what had already been disgorged").  *See also Kalish*, 626 F.3d at 169-70 ("once some *payment*

disgorged" by Rajaratnam, the government's calculation of total trading gains must be reduced accordingly. [4]

The amount is also excessive because it is based on gains attributable to conduct as to which Mr. Gupta was acquitted or where there was no substantive adjudication. In addition, the government assumes that Rajaratnam realized at least 10% of the trading profits of Galleon because he would have earned half of the 20% performance fee Galleon Management was entitled to receive from the Funds it managed. Yet according to Mr. Lau's declaration, the Galleon Technology and Diversified Funds did not earn a profit in 2008 and paid Galleon Management no performance fees that year. (Lau Decl. ¶ 12). Rajaratnam, therefore, received no performance fees on account of the September 23, 2008 Goldman trades.

Finally, the SEC has filed a civil action in which it seeks disgorgement and civil penalties as to both the (acquitted) January 2009 P&G transaction and the June 2008 Goldman Sachs transaction. In that parallel case, there will be an actual adjudication of these claims. While the Court is permitted to order forfeiture based on its own determination of whether the alleged proceeds are traceable to the conspiracy, we respectfully submit that the Court should wait for the jury determination in the SEC case by entering only a "General Order" of forfeiture at this time. *See* Fed. R. Crim. P. 32.2(b)(2)(C) (allowing courts to enter "General Order[s]" of forfeiture to be amended upon definitive calculation of proceeds). Doing so will allow the Court to benefit from the record that will be created in the civil case. In addition, this case is particularly suited to an apportionment of disgorgement/forfeiture responsibility in a manner

---

has been made . . ., a defendant would be in a position to argue that such payment should be a credit against any then remaining forfeiture amount") (emphasis in original).

[4] We also note that the government's gain calculation does not take into account certain costs associated with the transactions. *See, e.g., Elliott*, 727 F. Supp. at 1129 (brokerage commissions are direct costs that should not be included in the amount of forfeitable proceeds).

available to the Court in the SEC matter. Were Mr. Gupta to forfeit profits at this juncture –
especially in the amount sought by the government – reasonable apportionment would be made
more unlikely. The Court should avoid this disproportionate result by waiting to order forfeiture
until after the conclusion of the civil case.

## IV.   THE COURT SHOULD DENY GOLDMAN'S REQUEST FOR RESTITUTION OR, IN THE ALTERNATIVE, PERMIT FURTHER BRIEFING

Just last week, we learned that Goldman is seeking restitution from Mr. Gupta under the
Mandatory Victims Restitution Act of 1996 ("MVRA") in the amount of $6,780,369.34, the
lion's share of which consists of undifferentiated legal fees it purportedly "incurred in the course
of investigations and legal proceedings arising from [Mr.] Gupta's conduct." (Gov't Mem. 11).
Although the September 23 and October 23 Goldman trades by Galleon formed a significant
aspect of the conspiracy charges against Rajaratnam, Goldman made no claim to restitution at
the time of Rajaratnam's sentencing. And the government's submission here provides scant
explanation and no documentary support at all for Goldman's claim. On the present record,
there is no basis to grant Goldman's belated request. In the alternative, we respectfully request
that the Court require further briefing to determine whether Goldman's restitution claim is
properly grounded in fact and law.

Under 18 U.S.C. § 3663A(a)(1), the Court is to order "the defendant make restitution to
the victim of the offense." A "victim" is defined as "a person directly and proximately harmed
as a result of the commission of an offense . . . including, in the case of an offense that involves
as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed
by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18
U.S.C. § 3663A(a)(2).

The "burden of demonstrating the amount of the loss sustained by a victim . . . shall be on the attorney for the Government," 18 U.S.C. § 3664(e), and we respectfully submit this burden has not been satisfied by the government's one-paragraph description of Goldman's claim. (*See* Gov't Mem. at 11-12). In addition, further briefing (and, if necessary, discovery) is required to determine a range of issues concerning the claim, including, among others:

- Whether Goldman is a victim under the applicable law.

- Whether the failure to seek restitution in the *Rajaratnam* matter precludes or limits the belated attempt to obtain restitution here.

- Whether Goldman's more than $6.7 million in fees were "necessary" and "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). To assist the Court in making this assessment, Goldman should disclose the sort of records that will allow for "meticulous[] pars[ing] out [of] the fees and costs submitted by [Goldman to determine] which expenses were associated with each defendant and whether they were incurred while assisting the government . . . and in preparing for [Mr. Gupta's] criminal proceedings." *United States v. Battista*, 575 F.3d 226, 234 (2d Cir. 2009).

- Whether Goldman has alternative remedies or means to recoup any expenses to which it might arguably be entitled, so as to avoid duplicative litigation and recoveries.

- Whether "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process [in this case] to a degree that the need to provide restitution to [Goldman] is outweighed by the burden on the sentencing process" such that restitution should not be ordered here. 18 U.S.C. § 3663A(c)(3)(B).

- Whether apportionment "among . . . defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant" is available and appropriate in this case. 18 U.S.C. § 3664(h).

The request should be denied since the government has not provided the documentary basis required to support Goldman's claim. Alternatively, we respectfully request that the Court exercise its power to "require additional documentation or hear testimony" in relation to Goldman's restitution claim, 18 U.S.C. § 3664(d)(4), and set a further briefing schedule as necessary.

KL3 2900364.1

## V.    CONCLUSION

For the foregoing reasons and those set forth in Mr. Gupta's Sentencing Memorandum, we respectfully request that the Court impose a sentence of probation with the condition that Mr. Gupta perform a rigorous full-time program of community service.

Dated:  October 22, 2012

<div style="margin-left:40%">

Respectfully submitted,

Kramer Levin Naftalis & Frankel LLP


By:___/s/ Gary P. Naftalis_____
    Gary P. Naftalis
    David S. Frankel
    Robin M. Wilcox
    Megan Ryan
    Elliot Smith[5]
    1177 Avenue of the Americas
    New York, New York 10036
    Tel: (212) 715-9100
    Fax: (212) 715-8000
    gnaftalis@kramerlevin.com
    dfrankel@kramerlevin.com
    rwilcox@kramerlevin.com
    mryan@kramerlevin.com
    esmith@kramerlevin.com

    *Attorneys for Rajat K. Gupta*

</div>

---

[5] Not yet admitted.

KL3 2900364.1