UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                   :

UNITED STATES OF AMERICA                 :
                                   :

       - v. -                    :         S1 11 Cr.  907 (JSR)
                                   :

RAJAT K.  GUPTA,                  :
               Defendant.      :
                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## GOVERNMENT'S REPLY SENTENCING MEMORANDUM

                                           PREET BHARARA
                                           United States Attorney for the
                                           Southern District of New York

Richard C. Tarlowe
Damian Williams
Assistant United States Attorneys
     - Of Counsel -

I.      **INTRODUCTION**

The Government respectfully submits this memorandum to briefly respond to the

sentencing submission of defendant Rajat Gupta dated October 17, 2012.   Notwithstanding the

fact that the Sentencing Guidelines call for a sentence of 97-121 months' imprisonment, Gupta

urges the Court to impose a non-incarceratory sentence of probation.  For the reasons set forth

below and in the Government's October 17, 2012 sentencing memorandum, a substantial

incarceratory sentence is necessary to achieve all of the goals of sentencing set forth in Section

3553(a) of Title 18, United States Code ("Section 3553(a)").  The Government respectfully

submits that a sentence within the Guidelines range is appropriate.

The defense submission presents a thorough account of Gupta's life, his considerable

professional accomplishments, and his philanthropic efforts.  The Government acknowledges

that Gupta has made valuable contributions to the community, and does not doubt that in most

respects, Gupta has led an exemplary and law-abiding life.  Nor does the Government doubt the

sincerity of the voluminous letters of support from family, friends, and colleagues, or the fact

that a prison sentence will be devastating to his family.

The Court should consider those facts in exercising its discretion to fashion an

appropriate sentence.  But those facts must also be balanced against the reality that Gupta was

convicted of knowingly committing a very serious offense that threatened to harm the integrity

of the financial markets in a serious way.  Gupta understood as well as anyone – and indeed

better than most – the importance of protecting corporate confidences, and surely appreciated the

potential consequences of failing to do so.  Yet, Gupta flouted the law on multiple occasions,

over a period of two years, and intentionally betrayed the trust bestowed upon him by Goldman

Sachs, Procter & Gamble, and their shareholders, by disclosing corporate secrets to Raj

Rajaratnam, a hedge-fund manager responsible for managing billions of dollars, so that

Rajaratnam could profit illegally on the information, at the expense of others.  In the face of that

extremely serious conduct, the strikingly low sentence urged by Gupta simply fails to "reflect the

seriousness of the offense, . . . promote respect for the law, . . . provide just punishment for the

offense, [and] afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2).  Only a

substantial term of imprisonment could advance those goals.

      The Government does not seek to repeat the arguments made in its prior submission, but

briefly responds below to some of the defendant's latest arguments.

## II.      THE GUIDELINES CALCULATION SET FORTH IN THE PSR IS CORRECT

      Gupta challenges several aspects of the Guidelines calculation set forth in the Presentence

Report.  In particular, Gupta contends that (1) the "gain" should be limited to the trading gains

realized personally by Rajaratnam and not by the investors in Galleon funds, (2) the calculation

of loss avoidance resulting from Gupta's illegal tip on October 23, 2008 regarding Goldman's

negative interim financial results should not be based on the date of the company's public

earnings announcement, and (3) the Guidelines should not take into account acquitted conduct or

overt acts that were not the subject of substantive counts of conviction.   These arguments should

be rejected.

      A.  The "Gain" Is Not Limited To The Trading Profits Realized By Rajaratnam

      In his submission, Gupta urges the Court to limit the "gain resulting from the offense"

under Section 2B1.4 of the Guidelines to only those gains *personally* realized "by the defendant

and persons acting in concert with the defendant or to whom the defendant provided inside

information." Practically speaking, this calculation would exclude the bulk of the illegal profits generated by Rajaratnam's trading on the basis of Gupta's illegal tips. This argument defies logic and common sense and should be rejected by this Court, as it was by Judge Holwell in *United States* v. *Rajaratnam*, 2012 WL 362031, at \*14 (S.D.N.Y. Jan. 31, 2012).

Gupta's argument is rooted in the Commentary to Section 2B1.4, which states that the gain is the "total increase in value realized through trading in securities by the defendant or persons acting in concert with the defendant or to whom the defendant provided inside information." Gupta would have the Court believe that the word "by" refers to "value realized" and not to "trading in securities." In other words, Gupta's construction would effectively re-write the commentary to read: the total increase in value realized *by the defendant and persons acting in concert with the defendant or by persons to whom the defendant provided inside information* through trading in securities. As Judge Holwell explained, the "problem with that construction is that it leaves unmodified the phrase 'trading in securities.' That leaves open the question of who is doing the trading by which the defendant and others are realizing gains." *Rajaratnam*, 2012 WL 362031, at \*14.

An equally glaring flaw in Gupta's construction is that it would render the enhancement inapplicable to any tipper or tippee when the profits from illegal insider trading redounded to an innocent third party – even if that was the express intent of the crime. A simple hypothetical illustrates the point. Say, for instance, a brother obtained permission from his sister to trade securities on her behalf through her account. Unbeknownst to the sister, however, the brother proceeded to trade with inside information and with great financial success. Under Gupta's construction, the resulting gain to the innocent sister would play no role whatsoever in

3

determining the brother's Guidelines calculation, and the gain for Guidelines purposes would be

zero.  That is not, cannot be, the law.

For support, Gupta turns to the Second Circuit's recent decision in *United States* v.

*Contorinis*, No. 11-3-cr, 2012 WL 3538270 (2d Cir. Aug. 17, 2012), in which the Court

addressed the definition of "proceeds" in the forfeiture context.  Gupta quickly concedes, as he

must, that "criminal forfeiture focuses on the surrender by a defendant of his ill-gotten gains."

(Def. Mem. at 58.);  *see Contorinis*, 2012 WL 3538270, at *146 ("[T]he calculation of a

forfeiture amount in criminal cases is usually based on the defendant's actual gain.").  But the

disgorgement of ill-gotten gains is not a consideration under Section 2B1.4.   Other than the fact

that criminal forfeiture and Section 2B1.4 are both punitive measures, they share no similarities.

In fact, while the Second Circuit in *Contorinis* was not aware of "any decision" in the forfeiture

context where a defendant was "required to forfeit funds never acquired by him or someone

working in concert with him," *id.* at 147, courts have routinely held defendants accountable for

gains under the Guidelines even if some of the gains accrued to third parties.  *See, e.g.*,

*Rajaratnam*, 2012 WL 362031, at *15 (holding Rajaratnam responsible for gains made by

Galleon Management L.P., or Galleon investors); *United States* v. *Contorinis*, 10 Cr. 1083 (RJS)

(holding hedge fund manager responsible for gains made by fund); *United States* v. *Chiesi*, 09

Cr. 1184 (RJH) (holding hedge fund employee responsible for the gain to the fund resulting from

the illegal insider trading regardless of what the employee personally earned); *United States* v.

*Goffer,* 10 Cr. 56 (RJS) (holding employees of proprietary trading firm responsible for trading

gains even though firm kept a percentage of all trading profits).

When taking measure of the severity of an insider trading offense, there is no principled

basis to distinguish personal gain from third party gain, particularly when the plain text of the

Guidelines draws no such distinction.  Accordingly, the Court should hold Gupta responsible for

all gains resulting from trades based on Gupta's illegal tips – regardless of whether those gains

went to investors in Galleon.  That is what Judge Holwell concluded in *Rajaratnam* when he

held that "the commentary is indifferent to whether Rajaratnam, Galleon Management L.P., or

Galleon investors took home that increase in value." *Rajaratnam*, 2012 WL 362031, at *15.

And, as a matter of law – to say nothing of fairness, that should be the approach that governs

Gupta's sentencing as well.

      B.  The Presentence Report Properly Calculates The Losses Avoided Based On Gupta's October 2008 Tip

Gupta objects to the PSR's calculation of the "gain resulting from the offense" for

Gupta's October 2008 tip concerning Goldman Sachs's negative interim financial results and

asks that the Court "make a reasoned assessment of when Rajaratnam would likely have sold on

the basis of public information." (Def. Mem. at 62.)  Yet the method Gupta suggests for such a

reasoned assessment is not a persuasive alternative.

The PSR arrives at a loss avoidance amount of $3,800,565 by taking the 150,000

Goldman Sachs shares Rajaratnam sold on October 24, 2008 and multiplying it by the difference

between the share price on October 24 (approximately $97 a share) and the share price on

December 17, 2008 (approximately $75 a share) when Goldman reported its quarterly earnings.

Gupta's principal quarrel with the PSR's calculation is the length of time between the receipt of

inside information and the public release of such information to the market – and the premise

that Rajaratnam would not have sold his Goldman shares prior to the public release on December 17.

In the Government's view, there is nothing unrealistic about the notion that Rajaratnam might have held his Goldman shares until December 17.  Between October 24 and December 17, the markets were generally flat.[1]  For purposes of sentencing, the task for the Court is to make a "reasonable estimate" of Rajaratnam's gain.  It is admittedly impossible to divine what Rajaratnam might have done if Gupta had not illegally tipped him.  Yet the PSR's approach is reasonable because it is based on an actual price at which Goldman traded following the release of the announcement of Goldman's earnings.  That is how loss avoidance is generally calculated.  And that is how it should be calculated for Gupta.

Gupta offers another date (October 31, 2008) that, in his telling, offers a more realistic method of determining loss avoidance.  But this date is pegged to a single sell-side forecast that Goldman might suffer a fourth-quarter loss.  If the intention is to mimic the point at which the inside information Gupta provided Rajaratnam (namely, that Goldman Sachs was losing $2 per share) was absorbed by the public, then a lone voice sounding the alarm about Goldman is clearly insufficient.  Should the Court wish to pick a different date, then an available alternative is November 10, 2008.  On November 10, Barclay's lowered its estimate of Goldman's earnings to -$2.50 and Goldman's stock closed at $71.21.  Using November 10 as the point of comparison, the loss avoidance is approximately $4.3 million.

---

[1] From October 24 through December 16, the Dow Jones was down about one percent (from 8683.21 to 8565.65) and NASDAQ was up two percent (from 1493.79 to 1526.06).

C.  The PSR Properly Takes Into Account Acquitted Conduct And Overt Acts Not The
Subject of Substantive Counts of Conviction

Gupta asks the Court not to consider at sentencing conduct for which he has been

acquitted.  But, critically, he acknowledges that the Court can consider such conduct in

conducting a Guidelines analysis.  *See United States* v. *Watts*, 519 U.S. 148, 149 (1997) (holding

that the sentencing court can consider any wrongdoing that has been proven by a preponderance

of the evidence).

The Government maintains that the proof at trial established by a preponderance of the

evidence that Gupta unlawfully disclosed inside information to Rajaratnam in March 2007 and

January 2009, as charged in Counts Two and Six of the Indictment.  The acquittals on those

counts stand only for the proposition that guilt was not proven beyond a reasonable doubt.  If the

Court agrees with the Government that the evidence established by a preponderance that Gupta

violated the law on those two occasions, the Court can incorporate that finding into its

Guidelines calculation, *see, e.g.*, *United States* v. *Royer*, 549 F.3d 886, 904 (2d Cir. 2008)

(opinion of Rakoff, J.) (affirming district court's consideration of acquitted conduct for

sentencing in an insider trading case), and it is the Government's view that the Court *should*

consider that acquitted conduct in measuring gain.  As for the overt acts that were not charged

substantively, there is no dispute that such conduct can be included in the Court's gain

calculation.  The Government similarly believes that because the evidence established this

conduct by a preponderance, the overt acts also should be accounted for at sentencing.

### III.   A SUBSTANTIAL INCARCERATORY SENTENCE IS NECESSARY TO ACHIEVE ALL OF THE GOALS OF SENTENCING

Gupta urges the Court to impose a sentence of probation.  A sentence of probation would fall far short of achieving the goals of sentencing and, contrary to Gupta's claim, would fail to provide sufficient deterrence to others.

Gupta contends that he has already suffered "severe punishment" because of the professional and reputational consequences of his prosecution and conviction stemming from his unlawful conduct.  (Def. Mem. at 82-85).  Gupta notes that his reputation has been shattered, his accomplishments have been tainted, he has been forced to step down from a number of public companies, and he has been left with "little to do."  (Def. Mem. at 83).  Moreover, he argues that these consequences are sufficient to deter "directors and other very senior persons with access to sensitive information." (Def. Mem. at 82).  Respectfully, the Government disagrees.

As an initial matter, the "punishment" suffered to date by Gupta is of little moment.  *See United States* v. *Cutler*, 520 F.3d 136, 170 (2d Cir. 2008) (stating that, "[a]s a matter of law and reason, we cannot agree" with the premise that the defendant had already received "just punishment for the offense" because of "the public nature of the prosecution, the public humiliation that the defendant has suffered, the loss of his law license and various other consequences, and the certainty of prosecution.").  That is particularly true given the close nexus between Gupta's professional status and the offense conduct.  After all, it was his reputation and professional accomplishments that exalted him to the privileged position he abused and exploited to commit the crime of insider trading.

Moreover, while the Government agrees with Gupta that from a deterrence standpoint, "the target of the message" includes "directors and other very senior persons with access to sensitive information" (Def. Mem. at 82), the Government strongly disagrees with the conclusion that Gupta draws from that.  Gupta argues that in the context of that audience, the collateral consequences described above provide a sufficient level of deterrence, and incarceration is unnecessary.  As an initial matter, those consequences, which Gupta had to appreciate would result if he were caught disclosing corporate secrets to Rajaratnam, were insufficient to deter him.  Moreover, the result of this perverse logic would be that the people with the greatest access to sensitive information – *i.e.*, the people with the greatest opportunity to commit insider trading – would face the lightest sentences for the crime.  It cannot be the case, as a matter of logic or fairness, that a senior-level executive who discloses inside information should receive a lighter sentence than a lower-level employee who engages in similar conduct simply because the senior executive's fall from grace covers a greater distance.  As discussed in the Government's initial sentencing submission, people in the most sensitive positions of trust should understand that insider trading will be punished severely no matter how distinguished or accomplished the tipper.

Gupta also seeks to draw comparisons with a number of other insider trading defendants, including defendants who engaged in a wide range of conduct, some of whom pled guilty and some of whom cooperated with the Government.  In doing so, Gupta minimizes his own financial motivations for engaging in the crime.  Gupta plainly expected to benefit financially by helping Rajaratnam pad Galleon's profits.  When Gupta told Rajaratnam in the July 29, 2008 wiretapped conversation that he wanted to "be helpful in Galleon International.  By the way, not Galleon International, Galleon Group" (GX 9, 9-T), it was not for altruistic reasons.  And when

9

Gupta called Rajaratnam at 3:55 p.m. on September 23, 2008, immediately following the

Goldman Sachs Board meeting, so that Rajaratnam could profit on the inside information in the

minutes before the market closed and the news became public, he was not doing so for altruistic

reasons.  Gupta plainly expected that a financial benefit would flow to him.  But in any event, the

harm caused by insider trading is the same whether or not Gupta himself reaped the financial

benefits of his tipping.

## IV.    CONCLUSION

For the reasons set forth above and in the Government's initial sentencing memorandum,

the Government respectfully submits that the Court should reject Gupta's request for a non-

incarceratory sentence and impose a substantial term of imprisonment.  The Government

believes that a sentence within the applicable Guidelines range of 97 to 121 months'

imprisonment is appropriate.


Dated:  October 22, 2012
        New York, New York


                                    Respectfully submitted,
                                    PREET BHARARA
                                    United States Attorney


                         By:    s/ Richard C. Tarlowe
                                Richard C. Tarlowe
                                Damian Williams
                                Assistant United States Attorneys