UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA,                    :

          -v.-                                   :            S1 11 Cr. 907 (JSR)

RAJAT K. GUPTA,                              :

                 Defendant.          :
------------------------------------------------------x

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPPOSITION TO PETITIONER'S
MOTION FOR HABEAS RELIEF**

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Damian Williams
Assistant United States Attorney
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND .................................................................. 3

    **A.**  The Gupta-Rajaratnam Relationship ................................................................. 4

    **B.**  The Jury Instructions ........................................................................................ 7

    **C.**  The Direct Appeal ............................................................................................ 8

    **D.**  *United States* v. *Newman* ............................................................................... 9

ARGUMENT ........................................................................................................................... 10

    **I.**  The Court's Personal Benefit Instruction was Proper ....................................... 10

    **II.**  Gupta Procedurally Defaulted His *Newman* Claim ......................................... 12

        **A.**  Applicable Law ......................................................................................... 12

        **B.**  Discussion ................................................................................................ 15

CONCLUSION ........................................................................................................................ 20

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Bailey* v. *United States*,
  516 U.S. 137 (1995) ...........................................................................................14, 15

*Bousley* v. *United States*,
  523 U.S. 614 (1998) ............................................................................................ passim

*Coleman* v. *Thompson*,
  501 U.S. 722 (1991) .....................................................................................................13

*Engle* v. *Isaac*,
  456 U.S. 107 (1982) .....................................................................................................13

*Harrington* v. *Richter*,
  562 U.S. 86 (2011) .......................................................................................................15

*Herrera* v. *Collins*,
  506 U.S. 390 (1993) .....................................................................................................14

*McCleskey* v. *Zant*,
  499 U.S. 467 (1991) .........................................................................................12, 13, 15

*Murray* v. *Carrier*,
  477 U.S. 478 (1986) ................................................................................................ 12-15

*Reed* v. *Ross*,
  468 U.S. 1 (1984) .........................................................................................................13

*Reyes-Requena* v. *United States*,
  243 F.3d 893 (5th Cir. 2001) .......................................................................................14

*Rosario* v. *United States*,
  164 F.3d 729 (2d Cir. 1999) ........................................................................................12

*Ryan* v. *United States*,
  645 F.3d 913 (7th Cir. 2011) ..................................................................................15, 16

*Sawyer* v. *Whitley*,
  505 U.S. 333 (1992) .....................................................................................................14

*Schlup* v. *Delo*,
  513 U.S. 298 (1995) .....................................................................................................14

*SEC* v. *Sargent*,
  229 F.3d 68 (1st Cir. 2000) ....................................................................................10, 11

*SEC* v. *Yun*,
  327 F.3d 1263 (11th Cir. 2003) .................................................................10, 11

*Smith* v. *Murray*,
  477 U.S. 527 (1986) ...............................................................................13

*Underwood* v. *United States*,
  166 F.3d 84 (2d Cir. 1999) .........................................................................14

*United States* v. *Addonizio*,
  442 U.S. 178 (1979) ...............................................................................12

*United States* v. *Frady*,
  456 U.S. 152 (1982) ...............................................................................12

*United States* v. *Gupta*,
  747 F.3d 111 (2d Cir. 2014) ................................................................... passim

*United States* v. *Jiau*,
  734 F.3d 147 (2d Cir. 2013) .......................................................................10, 11

*United States* v. *Newman*,
  773 F.3d 438 (2014) ......................................................................... passim

*Wainwright* v. *Sykes*,
  433 U.S. 72 (1977) ................................................................................13

## STATUTES

Title 15, United States Code, Sections 78j(b) & 78ff ...........................................3

Title 17, Code of Federal Regulation, Section 240.10b-5 ......................................3

Title 18, United States Code, Section 2 ..........................................................3

Title 18, United States Code, Section 371 ......................................................3

Title 18, United States Code, Section 924(c)(1) ...............................................14

Title 28, United States Code, Section 2255 ....................................................1, 12

## OTHER AUTHORITIES

Petitioner's Brief ........................................................................... passim

**Preliminary Statement**

Rajat K. Gupta ("Gupta") is not an innocent man.  Gupta abused his position as a corporate insider by repeatedly divulging inside information to his business partner, Raj Rajaratnam ("Rajaratnam"), who reaped millions of dollars in illegal profits and avoided millions of dollars in losses based on Gupta's tips.  After being convicted at trial of one count of conspiracy to commit securities fraud and three counts of substantive securities fraud, and then losing his direct appeal seeking to overturn the jury's verdict, Gupta now seeks to set aside his conviction pursuant to Title 28, United States Code, Section 2255.  Gupta's prayer for relief is based entirely on the Second Circuit's recent decision in *United States* v. *Newman*, 773 F.3d 438 (2014), which among other things appeared to alter the "personal benefit" element of insider trading liability.  In Gupta's telling, *Newman* compels the vacatur of his conviction because the Government's trial evidence merely established a mutually beneficial personal relationship between Gupta (the tipper) and Rajaratnam (the tippee—and head of the multi-billion dollar hedge fund The Galleon Group ("Galleon")).

Gupta's petition is both substantively and procedurally unsound.  As a threshold matter, Gupta's petition incorrectly argues that the Court's jury instruction violated *Newman*.  Read properly, *Newman* endorses the benefit instruction that the Court gave.  Contrary to Gupta's claims, this Court never instructed (and therefore the jury could not have found) that Gupta's *personal* relationship with Rajaratnam was sufficient to infer a benefit.  Gupta's misreading of *Newman* and this Court's benefit instruction undercuts the foundation on which his petition rests.

And even were Gupta correct that *Newman* casts doubt on the Court's benefit instruction, his failure to raise this argument on direct appeal (despite objecting at trial) means that the claim is procedurally defaulted.  That default, in turn, means that Gupta must either satisfy the strict "cause and prejudice" standard to raise his claim for the first time on collateral review, or that he must

demonstrate his "actual innocence."   Gupta cannot establish "cause" because, as *Newman* aptly demonstrates, challenging the prevailing notion of what constitutes a sufficient benefit was certainly not "futile."   Gupta therefore was obliged to raise the claim on direct appeal to preserve it.   Nor can Gupta establish "actual innocence"—the showing that, in light of all the evidence adduced at trial, it is more likely than not that no reasonable juror would have convicted him.

As detailed more fully below, the trial record is replete with evidence of Gupta's financial entanglements with Rajaratnam and Galleon.   What was good for Galleon was good for Gupta.   The evidence established—beyond a reasonable doubt—that Gupta had a powerful, ongoing financial incentive to tip Rajaratnam with material nonpublic information that Rajaratnam could use to commit insider trading at Galleon.   In his petition, Gupta either ignores or misconstrues this damning evidence of his financial self-interest to tip Rajaratnman and seeks refuge in *Newman*'s newly articulated personal benefit standard.   But, as set forth below, *Newman*—whatever its flaws and even if left to stand[1]—did not decriminalize Gupta's conduct, which this Court rightfully described as "brazen" and the "functional equivalent of stabbing Goldman in the back."   (A. 1635.)[2]   A faithful reading of the trial record demonstrates that Gupta remains guilty in a post-*Newman* world.   As this Court explained at sentencing:

> Rajaratnam, a clever cultivator of persons with information, repeatedly held out prospects of exciting new international business opportunities that Rajaratnam would help fund but that Gupta would lead. . . . [T]here is no doubt that Gupta, though not

---

[1]      On January 23, 2015, the Government filed a petition seeking rehearing and rehearing *en banc* in *Newman*.   That petition is pending before the Second Circuit.   *See* Brief for Petitioner, *United States* v. *Newman*, 13-1837(L) (2d Cir. Jan. 23, 2015).

[2]      "A." refers to the joint appendix filed with Gupta's brief on appeal; "Tr." refers to the trial transcript, which appears at pages 212 to 1064 of the joint appendix; and "GX" refers to a Government exhibit admitted at trial.

> immediately profiting from tipping Rajaratnam, viewed it as an
> avenue to future benefits, opportunities, and even excitement.

(A. 1636.)  Accordingly, even though *Newman* appeared to redefine the boundaries of insider trading

liability, Gupta's egregious conduct falls well within the heartland of criminality under the securities

fraud laws.  His guilt therefore endures, and his petition for post-conviction relief should be denied.

### Factual and Procedural Background

Superseding Indictment S1 11 Cr. 907 (JSR) (the "Indictment") was filed on January 31,

2012, in six counts.  Count One charged Gupta with conspiracy to commit securities fraud, in

violation of 18 U.S.C. § 371.  Counts Two through Six charged Gupta with substantive securities

fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  The

jury returned verdicts of guilty on Counts One, Three, Four, and Five of the Indictment, and not

guilty on Counts Two and Six.  On October 26, 2012, this Court sentenced Gupta principally to

concurrent terms of 24 months' imprisonment and a $5 million fine.

The trial record is described in detail in the Second Circuit's opinion in this case, *United

States* v. *Gupta*, 747 F.3d 111 (2d Cir. 2014), and will not be repeated in full here.  In brief, the

Government's evidence demonstrated that Gupta, a member of the board of directors of Goldman

Sachs ("Goldman") and Procter & Gamble ("P&G"), illegally disclosed inside information about

those companies to Rajaratnam.  The pattern of conduct was simple and blatant.  As a board

member, Gupta regularly received confidential information from Goldman and P&G.  Yet instead of

keeping those companies' confidences, as he was obligated to do, Gupta routinely disclosed inside

information to Rajaratnam.  Rajaratnam and others who worked for him at Galleon then used

Gupta's inside information to trade securities, thereby reaping millions of dollars in profits and

avoiding millions of dollars in losses.

### A.  The Gupta-Rajaratnam Relationship

A substantial portion of the Government's case focused on establishing the close relationship between Gupta and Rajaratnam.  The personal aspect of their relationship was undeniable.  Gupta described Rajaratnam as a "very close friend[]."  (GX 1922.)  Rajaratnam, for his part, referred to Gupta as a "good friend" in his address book.  (GX 1965-R; Tr. 223.)  Indeed, Gupta was part of a select group of "important people" (five in all) that was authorized to speak with Rajaratnam at the end of the trading day.  (A. 1458; Tr. 209-14.)

Gupta's business relationship with Rajaratnam was extensive and equally close.  Gupta had a keycard that gave him access to Galleon's New York offices, where he frequently visited and worked to recruit investors for Galleon.  (Tr. 340; A. 1398; GX 1977-C.)  Gupta personally invested in Galleon, having put money in offshore Galleon funds.  (Tr. 2110-16.)  Gupta also participated in several actual and contemplated ventures with Rajaratnam.  For instance, in 2008, Gupta executed an agreement that gave him an ownership stake in an entity called Galleon Special Opportunities.  (A. 1399-1414; Tr. 2208-11.)  Gupta and Rajaratnam also explored launching an entity called Galleon Global.  (Tr. 1820-28.)  Gupta and Rajaratnam together successfully launched a private equity fund called New Silk Route ("NSR").  Rajaratnam committed $50 million to NSR and served on its investment committee.  Gupta served as the fund's chairman (Tr. 1796), and sent numerous letters to potential investors, including Goldman board directors, touting Rajaratnam's involvement, (*see, e.g.*, A. 1447-56.)

In 2005, Gupta and Rajaratnam formed Voyager Capital Partners ("Voyager"), an investment fund capitalized with $50 million—20% of which, or $10 million, was Gupta's stake.  (Tr. 2124-26.)  Rajaratnam held the remaining 80% stake of Voyager and made Voyager's investment decisions, which included investing Voyager's assets in other Galleon funds.  (Tr. 2122-24.)  The evidence

showed that Voyager initially performed exceedingly well (A. 1438), but the value of the fund plummeted in 2008 during the financial crisis.  (Tr. 2134-35, 1858-61.)  Gupta, as a result, lost much of his $10 million investment in Voyager.  (Tr. 1858-63.)  Anil Kumar testified that Gupta told him in mid-to-late October 2008 that Rajaratnam had mismanaged the Voyager fund and that Rajaratnam had "a moral and ethical responsibility to make [him] whole."  (Tr. 1860.)  The evidence showed, and the Government argued, that Gupta's desire to recoup his Voyager losses gave him a strong incentive to tip Rajaratnam with confidential information, thereby currying favor with the person best positioned to make Gupta whole.  (*See, e.g.*, Tr. 3342 ("[Gupta's Voyager loss] was the motive to tip and why he continued to tip Mr. Rajaratnam. . . .  Mr. Gupta had been tipping Mr. Rajaratnam in the fall of 2008 about Goldman Sachs and Procter & Gamble.  He wanted Mr. Rajaratnam to make him whole.").)

A July 29, 2008 wiretapped call between Gupta and Rajaratnam powerfully illustrates the clear link between Gupta's tips and his Voyager investment.  During the call, Rajaratnam mentioned a "rumor" he had heard that Goldman was looking to buy a commercial bank and asked Gupta, point blank, whether had "heard anything along that line."  (A. 1116.)  Gupta, as a Goldman board member, in fact had learned about such a potential investment during a confidential strategy meeting that had taken place the month prior in Russia.  (Tr. 807-19, 2045-49.)  But instead of maintaining that confidentiality, Gupta confirmed that there had been "a big discussion at the board meeting," that the discussion was "divided" and that the insurance company AIG was "definitely" in the "mix." (A. 1117.)  After receiving Gupta's confidential information (the *quid*), Rajaratnam seamlessly steered the conversation to something Gupta wanted (the *quo*): a promise from Rajaratnam that Galleon's CFO would send Gupta a letter memorializing Rajaratnam's earlier agreement to increase Gupta's Voyager stake by $4 million.  (*See* Tr. 2135-41.)  Rajaratnam agreed and promised Gupta

that the letter would be forthcoming.  Several days later, Rajaratnam fulfilled his promise.  (A. 1119, 1443-44.)[3]

In early 2008, Rajaratnam named Gupta chairman of Galleon International, a fund that managed more than $1 billion in assets.  Gupta received a 15% ownership stake in Galleon International and the right to participate in its performance fees.  (Tr. 1696; A. 1470.)  In his role, Gupta acted as a Galleon emissary, traveling to the Middle East to pitch investors, and meeting with potential investors in New York, including at Galleon's office.  (Tr. 1473-87, 1494-95, 1501-25, 1556.)  At trial, the defense vigorously disputed whether Gupta's chairmanship of Galleon International was ever consummated.  (*See, e.g.*, Tr. 3253.)  But the evidence made clear that Gupta believed that he was chairman of the fund.  For instance, in the July 29, 2008 wiretapped conversation, Gupta acknowledged that "you've given me . . . a position in Galleon International." (GX 9-T, at 13.)  And Gupta told Rajaratnam that he wanted to explore how he could "be helpful" not only to Galleon International, but also to the rest of Galleon.  (A. 1127; *see also* A. 1128 (Gupta encouraging Rajaratnam to "pull me in wherever [Galleon employees] think I can add value.").)  Additionally, according to notes taken by Heather Webster, Gupta's longtime banker from JP Morgan, Gupta reported that he was chairman of Galleon International, a company he described as having $1.3 billion in capital, and stated that he held a 15 percent ownership stake and was entitled to performance fees.  (A. 1470; Tr. 1696.)

In sum, Gupta's financial interests were heavily aligned with Galleon's.  Rajaratnam bestowed corporate titles on Gupta, gave him an ongoing financial interest in Galleon International,

---

[3]     Gupta's efforts to improve his Voyager investment continued, even after Rajaratnam increased his stake by $4 million.  Indeed, in January 2009, after Voyager's value had declined, Gupta sent Rajaratnam an email asking for an update on Rajaratnam's discussions with Voyager's lenders and asking whether he "could be of any help."  (A. 1445.)

restored millions of dollars to Gupta's Voyager stake (with the potential for further upward adjustments in the future), and generally granted Gupta a level of access and corporate prestige that Gupta craved. Those benefits—which, in *Newman*'s terms, were all "objective," "consequential" and "valuable"—reflected a bona fide exchange between Gupta and Rajaratman. As part of their business relationship, each had shared expectations. Rajaratnam expected, and Gupta consistently delivered, inside information that Gupta possessed as a corporate insider. For those tips, Gupta clearly expected potential pecuniary gain in return.

###### B.     The Jury Instructions

In his pre-trial proposed instructions of law, Gupta requested that the Court instruct the jury as follows with regard to benefit:

> [T]he government must prove beyond a reasonable doubt that Mr. Gupta intended that he would receive a personal benefit, be it monetary or an interest or position in a business venture, as a result of disclosing confidential information to Mr. Rajaratnam for the purpose of Mr. Rajaratnam (or the funds he managed) purchasing or selling securities of Goldman Sachs or Procter & Gamble.
>
> Not all disclosures of confidential information are inconsistent with the duty a director owes to shareholders. The government cannot prevail if it proves only that Mr. Gupta disclosed confidential information to Mr. Rajaratnam about Goldman Sachs or Procter & Gamble. Nor is it sufficient for the government merely to prove that Mr. Gupta and Mr. Rajaratnam were at some point friends or business associates. The test for determining if a disclosure of confidential information is unlawful is whether material non-public information was disclosed with the intent to personally benefit as a result of the disclosing. Absent proof beyond a reasonable doubt of an intent to secure some concrete and actual personal benefit, there has been no improper disclosure and, thus, no breach of duty to shareholders.

(Doc. # 68 at 17.)

At the close of evidence, this Court gave the following benefit instruction to the jury, which, as explained below, coheres with *Newman*:

> First, that on or about the date alleged, Mr. Gupta engaged in an insider trading scheme, in that, in anticipation of receiving at least some modest benefit in return, he provided to Mr. Rajaratnam the material non-public information specified in the count you are considering. . . .
>
>            * * * *
>
> [A]s to the benefit that the defendant anticipated receiving, the benefit does not need to be financial or to be tangible in nature. It could include, for example, maintaining a good relationship with a frequent business partner, or obtaining future financial benefits.

(Tr. 3370-71.)  In the charge conference, defense counsel objected to this instruction.  (Tr. 3050.) Although the Court previously informed defense counsel that the instruction comported with "the law of the circuit," (Tr. 678), defense counsel nonetheless made clear that his objection was meant to "preserv[e] the record."  (*Id*.)

## C.    The Direct Appeal

Gupta appealed his conviction in January 2013.  Yet despite his objection to the Court's benefit instruction, and his clearly stated desire to preserve the record, Gupta abandoned the issue before the Circuit.  Instead, Gupta attacked his conviction on two evidentiary grounds.  First, Gupta asserted that the Court erred in admitting certain wiretap evidence.  Second, Gupta argued that the Court erred by excluding certain defense evidence.  The Second Circuit concluded that Gupta's arguments "lack[ed] merit" and affirmed his conviction.  *Gupta*, 747 F.3d at 116.

On November 10, 2014, Gupta petitioned the Supreme Court for a writ of certiorari.  Like his appeal to the Second Circuit, Gupta's petition (which is still pending) is also silent on the propriety of this Court's benefit instruction.

### D.     *United States* v. *Newman*

On December 10, 2014, a panel of the Second Circuit decided *United States* v. *Newman*, 773 F.3d 438 (2014).  Todd Newman ("Newman") and Anthony Chiasson ("Chiasson") were hedge fund portfolio managers who traded securities with the assistance of a select number of analysts.  *Id.* at 443.  Those analysts, in turn, belonged to a small group of friends who conspired to obtain material non-public information so that they and their bosses could benefit by trading on it.  *Id*.  The circle had particular success in developing sources inside public companies—sources that had access to periodic earnings numbers before they were released to the public.  *Id.*  At trial, the evidence proved that Newman and Chiasson obtained inside information concerning earnings at two public companies—Dell, Inc. and NVIDIA Corporation—that netted Newman and Chiasson $4 million and $68 million in profits, respectively, for their hedge funds.  *Id.*  Both defendants were convicted at trial of securities fraud.  *Id.* at 444.

On appeal, the primary question presented to the Second Circuit was whether the trial court properly instructed the jury that, in order to be held criminally liable, both defendants had to know that the insider-tippers' breaches were in exchange for a personal benefit.  *Id.* at 447.   One defendant, Newman, also argued that the Government failed to prove that the corporate insiders received a sufficiently meaningful personal benefit to support criminal liability.  *See* Brief for Appellant Todd Newman, *United States* v. *Newman*, 13-1837(L) at *49-51 (2d Cir. Aug. 15, 2013).

The *Newman* panel reversed Newman's and Chiasson's convictions and ordered the charges dismissed with prejudice.  The panel offered two bases for reversal.  First, the panel seized on Newman's personal benefit argument and held that in order for a tippee to be guilty of insider trading, the insider who breached his duty must have done so in exchange either for pecuniary gain or as part of a "meaningfully close personal relationship that generates an exchange that is objective,

consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Newman*, 773 F.3d at 452.   Second, the panel concluded that a tippee must know of the tipper's personal benefit.   *Id.* at 450.   The panel ultimately found insufficient the Government's evidence that the insider-tippers obtained a legally cognizable personal benefit in exchange for providing material non-public information, and that Newman and Chiasson had the requisite knowledge of the insider-tippers' benefit.   *Id.* at 455.

## ARGUMENT

## I.    THE COURT'S PERSONAL BENEFIT INSTRUCTION WAS PROPER

Gupta repeatedly asserts that this Court's benefit instruction "permitted the jury to convict Mr. Gupta without finding that his tips were part of an agreed upon exchange of tips for consequential benefits."   (*See, e.g.*, Pet'r Br. at 3.)   *Newman*, Gupta declares, rejects the Court's instruction that the tipper's benefit need not be "financial" or "tangible in nature" and that it can include "maintaining a good relationship with a frequent business partner."   (*See id.* at 2-3; Tr. 3371.)

But *Newman* did no such thing.   *Newman* held that the benefit must be "objective" and "consequential" and have the *potential* to lead to a "pecuniary" or otherwise "valuable" gain. *Newman*, 773 F.3d at 452.   To shed light on this newly articulated standard, *Newman* specifically endorsed three cases, *United States* v. *Jiau*, 734 F.3d 147 (2d Cir. 2013), *SEC* v. *Yun*, 327 F.3d 1263 (11th Cir. 2003) and *SEC* v. *Sargent*, 229 F.3d 68 (1st Cir. 2000), as illustrative of the types of benefits that would suffice.   *Id.*   Critically, two of those cases, *Yun* and *Sargent*, used language that *mirrors* the portion of the jury instruction that Gupta disputes.   In *Yun*, the evidence established that tipper and tippee were "friendly" and "split commissions on various real estate transactions over the years."   *Yun*, 327 F.3d at 1280.   The Eleventh Circuit found (and the *Newman* panel agreed) that this

evidence was "sufficient for a jury reasonably to conclude that [the tipper] expected to benefit from her tip to [the tippee] by *maintaining a good relationship between a friend and frequent partner in real estate deals*." *Id*. (citing *Sargent*, 229 F.3d at 77) (emphasis added).  In *Sargent*, the tipper and tippee were "friendly" and the tipper referred numerous people to the tippee "for their dental work." *Sargent*, 229 F.3d at 77.  The tipper and tippee also shared a connection through the local chamber of commerce.  *Id*.  The First Circuit concluded (and the *Newman* panel agreed) that "[f]rom this evidence, a jury could infer that [the tipper conveyed inside information] in an effort *to effect a reconciliation with his friend* and *to maintain a useful networking contact*." *Id*. (emphasis added).

If Gupta's reading of *Newman* were correct, then *Newman* would seek to bury *Yun* and *Sargent*, not to praise them.  There is, after all, no discernible distinction between this Court's instruction that "maintaining a good relationship with a frequent business partner" represents a personal benefit and *Yun*'s holding that "maintaining a good relationship between a friend and frequent partner in real estate deals" suffices.  Nor is there a difference between this Court's instruction and *Sargent*'s holding that "maintain[ing] a useful networking contact" is legally sufficient to establish a tipper's benefit.

At no point did the Court instruct the jury that Gupta's longstanding personal relationship with Rajaratnam was, standing alone, sufficient to infer a benefit.[4]  Gupta's petition therefore fails at

---

[4]    Gupta also complains that the Court's instruction violated *Newman* by stating that the tipper's benefit can be "modest" and not "tangible" in nature.  That, however, is a correct statement of the law.  For instance, in *Jiau*, which *Newman* endorsed, the tipper's benefit was membership in an "investment club" where stocks were discussed.  *See Jiau*, 734 F.3d at 153; *Newman*, 773 F.3d at 452.  *Jiau* observed that it was "of no moment" that the tipper "did not receive any tips from [the] investment club in return for the tips he gave." *Jiau*, 734 F.3d at 153.  The mere "*opportunity* to access information that *could* yield a future pecuniary gain" was sufficient under the law, even though that benefit was both modest and intangible.  *Id*. (emphasis added).

the outset by misreading *Newman* and concluding incorrectly that it undermined any portion of the Court's benefit instruction.

## II.      GUPTA PROCEDURALLY DEFAULTED HIS *NEWMAN* CLAIM

Gupta's petition suffers from an equally serious procedural flaw.  Instead of justifying his failure to raise the benefit claim on direct appeal, Gupta simply declares (in a single sentence, in a footnote) that the law "imposes no impediment" to his argument being presented for the first time on collateral review.  (*See* Pet'r Br. at 4 n.3.)  Gupta otherwise makes no effort to engage with the strict procedural rules that govern his petition.

As explained below, the law does not freely grant the do-over that Gupta seeks.  It requires Gupta to demonstrate "cause and prejudice" that would excuse his procedural default or, in the alternative, prove his "actual innocence" in a post-*Newman* world.  Because Gupta can do neither, his petition should be denied.

### A.      Applicable Law

It is well settled that Section 2255 is not designed as a substitute for a direct appeal, *see United States* v. *Frady*, 456 U.S. 152, 165 (1982), *United States* v. *Addonizio*, 442 U.S. 178, 184-85 (1979), and that a federal prisoner cannot use a Section 2255 petition to litigate questions that could have been raised on direct appeal but were not, *see Rosario* v. *United States*, 164 F.3d 729, 731 (2d Cir. 1999).  Society's interest in repose of criminal judgments animates these procedural rules and compels their vigorous enforcement.  *See, e.g.*, *Harrington* v. *Richter*, 562 U.S. 86, 103 (2011); *McCleskey* v. *Zant*, 499 U.S. 467, 490-91 (1991).  Thus, where a petitioner has procedurally defaulted a claim by failing to raise it at trial, sentencing, or on direct appeal, the claim may be raised in habeas only if the petitioner "can first demonstrate either 'cause' and 'actual prejudice,' or that he is 'actually innocent.'"  *Bousley* v. *United States*, 523 U.S. 614, 622 (1998) (quoting *Murray*

v. *Carrier*, 477 U.S. 478, 485, 496 (1986); *Wainwright* v. *Sykes*, 433 U.S. 72, 87 (1977), and *Smith* v. *Murray*, 477 U.S. 527, 538 (1986)); *see also Rosario*, 164 F.3d at 732 (defendant must demonstrate "either (1) 'cause for failing to raise the issue, and prejudice resulting therefrom,' . . . or (2) 'actual innocence'" (citations omitted).)

The Supreme Court has made clear that "cause" is measured by a stringent standard of diligence. *See, e.g.*, *Coleman* v. *Thompson*, 501 U.S. 722, 752 (1991) ("Cause" is "something external to the petitioner" which "cannot be fairly attributed to him"). "Cause" to excuse a procedural default may exist where a claim "is so novel that its legal basis [was] not reasonably available to counsel." *Reed* v. *Ross*, 468 U.S. 1, 16 (1984). A claim is "reasonably available," however, if at the time of the default, it was being raised by litigants and addressed by the courts. *See Bousley*, 523 U.S. at 622-23 (claim not "novel" where judicial decisions in the reporters show that the legal basis for the claim was "reasonably available").

Critically, the Supreme Court has long made clear that a petitioner cannot demonstrate "cause" for failing to raise a claim simply because doing so would have been futile. It matters not that the claim may have been doomed under prevailing law; even when the law is against a contention, a litigant must make the argument to preserve it. As the Supreme Court stated in *Bousley*: "[F]utility cannot constitute cause if it means simply that a claim was unacceptable to the particular court at that particular time." 523 U.S at 623 (quoting *Engle* v. *Isaac*, 456 U.S. 107, 130 n.35 (1982)).

If a petitioner cannot demonstrate "cause" for his procedural default, he can attempt to obtain review for his claim by establishing "that a fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey*, 499 U.S. at 494-95. The Supreme Court has repeatedly emphasized that by the term "fundamental miscarriage of justice," it means the "actual innocence"

13

of the petitioner.  *See Herrera* v. *Collins*, 506 U.S. 390, 404 (1993) (referring to rule requiring "proper showing of actual innocence" as the "fundamental miscarriage of justice exception" and explaining that the purpose of the exception is "to see that federal constitutional errors do not result in the incarceration of innocent persons"); *Murray* v. *Carrier*, 477 U.S. at 495-96 (explaining that the exception is reserved for those extraordinary cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent").  As the Court explained in *Schlup* v. *Delo*, 513 U.S. 298 (1995):

> To ensure that the fundamental miscarriage of justice exception would remain "rare" and would only be applied in the "extraordinary case," while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.

*Id.* at 321.

Furthermore, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623 (citing *Sawyer* v. *Whitley*, 505 U.S. 333, 339 (1992)).  This extremely narrow test is satisfied only if the petitioner can demonstrate that his acts "have been ruled not to constitute criminal conduct."  *Underwood* v. *United States*, 166 F.3d 84, 88 (2d Cir. 1999); *see also Reyes-Requena* v. *United States*, 243 F.3d 893, 904 (5th Cir. 2001) (petitioner must establish that he or she "may have been convicted of a nonexistent offense").  For example, in *Bousley*, the Supreme Court remanded the case for a determination whether the petitioner had satisfied the "actual innocence" test.  523 U.S. at 624.  There, the Court was considering whether the petitioner could obtain relief based on *Bailey* v. *United States*, 516 U.S. 137 (1995), in which the Court curtailed the reach of the version of 18 U.S.C. § 924(c)(1) in effect at the time of Bailey's conduct and held that the term "use" of a weapon in the statute required "active employment" of the weapon.  *Id.* at 617.

14

Petitioner Bousley had failed to raise any *Bailey*-type claim; *Bailey* itself had been handed down after his appeal was complete.  *See* 523 U.S. at 622-23.  The Supreme Court ruled that Bousley would be afforded the opportunity, on remand, to demonstrate "actual innocence"—that is, that he had not "used" a firearm within the meaning of the term adopted in *Bailey*—but that his claim would be procedurally barred absent such a demonstration.  *See id.* at 624.

### B.    Discussion

Measured against the foregoing legal standard, Gupta's petition establishes neither "cause" nor "actual innocence."   As for "cause," Gupta simply asserts that, during trial, the law was decidedly against him and that an appellate challenge would have been futile.  (*See* Pet'r Br. at 4 n.3.)  But Gupta's pessimism merely explains, but certainly does not excuse, his procedural default. *See Ryan* v. *United States*, 645 F.3d 913, 916 (7th Cir. 2011) (Easterbrook, J.) ("That the argument seems likely to fail is not 'cause' for its omission.  So *Bousley* tells us.").  The Supreme Court has repeatedly emphasized that "cause . . . requires a showing of some external impediment *preventing* counsel from constructing or raising the claim."  *McCleskey*, 499 U.S. at 497 (quoting *Murray* v. *Carrier*, 477 U.S. at 492) (emphasis in original).  There was no such external impediment that *prevented* Gupta from raising his claim, a point made clear by Gupta's multiple objections to the benefit instruction which, as defense counsel explained, were designed to "preserv[e] the record." (Tr. 678.)

Ultimately, Gupta's assertion that his argument was "futile" simply begs two practical questions:  First, if the argument was so clearly futile, why meticulously "preserv[e] the record" at all?  (*Id.*)  And, second, if the argument had no chance to succeed on appeal, how does Gupta explain Newman's success?  After all, both Gupta and Newman were tried and convicted in 2012, of the same crime, in the same courthouse.  Both Gupta and Newman appealed their convictions in

2013 before the same circuit court.  But only Newman pressed the benefit argument on appeal.  Had this Court actually instructed the jury improperly (and, as explained above, it did not) and had Gupta appealed that instruction (as he was required to do), then Gupta could have presented his personal benefit argument to the Second Circuit.  *See Ryan*, 645 F.3d at 916 ("If Ryan's lawyers had done what Skilling's lawyers did, the controlling decision today might be *Ryan* rather than *Skilling*."). Instead, by failing to present the claim when it was available, Gupta cannot show "cause" for his default.

Gupta's unexcused default means that, to prevail, he must demonstrate that he is "actually innocent."  The standard is strict by design:  Gupta must prove, based on the content of the entire trial record, that no reasonable juror would have convicted him.  *See Bousley*, 523 U.S. at 623-24 (setting forth actual innocence standard); *Ryan*, 645 F.3d at 917 ("*Bousley* afford[s] relief if a person is in prison for acts that the law does not make criminal.  *That standard depends on the content of the trial record, not the content of the jury instructions*." (emphasis added)).

As demonstrated above, the trial record is filled with evidence that Gupta's illegal tips were part of an agreed-upon exchange whereby Gupta plied Rajaratnam with corporate secrets while Rajaratnam offered Gupta a future of potential financial enrichment.[5]  The Government's proof of

---

[5]     Much of Gupta's petition argues that any emolument Rajaratnam provided, such as Gupta's Galleon International chairmanship or his Voyager stake, predated Gupta's tips and that, therefore, the only benefit the jury could have found was rooted in Gupta's "longstanding relationship" with Rajaratnam.  (*See, e.g.*, Pet'r Br. at 4.)  That assertion incorrectly assumes that once he was financially yoked to Rajaratnam through Galleon International and Voyager, Gupta lacked any financial motive to disclose corporate secrets.  But of course, as made plain at trial, the ongoing nature of these business relationships, including Gupta's continuing losses, created an incentive for Gupta to tip throughout the charged conspiracy.  Furthermore, defense counsel previously made—and the jury rejected—these very arguments at trial.  (*See, e.g.*, Tr. 3270-74 (referring to Gupta's Voyager investment loss as a "badge of innocence" and claiming that the Government's financial motive arguments were "not credible on their face").)

this *quid pro quo* was overwhelming.   Two aspects of Gupta's financial entanglements with Rajaratnam and Galleon are particularly devastating and readily illustrate Gupta's guilt.

First, Gupta's chairmanship of and ownership stake in Galleon International proved that his finances were deeply connected to and highly dependent on Rajaratnam and Galleon.  The evidence showed that Gupta took his role seriously and that he helped Galleon by pitching investors during a trip to the Middle East and in meetings in Galleon's New York offices.  (Tr. 1473-87, 1494-95, 1501-25, 1556.)  Gupta also saw Galleon International as a fruitful source of future income.  That is why, in a meeting with his personal banker, Heather Webster, Gupta listed Galleon International as part of his "income stream." (Tr. 1696.)  Specifically, Gupta told Webster that he was chairman of Galleon International, that he "own[ed] 15 percent of it" and that he was "entitled to performance fees." (*Id.*)  Gupta's Galleon ties motivated him to tip Rajaratnam with inside information.  Or, as the Government put it in summation when discussing Galleon International: "Gupta had a direct financial stake in Galleon.  That's another example of [Gupta and Rajaratnam's] interests being aligned: What was good for Rajaratnam and Galleon was good for Gupta."  (Tr. 3204.)

Gupta's own words, captured in the July 29, 2008 wiretapped conversation with Rajaratnam, confirm that Gupta viewed his financial interests and Galleon's financial interests in harmony.  In that call, which revealed the true transactional nature of their relationship, Gupta acknowledged to Rajaratnam that "you've given me . . . a position in Galleon International."  (GX 9-T, at 13.)  And Gupta told Rajaratnam that he wanted to explore how he could "be helpful" not only to Galleon International, but also to the rest of Galleon.  (A. 1127; *see also* A. 1128 (Gupta: "[P]ull me in wherever [Galleon employees] think I can add value.").)  For Gupta, helping Galleon meant helping himself, and it provided him with a powerful and enduring financial incentive to tip Rajaratnam with inside information.  On this basis alone, a reasonable jury would be entitled to conclude that Gupta,

by conveying inside information to Rajaratnam, ultimately expected his tips to lead to "a potential gain of a pecuniary or similarly valuable nature." *Newman*, 773 F.3d at 452.[6]

Similarly, Gupta's Voyager investment provided Gupta with an ongoing incentive to leak corporate secrets to Rajaratnam.[7] The connection between Gupta's tips and his Voyager investment was made plain in the July 29, 2008 wiretapped conversation. In that call, Gupta first divulged confidential information about Goldman's internal deliberations and then immediately obtained Rajaratnam's help with his Voyager investment. (A. 1119, 1443-44.) Later, in September and October 2008, as Voyager's value suffered during the financial crisis and Gupta's Voyager stake plummeted by nearly $10 million (Tr. 1858-63), Gupta continued tipping Rajaratnam about Goldman. At trial, the Government argued that Gupta was motivated to tip Rajaratnam because Gupta was simultaneously seeking Rajaratnam's assistance in recouping his Voyager loss. (*See* Tr. 3342.) Anil Kumar's testimony on this point was key: Kumar explained that Gupta told him in mid-to-late October 2008 that Rajaratnam's mismanagement of Voyager meant that Rajaratnam had "a moral and ethical responsibility to make [him] whole." (Tr. 1860.) Gupta, for his part, vigorously disputed that Voyager gave him a motive to tip Rajaratnam. Gupta instead claimed that he was "upset" at Rajaratnam and "depressed" about his financial loss. (*See, e.g.*, Tr. 3270-74; Pet'r Br. at

---

[6]     In an October 24, 2008 wiretapped call, Rajaratnam shared one of Gupta's tips (an October 23, 2008 tip about Goldman's unprecedented quarterly loss) with Galleon International portfolio manager David Lau ("Lau"). Rajaratnam advised Lau that he "heard yesterday from somebody who's on the Board of Goldman Sachs, that they are gonna lose $2 per share. The Street has them making $2.50." (GX 29-T, at 2.) Rajaratnam went on to advise Lau about the potential for selling the Goldman stock short. (*Id.*)

[7]     As mentioned above, Rajaratnam, who was responsible for making Voyager's investment decisions, invested Voyager's assets in various Galleon funds. (*See* Tr. 2122-24.) Indeed, Voyager's money was invested in Galleon Buccaneer's Offshore fund (Tr. 2124), a fund that Rajaratnam used to purchase Goldman stock after Gupta's September 23, 2008 tip about Warren Buffett's $5 billion investment in Goldman. (GX 178-A; Tr. 360.)

7-8.)  But Gupta's actions (repeatedly tipping Rajaratnam in September and October 2008 with highly confidential information) reveal that Gupta, no matter his feelings, was determined to please Rajaratnam and recoup his Voyager loss.  Accordingly, in summation, the Government highlighted the Voyager evidence and explained that it was at the heart of Gupta's *quid pro quo* with Rajaratnam:

> Clearly, even if Gupta was upset with Rajaratnam, Gupta clearly believed that helping Rajaratnam by providing benefits and assistance to Rajaratnam made it more likely that Gupta would get his money back and receive other benefits from Rajaratnam.  So, don't be distracted by the defense's efforts to suggest that . . . the decline in value of Voyager somehow eliminated any incentive that Gupta had to help Rajaratnam.  Gupta's own words show you that that's not the case.

(Tr. 3216.)  The jury's verdict—convicting Gupta of tipping Rajaratnam during the period when he was simultaneously seeking to staunch his Voyager loss—is consistent with the Government's view that Gupta expected a potential pecuniary benefit in exchange for his tips.  Gupta's disagreement with the Voyager evidence (and with the jury's verdict that naturally flows from it) does not entitle him to habeas relief.

## CONCLUSION

For the reasons set forth above, the Court should deny Gupta's petition for post-conviction relief.

<div style="margin-left: 40%;">

Respectfully submitted,
PREET BHARARA
United States Attorney
Southern District of New York

By:     _____
Damian Williams
Assistant United States Attorney

</div>

Dated:  New York, New York
April 2, 2015