UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

          -v-                     :          11 Cr. 907 (JSR)

                                  :          MEMORANDUM ORDER

RAJAT K. GUPTA,                   :

          Defendant.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JED S. RAKOFF, U.S.D.J.

     On June 15, 2012, a jury convicted defendant Rajat Gupta of

one count of conspiracy and three counts of substantive

securities fraud in connection with his conveying material non-

public information about Goldman Sachs Group, Inc., on whose

board of directors Gupta served, to Raj Rajaratnam, the head of

a hedge fund called The Galleon Group. Rajaratnam then traded on

the basis of the information. Following sentencing, Gupta

appealed his conviction on various grounds, but the Second

Circuit rejected his arguments and affirmed the conviction.

United States v. Gupta, 747 F.3d 111 (2d Cir. 2014). Now,

however, seeking to take advantage of the Second Circuit's

recent decision in United States v. Newman, 773 F.3d 438 (2d

Cir. 2014), Gupta moves pursuant to 28 U.S.C. § 2255 to vacate

his sentence and the judgment against him on the basis of an

argument he raised at trial but abandoned on appeal, viz., that

the Court's instruction to the jury concerning the "personal

benefit" element of an insider trading violation under § 10(b)

of the Securities Exchange Act of 1934 was erroneous and that the evidence of such benefit adduced at trial was insufficient to sustain his conviction. The argument is both too late and too little.

"A motion under § 2255 is not a substitute for an appeal." United States v. Munoz, 143 F.3d 632, 637 (2d Cir. 1998). Thus, where, as here, "a criminal defendant has procedurally forfeited his claim by failing to raise it on direct review, the claim may be raised in a § 2255 motion only if the defendant can demonstrate either: (1) cause for failing to raise the issue, and prejudice resulting therefrom; or (2) actual innocence." Rosario v. United States, 164 F.3d 729, 732 (2d Cir. 1998) (internal quotation marks omitted). Gupta cannot avail himself of either exception.

Regarding the "cause and prejudice" alternative, a habeas petitioner may demonstrate cause for a failure to raise an issue during trial or to preserve it on appeal where doing so would have been futile in light of "prior . . . case law that consistently rejected [the] particular . . . claim." DiSimone v. Phillips, 461 F.3d 181, 191 (2d Cir. 2006). "Cause" based on futility, therefore, requires more than "'simply that a claim was unacceptable to that particular court at that particular time.'" Id. (quoting Bousley v. United States, 523 U.S. 614, 623

(1998)).

Here, Gupta's own actions belie any claim that the argument
he now raises would have been "futile." At trial, he objected to
the Court's description of the benefit element in both the
preliminary jury charge and the final instructions, see May 24,
2012 Trial Transcript at 677:16-20; June 11, 2012 Trial
Transcript at 3050:19-21, and he also objected to the
Government's characterization of the element during its closing
argument, see June 13, 2012 Trial Transcript at 3341:9-10. That
he later decided to leave this argument on the cutting room
floor to narrow the issues on appeal does not establish that it
was futile.

In any event, the argument was not futile for the simple
reason that Newman did not open the door to an argument that
"prior . . . case law [had] consistently rejected." DiSimone,
461 F.3d at 191. While Newman arguably narrowed the range of
evidence that would support an inference of "benefit," it did
not purport to overrule any binding precedent, something,
indeed, that its panel lacked authority to do. Thus, if Gupta's
argument is not futile now, it was not futile at the time of his
appeal, and should have been raised then.

As for actual innocence, Gupta argues that, if what he
interprets to be the Newman standard of "benefit" had been

3

applied, the evidence adduced by the Government at trial would
not have satisfied this standard. This, argues Gupta, is because
Newman requires that a tipper (here Gupta) receive from his
tippee (Rajaratnam) a "quid pro quo" in the form of "a potential
gain of a pecuniary or similarly valuable nature." Newman, 773
F.3d at 452.

Gupta's argument misreads Newman. To begin with, Newman was
concerned with the liability of a remote tippee, whereas Gupta
was convicted as a tipper. As the Supreme Court has repeatedly
made clear, a tipper is liable for securities fraud if he takes
sensitive market information provided to him in a fiduciary
capacity and exploits it for some personal benefit. See, e.g.,
Dirks v. SEC, 463 U.S. 646, 662-64 (1983); United States v.
O'Hagan, 521 U.S. 642, 647 (1997). This is precisely how the
jury was instructed in Gupta's case, and Newman in no way
purports to change this fundamental concept.

Newman, instead, was concerned with tippee liability.
Newman held, in its primary holding, that a tippee, to be
criminally liable, must know that the information provided to
him by the tipper was a product of a fiduciary breach by the
tipper. Such tippee knowledge is irrelevant to Gupta, a tipper.

Newman then, in its secondary holding, was concerned with
what evidence could reasonably support an inference of such

4

knowledge on the part of a remote tippee. Thus, in the passage

on which Gupta primarily relies, the Newman court stated:

> To the extent Dirks suggests that a personal benefit may
> be inferred from a personal relationship between the
> tipper and tippee, where the tippee's trades "resemble
> trading by the insider himself followed by a gift of the
> profits to the recipient," see 463 U.S. at 664, we hold
> that such an inference is impermissible in the absence
> of proof of a meaningfully close personal relationship
> that generates an exchange that is objective,
> consequential, and represents at least a potential gain
> of a pecuniary or similarly valuable nature. In other
> words, as Judge Walker noted in Jiau, this requires
> evidence of "a relationship between the insider and the
> recipient that suggests a quid pro quo from the latter,
> or an intention to benefit the [latter]." [United States
> v. ]Jiau, 734 F.3d [147, 153 (2d Cir. 2013)].

Id. As the use of the word "or" in the last sentence indicates,

a tipper's intention to benefit the tippee is sufficient to

satisfy the benefit requirement so far as the tipper is

concerned, and no quid pro quo is required. On the other hand,

so far as a remote tippee's knowledge of that intent is

concerned, the jury, according to the Newman court, cannot infer

such knowledge from the mere fact that the remote tippee knew

that the tipper and direct tippee were friends. Rather, to

warrant such an inference in such circumstances, there must be

evidence of a "meaningfully close personal relationship that

generates an exchange that is objective, consequential, and

represents at least a potential gain of a pecuniary or similarly

valuable nature."

5

While this passage is concerned on its face with what evidence would warrant a fact-finder in inferring that a remote tippee knew that the tipper intended a benefit to the direct tippee, Gupta reads this language to suggest that the potential pecuniary benefit must be to the tipper. This is not a fair reading since it would contravene the plain language of Dirks, Jiau, and Newman itself; but, in any event, the proof at trial easily satisfied even Gupta's view of Newman.

As to the "meaningfully close relationship," Gupta and Rajaratnam were "very close friend[s]," and Gupta was on a short list of five to ten people allowed to speak with Rajaratnam at the end of the trading day. See Gupta, 747 F.3d at 121. Furthermore, they were close business associates with a considerable history of exchanging financial favors. The Second Circuit summarized the evidence as follows:

> Gupta and Rajaratnam were . . . involved in several business ventures together. In 2005, they, along with a third partner, formed Voyager Capital Partners Ltd. ("Voyager"), an investment fund capitalized with $50 million, $5 million of which was contributed by Gupta and $40 million by Rajaratnam; Gupta later borrowed $5 million from Rajaratnam in order to buy out the third partner's share, giving Gupta a $10 million stake in Voyager. . . . In 2007, Gupta, Rajaratnam, and two others launched another investment fund, New Silk Route, in which Rajaratnam invested $50 million; Gupta was the chairman. Gupta was also heavily involved in Galleon itself. He had invested several million dollars in Galleon funds; he was involved in the planning of a new Galleon fund called Galleon Global (which ultimately was

not created); he had a keycard allowing him access to Galleon's New York offices; and he regularly worked on Galleon's behalf in seeking potential investors. In early 2008, Gupta was made chairman of Galleon International, which, as of April 2008, managed assets totaling some $1.1 billion and could earn "performance fees." Gupta was given a 15 percent ownership stake.

Gupta, 747 F.3d at 121 (internal citations omitted).

As to whether the tips were part of an exchange that was "objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature," this was obvious from the very nature of the tips. With the first tip, Gupta conveyed to Rajaratnam that Warren Buffet planned to invest -- in the midst of a financial crisis -- $5 billion in Goldman Sachs two hours before that fact was announced to the public. Gupta, 747 F.3d at 117. The second tip was no less momentous; Gupta informed Rajaratnam that Goldman's "fourth-quarter result would be a loss," though "[a]t that time, Wall Street analysts were projecting that Goldman -- which, since becoming a public company, had never reported a quarterly loss -- would continue to report profits." Id. at 119.

And, even if one were to read Newman the way Gupta erroneously does, as requiring a potential pecuniary benefit to Gupta, such a benefit was also clearly present, as demonstrated by prior exchanges. For example, the wiretapped phone call between Gupta and Rajaratnam from July 29, 2008, less than two

7

months before the tips at issue, illustrated the mutually beneficial and quid pro quo nature of their relationship. At the start of the call, Rajaratnam asked whether Gupta has "heard anything" related to whether Goldman Sachs was considering purchasing a commercial bank, and Gupta responded that it had, indeed, been the subject of a "divided" and "big discussion at the board meeting." January 8, 2013 Joint Appendix at A1116-17. Rajaratnam then informed Gupta that he was taking steps to send Gupta a letter memorializing an earlier agreement to increase Gupta's stake in Voyager. Id. at A1119, A1444.

Moreover, the tips for which Gupta was convicted yielded the possibility of a more immediate benefit to Gupta. Specifically, because both Gupta and Voyager, in which Gupta held an equity stake, were investors in Galleon, any tips on which Rajaratnam traded had the potential to increase the value of Gupta's and Voyager's shares. Indeed, Rajaratnam used one of the funds in which Voyager invested, the "Galleon Buccaneer's Offshore" fund, to make trades after receiving the first of the two tips for which Gupta was convicted. See January 8, 2013 Joint Appendix at A742, A1180.

It is thus clear even on Gupta's own reading of Newman, let alone on the reading this Court gives it, that Gupta cannot

satisfy any part of his claim. Accordingly, for the foregoing

reasons, the Court hereby denies Gupta's motion in its entirety.

SO ORDERED.

Dated:     New York, New York
           July 2, 2015                    _____
                                           JED S. RAKOFF, U.S.D.J.