1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------x

3   UNITED STATES OF AMERICA

4              v.                        11 CR 907 (JSR)

5   RAJAT GUPTA,
                                         Argument
6                 Defendant.

7   -------------------------------x

8                                        New York, N.Y.
                                         May 16, 2012
9                                        11:50 a.m.

10  Before:

11          HON. JED S. RAKOFF

12                                       District Judge

13

14          APPEARANCES

15

16  PREET BHARARA
         United States Attorney for the
         Southern District of New York
17  BY:  REED M. BRODSKY
         RICHARD C. TARLOWE
18       Assistant United States Attorneys

19

20  KRAMER LEVIN NAFTALIS & FRANKEL LLP
         Attorneys for Defendant
    BY:  GARY NAFTALIS
21       DAVID S. FRANKEL
         MICHAEL S. OBERMAN
22       STEPHEN M. SINAIKO

23

24

25

1              (Case called)

2              THE CLERK:  Will the parties please identify

3    themselves for the record, and will everyone please be seated.

4              MR. BRODSKY:  Reed Brodsky and Richard Tarlowe on

5    behalf of the government.  With us at counsel table is Sean

6    Fernandez and Kaitlin Paulson, both paralegals in our office.

7              MR. NAFTALIS:  Good morning, your Honor.  Gary

8    Naftalis for Mr. Gupta.  With me is David Frankel and two other

9    colleagues from my firm, Michael Oberman and Steve Sinaiko.

10             THE COURT:  Good morning.  I take it Mr. Gupta waives

11   his appearance here this morning?

12             MR. NAFTALIS:  Yes, he does, your Honor.

13             THE COURT:  I'm sorry for the delay, but I actually

14   used the time to do what I think will be helpful in short

15   circuiting this argument.  I have been already blessed with

16   your excellent but voluminous papers, and I wanted to

17   double-check on some points.

18             I think I can give you right now my tentative rulings

19   on these various motions and then leave it to you jointly and

20   severally to decide which, if any, you feel are worth trying to

21   argue me out of, rather than having oral argument on each and

22   every motion.

23             Let me start by saying that a decision on a motion in

24   limine is never absolutely final until the trial is concluded.

25   Many times events at the trial recast the situation.  Doors are

1  opened, for example, so evidence that was previously excluded

2  as irrelevant becomes relevant, or just in the fullness of the

3  trial a judge changes his or her mind.

4          If you look at the comments to the Federal Rules of

5  Evidence 103 and 104, which deal with preliminary motions, they

6  point out that by its very nature these kinds of motions can

7  never be final.  They serve nevertheless the useful purpose of

8  guiding counsel as to, for example, what they can say in their

9  opening statements, what they can present in evidence without

10 having extensive side bars, etc.  So, they are very useful, but

11 they are not necessarily the final say.

12         By contrast, that doesn't mean that every time a judge

13 decides a motion in limine, leave is given to counsel to

14 endlessly reargue it throughout the course of the trial.  It's

15 a balancing situation.

16         I should mention, and this is off the subject, but

17 while we are mentioning side bars, there are various feeds of

18 the proceedings of the trial that have been set up at the

19 request of counsel and the request of others.  The result is

20 that side bars will be heard as well, not by the jury but by,

21 for example, people in the overflow room.

22         If there is a need for a confidential side bar, you

23 need to alert me to that, and we can do that in the robing

24 room, I suppose, rather than at the side bar.  I wanted to

25 mention that while it's on my mind.

1          With respect to the government's motion to admit three

2    wiretapped conversations, two of Mr. Rajaratnam with Mr.

3    Horowitz and one of Mr. Rajaratnam with Mr. Lau, which

4    undoubtedly, whichever way I rule, one side or the other will

5    want to be heard today, nevertheless, to guide your arguments I

6    think that they are admissible subject to connection as being

7    in furtherance of the alleged conspiracy between Mr. Gupta and

8    Mr. Rajaratnam.  I'll get into that a little bit more later.  I

9    am much more dubious about whether they are admissible as

10   statements against interest, but I don't have to rule on that

11   in light of the ruling I just tentatively made.

12          I am completely unconvinced that they are admissible

13   under the residual hearsay exception, and there I will rule

14   finally and say that they are not admissible under the residual

15   hearsay exception.  If the government, at its peril, wants to

16   be heard on that, I will hear them.

17          With respect to the government's motion to compel

18   disclosure of attorney-client communications of Mr. Gupta's

19   considering suing Mr. Rajaratnam on the theory that Gupta might

20   seek to introduce that at trial, that motion is denied without

21   prejudice to the government seeking a short adjournment or a

22   deposition in the evening or some hearing before the Court

23   outside the presence of the jury.

24          If we get to that stage of the trial the defense

25   decides it does want to introduce evidence of that sort, I see

1    no reason to go through this elaborate procedure of having

2    disclosures made to a sealed-off Assistant United States

3    Attorney, who would then of course have to carry these secrets

4    to her grave if the evidence wasn't introduced.

5            If and when this becomes a real live controversy, we

6    will allow some procedure right then and there.  Assuming there

7    is waiver of some attorney-client privilege, the defense makes

8    the point that there may not even be a waiver of the

9    attorney-client privilege depending on how this is presented,

10   if it's presented.  So there are many hypotheticals there that

11   seem to me to make it inappropriate to grant the government's

12   request at this time.

13           With respect to the government's motion to preclude

14   mention of Mr. Gupta's alleged plan to file a civil lawsuit

15   against Mr. Rajaratnam as bearing on their relation or how it

16   was perceived by Mr. Gupta, I think again this is premature.  I

17   assume, Mr. Naftalis, you're not going to be referring to

18   anything like that in your opening statement, correct?

19           MR. NAFTALIS:  I didn't plan on it.

20           THE COURT:  That's good.  Again, this is totally

21   without prejudice to the government's reraising this point if

22   and when it becomes a real issue, at which point at an absolute

23   minimum the defense would alert the government that the

24   question is about to be put or something like that, or we would

25   have a side bar or other proceeding.

1          With respect to the government's motion to preclude

2    the introduction of any evidence or argument that would tell

3    the jury what potential maximum sentence Mr. Gupta faces if

4    convicted, that motion is granted.  But by the fact that Mr.

5    Gupta did not respond, I take it there is no opposition to that

6    motion in any event.

7          With respect to the government's motion that the

8    defendant be prohibited from arguing or raising or introducing

9    evidence about the government's investigative and prosecutorial

10   methods, such as wiretaps, or its alleged motives in

11   prosecuting him or anything like that, that motion is granted

12   without prejudice, of course, to the defense making a very

13   specific proffer at side bar depending how things turned out.

14          With respect to the government's motion that the

15   defense not be permitted to refer to Mr. Gupta's charitable

16   contributions and work, the dismissal of the SEC's

17   administrative action against him, the damage Gupta has

18   suffered to his reputation and livelihood, and how Gupta's

19   family will suffer if he is convicted, the motion is granted in

20   part and denied in part.

21          It is granted to preclude the defense from referring

22   to the dismissal of the SEC's administrative action, from

23   introducing any evidence regarding reputational harm or family

24   suffering.  But I am not yet prepared to preclude on summation

25   some argument along those lines.  I'd have to hear it.  I would

1    have to assess it along the lines of what had emerged at trial.

2            On the charitable contributions, I think the law of

3    the land is that some quick general background can be given

4    when any witness takes the stand.  I think the key word there

5    is "quick."  I might allow charitable contribution reference if

6    Mr. Gupta took the stand and was giving his general background,

7    but I would want to hear in advance at the side bar exactly

8    what was being proffered in that respect.

9            This is a good example of why these motions in limine

10   cannot be often ruled on in any final way at this stage.

11           Gupta's motion to exclude the July 29, 2008, phonecall

12   between Rajaratnam and Gupta, my tentative ruling is to deny

13   that motion.  I'll elaborate on that later.

14           With respect to Gupta's motion to exclude phonecalls,

15   I guess there are three phonecalls that do not relate to the

16   stock conspiracies charged in this case, I think that is a very

17   good example of a motion in limine that is not prudent to rule

18   on at this time.  As the calls are proposed to be introduced,

19   we will deal with it one by one.

20           Each one would be different.  Each one would have to

21   be assessed in the context of the case at that point.  So, that

22   motion is, if you will, denied without prejudice.  What I'm

23   really saying is it's going to have to be dealt with on an

24   item-by-item basis when and only when specific calls are sought

25   to be introduced.

1           I think that covers all the motions.  As you may

2     infer, I'm certainly prepared to hear further argument on the

3     three calls that the government wants me to rule they can

4     introduce and that I have tentatively ruled they can introduce

5     subject to connection under the co-conspirator exception to the

6     hearsay rule.  I'd be pleased also to hear argument on Mr.

7     Gupta's motion to exclude the July 29, 2008, phonecall, which

8     motion I have tentatively denied.

9           Before we get to those important matters, are there

10    any of the other motions that I have ruled on that anyone, in

11    the interests of wasting time, wants to be heard on?

12           MR. BRODSKY:  Nothing from the government, your Honor.

13           MR. NAFTALIS:  Even forewarned about the hill I have

14    to climb, there is one.

15           THE COURT:  OK.

16           MR. NAFTALIS:  Should I state it now?

17           THE COURT:  Yes, go ahead.

18           MR. NAFTALIS:  To the sort of narrow ruling your Honor

19    made on Mr. Gupta's charitable activities.  I, think, and I say

20    it most respectfully, that would create a false and misleading

21    picture that the government would present to the jury here.

22    Let me tell you why.

23           We are not talking about somebody just writing a check

24    to the United Jewish Appeal or the American Cancer Society.

25    We're talking about someone who, during this period of time, is

1  one of the most renowned and active humanitarians probably in

2  the private sector in the world, spending half his time on

3  activities including the eradication of AIDS, malaria,

4  tuberculosis around the world.

5        THE COURT:  What is the relevance of that?  If Mother

6  Teresa were here charged with bank robbery, what the jury would

7  still have to determine is whether the evidence showed that she

8  had committed bank robbery or not.

9        MR. NAFTALIS:  I think, your Honor, you give a good

10 example and an example actually which supports my position, if

11 I could expound.

12       THE COURT:  Of course.

13       MR. NAFTALIS:  The government in its pleading says Mr.

14 Gupta -- and they went through great lengths, we had all those

15 arguments about benefit and motive -- that Mr. Gupta is

16 motivated by money.  That's what they have said.  They have

17 said it in their pleading, in their indictment.

18       Indeed, in the filing that they made on the July 29th

19 motion, one of the arguments they made, which I was a little

20 surprised by, was, oh, my gosh, we are going to be able to show

21 that his Voyager value increased $4 million after this.  They

22 are going to argue, as they do in all of these cases, that the

23 man is out for money and the reason he committed these crimes

24 is money, greed, or whatever labels.

25       It is thoroughly misleading for them to say we can't

1    show what kind of a person he is if for no other reason than it

2    rebuts -- again, it is weight for the jury.  The jury can

3    consider.

4          Mother Teresa could be a bank robber even if she

5    devotes her life to charity.  On the other hand, if you're

6    defending Mother Teresa and you're not allowed to bring out in

7    a case where there is a pecuniary crime alleged against her --

8          THE COURT:  I think there is a difference.  For

9    example, if they were arguing as to motive, which of course is

10   not an element of the crime but still may be inquired into by

11   both sides, as to motive or lack of motive.  If the alleged

12   motive was greed, you would certainly be permitted to show

13   that --

14         I don't know what Mr. Gupta's financial situation is,

15   but let's assume for the sake of argument that whatever he

16   allegedly made on the insider trading stuff was peanuts

17   compared to his net worth or salary or something like that.

18   That's all fair game.  It's directly responsive.

19         How does the fact that Mr. Gupta has another string to

20   his bow in that he is very interested and very active in

21   charitable works relate to disproving the motive?

22         MR. NAFTALIS:  With all respect, I think, Judge, this

23   goes directly to disproving what the government is trying to.

24   Here you have a man who by everybody's lights, even the

25   government would concede it, has lived this wonderful blameless

1    life and done all these wonderful things.  They would say that

2    one day out of the clear blue sky in the seventh decade of his

3    life all of a sudden he decides to become a criminal.

4          We have a right to show that is thoroughly

5    inconsistent with the way he lives his life.  The jury can take

6    whatever weight they would from it.  But what we then have is

7    the government presenting, and I must say this most

8    respectfully, a false and misleading picture of him.  They are

9    going to argue that he is greedy, he is out for money and this

10   and that, and we can't even fight back by showing the kind of

11   person he is.

12         THE COURT:  This is all premised on your assertion as

13   to what you believe they will be showing in this regard.  I

14   have grave doubts that they are going to be introducing

15   evidence that will remotely get to what you are now arguing.

16   Let me hear from the government, and then we will come right

17   back to you at this point.

18         MR. NAFTALIS:  If you look at their July 29th

19   opposition, it's perfectly clear that they are arguing --

20         THE COURT:  The last I checked, it's clear that the

21   government puts in their papers all sorts of stuff, as does the

22   defense.  Because this, regretfully, is a sort of high-

23   visibility case, you both have a ready and willing audience for

24   whatever you put in your papers.  But last I checked, what

25   comes into evidence is largely in the hands of the judge.

1           MR. NAFTALIS:  I not only agree but concede on that

2      one.  But I do think most respectfully if you just look at

3      their indictment, they are going to argue that he is motivated

4      by money and pecuniary interest.  The indictment says that.

5           THE COURT:  Let's hear from the government.  That is

6      the first question.  What, if anything, are you going to argue

7      about motive?

8           MR. BRODSKY:  Your Honor, you won't hear the

9      government use the word "greed" in its case.  What the

10     government is going to say is that the defendant was tipping

11     Mr. Rajaratnam for a variety of reasons, one of them being his

12     close relationship with Mr. Rajaratnam, another being that Mr.

13     Rajaratnam provided opportunities to him with respect to

14     different funds.

15          THE COURT:  There we are going not to motive but to an

16     element -- it also relates to motive, but it is also an element

17     of the crime.

18          MR. BRODSKY:  Correct.

19          THE COURT:  Of the quid pro quo variety.

20          MR. BRODSKY:  We are going to show that Mr. Gupta

21     provided the information to Mr. Rajaratnam under Dirks to

22     receive benefits within the Dirks variety, which includes

23     giving a gift to Mr. Rajaratnam at times, which includes the

24     fact that their relationship involved doing each other favors.

25          You won't hear the government say that it was out of

1    greed.  In the Rajaratnam trial Mr. Rajaratnam also was quite a

2    charitable person.  Mr. Holwell so found at sentencing.

3            THE COURT:  Judge Holwell.

4            MR. BRODSKY:  Judge Holwell.  I'm so sorry.  I

5    apologize, your Honor.  Judge Holwell found during sentencing

6    that Mr. Rajaratnam had done great things in his charitable

7    works, not just made money payments to people, but actually

8    spent core time contributing to things like various activities.

9    The government didn't dispute that.  He was allowed to put on a

10   character witness to provide context, to say how they met, how

11   the character witness -- it was Mr. Geoffrey Canada -- how Mr.

12   Canada met Mr. Rajaratnam.

13           But he wasn't allowed, Mr. Rajaratnam, to put on

14   evidence of all of his extensive charitable works for exactly

15   what your Honor says.  Rule 405 makes it clear that the

16   defendant's character can only be proven through testimony

17   regarding his reputation, it can't be proven through specific

18   acts of kindness.

19           There is a disconnect between acts of kindness that

20   Mr. Gupta may do.  Certainly the government doesn't dispute he

21   has done acts of kindness in his life and he has been in

22   certain parts of his life a valuable contributor to society.

23   We are not disputing that, but that is really not at issue.

24           THE COURT:  Classically, this kind of evidence has

25   been presented at sentencing rather than during the trial.  In

1   addition to I think its modest relevance at best, it has a

2   tremendous tendency to be prejudicial to the government by

3   confusing the jury as to what it is they are to determine,

4   which is not whether this is a, quote, good man or a, quote,

5   bad man, but whether the government has proved beyond a

6   reasonable doubt that the defendant committed certain specific

7   crimes.

8          Let me hear again from Mr. Naftalis.

9          MR. NAFTALIS:  They may not use the word "greed," but

10  they will be using different things.  For example, one of the

11  items here which I expect that the government will be doing and

12  arguing is -- if you remember, there has been evidence here

13  that our client was victimized by Mr. Rajaratnam and lost his

14  $10 million investment.  You remember there was a lot of Brady

15  back and forth before your Honor about that.  Obviously, that

16  is a part of our defense.

17         The government has made it plain that they would like

18  to turn that on its head and argue that he was tipping him to

19  get his money back and that therefore he decided to become a

20  criminal to get his money back.  Are they saying they are not

21  going to make that argument now?  I didn't hear Mr. Brodsky say

22  he wasn't.  He may not use the word "greed," but he is going to

23  argue that.

24         Judge, we are not looking for sympathy.  We think the

25  government has a lousy case.  They think they've got a great

case.  The jury will decide.  I'm not talking about some appeal

to sympathy or anything, and Mr. Rajaratnam has nothing in the

world to do with this.  Rather, this is a man who spends half

his time on these other endeavors.  We have a right to show

that to the jury.  We just do.  I'm not here to put on two

weeks of proof on it.

THE COURT:  I'm not sure you have that right.  But

that's the question.  The only place I would imagine this would

come up before the defense case, where I indicated that I would

allow some modest reference to his charitable endeavors subject

to being further defined at that time, would be in your opening

statement.  Is this something you're planning to put in your

opening statement?

MR. NAFTALIS:  I certainly planned on mentioning it.

I can assure you it wasn't going to be a long-winded thing.  I

was going to mention who he is and how he spent his life and

talk about why that's inconsistent.

THE COURT:  Since the only way that could come into

evidence, it seems to me, if at all, is if he took the stand, I

take it you are thereby committing that he will take the stand.

MR. NAFTALIS:  Judge, as your Honor has told us, we

don't have to make that decision until the close of evidence in

the case.

THE COURT:  That's right.  That doesn't mean, then,

you can present argument on opening that presupposes that.

1          MR. NAFTALIS:  No.  I know what the rules are.

2          THE COURT:  I know you know.

3          MR. NAFTALIS:  On the other hand, I'm allowed to say

4    something in my opening about who my client is.  I understand

5    where your Honor draws lines.  I know where the fair pole is

6    and the foul pole is.

7          THE COURT:  Your whole argument was that this was

8    responsive to something the government was going to be raising.

9    Why don't we do this.  After the government's opening

10   statement, you can approach the side bar and tell me what, if

11   anything, you want to say in this regard on your opening and

12   we'll deal with it then.

13         My inclination, just so you are not under any

14   illusions, would be to cabin you in the same way that I

15   tentatively had in mind cabining you when he takes the stand,

16   if he does, and that is not to exclude it altogether.  I do

17   think the law is clear that you are allowed to give some sort

18   of background to the jury just so they have a basic

19   understanding of what the human being is that they are being

20   asked to judge.

21         The law on that prong is quite modest.  You are making

22   argument that it should be more extensive because it was

23   responsive to a particular argument the government made.  Let's

24   see what the government says on their opening, and then we can

25   see what, if anything, you can say in response.

1            MR. NAFTALIS:  Obviously, that's your Honor's ruling.

2    I did want to say, just so I make my point clear, I agree that

3    there are things that we can do only if the client takes the

4    stand.  I agree with that.  But I also contend that there are

5    things we can do and things we can prove in response to

6    government explicit arguments and government anticipated

7    arguments and things to negate government arguments which we

8    can make irrespective of whether the client takes the stand or

9    not.

10            THE COURT:  Given, as the government correctly points

11   out, Rule 405, and given the hearsay rule, I don't see how you

12   could get this into evidence, assuming it were relevant,

13   through anyone other than Mr. Gupta.  If, for example, you put

14   a question to a government witness on the stand, isn't it your

15   understanding that Mr. Gupta gives lots of money to charity,

16   that's objectionable on about 20 different grounds.

17            MR. NAFTALIS:  No, I certainly didn't intend to do

18   that.

19            THE COURT:  OK.

20            MR. NAFTALIS:  But I certainly can ask a witness

21   called by the government how they know Mr. Gupta.  On cross-

22   examination of a government witness I certainly can do that.

23   How do you know Mr. Gupta?  I know him this way and that way,

24   etc.  You mean I can't do that?

25            THE COURT:  I'm not saying you can't do that.  It

1   would depend on the situation.  That again shows why we really

2   can't deal with this totally on a motion in limine.

3         MR. NAFTALIS:  Yes.

4         THE COURT:  For immediate guidance the government asks

5   to exclude it altogether.  My ruling was that it would be

6   permitted but very modestly and subject to careful Court

7   scrutiny.  That remains my ruling.

8         I understand that you feel that the door will be

9   opened more broadly than I presently anticipate.  As I said at

10  the very beginning about all motions in limine, that's fair

11  game.  I don't think we can give more guidance.  I'm glad this

12  came out now so I'll be alerted to the issue.  I guess we will

13  take it up next right after the government's opening.

14        MR. NAFTALIS:  I appreciate your Honor giving us that

15  opportunity.  As I said, I hope I haven't been too aggressive

16  on the point, but I think there are things we should be able to

17  say to counter innuendos and arguments that they are making

18  expressly or implicitly attacking our client.

19        THE COURT:  All right.  Let's go to the government's

20  motion to admit the three calls.  It seemed to me that taking

21  into account both the calls themselves, which under Supreme

22  Court precedent I can take account of, though it can't be

23  sufficient, and the other documents in evidence that the

24  government proffered in its papers, the government had made out

25  a likelihood that they would be able to establish the alleged

conspiracy between Mr. Gupta and Mr. Rajaratnam sufficient for evidentiary purposes, which is a preponderance standard.

The government wanted to know whether they could refer to this in their opening. Of course, under my tentative ruling the answer to that is yes. The government seemed to feel that they were entitled to a final ruling on this now. I don't think that's right as a matter of law and I don't think it makes sense.

They have to prove the conspiracy anyway. They have alleged a conspiracy that they are alleging they can prove beyond a reasonable doubt. All they have to show to get the evidence in is a preponderance. Everything I've seen so far gives me every reason to believe they will be able to make that showing, but I don't see why I should make a final ruling on that until the evidence is in.

The government points out that they normally wouldn't be presenting a lot of evidence about Mr. Horowitz or Mr. Lau, but they don't need to. If there is a conspiracy between Mr. Gupta and Mr. Rajaratnam relating to the insider trades that are the subjects of these calls, Mr. Horowitz doesn't have to be a co-conspirator, Mr. Lau doesn't have to be a co-conspirator.

What has to be is that Mr. Gupta, in making these statements that the government wants to introduce against him, has to be acting in furtherance of the conspiracy. So, I don't

1    see why we need to get into long-winded proffers about Mr.

2    Horowitz's role or Mr. Lau's role.  That is why it seemed to me

3    that this should all come in subject to connection.

4         The first call, which is September 24, 2008, at 7:09

5    a.m., is Mr. Rajaratnam saying to Mr. Horowitz, "No, I got a

6    call at 3:58, right.  This is all --"  Horowitz says, "Yeah."

7    Rajaratnam says, "Saying something good might happen to

8    Goldman, right?"

9         By the way, I think I misspoke a minute ago.  These

10   statements by Mr. Rajaratnam have to be in furtherance of the

11   conspiracy.  I might have said Gupta by accident.  These are

12   obviously statements by Rajaratnam.

13        Horowitz is his trader who was not around when the

14   alleged trades were made, so he is explaining to him, as he

15   would inevitably have to, why they were made.  If the call that

16   he got was from Mr. Gupta as part of the alleged conspiracy,

17   and the circumstantial evidence certainly permits an inference

18   to that effect, this is a discussion in furtherance of the

19   conspiracy between Rajaratnam and Gupta.

20        I'm looking now at the call itself and a little of the

21   extrinsic evidence, but of course I am required to and did look

22   at the considerable extrinsic evidence that the government

23   presented in its papers.

24        Similarly with respect to the call that occurs just a

25   little while later, also on September 24th at 7:56 a.m.  Now

1    Rajaratnam is explaining further to Horowitz why the trade took

2    place.  Horowitz says, "Something happened."

3            Rajaratnam says, "I got a call, right, saying

4    something good's going to happen."  So he's blurting out that

5    of course something happened, I got this inside information,

6    some others may have gotten it, too, looking at the way the

7    market moved in the last few minutes.

8            Horowitz, who may be presciently worried about

9    conversations on the phone, says, "We'll talk about -- how

10   about this.  We'll talk when you come in."  Don't be a fool and

11   say this on the phone because, who knows, there might be a

12   wiretap.

13           Then there is this, if you will, self-protected

14   statement by Horowitz:  You did nothing wrong, all you did was

15   trade on inside information.  "You did nothing wrong.  We'll

16   talk about it when you come in.  Nothing's wrong."  Again, I am

17   required to look beyond the conversation itself, but I

18   certainly can look at the conversation under the holding of the

19   Supreme Court in Bourjaily.  Don't ask me, Mr. Reporter, how to

20   spell Bourjaily.  This conversation reeks of knowledge, intent,

21   and the need of Mr. Rajaratnam to explain to his lieutenant why

22   in his absence the significant trade occurred.

23           With respect to the call with Lau, here Mr.

24   Rajaratnam, in talking to Mr. Lau, is much more explicit about

25   what he has learned from an unnamed source telling him about

1    Goldman's bad quarterly results.  There is a dispute between

2    the parties as to whether this was really inside information or

3    was publicly available, etc.

4           On the government's proffer that Mr. Rajaratnam had

5    every reason to believe this was inside information, then this

6    becomes a call again to an important colleague and subordinate

7    who had the ability to execute further trades in Galleon

8    International, so clearly in furtherance of the conspiracy on

9    those premises.

10          I did not think the government's position on

11   statements against interest was as strong, but, as I say, I

12   don't need to reach that unless I am persuaded that the

13   co-conspirator exception is ultimately not met through lack of

14   connection or whatever.  I have already expressed my views

15   about the residual exception.  It would be an exercise in

16   residualism for me to say anything more.

17          Let me hear from the defense if they wish to be heard

18   on this.

19          MR. NAFTALIS:  May I be heard, your Honor?

20          THE COURT:  Please.

21          MR. NAFTALIS:  I had a question so I'm sure I

22   understand the scope of your Honor's ruling.

23          THE COURT:  Yes.

24          MR. NAFTALIS:  Is your Honor's ruling that the

25   government does not have to proffer evidence at the trial now

to establish a connection?

THE COURT:  No.

MR. NAFTALIS:  That's why I was a little confused.

THE COURT:  That's what they wanted, but I'm not
ruling that.  I understand the government's dilemma, so to
speak.  They are concerned for two things.  One is they are
concerned that if this evidence comes in and they do not make
the connection, at that point there would be a real risk of a
mistrial, because this is powerful evidence and it would be
difficult to instruct the jury to disregard it and have
confidence that they could follow that instruction.  That's one
of their concerns.

Their other concern is that at least they thought
there might be a possibility that they would have to prove all
sorts of things about Mr. Horowitz and Mr. Lau that would be
irrelevant to the real case but would be confusing to the jury.
The latter is, I think, is not at concern at all, because Mr.
Horowitz and Mr. Lau don't have to be co-conspirators for this
to come in, in my view, as statements in furtherance of the
conspiracy.

If Mr. Rajaratnam is carrying out a conspiracy with
Mr. Gupta, of which there is presumably going to be tons of
evidence if the government is going to achieve its stated goal
of proving the conspiracy count beyond a reasonable doubt, the
fact that one of the conspirators, Mr. Rajaratnam, takes steps

1    or has conversations with third parties in furtherance of the

2    conspiracy is all you need.  That third party doesn't have to

3    be a co-conspirator.

4              Furthermore, if real push came to shove, I can at any

5    time hear evidence outside the presence of the jury relating to

6    the admissibility of evidence, and the rules of evidence don't

7    apply to those proffers.  I can hear, as I have read in the

8    papers that they have already given me here, stuff that is not

9    formally admissible in evidence at the trial or otherwise

10   complies with the rules of evidence, but I can consider it for

11   these limited purposes.

12             What I'm holding is they still have to establish to a

13   preponderance standard the conspiracy between Rajaratnam and

14   Gupta.  If they fail that, all sorts of things are going to

15   happen.  The likelihood is the conspiracy count might not even

16   get to the jury, a bunch of evidence would undoubtedly have to

17   be stricken, there might be a mistrial, etc.

18             So, yes, they still have to make out by a

19   preponderance standard the conspiracy between Rajaratnam and

20   Gupta.  That's the connection they have to make, and they have

21   to show that these were in furtherance of it.  What I'm saying

22   is that they have provided sufficient basis for my allowing

23   this into evidence subject to connection and therefore allowing

24   them to refer to it on their opening statement.  I don't know

25   what else I can tell you in that regard.

1          MR. NAFTALIS:  I blame it on me.  I wanted to

2     understand.

3          THE COURT:  I'm sorry I'm being obscure.  What else

4     would you like to know?

5          MR. NAFTALIS:  Why you didn't come out our way.

6          (Laughter)

7          I only asked because I wanted to be sure.

8          THE COURT:  I have not made any final ruling that they

9     have shown that there is a conspiracy.  I've made a ruling that

10    they have shown sufficient evidence that there was a conspiracy

11    to allow this to come in subject to connection.

12         MR. NAFTALIS:  Where I would most respectfully take a

13    different path, your Honor, is I don't understand what evidence

14    they have proffered in a real way, as opposed to just writing

15    it in a brief, of a conspiracy between Mr. Gupta, which is

16    where you focused the issue, and Mr. Rajaratnam.  I saw no

17    evidence that they proffered here.  I would have thought that

18    before your Honor even tentatively put your toe in the water,

19    the better course, most respectfully, would be to wait to see

20    if they proffer it at the trial.

21         All we have here is ipse dixit and very, in my view,

22    unpersuasive ipse dixit, mostly aimed at an issue that I think

23    your Honor said is not a real issue, what Horowitz and what Mr.

24    Horowitz did, whereas the real issue is Mr. Gupta and Mr.

25    Rajaratnam.

1           THE COURT:  As I said, the rules of evidence don't

2    apply.  But I agree that conclusory statements are not

3    sufficient.  For example, they proffered stuff about how right

4    after the board meeting where the relevant information was

5    conveyed, Mr. Gupta had several conversations, depending which

6    call we are talking about, with Mr. Rajaratnam and Mr.

7    Rajaratnam then makes the appropriate trade -- this is the

8    Horowitz calls -- and does so even though the guy he normally

9    works through, Horowitz, is not around, and then explains to

10   Horowitz the next morning, not once but twice, it's because he

11   got a call from a guy who told him, what was that wording

12   again?, that something good might happen to Goldman.

13          Let's take just those facts.  That is by no means all

14   of the specific nature they gave me, but let's just take that.

15   Why isn't that enough?

16          MR. NAFTALIS:  For one thing, it's perfectly clear

17   they don't have a stitch of direct evidence as to what was said

18   in any phonecall.

19          THE COURT:  Yes.

20          MR. NAFTALIS:  Also with respect to this one, your

21   Honor, there may not have even been a conversation.  There is a

22   brief connection.  That's why I think these things should be

23   best done in the trial context.  There was a brief connection

24   of one phone to another for -- how many seconds, David? -- 30

25   seconds with no direct evidence that they even had a

1   conversation at that point in time.  So we are doing

2   speculation on top of speculation here.

3          THE COURT:  I don't think that's right, but I'll hear

4   from the government in a minute.  It seems to me that it's the

5   government that is taking the risk here.  In the end if there

6   is no conspiracy even to a preponderance standard, as I have

7   already indicated, I think the likelihood, I won't make a final

8   determination, but the likelihood is that if these calls were

9   to come in, we would have to have a mistrial.  So they are the

10  ones who are taking that risk.

11         MR. NAFTALIS:  May I consult?

12         THE COURT:  Sure.

13         MR. NAFTALIS:  May I make one other point?

14         THE COURT:  Sure.

15         MR. NAFTALIS:  I'm slow at this early hour in the

16  morning.  I had one issue on which we most respectfully have a

17  disagreement with the government, and most respectfully I think

18  have a disagreement with what the Court can properly consider

19  and not consider.  That is a different issue.

20         THE COURT:  Go ahead.

21         MR. NAFTALIS:  It goes not to the substance of the

22  ruling.  It goes to the issue of whether or not, in connection

23  with making any sort of evidentiary ruling subject to

24  connection or whatever, the Court can and should be relying on

25  evidence which is inadmissible at the trial or not being

1    proffered at the trial.

2            We have done some research on that.  As I understand

3    it, the issue of whether or not the Court can consider

4    inadmissible evidence was decided by the Second Circuit in a

5    case called U.S. v. Cicale, 691 F.2d 95 at 103, note 3, a

6    Second Circuit opinion written by Judge Winter with Judge

7    Kaufman and I guess Judge Ward sitting by designation, saying

8    this was an open question whether courts can consider

9    inadmissible evidence in assessing whether purported

10   co-conspirator statements meet the requirements of 104(a).

11           We have looked and -- although our research is not

12   always perfect, we like to be as perfect as we can -- we have

13   not found any subsequent Second Circuit cases where --

14           THE COURT:  What about, first of all, Rule 104?  Let

15   me pull out the rules here.  Rule 104.  "Preliminary questions

16   concerning the qualification of a person to be a witness, the

17   existence of a privilege, or the admissibility of evidence

18   shall be determined by the court subject to the provisions of

19   subdivision (b).  In making its determination, it is not bound

20   by the rules of evidence except those with respect to

21   privileges."

22           If it's not bound by the rules of evidence, that means

23   it's considering things that don't meet the requirements of the

24   rules of evidence.

25           Then of course there is (b).  What I just read was

104(a).   104(b) "When the relevancy of evidence depends upon

the fulfillment of a condition of fact, the court shall admit

it upon or subject to the introduction of evidence sufficient

to support a finding of the fulfillment of the condition."

       There the key word is "shall."  The clear thrust of

(b) is that you normally allow in evidence.  You make this

determination without reference to the rules of evidence.

You're not bound by the rules of evidence.  That's all I'm

doing.

       (Continued on next page)

```
 1              THE COURT:  I just received word that there is a truck

 2   loaded with equipment attempting to gain access to the

 3   courthouse called Doke.

 4              THE DEPUTY CLERK:  D-o-a-r.

 5              THE COURT:  Oh, Doar, D-o-a-r.  Doar Litigation

 6   Consultants.  Do any of the coconspirators here want to fess up

 7   to this?

 8              MR. NAFTALIS:  We plead guilty under 104(a), 371,

 9   anything else that you're -- as I understood, and I hope my

10   hearsay declaration report is correct, that arrangements had

11   been made with your --

12              THE COURT:  All right.

13              MR. NAFTALIS:  With --

14              THE COURT:  They had not, but we will do that now.

15              MR. NAFTALIS:  Am I wrong about that?  At lunchtime we

16   were allowed to bring in this equipment to set up.

17              THE COURT:  Oh, I'm sorry.  Well, my law clerk is

18   confessing under duress now.

19              MR. NAFTALIS:  I'm prepared to represent him pro bono.

20              THE COURT:  All right.  Anyway, coincidentally I have

21   a long standing luncheon engagement with Judge Kaplan, which I

22   have to go fulfill, so we will continue at 2:00 o'clock, but

23   we'll take care of this for you.

24              MR. NAFTALIS:  And I apologize if that caused any

25   disruption.
```

 1          THE COURT:  No problem.  We'll see you all at 2:00

 2   o'clock.

 3          MR. NAFTALIS:  Thanks, Judge.

 4          THE DEPUTY CLERK:  All rise.

 5          (Luncheon recess)

 6          A F T E R N O O N   S E S S I O N

 7          2:05 p.m.

 8          THE DEPUTY CLERK:  All rise.

 9          THE COURT:  Please be seated.

10          THE DEPUTY CLERK:  Please be seated.

11          THE COURT:  All right.  Mr. Naftalis, you were in the

12   midst.

13          MR. NAFTALIS:  I don't get sentenced first on the

14   truck?

15          THE COURT:  I thought, you know, and under the

16   sentencing guidelines, as you know, it's at least 35 years, but

17   it seemed to me on reflection that one must take pity on

18   elderly people, please.

19          MR. NAFTALIS:  Someone actually offered me a seat the

20   other day on the bus too.

21          THE COURT:  It was particularly strange, because it

22   was your wife, right?

23          MR. NAFTALIS:  For the first time.

24          THE COURT:  All right.

25          MR. NAFTALIS:  I was inartfully trying to make a point

1    before, and which was about the fact that the gloss or the

2    possible gloss on 104(a) in this context, because the issue

3    being left open by the Second Circuit in the Cicale case, 691,

4    Fed. 2d, 95, at 103, footnote three, Second Circuit 1982.  I

5    think I'm being repetitive, but I wasn't sure how much got

6    caught.

7             THE COURT:  No.  Go ahead.

8             MR. NAFTALIS:  Judge Winter, Judge Kauffman and

9    District Judge Ward sitting by designation, which in the

10   context of discussing 104(a) in the context of making

11   preliminary rulings on the admissibility, what we used to call

12   from the elderly generation, the Geaney issue, that they left

13   open the issue of whether the Court could consider inadmissible

14   evidence in making that kind of finding.  It says in footnote

15   three, "As a consequence of the rationale we adopt, we need not

16   decide whether Federal Rule of Evidence 104(a), permits a

17   Geaney finding based on hearsay, which is inadmissible under

18   the federal rules."  Rule 104(a) specifically states the

19   preliminary questions of admissibility of a trial court that is

20   not bound by exclusionary rules, other than privileges, in

21   making that determination artfully therefore seen as statements

22   can be considered for Geaney purposes notwithstanding the

23   hearsay rule.

24             So our, based on our research, which we've recently

25   become more expert on this issue, which I will candidly admit

1    I've given no thought to until this round of briefing, that it

2    appears based on our research that the Second Circuit is -- you

3    know, I'm not making any wholesale comments about 104(a),

4    which, you know, gives a judge broad, you know, kind of powers

5    in making preliminary findings.

6            At least in this, the instant at least with respect to

7    coconspirator statements, whether or not it's appropriate to

8    consider inadmissible evidence in making these preliminary

9    findings, they labeled it an open question in the Second

10   Circuit.  Our research or research done by smart people at my

11   firm, not I, indicates they've seen no Second Circuit case

12   since then which has resolved this issue.

13           THE COURT:  Well --

14           MR. NAFTALIS:  So, therefore, our view would be -- I

15   think your Honor kind of, just to finish my record before your

16   Honor defeats me.  Because your Honor averted to the notion

17   that, gee, even if they weren't able, and I'm paraphrasing my

18   best memory about, well, we could always take some additional

19   evidence during the trial, which may not necessarily be

20   presented to the jury, you know, our view would be from our

21   standpoint is we would say that any evidence that should be

22   considered on the issue of making the appropriate findings on

23   the admissibility of a coconspirator ought to be admissible in

24   order to be presented to the jury.

25           THE COURT:  All right.

1          MR. NAFTALIS:  That would be our -- I think that would

2    be our long-winded way of stating our position.

3          THE COURT:  Okay.  So, I mean I understand that, and

4    you're right to preserve it.

5          It seems to me there are several situation.  The first

6    and most common, which happens in this courthouse several times

7    a year, is that someone will offer some evidence, quote,

8    subject to connection.  The other side will object.  There will

9    be a sidebar, and the government will proffer that we're going

10   to introduce X, Y and Z.  The proffer itself is not admissible.

11   It's an attorney making a representation about what one side of

12   a litigation expects to offer, and it's often in fairly summary

13   fashion so that it's doubly in a proffer form, not in

14   compliance with the Federal Rules of Evidence.

15         I think no one would argue that that's not a proper

16   way to make a proffer, and the judge can then rule under 104

17   based on that proffer and can say, okay, based on that proffer

18   I find there will be a connection, so go ahead and put in the

19   evidence.  And then if it turns out, of course, that the

20   proffer was a misstatement, then the party will be -- will have

21   its evidence excluded and may suffer other problems as well.

22         What you're raising -- I'm sorry, then there's a

23   second situation where the evidence is offered subject to

24   connection based on a proffer at the sidebar.  What was

25   proffered does not come into evidence, but other evidence does

come in that makes the connection, and you don't go back and

rule out the earlier evidence because there is still a

connection to be made, just to be made by different evidence

than the evidence that was originally proffered.

What you're talking about is the situation where the

government says, we think we can show the connection, but we

don't think we show it in this case.  We have some perfectly

good evidence, although we're only proffering it now,

summarizing it and not presenting it in its evidentiarily

correct form that would make the connection, but it would be a

gross waste of time to present it because it doesn't really

bear on the main issue before the jury, so we don't propose to

offer it, though we can if we absolutely had to.

I don't think that's the situation here.  I mean,

that's an interesting question whether that could still be

permitted.  My instinct is it could.

But what we have here, as I understand it, is, as I

recast the issue so it wasn't of particular moment whether

Horowitz and Lau are themselves coconspirators or not.  We're

talking about a connection that's going to be made largely

through trading records and telephone records, which I

understand the government will be putting in.  They probably

have it with them here today, because I asked them to bring

whatever evidence they needed if we got to that point.  They

could proffer them right now in specifics.  But they proffered

1   them in their papers with enough, I thought, particularity to

2   meet their burden.  So I don't know that we reached the issue

3   you're talking about, because I -- unless I misunderstand it,

4   the government proposes to put these same trading records and

5   telephone records into evidence at trial.  Is that right?

6           MR. BRODSKY:  Yes, your Honor.

7           THE COURT:  Yes.

8           MR. NAFTALIS:  Well, I guess two or three things.

9   First, with respect to the first two hypotheticals that your

10  Honor raised.  Obviously, you know, I didn't just fall off a

11  turnip truck.  I've seen that a few times.  And obviously that

12  we were not talking about that.  We were obviously talking

13  about the third --

14          THE COURT:  Yes.

15          MR. NAFTALIS:  -- situation.

16          My understanding was, obviously this dates from prior

17  to the way your Honor recast the issue.  The government was

18  intending to put in tape recordings of stuff to link

19  Mr. Horowitz or whatever, all kinds of tapes which they were

20  choosing they would prefer so that their presentation looked

21  better, not to show to the jury.

22          THE COURT:  Yes, I agree that was their approach.  And

23  if I had, and I agreed that that raises the issue you say is an

24  open issue in that footnote, and if I had to decide that issue,

25  I would decide it in favor of allowing that.  But I don't have

1    to decide that issue.  Because as I recast it, it seems to me

2    irrelevant or unnecessary to my ruling.  So the way I looked at

3    this was, if there is evidence that the government has

4    proffered that they are going to put into evidence, namely, the

5    trading records, the telephone records and the like that are

6    sufficient to circumstantially -- because this is a

7    circumstantial case -- establish a conspiracy between Raj

8    Rajaratnam and Gupta on insider trading to a preponderance

9    standard, and if that is further -- and if the conversations on

10   their face are conversations in furtherance of that conspiracy

11   that it doesn't matter whether Horowitz or Lau are

12   coconspirators or not, ergo, the question you're raising,

13   interestingly, the question you're raising seems to be mooted

14   by the approach the Court is taking.

15           MR. NAFTALIS:  I guess --

16           THE COURT:  Well --

17           MR. NAFTALIS:  -- whether it's mooted or not will

18   depend on what they do, right.

19           THE COURT:  Of course.  That's why it's, why I'm

20   reserving the qualification, that's why I put the

21   qualification, subject to connection.

22           If, in fact, contrary to what they've proffered and/or

23   as a result of when they do proffer it as your

24   cross-examination or the limitations you develop or whatever,

25   they fail to make the connection, then -- if for example -- I

1    don't think this is the case -- but just supposing that at the

2    same time as one of those telephone conversations at the

3    critical moment between Raj Rajaratnam and Gupta there was, a

4    minute earlier or minute later, a conversation between Raj

5    Rajaratnam and some other suspect Goldman person so that the

6    force is diminished, then I might have to reevaluate that.

7    That's what the "in connection" part preserves.

8         Okay.  Now I think the only other thing -- I want to

9    talk about some things, some mechanical things for the trial.

10   But the only other argument we needed to hear was on the Gupta

11   motion -- let me just find my notes here -- to exclude the

12   July 29th, 2008 phone call between Raj Rajaratnam and Gupta.

13   This was a 24 minute phone call.  And, as I understand, it's

14   the only recording of a conversation between Gupta and Raj

15   Rajaratnam.  No one traded on the basis of this conversation,

16   but they discussed various matters.

17        But the government suggests that it shows the

18   relationship between Gupta and Raj Rajaratnam, which is

19   concededly a very important part of this case, as prior

20   argument of counsel for both sides has indicated.  And the fact

21   that the discussions were about matters that would not normally

22   be the subject of discussion between two persons who were in a

23   formal business relationship, but did involve lots of Goldman

24   information that you would suggest that they were -- had the

25   kind of relationship where this kind of exchange went on.

1           I don't know in the end whether that will be material

2    or not, but I certainly think it passes the very modest

3    threshold of relevancy, and I don't see any prejudice.  So I

4    don't see why it shouldn't come in.  But let me hear from

5    defense counsel.

6           MR. NAFTALIS:  When you used to sit at the defense

7    table, you saw prejudice to us more readily.

8           THE COURT:  Go ahead.

9           MR. NAFTALIS:  Look, I think -- look, there are

10   three -- to me there are three parts of this call, okay, or

11   there's two but there is the first --

12          THE COURT:  You notice I refrained from expressing

13   what would have been your views when you were Assistant U.S.

14   Attorney.

15          MR. NAFTALIS:  I'm too old to remember that.

16          THE COURT:  Yeah.

17          MR. NAFTALIS:  No.  That was fair comment back to me.

18          THE COURT:  Go ahead.

19          MR. NAFTALIS:  Look, on this call, your Honor, there's

20   two aspects to the call.  There is the first part of the

21   conversation, which is the conversation about -- which is about

22   the bank I'll call it, okay.  There is the second part of the

23   conversation, that's the four minute part as I remember if my

24   numbers are right.  Then there's a 20 minute conversation which

25   covers a variety of matters, one of which we move to exclude.

1    I mean, I don't know if, because the government in the second

2    part of the conversation answered a part about business

3    relations and this and that.  I think as we made clear in

4    footnote number four on page nine of our in limine motion, we

5    were not seeking -- well, we're reserving our rights to object

6    to it later.  We were not seeking for an in limine ruling on

7    that part of the call.

8            THE COURT:  Okay, maybe I missed that.  Let me just

9    take a look at that.  Hold on.

10           MR. BRODSKY:  With respect to that, your Honor, I'm

11   sorry to interrupt.  We did, we did inform the defense that we

12   marked the entire call as an exhibit.  We did inform we plan to

13   play the entire call.  We played the entire call during the Raj

14   Rajaratnam trial.  There's no portion which we don't plan to

15   play.

16           MR. NAFTALIS:  I don't doubt that for a -- all we're

17   saying was, although the government made much response to the

18   parts of the call, we were not moving in limine on the major

19   part of the second part of the call, while reserving our rights

20   to challenge the admissibility of that later.  I just wanted

21   because there is an awful lot of response on something we

22   weren't moving.

23           THE COURT:  Well, are you saying that all -- you're

24   moving -- most of your brief is directed at the entire call.

25           MR. NAFTALIS:  Actually most of our brief is directed

1   on the first four minutes of the call.

2          THE COURT:  Well, that's fair.  But --

3          MR. NAFTALIS:  I think --

4          THE COURT:  But you do also -- I mean, you know, the

5   first sentence of your brief is defendant Rajat Gupta

6   respectfully submits this memorandum of law, the omnibus

7   declaration of Steven M. Sinaiko, and the accompanying exhibits

8   in support of his motion in limine to exclude from evidence the

9   recorded phone conversation between Mr. Gupta and Raj

10  Rajaratnam of July 29th, 2008, right?

11         So you are asking, your overall motion is to exclude

12  the whole call?

13         MR. NAFTALIS:  Yeah.  You see the inconsistency in how

14  we wrote it, and I'll take the blame for that.  I'm saying if I

15  direct your attention to the footnote four on page nine, we

16  weren't asking for an in limine ruling on these different

17  business relation stuff now, though we deal with that at trial.

18         THE COURT:  All right.  So the only part of, the

19  second part of the call, the 20 minute part of the call is,

20  that you're objecting to is the words "a million dollars a year

21  for doing literally nothing."

22         MR. NAFTALIS:  Yeah, the references to Mr. Kumar,

23  those words, yes.  So --

24         THE COURT:  I must, and I don't want to belabor this,

25  but I mean the paragraph at the beginning of the -- at the

1    bottom page eight, "As for the second part of the call, it too

2    is more prejudicial than probative of any issues in dispute."

3    But taking now your more narrow objection to the second part of

4    the call, only -- this is from your brief -- "only after

5    complaining that Kumar was not bringing anything new to the

6    party, did Raj Rajaratnam say he was giving Kumar money for

7    doing literally nothing."  And then you go onto say, "There is

8    a real risk that the jury would speculate about the words a

9    million dollars a year for doing literally nothing and ascribe

10   guilt to Mr. Gupta based on his mere association with Raj

11   Rajaratnam and Kumar."

12           I really think that is highly speculative, to say the

13   least.  But let's turn to the first part of the call.  What did

14   you want to say about the first part?

15           MR. NAFTALIS:  Yeah, and what I wanted to say about

16   the first part of the call is, is that is, that with respect to

17   that part of the call, we have a situation where the government

18   at the first trial, the first trial -- it wasn't our trial, the

19   trial of Mr. Raj Rajaratnam, in our view substantially misused

20   those materials.  They argued and we quote what they argued in

21   summation.  "Gupta violated his duty right there and then.  He

22   was basically confirming a rumor that Goldman was thinking

23   about acquiring a commercial bank.  Breaching his duty and,

24   number two, he was telling him there, there is nothing

25   imminent, that there's nothing that's going to happen right

 1    away.  That's information that nobody in the public has access

 2    to except Mr. Raj Rajaratnam by talking to Mr. Gupta."  He then

 3    went on to argue, basically, a propensity argument.  "He did it

 4    there, he must have done it in September and October," which we

 5    also quote further down on page of our brief.

 6           The problem with the Government's argument is just

 7    demonstrably innacurate, I mean.  And because in fact this was

 8    not information that nobody in the public had access to, except

 9    Mr. Rajaratnam, this information about acquiring a commercial

10    bank.  The fact is as the attached exhibits show, the most

11    senior people at Goldman Sachs had gone out and disseminated

12    this very information.

13           THE COURT:  So but why -- it seems to me -- I

14    understood that from your papers.  And that may mean -- I want

15    to hear from the government -- but that may mean that they

16    can't make the same argument about the first four moments that

17    they made in the Raj Rajaratnam trial.

18           But assuming that, arguendo, that doesn't mean that

19    the conversation isn't relevant to show the general

20    relationship between the two of them, which is very much an

21    issue in this case.

22           So your objection, seems to me, goes to what they

23    should be permitted to argue or not argue about those first

24    four minutes, as opposed to exclusion of the first four minutes

25    or any other part of the tape.

1           MR. NAFTALIS:  But see what they -- and obviously I

2       know that there's only one person in the courtroom that makes

3       the rulings, they don't and we don't -- but they indicated in

4       opposing this the way they want to use it.  Because they said

5       that this, this part of the July 29th call is probative to show

6       that Gupta and Raj Rajaratnam had an unlawful agreement whereby

7       Gupta would disclose material non-public information to Raj

8       Rajaratnam in violation of Gupta's duties for purposes of

9       trading on it.

10          THE COURT:  Okay.  But -- and I want to hear from them

11      on that in a minute -- but I come back to my basic point.

12          When I ruled preliminarily a few minutes ago, I was

13      explaining my ruling from earlier, I did not predicate it on

14      that.  I predicated on showing the relationship between the

15      two.  And so if I were to hypothetically preclude them from

16      making the argument that they're making, and just -- is there

17      any objection to the admission of this call?

18          MR. NAFTALIS:  Well, I'm trying to --

19          THE COURT:  Okay.

20          MR. NAFTALIS:  -- think it through because I worry --

21      because your Honor had raised the 403 issue.  Because if they

22      can imply or explicitly argue that this, from this call that

23      they can infer in any fashion that Raja Gupta tipped in these

24      other calls where they have --

25          THE COURT:  They --

1          MR. NAFTALIS:  It seems to me I got, then we are --

2          THE COURT:  No, no.

3          MR. NAFTALIS:  We are --

4          THE COURT:  There's already going to be evidence from

5     you about how they had a much more mixed relation; there came a

6     time when they had a falling out, and, conceivably, an argument

7     that, in any event -- this I'm sure is overstating it -- that

8     Mr. Gupta spent all his time doing good charitable deeds.  But

9     they have here the one and only direct evidence of the nature

10    of the telephone relationship between Gupta and Raj Rajaratnam.

11         So assuming it contains nothing improper, it is still

12    probative on the very issue that has become, from everything

13    I've heard so far in the previous hearings, one of the main

14    issues in this case, which is the nature of their relationship.

15         MR. NAFTALIS:  But if they're going to argue that

16    there's anything in any way, shape or form about, improper --

17         THE COURT:  Well, that's what I want to hear the

18    government on.  But my point is that that's not the ground for

19    excluding.  That's the ground for limiting their argument.

20         MR. NAFTALIS:  Look, assuming, you know, that's the

21    same ruling, our only risk and concern would be, would the jury

22    still misuse the evidence.  Because -- but that's --

23         THE COURT:  I'm not persuaded by that, but let me hear

24    from the government as to what --

25         MR. BRODSKY:  Yes, your Honor.

1          THE COURT:  Just to make clear before you answer, with

2     all the other caveats about motions in limine, nevertheless,

3     I'm denying the motion to exclude this tape and, therefore, it

4     would normally be coming in, assuming it meets, you know,

5     foundation or whatever other technical problems there might be.

6          So the question now I really want you to address is

7     not its admissibility, because that's been resolved at least

8     for now in your favor, but the argument you would make from it.

9          MR. BRODSKY:  Yes, your Honor.  We tried to list them

10    out in our papers on pages seven through eight.

11         I think we have a fundamental disagreement with the

12    defense regarding the call.  First, we have a fundamental

13    disagreement with the defense regarding how I, in the Raj

14    Rajaratnam trial, characterized the call to the jury.

15         What we told the jury in the Raj Rajaratnam trial,

16    which is something that we intend to tell the jury in this

17    trial, which is that if you listen to the call, particularly --

18    I think it's so important to listen to the call.  But during

19    this call -- but before I get to the call.  There will be

20    testimony about the role of a member of the board of directors

21    of a public company, and how that role by both policy and

22    procedure at Goldman Sachs, and also as a matter of practice is

23    in completely different than the role of management.

24         The defense would like to conflate the two.  They are

25    completely different.  An outside director of a member of the

1    board of Goldman Sachs cannot discuss internal conversations

2    about board meetings regarding whether there was a mixed

3    discussion or debate about doing something.  An outside

4    director of Goldman Sachs oversees management and makes the

5    fundamental ultimate decision as to whether or not Goldman

6    Sachs will acquire a company or whether or not Goldman Sachs

7    will not take the strategic decision to acquire a company.

8            The defense seems to take the view that if management

9    Mr. Vinier, a CFO, or another member of senior management

10   speaks to an analyst on Wall Street and tells that analyst, we

11   do not believe in the near future we are unlikely -- we believe

12   we're unlikely to acquire a commercial bank unless there's a

13   regulatory seat change, they think that gives the green light

14   to an outside director to disclose the internal board

15   discussions to a hedge fund manager, whom the outside director

16   has a relationship and has an indirect investment in that fund,

17   we have a fundamental disagreement about that.  We will put on

18   testimony, from Mr. Blankfein, the CEO and potentially other

19   directors, that will show the Court and the jury that by what's

20   stated in here by Mr. Gupta revealing internal board

21   discussion, he violated Goldman Sachs policy and procedure that

22   we proffer to the court.  The defense will say that can't be,

23   because management was disclosing things to analysts.  They

24   have a completely different view of an outside director's role

25   and the policies and procedures at Goldman Sachs that apply.

1    So I take that fundamental big difference and I want to put

2    that before the Court.  But if you listen to the call, during

3    the call Mr. Raj Rajaratnam says he hears there is a rumor

4    about whether -- on page two, line 21 and 22 -- there's a rumor

5    Goldman might look to acquire a commercial bank.  And he says

6    he's going to, you know, have you -- on line 36 -- have you

7    heard anything along that line?  Now, listening to the call is

8    quite potent, because Mr. Gupta doesn't hesitate for a moment,

9    doesn't think to himself, which is exactly what we told the

10   jury in the Raj Rajaratnam trial.  He doesn't think to himself,

11   I shouldn't be answering that question, I'm being asked about a

12   rumor about whether Goldman Sachs plans to acquire a commercial

13   bank.  I'm an outside director on the board of Goldman Sachs,

14   I'm responsible, along with the other directors, in determining

15   whether or not to acquire a commercial bank, should management

16   come to us and recommend it.  What he does immediately, without

17   hesitation and with complete ease is says, on line 38, yeah,

18   this was a big discussion at the board meeting.  And then they

19   go on.  And Mr. Gupta says, Mr. Raj Rajaratnam on line -- page

20   three line one, buy a commercial bank?  Without hesitation Mr.

21   Gupta goes, buy a commercial bank and, you know it was a

22   divided discussion in the board.

23          He then goes on from lines eight to ten.  I think more

24   people say why, because its essence is a low return business

25   and, well, yeah, maybe interesting to develop a deposit base,

which is a low cost source of funding.  And lines 14 through

18, you know what we should probably explore more is, I mean we

aren't having trouble funding ourselves, but, you know, we

should explore more global sources of funding, and perhaps

even, you know, insurance or other things which are a low cost.

And then he goes on and confirms for Mr. Raj Rajaratnam, lines

33.  Mr. Gupta brings up insurance.  Line 33 Mr. Raj Rajaratnam

says, or even AIG -- which at that time nobody knew AIG was

going to implode, nobody knew AIG had all these problems, which

comes out after the Lehman bankruptcy.  But Mr. Gupta then

says, at line 35 to 39, or even AIG, yeah, AIG was definitely

in the discussion mix.

        We will show that none of the analyst reports that Mr.

Gupta's defense team relies on had anything about any potential

acquisition of an insurance company.  It had no confirmation of

specific companies that were under discussion.  This is potent

market moving information.

        We're not going to argue it's material.  We never

alleged in the bill of particulars it was material.  We alleged

it was an over overt act in furtherance of the charged

conspiracy.  We never told the jury in Raj Rajaratnam it was

material.  What we argued, and what they attached as a portion

of our argument in summation, was the ease with which, if you

listen to the call, Mr. Gupta responded to Mr. Raj Rajaratnam's

question without hesitation, revealed the nature of how they

1   talked about what was going on at the board of Goldman Sachs

2   and its future plans.  They say, there's nothing non-public in

3   here because they point to three analyst reports; one that's

4   dated July 28, 2008, the day before this.  How they presume to

5   suggest that Mr. Gupta had read this analyst report is another

6   question.

7           But let's presume that Mr. Gupta had known that

8   management disclosed to Merrill Lynch on July 28 or days

9   preceding, that management was indicating they were unlikely to

10  acquire a commercial bank, there's nothing in there about

11  insurance company, there's nothing in there about confirming

12  AIG in the mix.  Management wouldn't have done that.  And even

13  if management did, a member of the board of directors, an

14  independent director who has a duty to the shareholders of that

15  company, we believe it's fair argument and inference, we can

16  argue to this jury he violated his duty of loyalty when he

17  should be loyal to the shareholders of Goldman Sachs, not to --

18          THE COURT:  All right, I understand the argument.

19          MR. BRODSKY:  Sorry for my summation.

20          THE COURT:  No, no.

21          MR. BRODSKY:  I was just working myself.

22          MR. NAFTALIS:  May I respond?

23          THE COURT:  Yes.

24          MR. NAFTALIS:  I mean, I think he makes, in part, my

25  argument for me about how he wishes to misuse this evidence the

1    same way he misused it in the Raj Rajaratnam case.

2            This case is not about Goldman Sachs' internal rules.

3    This is an insider trading case.  And we will have strong views

4    about him trying to bring it in and trying to bring opinions

5    there.  And his notion of the difference between management,

6    Mr. Blankfein is the chairman of the board of directors of

7    Goldman Sachs.  He has the same fiduciary obligations as any

8    member of the board.  We're going to have a trial here about

9    whether or not Mr. Blankfein can yap around town, but we can't?

10   This is public information.

11           THE COURT:  So I'm going to --

12           MR. NAFTALIS:  But I would really, but --

13           THE COURT:  Go ahead.

14           MR. NAFTALIS:  Your Honor --

15           THE COURT:  Go ahead.

16           MR. NAFTALIS:  As a matter of fact, there was a Brady

17   disclosure by Mr. Cohen that this matter was all public.

18   That's why they didn't put him on their witness list.

19           MR. BRODSKY:  That's not accurate, your Honor.

20           MR. NAFTALIS:  And Mr. --I just want to read into the

21   record again what he actually said in his summation, which was

22   demonstrably inaccurate, when he -- he said, "Mr. Gupta was

23   basically confirming a rumor that Goldman was thinking about

24   acquiring a commercial bank, breaching his duty and, number

25   two, he was telling them there's nothing imminent.  There's

1   nothing that's going to happen right away."  And then he said,

2   "That's information that nobody in the public has access to

3   except Mr. Raj Rajaratnam by talking to Mr. Gupta."

4            That argument was inaccurate.  Because Goldman Sachs

5   in the days before it had gone out to analysts and major

6   customers, including hedge funds and disclosed these very facts

7   about the -- and it was done by Mr. Vinier, the CFO,

8   Mr. Wigelrey(phonetic), the co-president.  And not only was it

9   in public analyst's reports out there, but it was reported in

10  the Wall Street Journal.

11           THE COURT:  Okay.

12           MR. NAFTALIS:  These disclosures -- and Mr. Blankfein

13  admitted it was not non-public and not confidential.

14           THE COURT:  So here's what I think about that

15  situation.  This is very useful argument, and not least because

16  it has raised the temperatures of counsel in what was otherwise

17  a quite dull afternoon.

18           But all I'm ruling now is that the motion to exclude

19  this taped conversation is denied, and the conversation

20  presumptively, therefore, can come in for the general purpose

21  of showing the nature of their relationship.  It will have to

22  be decided, but not today, what arguments could be made, what

23  other evidence will come in about whether the rules of Goldman

24  Sachs are that relate to things other than trading on inside

25  information are relevant and, if so, what arguments can be made

1  about that, et cetera, et cetera.  Those were all interesting

2  questions.  I really seriously am glad you flagged those for me

3  but that's not what's before me right now.  All those are

4  preserved.

5          It does seem to me that the one thing that there

6  clearly is is prejudice.  The relevance may or may not be as

7  great as the government believes, depending on what I allow

8  them to argue; still has relevance for the reasons I indicated.

9  I see no prejudice.  Because if the defense is right, that

10  everything in this conversation was fine, you would think they

11  would be embracing this conversation saying, look, here's the

12  one recorded conversation we have and look how innocent it is.

13  And conversely, of course, the government will be saying, look

14  at the one recorded conversation we had and see how closely

15  knit they were.  You know, both fair arguments, without getting

16  into the more difficult and thorny questions of what more

17  specifically will be able to be argued from it.  But I see

18  under any analysis some relevance.  I see no prejudice.  So

19  that's the ruling on that conversation.

20          Now let's talk about just a few housekeeping details.

21  How long does the government want for opening statement?

22          MR. BRODSKY:  20 to 30 minutes, your Honor.

23          THE COURT:  Okay, and defense counsel.

24          MR. NAFTALIS:  I'm going to be a good deal longer,

25  Judge.  I would like closer to an hour.

1         THE COURT:  I don't think I can allow an hour.  My

2    normal practice, which I'm willing to be a little flexible in

3    this case, is maximum half-hour.  And the reason for that

4    having nothing to do with any given case, is that there are

5    limits to what even the best jury can absorb in an opening

6    statement.  Counsel on both sides are always so into it that

7    they just rattle off these names and these events and so forth,

8    as if everyone knew them like the back of their hand, but it's

9    not that way for the jury.  And, therefore, there is a need to

10   make sure that counsel does not get too mired in detail.  And

11   one way to bring that about, without telling counsel you can

12   argue this or you can't argue that, is simply to set a

13   reasonable time limit.

14        However, I am willing to expand it in this case to 45

15   minutes, but that is a firm deadline.  And if either side goes

16   beyond 45 minutes in opening, they will be interrupted sua

17   sponte by the Court.

18        And I point out to you, as you probably are aware,

19   that Judge Walton in the Clemens trial has already had to

20   excuse two jurors for sleeping.  I would hate to have to excuse

21   a juror who is sleeping on opening statements.  So 45 minutes

22   it is.

23        With respect to the jury, you're going to be getting

24   me any voir dire requests.

25        Normally, in a criminal case it takes me about an hour

1    to an hour and a half to pick a jury.  I anticipate I'll be

2    longer in this case, but I think the likelihood is that we will

3    reach opening statements in the afternoon.  It is even

4    conceivable we might reach the first witness, so the government

5    should at least have their witness available.  Who is the first

6    witness?

7              MR. BRODSKY:  Ms. Karen Eisenberg.

8              THE COURT:  Okay.

9              Next, I use the old jury box method of selection.  So

10   we will put 12 jurors in the box.  We will -- I will question

11   them relating to matters where they might be excused for cause.

12   Those excused for cause will be replaced.  And then counsel

13   will exercise their peremptory challenges, six for the

14   government, ten for the defense.  We do this in six rounds.

15   There will be a board with the cards on it of the individual

16   jurors.  The board will be handed to the government.  You'll

17   exercise each round one challenge or none if you prefer to

18   waive on any given round.  The defense in the first four rounds

19   will exercise two challenges or up to two challenges and one

20   challenge, and in the last two rounds, so defense will have

21   ten and the government will have six.  The defense will then

22   hand the board back to the government just so that the

23   government can see who the defense challenged, and then the

24   government will hand the board back to my Courtroom Deputy who

25   will excuse whoever was struck that time.  The reason I do it

1    that way is so that the jury does not know which side is

2    striking who, but you guys know in case there's any Batson

3    challenge or anything anyone wants to raise.

4         I think I'm going to tell the jury four weeks and

5    guarantee them that.  That's a lot longer than I think the

6    trial will in fact go, but I prefer to give them an outside

7    date, but coupled with a guarantee that they can rely on so

8    they can go about the rest of their lives and plan the rest of

9    their lives after that four week period.

10        We will have -- I think I want to pick four alternates

11   in this case.  I originally thought of three, but I think four.

12   Just because I've had the experience in recent trials of jurors

13   suddenly remembering, after they were chosen, after the jury

14   was sworn, after the evidence is cited that oh, yes, they had

15   to attend their daughter's wedding on such and such a day or

16   something like that.  So in an excess of caution we'll have

17   four alternates, two challenges per side for the alternates.

18        I will be completely unreachable this weekend, because

19   I have to perform a wedding of one of my former law clerks

20   outside New York.  And I don't want to be in the situation

21   where I say to them, so do you take so and so to be your lawful

22   wedded husband, and then the phone rings, and I have to say,

23   oh, I'm sorry, there's a matter I have to handle in the Gupta

24   trial.  That would be unfortunate.  So any applications -- I

25   hope we're covering everything today, but if there is anything

1      further just make sure you call me before close of business

2      Friday.

3              I think that's pretty much everything on my laundry

4      list.  Is there anything else that counsel wishes?  Yes.

5              MR. NAFTALIS:  I just had one issue was, we do not

6      have the order of the Government's witnesses, other than being

7      told for the first time, a minute or two ago, that

8      Ms. Eisenberg was their first witness.  Will they be giving us

9      their order of witnesses now?

10              MR. BRODSKY:  It's due today, your Honor, according to

11      your rules, and we planned on giving it after this hearing,

12      sitting down going through our witnesses.  We know the first

13      one, but we don't yet have our order set, so some point later

14      today --

15              THE COURT:  Okay.

16              MR. BRODSKY:  -- they will get it.

17              MR. NAFTALIS:  Then the second thing I wanted to raise

18      which was --

19              MR. BRODSKY:  Your Honor, I think the defense order is

20      also due today, the likely order of defense according to your

21      local rules, your individual rules.

22              THE COURT:  Whatever my rules say, I can't imagine

23      that I could possibly remember them, but whatever they say,

24      they're binding, so.  But if you have a problem with anything

25      with my individual rules, give me a call.  But I think, you

1    know, they do govern this, I mean I decide in these kind of

2    situations.

3              MR. NAFTALIS:  I don't know what you want -- I'll do

4    whatever you want us to do.  Obviously if you say jump, I'll

5    say how high.  But we gave them a list of our prospective

6    witnesses as per your Honor's order of a week before, it was on

7    Monday, whatever the day was.

8              THE COURT:  Yeah, I --

9              MR. NAFTALIS:  Which was --

10             THE COURT:  I usually --the order of the defense

11   witnesses, as opposed to who they are, is something that I

12   think doesn't have to be given, you know, in the next day or

13   two.  If that's your problem, we could work that out.

14             MR. NAFTALIS:  Yeah, because, Judge --

15             THE COURT:  Yeah.

16             MR. NAFTALIS:  -- we may call all, or we may call a

17   few.

18             THE COURT:  How many witnesses?

19             MR. NAFTALIS:  We have like 30 some, but --

20             THE COURT:  Oh, that's --

21             MR. NAFTALIS:  But we put -- Judge, we didn't want to

22   be precluded, so we put on there and as you -- look, I've had

23   cases where I had a long list of witnesses and I decided I'm

24   not putting anybody on at the end of the government's case.

25   You real don't know who you're going to -- what order you're

1    really going to call and how many of them.

2              THE COURT:  Well, I understand that difficulty.

3              MR. NAFTALIS:  I gave them an honest estimate.

4              THE COURT:  But there is a corresponding problem,

5    which is that they have -- even while they're putting on their

6    case, they have to start preparing to meet the defense.  So I

7    think you should be prepared by no later than the close of the

8    first week of trial to cut your list down to those you are

9    reasonably certain you will call, if you call anybody.

10             MR. NAFTALIS:  That's fair.

11             THE COURT:  All right?

12             MR. BRODSKY:  And --

13             MR. NAFTALIS:  I had one other question, your Honor,

14   which I hesitate to raise.

15             THE COURT:  Yes.

16             MR. NAFTALIS:  Because I raise this -- as a long time

17   fan of both the Mets and Bob Fisk, I notice that your Honor in

18   the Picard against whatever, against Wilpon, whatever the name

19   of the case is, was going to deviate from your normal long time

20   practice and sit -- consider sitting four days a week, and I

21   wondered whether or not that was anything you were

22   considering --

23             THE COURT:  No --

24             MR. NAFTALIS:  -- in this case.

25             THE COURT:  -- I'm not, but I will -- but there is one

1    little solace.  I'm glad you raised that.  We will not be

2    signature on Tuesday, June 5th, for the rather weak reason that

3    I committed many months ago to give a little speech in

4    Washington on that day.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          When I was dealing with the Mets, a team like that

2    would be exhausted by having played five days in a row.  But

3    this is not that case, so it will be Monday to Friday.

4          When you give, by the way, that narrowed-down list

5    after a week of trial, that should also have the likely order

6    of appearance of those witnesses at that time.

7          MR. NAFTALIS:  I had a question for family members.

8    Do we get two rows?  Do we get a row?  What do we get in the

9    courtroom?

10          THE COURT:  Certainly it makes sense that your son Ben

11   as an Assistant U.S. Attorney should come and sit on the

12   government's side or your second, twin son Josh, who to my

13   understanding is going to become an Assistant U.S. Attorney in

14   the very midst of this trial.  If they could both sit on the

15   government's side, they could really gang up on you.

16          To get serious, I'm happy to give assets to anyone,

17   but I worry about excluding anyone from the general public.  We

18   are going to have an overflow room here.  I have put aside four

19   rows for the press, and they are already marked as such.  The

20   only time they will be excluded is when we are picking the

21   jury, because we need every seat.  We are going to have a total

22   panel of 100, so we will need every seat here.  Even then, some

23   people will have to stand.

24          At the request of the media -- and this is all being

25   handled not by me but by the courthouse media person Stephanie

 1    Cirkovich -- the media collectively can elect five people to be

 2    present in this courtroom when the jury is selected.  That is

 3    the best I can do.  But of course everyone can be in the

 4    overflow courtroom, where everything will be piped in.

 5            Given the perfectly reasonable request of the media to

 6    have more people here other than when the jury is being

 7    selected, on the theory that there is nothing that is closer to

 8    cruel and unusual punishment than having to cover a trial from

 9    start to finish, that leaves us with relatively few rows

10    remaining.

11            I am happy to at least put one row aside for family,

12    and so forth.  I just can't guarantee you two.  Experience

13    suggests that after a day or two of the trial, the interest of

14    the general public will be reduced and it will be much easier

15    to accommodate people.  But obviously people like family, and

16    this goes for the prosecutors as well, may have people they

17    want to have present during opening statements.  That is a

18    natural thing.  I can only do what I can do.

19            I am going to delegate total dictatorial powers over

20    this to my courtroom deputy, Linda Kotowski.  I know that she

21    will administer that in a fair, reasonable, and judicious

22    fashion.

23            MR. NAFTALIS:  She is showing great happiness.  Is it

24    permissible for us to speak directly to her about these kinds

25    of things?

1            THE COURT:  Yes, both sides can talk to her about that

2       kind of logistics.

3            That is my only concern.  I would be happy to put

4       aside seats for anyone in the world, but we are going to have a

5       problem, the first couple of days at least.

6            Other things?  Did the government have something it

7       wanted to raise?

8            MR. BRODSKY:  Yes, your Honor, a couple of things.  We

9       had a conference call before this conference and hearing today

10      in which the government raised the issue of summary charts.

11      You had directed the parties to bring their summary charts.  It

12      is the government's view that there is no hundred percent

13      certainty with respect to what charts the defense is going to

14      put up and finally have.  There is no hundred percent certainty

15      that we will not add a chart or two to respond to some of the

16      defense arguments.

17           We in good faith have our summary charts here today.

18      The defense exhibits are due to the government today.  We

19      wanted to raise the issue of summary charts.  I think the

20      defense has a different view as to when they want to give us

21      summary charts.

22           MR. FRANKEL:  Your Honor, if I could address the

23      background briefly.  I think it is relevant.  We had a

24      conversation with the government on April 29th in which we

25      discussed a number of issues between us, some of which we

1    resolved and some of which we did not.

2           One issue that we did not resolve in that call was the

3    timing for the parties to supply each other with summary

4    charts.  We did reach an agreement on the timing for each side

5    to provide the other side with its exhibits and exhibit list,

6    which was May 2nd.  As Mr. Brodsky said, ours is due today.

7           The government's was due on May 2nd.  On May 2nd, when

8    we got it, we were surprised that the government included what

9    it described as preliminary descriptions of summary charts we

10   expect to offer.  That is one thing they said.  The second

11   thing they said is samples of some of those charts.  As I say,

12   we were surprised, your Honor, because we had not reached

13   agreement on that subject on April 29th, when we discussed it.

14          Rather than attempt further to work it out or to raise

15   it with the Court, as we simply got this unilaterally from the

16   government, we immediately responded, saying first of all that

17   we were surprised and also saying that we were not going to

18   look at what they supplied and offering to either return it or

19   discard it if they preferred.  We went back and forth on this.

20   The government was not amenable to doing that.

21          THE COURT:  This is coming back to me.  Why in the

22   world did you say, we are not going to look at it?

23          MR. FRANKEL:  At what they had provided?

24          THE COURT:  Yes.  Don't show me anything, I don't want

25   to know.

1              MR. FRANKEL:  It may have been unwise.  The rationale,

2      your Honor, was that we thought -- we actually thought the

3      appropriate thing to do was what the government originally

4      suggested.  I'm perfectly happy for taking the blame for not

5      having taken that suggestion in the first place.

6              The suggestion was at some appropriate time, and the

7      parties would attempt to work out the timing, the government,

8      in advance of its summary witness, would disclose its final

9      summary charts to us, and we might have an issue about them or

10     not, and if so, we would raise them with the Court.  Then we

11     would reciprocally do the same, presumably on the same

12     schedule.

13             As I say, I plead guilty on this one.  I did not

14     initially think that was a good idea.  But we did think it was

15     a good idea ultimately.  The reason for not looking at what

16     they provided was so there would be no claim that we had gotten

17     an advantage in some fashion.

18             I should also tell you, your Honor, that when your

19     Honor, through your law clerk, ruled on this, I think what your

20     Honor said was either bring the charts if you have them in

21     draft form or, alternatively, be prepared to describe them,

22     which we can certainly do.

23             THE COURT:  That's correct, that's what I said.

24             MR. FRANKEL:  We then did perhaps as your Honor

25     suggested we should have done in the first place, we looked at

1   them.  I must say what they turn out to be is the samples are

2   the very same charts, I believe this is accurate, the very same

3   charts the government used in the portion of the Rajaratnam

4   trial which addressed the issues that are at issue in this

5   trial.

6          As far as the descriptions that they also provided,

7   they read, for example, "certain communications" and then a

8   time frame or certain trades and then a time frame.  That is

9   under the heading of what the government said we are providing

10  you with some sample charts, those are the same ones from the

11  prior case, which of course we had seen, and we are going to

12  give you descriptions of other charts we are intending to use

13  or may use, whatever the language was.  Those descriptions were

14  so generic, so general, "certain communications in" and then a

15  time period that is plainly at issue in this case.

16         I raise this simply by way of saying that I think that

17  far from having been disadvantaged or prejudiced in any

18  fashion, the government gave us something which, when we

19  finally looked at it, was really no new disclosure at all.

20         We continue to think that the sensible thing to do is

21  again what the government suggested in the first place, which

22  is to say come to an agreement on when they will give us their

23  final ones for their summary witness and we will do the same.

24  As I said before, your Honor, I'm prepared to --

25         THE COURT:  I take it neither side is presenting any

1   charts on opening statements.  Yes or no?

2          MR. BRODSKY:  That's correct, your Honor, we're not.

3          MR. NAFTALIS:  We are not, Judge.

4          THE COURT:  Let me ask the government, what about the

5   defense adoption of your prior proposal?

6          MR. BRODSKY:  I don't want to go over ancient history.

7   We have a different characterization of the preceding events,

8   but we don't need to go there.  I don't think it is necessary.

9          The defense view of it, as we understand it in having

10  a conversation with them, -- we even tried to have a

11  conversation with them after they rejected our initial

12  proposal -- is that they will provide us with summary charts

13  during their defense case.  At some point during their defense

14  case, before our case ends, they will give us summary charts.

15         Of course, they will have our summary charts before

16  our case starts or at some point before, many days about the

17  summary chart witness gets on.  They will put on part of their

18  case during cross-examination of our witnesses, and then they

19  will hide whatever they plan on doing with summary charts until

20  they put on their case.  We had an objection to that.  We said

21  we don't think that is reasonable.  What we would like to do is

22  some certain date during our case receive their summary charts.

23         THE COURT:  How many charts are we talking about?

24         MR. BRODSKY:  From the government's perspective I

25  think maybe 25, 30 charts, your Honor.

```
 1              THE COURT:  25 or 30 charts?

 2              MR. BRODSKY:  The reason for that is with respect to a

 3    period of time, say September 23 --

 4              THE COURT:  25 or 30 charts?  You can get a job as a

 5    stock analyst.

 6              MR. BRODSKY:  Not if you've seen these charts.  They

 7    are very basic.  September 23, 2008, will have four charts to

 8    it.  One chart will be just telephone calls.  The second chart

 9    will be trades.  The third chart will be a calculation of

10    profit.  A fourth chart might be the reflection of the stock

11    price.  It sounds like a lot of charts, but when you actually

12    pinpoint it, it's not that many.

13              THE COURT:  You say you have that for each of the --

14              MR. BRODSKY:  For each of the events we will have

15    multiple charts.

16              THE COURT:  When will those charts be ready in final

17    form?

18              MR. BRODSKY:  In final form, that's a different

19    question.  We do have filled-in charts in draft form for them

20    to have today.

21              THE COURT:  Of course, you always have to change the

22    chart if the evidence turns out differently than you anticipate

23    it.  But most of the stuff sounds like it's based on records

24    that are unlikely to change.  With the caveat that you of

25    course have to change charts if the evidence turned out
```

1    differently than you anticipate, are your charts otherwise

2    essentially final?

3           MR. BRODSKY:  They are, your Honor, except for the

4    following.  I am informed that a few of them have not been

5    filled in yet.  95 percent of them have.  The person who will

6    be testifying regarding the charts has not done his own work on

7    them.  The person testifying has done this before and prefers

8    to do his own verification in his own way, so he reserves the

9    right that if he doesn't like the way it's presented or if

10   he --

11          THE COURT:  Is he the witness?

12          MR. BRODSKY:  He is the witness.

13          THE COURT:  That makes perfect sense.  When is that

14   going to occur?

15          MR. BRODSKY:  You can tell us, your Honor.

16          THE COURT:  I like that solution.  Before I accept

17   your invitation, let me find out from the defense side how many

18   charts you're going to have.

19          MR. FRANKEL:  Not 25 or 30.

20          THE COURT:  Are they charts that you are already in

21   the process of preparing?

22          MR. FRANKEL:  There are a handful that we are in the

23   process of preparing.  They are not very far long.

24          The one thing I would respectfully urge on your Honor

25   is it really is different as between the government and the

1   defense.  It seems to me, again respectfully, inappropriate for

2   the government to say we would like to have a look in advance

3   at what the defense is intending to put on by way of summary

4   charts, in effect saying so that we can anticipate that and do

5   something in our trial proof on our direction case.  I don't

6   think that is appropriate.  I think they ought to have to wait.

7          What we did say is that we would of course provide

8   them --

9          THE COURT:  Not that I want to get off on a long

10  tangent, but why do you think that?  With the exception of the

11  Fifth Amendment that the defendant has, the entire thrust of

12  changes in the federal rules over the last 20 or 30 years has

13  been to try to prevent trial by ambush and to therefore, while

14  encouraging the government to provide its evidence in advance

15  of trial, have the defense provide various things either in

16  advance of trial or certainly well before the defense case

17  begins.

18         MR. FRANKEL:  As to some things, your Honor, I think

19  that is certainly a fair overall characterization and as to

20  some things that seems not unreasonable.  Here we are talking

21  about a situation where we are certainly in agreement that we

22  need to provide them in advance so that they can react to them

23  and raise an objection if they have one and be in a position to

24  cross-examine the witness regarding the charts.

25         I think it is different to say that they ought to have

1    some sense of who the witnesses are in advance of the beginning

2    of our case as compared to something like this.  It seems to me

3    a difference.  Maybe it's a difference in degree, but that

4    seems to be the reason for the difference.

5            THE COURT:  Here is what I think makes sense.  The

6    government will provide its final charts, the sole caveat being

7    if the evidence changes -- these will be charts that your

8    witness will have to prepare and have done whatever he or she

9    wants to do -- by no later than May 28th, a week after the

10   start of trial.  The defense will have to provide their charts,

11   again with the sole caveat being if the evidence changes, by --

12           The government is still predicting two weeks for your

13   case?

14           MR. BRODSKY:  Yes, your Honor.  It could move a little

15   faster, depending on cross-examination.

16           THE COURT:  Assuming the government's case goes the

17   full two weeks, then the defense charts would have to be

18   presented by Monday, June 4th.  But if the government's case

19   goes faster, we may have to move that up a little earlier.

20           Anything else we need to take up today?

21           MR. NAFTALIS:  Does the defense intend to produce the

22   same thing we did, which they did not find helpful, but we

23   certainly would, the subject matter areas and so forth which we

24   provided well in advance?

25           THE COURT:  I think that makes sense, sure.  I assume

1   that is no problem for the defense.

2          MR. FRANKEL:  I guess the question I have is when

3   would we be required to do that?  My suggestion would be some

4   reasonable amount of time in advance of when we have to provide

5   the charts.

6          THE COURT:  On Monday the 28th.

7          MR. FRANKEL:  Thank you.

8          THE COURT:  Anything else?

9          MR. BRODSKY:  Your Honor, a question regarding playing

10  a wiretap call or two before the jury.  May the government

11  play, in your view, a wiretap call without a witness being on

12  the stand or must a witness always be on the stand?

13         THE COURT:  No, a witness doesn't have to be on the

14  stand.  I assume you're going to have transcripts so they can

15  follow along?

16         MR. BRODSKY:  Yes.

17         THE COURT:  Your adversary will object or not in

18  advance so I can deal with any transcript issues.  But assuming

19  we get to the point where the transcripts are ready, you can

20  just play the tape and give the jury the transcript.

21         MR. BRODSKY:  The one other thing that came up on the

22  conference call with the Court prior to today was we had told

23  the defense in a letter on April 30th that there was a

24  congressional referral of a report regarding the financial

25  crisis relating to a number of companies, including Goldman

1   Sachs.  We asked if they intended to cross-examine certain

2   Goldman Sachs witnesses relating to it.  We had not heard.  We

3   made certain proffers during that conference call with the

4   Court relating to it.  We would want an opportunity to move

5   that they not cross regarding that referral.

6            THE COURT:  It's not ripe until they decide.  If there

7   is any cross on that, I would expect counsel would flag that

8   for me ideally, even before cross begins, but worst case before

9   the question is put, so we can deal with it at the side bar

10  and, if necessary, defer it to a later point in the day.  Tell

11  me a little bit more.  I'm not sure that I understood what this

12  line of inquiry was about.

13           MR. BRODSKY:  The defense had asked if there were any

14  investigations relating to any of our witnesses or the

15  entities --

16           THE COURT:  I remember that.  You're saying in

17  response to that, among other things, you said that this --

18  what is this?

19           MR. BRODSKY:  There was a congressional report

20  relating to the financial crisis.  It was referred to the

21  Department of Justice for potential investigation.

22           THE COURT:  When was this?

23           MR. BRODSKY:  This was April of 2011 the referral was

24  made to the Department of Justice.

25           THE COURT:  This was a result of public inquiries by

1  the Congress?

2          MR. BRODSKY:  Congress had public inquiries.  They

3  questioned a number of witnesses.  They collected a number of

4  documents.

5          THE COURT:  Now I know what you are talking about.

6          MR. BRODSKY:  Then they referred it to the Department

7  of Justice.

8          THE COURT:  It's hard to see what the relevance would

9  be of cross on that, but I don't know.  If and when someone

10 wants to raise a question like that, we'll deal with it.  I

11 want counsel to flag that for the government before they do it.

12         The one thing that can really bother this Court is

13 where either side puts a question to a witness that they know

14 for sure is something that the other side is going to

15 vehemently object to and want a side bar about but they put the

16 question anyway.

17         When I'm saying I want you to come to me, that's a

18 more general announcement.  It's not just on the things that we

19 have already covered, it's on anything where you know from your

20 discussions jointly that the other side is going to go

21 ballistic and will want to be heard.  Be sure to always come to

22 the side bar.  While I don't encourage side bars on every

23 question, obviously, I freely do give side bars whenever

24 responsible counsel, like you guys, want it.  You will be heard

25 at the side bar on all such occasions.  Then the jury can

1   really go to sleep.  Anything else?

2          MR. BRODSKY:  One final thing, your Honor.  We have an

3   individual on our witness list who is an attorney from Sullivan

4   & Cromwell.

5          THE COURT:  One of those firms that still exists.

6          MR. BRODSKY:  Yes, who represents Goldman Sachs.  The

7   defense has some family members on their witness list.  The

8   general rule as I understand it, is witnesses who are on the

9   witness list should not appear in the courtroom from opening

10  through --

11         THE COURT:  Oh, yes.  This is the first thing I say

12  normally on Monday when we convene, but I'll say it now.  I

13  don't want any witness in this courtroom at any point during

14  trial.  If, after they testified, they want to come into the

15  courtroom, they may, but counsel has to realize that they will

16  then be precluded from ever testifying again in this case.

17         For example, if they come into the courtroom and

18  suddenly, unexpectedly they say, oh, there is something I want

19  to add, or counsel says, oh, we want to recall that person for

20  rebuttal or something because something came up, no way, not if

21  they came back into the courtroom.

22         To repeat, no witness should be in the courtroom at

23  all until after they testify.  If you want to reserve the

24  possibility that they could testify again in some unexpected

25  fashion, such as on rebuttal or whatever, don't let them come

1   into the courtroom after they testify.

2            MR. BRODSKY:  The lawyer from Sullivan & Cromwell's

3   sole purpose would be the lawyer who represented Goldman Sachs

4   and had been in a lot of --

5            THE COURT:  He is permitted, but then he can't be a

6   witness.  He can't have it both ways.

7            MR. BRODSKY:  I don't think it is his choice to be on

8   the witness list, your Honor.

9            THE COURT:  But if he is on the witness list, then he

10  is not going to be able to -- who is this?

11           MR. BRODSKY:  Steve Peikin.

12           THE COURT:  He should know the rules.

13           MR. BRODSKY:  He does, your Honor.  We were wondering

14  what the flexibility is with respect to that rule simply

15  because his testimony would be related to certain statements

16  made by Mr. Gupta in an interview.  Of course, prior to doing

17  that, we would --

18           THE COURT:  I understand.  This rule is, in my view,

19  inflexible.  The last I heard, there were other lawyers at

20  Sullivan & Cromwell, perhaps not as good as Steve Peikin, but

21  still others.

22           MR. BRODSKY:  I understand, your Honor.

23           MR. NAFTALIS:  At the risk of asking you to show some

24  flexibility on something which you have just told me is

25  inflexible, I did want to raise the issue of the family.  Your

1   Honor told us we had to give a list of prospective witnesses as

2   of the day before yesterday, and we did.  We listed on there

3   Mr. Gupta's wife and eldest daughter.  I don't realistically

4   know if they ever really will be called, but I didn't want to

5   lose the opportunity of calling them.  If they were called, it

6   would be for a very narrow and quite minor matter.

7        Obviously, the family I think is different.  Not that

8   I have done an enormous amount of research, I don't want to

9   make a misrepresentation to the Court, but the notion that the

10  wife of the defendant should be excluded from the courtroom

11  because of the minor possibility that she might have to give

12  some minor testimony, I would ask your Honor to -- the same

13  with the eldest daughter.

14        THE COURT:  If she was called to testify, what would

15  she testify about?

16        MR. NAFTALIS:  I would prefer to do that outside the

17  presence of the government.  I'd be happy to do it at the side

18  bar subject to it being ex parte.

19        THE COURT:  You all know this, but just for the

20  benefit of the record, so to speak, the key to the truth-

21  finding process is cross-examination.  One of the ways one can

22  expose a witness's lack of credibility, if they have it, is by

23  reference to events that the jury has already heard about from

24  other witnesses which may be in direct contrast to the

25  testimony given by the witness in question.  That form of

cross-examination would be worthless if the witness in question

had heard the prior testimony because they would adjust their

testimony accordingly.

        The truth-finding process is so central to the legal

system generally and the criminal legal system in particular

that this Court has always felt that it had to be fairly tough

in enforcing the rules that safeguard that process.

        I understand the human dimensions with regard to

having family present.  I understand the practical problems if

someone has been the lawyer for Goldman Sachs in connection

with this matter for months and then is excluded from the

courtroom because of the possibility that he or maybe the

probability that he would have to testify, even though not of

his own volition.  Those are not without substance.  But I

think they are outweighed by the need to be really protective

of the truth-finding process.

        Having said all that, if counsel for both sides are

agreed that the witnesses we have just been discussing are so

minor or their credibility is so unlikely to be placed in doubt

by anything else that occurs at the trial, you are both in

agreement on that, I would at least reopen.  I'm not

guaranteeing you anything.  You know the case, your cases,

better than I do, obviously.

        If, for example, the defense was agreeable to have Mr.

Peikin here even though he was going to testify and the

1  government was agreeable to having Mrs. Gupta here even though

2  she might testify, I would at least consider the issue.  Even

3  then I'm not making you any promises.  But that is the only

4  exception.

5          And I'm not sure that the government could do that

6  without knowing, Mr. Naftalis, what Mrs. Gupta was going to

7  testify about.  Why don't you take that up among yourselves.

8  For now everyone is excluded.  Obviously, you will need to

9  resolve this by Monday.  If you do reach some sort of

10  agreement, give me a call on Friday and I'll hear you on that.

11          MR. NAFTALIS:  Thank you, your Honor.

12          THE COURT:  Anything else anyone wants to take up?

13          MR. BRODSKY:  Nothing further from the government.

14          MR. NAFTALIS:  A small matter of scheduling.  On the

15  second day of this trial there is an event being held at the

16  U.S. Attorney's office involving the swearing in of my son,

17  Josh.  I believe it's at 10:30.  Maybe Mr. Brodsky would know

18  the accurate time better than I.  I was hoping that the Court

19  would show the hand of mercy on the bedraggled litigants before

20  you in allowing me to go over and witness my son's swearing in.

21          THE COURT:  I'm sorry it's at 10:30.  I think it would

22  have been a lot easier if it could have occurred during the

23  normal jury break.  My normal break is at 11 o'clock.  Maybe it

24  could be moved.  My suggestion would be, and this would work

25  particularly well if it is at 11 o'clock, that Mr. Brodsky and

1    Mr. Naftalis and the Court, to assure neutrality, all go to Mr.

2    Josh Naftalis' swearing-in and promise to remain good

3    throughout.  That is my proposal.

4            MR. NAFTALIS:  I accept.

5            MR. BRODSKY:  We will try to ask the U.S. Attorney to

6    move it to 11 o'clock.

7            THE COURT:  That would be great.

8            Very good.  Thanks very much.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25